.THE PROPRIETORS OF THE CHARLES RIVER ·BRIDGE, PLAINTIFFS
IN ERROR ·V. THE PROPRIETORS OF THE WARREN BRIDGE, AND
OTHERS.

In 1650, the legislature of Massachusetts granted to Harvard College, the liberty .
and power to dispose of a ferry by lease or otherwise, from Charlestown to Boston,
passing over Charles River. The right to set up a ferry between these places, had
been given by the governor, under the authority of the court of assistance, by an
order dated November 9, 1636, to a particular individual; and was afterwards
leased successively to others, they having the privilege of taking tolls regulated
in the grant; and when, in 1650, the franchise of this ferry was granted to the col-
lege, the rights of the lessees in the same had expired. Under the grant the col-
lege continued to hold the ferry by its lessees, and receive the profits therefrom
until 1785, when the legislature of Massachusetts incorporated a company to build a
bridge over Charles River where the ferry stood, granting them tolls; the company
to pay to Harvard College two hundred pounds a year during the charter, for forty
years, which was afterwards extended to seventy years; after which the bridge
was to become the property of the commonwealth. The bridge was built under this
charter, and the corporation received the tolls allowed by the law; always keeping
' the bridge in order, and performing all that was enjoined on them to do. In 1828,
the legislature of Massachusetts incorporated another company for the erection of
another bridge, the Warren Bridge, over Charles River, from Charlestown to Bos-
ton, allowing the company to take tolls; commencing in Charlestown, near where
the Charles River Bridge commenced, and terminating in Boston, about eight hun-
dred feet from the termination of the Charles River Bridge. The bridge was to
become free after a few years, and has actually become free. Travellers, who for-
merly passed over the Charles River Bridge from Charlestown Square, now pass
over the Warren Bridge; and thus the Charles River Bridge company are deprived
of the tolls they would have otherwise received. The value of the franchise grant-
ed by the act of 1785, is now entirely destroyed. The proprietors of the Charles
River  ge filed a bill in the supreme judicial court of Massachusetts against
the proprietors of the Warren Bridge, first for an injunction to prevent the erection
of the bridge, and afterwards for general relief: stating that the act of the legislature
of Massachusetts, authorizing the building of the Warren Bridge, was an act im-
pairing the obligations of a contract, and therefore repugnant to the constitution
of the United States. The supreme court of Massachusetts dismissed the bill of.
the complainants; and the case was brought by writ of error to the Supreme
Court of the United States, under the provisions of the 25th section of the judi-
ciary act of 1789. The judgment of the supreme judicial court of Massachu-
. setts, dismissing the bill of the plaintiffs in error, was affirmed.
The Court are fully sensible, that it is their duty in exercising the high powers con-
ferred on them by the constitution of the United States, to deal with these great
and extensive interests, (chartered property,) with the utmost caution; guarding,

[Charles River Bridge v. Warren Bridge et al.]

as far as they have power to do so, the rights of property, at the same time carefully abstaining from any encroachment on the rights reserved to the states.

The plaintiffs in error insisted on two grounds for the reversal of the judgment, or decree of the supreme court of Massachusetts. 1. That by the grant of 1650, Harvard College was entitled, in perpetuity, to the right to keep a ferry between Charlestown and Boston: that the right was exclusive, and the legislature had no right to establish another ferry on the same line of travel, because it would infringe the rights of the college and those of the plaintiffs, under the charter of 1785. 2. That the true construction of the acts of the legislature of Massachusetts, granting the privilege to build a bridge, necessarily imported, that the legislature would not authorize another bridge, and especially a free one, by the side of the Charles River Bridge; so that the franchise which they held would be of no value; and that this grant of the franchise of the ferry to the college, and the grant of the right of pontage to the proprietors of the Charles River Bridge, is a contract, which is impaired by the law authorizing the erection of the Warren Bridge. By the Court. It is very clear, that in the form in which this case comes before us, being a writ of error to a state court, the plaintiffs, in claiming under either of these rights, must place themselves on the ground of contract; and cannot support themselves upon the principles, that the law divests vested rights. It is well settled by the decisions of this Court, that a state law may be retrospective in its character, and may divest vested rights; and yet not violate the constitution of the United States, unless it also impairs the obligation of a contract.

The case of Satterlee v. Mathewson, 2 Peters, 413, cited.

The ferry right which was owned by Harvard College, was extinguished by the building of the Charles River Bridge. The ferry, with all its privileges, was then at an end for ever, and a compensation in money was given in lieu of it.

As the franchise of the ferry and that of the bridge are different in their nature, and were each established by separate grants, which have no words to connect the privileges of the one, with the privileges of the other; there is no rule of legal interpretation which could authorize the Court to associate these grants together; and to infer that any privilege was intended to be given to the bridge company, merely because it had been conferred on the other. The charter of the bridge is a written instrument, and must speak for itself, and be interpreted by its own terms.

The grant to the bridge company is of certain franchises by the public, to a private corporation; and in a matter where the public interest is concerned. There is nothing in the local situation of this country, or in the nature of our political institutions, which should lead this Court to depart from the rules of construction of statutes, adopted under the system of jurisprudence which we have derived from the English law. No good reason can be assigned for introducing a new and adverse rule of construction in favour of corporations; while we adopt, and adhere to the rules of construction known to the English common law, in every other case, without exception.

Public grants are to be construed strictly. In the case of the United States v. Arredondo, 6 Peters, 736, the leading cases on this subject are collected together by the learned judge, who delivered the opinion of the Court; and the principle recognised, that in grants by the public, nothing passes by implication: Jackson v. Lamphire, 3 Peters, 289; Beatys v. The Lessee of Knowles, 4 Peters, 165; The Providence Bank v. Billings and Pittman, 4 Peters, 514; cited.

In the case of The Providence Bank v. Billings and Pittman, 4 Peters, 514; Chief Justice Marshall, speaking of the taxing power, said, " as the whole community is interested in retaining it undiminished; that community has a right to insist that

[Charles River Bridge v. Warren Bridge et al.]

its abandonment ought not to be presumed, in a case in which the deliberate pur-
pose of the state to abandon it does not appear." The case now before the Court
is in principle precisely the same. It is a charter from a state. The act of incor-
poration is silent in relation to the contested power. The argument in favour
of the proprietors of the Charles River Bridge is the same, almost, in words,
with that used for the Providence Bank; that is, that the power claimed by the
state, if it exists, must be so used as not to destroy the value of the franchise they
have granted to the corporation. The argument must receive the same answer.
And the fact, that the power has been already exercised so as to destroy the
value of the franchise, cannot in any degree affect the principle. The existence
of the power does not, and cannot depend upon the circumstance of its having
been exercised or not.

The object and the end of all government, is to promote the happiness and prosperity
of the community by which it is established; and it can never be assumed, that the
government intended to diminish its power of accomplishing the end for which it
was created: and in a country like ours, free, active and enterprising, continually
advancing in numbers and wealth; new channels of communication are daily
found necessary both for travel and trade; and are essential to the comfort, conve-
nience, and prosperity of the people. A state ought never to be presumed to sur-
render this power; because, like the taxing power, the whole community have an
interest in preserving it undiminished: and when a corporation alleges, that a state
has surrendered, for seventy years, its power of improvement and public accom-
modation in a great and important line of travel, along which a vast number
of its citizens must daily pass; the community have a right to insist, in the lan-
guage of this Court, " that its abandonment ought not to be presumed, in a
case in which the deliberate purpose of the state to abandon it does not appear."
The continued existence of a government would be of no great value, if, by im-
plications and presumptions, it was disarmed of the powers necessary to accom-
plish the ends of its creation; and the functions it was designed to perform, trans-
ferred to the hands of privileged corporations. The rule of construction an-
nounced by the Court, was not confined to the taxing power, nor is it so limited
in the opinion delivered. On the contrary, it was distinctly placed on the ground
that the interests of the community were concerned in preserving, undiminished,
the power then in question; and whenever any power, of the state is said to be
surrendered or diminished, whether it be the taxing power, or any other affecting
the public interest, the same principle applies, and the rule of construction must
be the same. No one will question, that the interests of the great body of the
people of the state, would in this instance be affected by the surrender of this
great line of travel to a single corporation, with the right to exact toll and exclude
competition for seventy years. While the rights of private property are sacredly
guarded, we must not forget, that the community also have rights; and that the
happiness and well-being of every citizen depends on their faithful preservation.

The act of incorporation of the proprietors of the Charles River Bridge, is in the
usual form; and the privileges such as are commonly given to corporations of that
kind. It confers on them the ordinary faculties of a corporation for the purpose of
building the bridge; and establishes certain rates of toll, which the company
are authorized to take. This is the whole grant. There is no exclusive privilege
given to them over the waters of Charles River, above or below their bridge; no
right to erect another bridge themselves, nor to prevent other persons from erect-
ing one; no engagement from the state, that another shall not be erected; and no
undertaking not to sanction competition, nor to make improvements that may

[Charles River Bridge v. Warren Bridge et al.]

diminish the amount of its income. Upon all these subjects the charter is silent: and nothing is said in it about a line of travel so much insisted on in the argument, in which they are to have exclusive privileges. No words are used, from which an intention to grant any of these rights can be inferred. If the plaintiffs are entitled to them, it must be implied simply from the nature of the grant; and cannot be inferred from the words by which the grant is made.

Amid the multitude of cases which have occurred, and have been daily occurring for the last forty or fifty years, this is the first instance in which such an implied cont. .ct has been contended for; and this Court is called upon to inter it from an ordinary act of incorporation, containing nothing more than the usual stipulations and provisions to be found in every such law. The absence of any such controversy, where there must have been so many occasions to give rise to it, proves that neither states, nor individuals, nor corporations ever imagined that such a contract can be implied from such charters. It shows, that the men who voted for these laws never imagined that they were forming such a contract; and if it is maintained that they have made it, it must be by a legal fiction, in opposition to the truth of the fact, and the obvious intention of the party. The Court cannot deal thus with the rights reserved to the states; and by legal intendments and mere technical reasoning, take away from them any portion of that power over their own internal police and improvement, which is so necessary to their well-being and prosperity.

Let it once be understood, that such charters carry with them these implied contracts, and give this unknown and undefined property in a line of travelling; and you will soon find the old turnpike corporations awakening from their sleep, and calling upon this Court to put down the improvements which have taken their place. The millions of property which have been invested in rail roads and canals upon lines of travel which had been before occupied by turnpike corporations, will be put in jeopardy. We shall be thrown back to the improvements of the last century; and obliged to stand still, until the claims of the old turnpike corporations shall be satisfied, and they shall consent to permit these states to avail themselves of the lights of modern science, and to partake of the benefit of those improvements, which are now adding to the wealth and prosperity, and the convenience and comfort of every other part of the civilized world.

IN error to the supreme judicial court of Massachusetts.

The plaintiffs in error, are a corporation created by an act of the legislature of the state of Massachusetts, passed on the 9th of March, 1785, entitled "An act for incorporating certain persons for the purpose of building a bridge over Charles river, between Boston and Charlestown, and supporting the same during forty years." The preamble of the act states, "whereas the erecting a bridge over Charles river, in the place where the ferry between Boston and Charlestown is now kept, will be of great public utility, and Thomas Russell, Esq. and others, have petitioned this court for an act of incorporation, to empower them to build the same bridge," &c.

The act authorizes taking certain tolls, prescribes the size of the

bridge, and fixes certain regulations by which it will not be permitted to impede the navigation of Charles river; and enjoins certain things to be done, by which the bridge shall be kept in good order, and fitted for constant and convenient use.

The fifth section of the act provides, "That after the said toll shall commence, the said proprietors or corporation, shall annually pay to Harvard College or University, the sum of two hundred pounds, during the said term of forty years; and, at the end of the said term, the said bridge shall revert to, and be the property of the commonwealth; saving to the said college or university, a reasonable and annual compensation for the annual income of the ferry; which they might have received had not said bridge been erected."

The bridge was erected under the authority of this act; and afterwards, on the 9th of March, 1792, in an act which authorized the making a bridge from the western part of Boston to Cambridge, after reciting that the erecting of Charles River Bridge was a work of hazard and public utility, and another bridge in the place proposed for the West Boston Bridge, may diminish the emoluments of Charles River Bridge; therefore, for the encouragement of enterprise, the eighth section of the act declares, ".that the proprietors of the Charles River Bridge shall continue to be a corporation and body politic, for and during the term of seventy years, to be computed from the day the bridge was first opened for passengers."

The record contained exhibits, relating to the establishment of the ferry from Charlestown to Boston, at the place where the bridge was erected; and also the proceedings of the general court of Massachusetts, by which the ferry there became the property of Harvard College.

Some of these proceedings, verbatim, were as follow:

" A COURT OF ASSISTANCE HOLDEN AT BOSTON, Nov. 9th, 1830.

" Present, the Gov'nr, Dep'y Gov'r, Sir Richard Saltonstall, Mr. Ludlow, Capt. Endicott, Mr. Coddington, Mr. Pinchon, Mr. Bradstreet.

" It is further ordered, that whosoever shall first give in his name to Mr. Gov'nr, that hee will undertake to sett upp a ferry betwixt Boston and Charlten, and shall begin the same at such tyme as Mr. Gov'nr shall appoynt; shall have 1d. for every person, and 1d. for every one hundred weight of goods hee shall so transport."

[Charles River Bridge v. Warren Bridge et al.]

" A court holden at Boston, November 5th, 1633. Present, the Governor, Mr. Ludlow, Mr. Nowell, Mr. Treasu'r, Mr. Coddington, S. Bradstreet.

" Mr. Rich. Brown is allowed by the court to keepe a fferry over Charles ryver, against his house, and is to have 2d. for every single person hee soe transports, and 1d. a piece if there be two or more."

" Att the Gen'all Court holden at Newe Towne, May 6th, 1635. Present the Gov'nr, Deputy Gov'nr, Mr. Winthrop, sen'r., Mr. Haynes, Mr. Humphrey, Mr. Endicott, Mr. Treasu'r, Mr. Pinchon, Mr. Nowell, Mr. Bradstreete, and the deputies:

· " It is ordered that there shall be a fferry sett upp on Boston syde, by the Wynd myll hill, to transport men to Charlton and Wenesemet, upon the same rates that the fferry-men att Charlton and Wenesemet transport men to Boston."

" A Generall Courte held at Newtowne, the 2d day of the 9th mo. 1637. (Adjourned until the 15th, present.)

" Present, the Governor, Deputy Gov'nr, Mr. John Endicott, Mr. Humfrey, Mr. Bellingham, Mr. Herlakenden, Mr. Stoughton, Mr. Bradstreete, and Increase Nowell:

" The fferry betweene Boston and Charlestowne, is referred to the Governor and Treasurer, to let at 40l. pr. A. beginning the 1st of the 10th mo., and from thence for three years."

" At a General Court of elections, held at Boston the 13th of the 3d mo., A. 1640.

" Present, the Governor, &c. Mr. Treasurer, Mr. Samuel Sheapard and Leift. Sprague, have power to lett the ferry between Boston and Charlestown, to whom they see cause, when the time of Edward Converse is expired, at their discretion.

" At a session beginning the 30th of the 8th mo. 1644. It is ordered that the magistrates and deputies of ye. co'rte, their passage over the fferries, together with their necessary attendants, shall be free, not paying any thing for it, except at such ferries as are appropriated to any, or are rented out, and are out of the countries' hands, and there it is ordered that their passages shall be paid by ye. country."

Further extract from the colony records filed by the plfs. " At a General Court, &c. 7th day 8th mo.

The ferry betweene Boston and Charlestown is granted to the Colledge."

" At a Generall Courte of elections, begunne the 6th of May,

[Charles River Bridge v. Warren Bridge et al.]

1646. In answer to the petition of James Heyden, with his partners, ferry-men of Charlestown, and for the satisfaction of all other ferry-men, that there may be no mistake who are freed, or should be passage free, and how long: It is hereby declared, that our honored magistrates, and such as are, or from time to time, shall be chosen to serve as deputyes at the Generall Court, with both their necessary attendants, shall be passage free over all ferryes; and by necessary attendants, wee meane a man and a horse, at all times during the term of their being magistrates or deputyes, but never intended all the familyes of either at any time, and that ye. order neither expresseth nor intendeth any such thing.

" Att a third session of the Generall Courte of elections, held at Boston the 15th of October, 1650. In answer to the petition of Henry Dunster, president of Harvard Colledge, respecting the hundred pounds due from the country to the college, and rectifying the fferry rent, which belongs to the college. It is ordered that the treasurer shall pay the president of the college the some of one hundered pounds, with two years forbearance, as is desired; and forbearance till it be paid out of this next levy, that so the ends proposed may be accomplisht; and for the ferry of Charles Towne, when the lease is expired, it shall be in the liberty and power of the president, in behalfe and for the behoofe of the College, to dispose of the said ferry by lease, or otherwise, making the best and most advantage thereof to his own content, so as such he disposeth it unto performe the service and keep sufficient boates for the use thereof, as the order of the court requires."

The case of the plaintiffs in error is thus stated in the opinion of the Court:

It appears from the record, that in the year 1650, the legislature of Massachusetts granted to the president of Harvard college " the liberty and power" to dispose of the ferry from Charlestown to Boston, by lease or otherwise, in the behalf, and for the behoof of the college; and that under that grant the college continued to hold and keep the ferry, by its lessees or agents, and to receive the profits of it until 1758. In that year a petition was presented to the legislature by Thomas Russell and others, stating the inconvenience of the transportation by ferries over Charles river, and the public advantage that would result from a bridge; and praying to be incorporated, for the purpose of erecting a bridge in the place where the ferry between

Boston and Charlestown was then kept. Pursuant to the petition, the legislature, on the 9th of March, 1785, passed an act incorporating a company by the name of "The Proprietors of the Charles River Bridge," for the purposes mentioned in the petition. Under this charter, the company were authorized to erect a bridge "in the place where the ferry is now kept;" certain tolls were granted, and the charter was limited to forty years, from the first opening of the bridge for passengers; and from the time the toll commenced, until the expiration of the term, the company were to pay two hundred pounds, annually, to Harvard College; and at the expiration of the forty years, the bridge was to be the property of the commonwealth; "saving, as the law expresses it, to the said college or university, a reasonable annual compensation for the annual income of the ferry, which they might have received, had not the said bridge been erected."

The bridge was accordingly bu lt and was opened for passengers, on the 17th June, 1786. In 1792, the charter was extended to seventy years from the opening of the bridge, and at the expiration of that time, it was to belong to the commonwealth. The corporation have regularly paid to the college the annual sum of two hundred pounds; and have performed all the duties imposed on them, by the terms of their charter.

In 1828, the legislature of Massachusetts incorporated a company by the name of "The Proprietors of the Warren Bridge," for the purpose of erecting another bridge over the Charles river. The bridge is only sixteen rods at its commencement, on the Charlestown side, from the commencement of the bridge of the plaintiffs, and they are about fifty rods apart, at their termination on the Boston side. The travellers who pass over either bridge, proceed from Charlestown Square, which receives the travel of many great public roads, leading from the country; and the passengers and travellers who go to and from Boston, used to pass over the Charles River Bridge, from and through this square, before the erection of the Warren Bridge.

The Warren Bridge, by the terms of the charter, was to be surrendered to the state, as soon as the expenses of the proprietors in building and supporting it should be reimbursed; but this period was not in any event to exceed six years from the time the company commenced receiving toll.

When the original bill in this case was filed, the Warren Bridge had not been built; and the bill was filed after the passage of the law,

[Charles River Bridge v. Warren Bridge et al.]

in order to obtain an injunction to prevent its erection, and for general relief.

The bill, among other things, charged as a ground for relief, that the act for the erection of the Warren Bridge impaired the obligation of the contract between the state of Massachusetts and the proprietors of the Charles River Bridge; and was therefore repugnant to the constitution of the United States. Afterwards, a supplemental bill was filed, stating that the bridge had been so far completed, that it had been opened for travel; and that divers persons had passed over, and thus avoided the payment of the toll, which would otherwise have been received by the plaintiffs.

The answer to the supplemental bill, admitted that the bridge had been so far completed, that foot passengers could pass, but denied that any persons but the workmen and superintendents had passed over with their consent.

In this state of the pleadings the cause came on for a hearing in the supreme judicial court for the county of Suffolk, in the commonwealth of Massachusetts, at November term, 1829, and the court decided, that the act incorporating the Warren Bridge, did not impair the obligation of the contract with the proprietors of the Charles' River Bridge; and dismissed the complainants' bill.

The complainants prosecuted this writ of error.

The case was argued by Mr. Dutton and Mr. Webster, for the plaintiffs in error: and by Mr. Greenleaf and Mr. Davis, for the defendants.

Mr. Dutton for the plaintiffs.

This case comes before the Court upon the bill and answer, amended bill and answer, exhibits, evidence, &c., contained in the record.

The plaintiffs, in their several bills, after setting forth the grants made to them by the acts of 1785, and 1792, and their compliance with the terms and conditions of them, complain that the defendants are about to construct, and have constructed, a bridge between Charlestown and Boston, so near to the plaintiffs' bridge as to be, in contemplation of law, a nuisance to it; and they therefore pray that the defendants may be enjoined, &c.

The defendants justify, under the authority of an act passed on

the 12th of March, 1828, establishing the Warren Bridge Corporation.

The plaintiffs allege, that this act of the legislature, under which the defendants justify themselves, impairs the obligation of a contract, and is, therefore, unconstitutional and void.

The defendants, in their answer, deny this; and the issue raised by these pleadings, and the only one, of which this Court has jurisdiction, is, whether the said act of March 12th, 1828, does, or does not, impair the obligation of a contract.

Such being the state of the pleadings, and such the only issue, which this Court can try, I shall endeavour to maintain this single proposition, viz:

The act of the legislature of Massachusetts, passed on the 12th of March, 1828, establishing the Warren Bridge Corporation, is repugnant to the 10th section of the 1st article of the constitution of the United States, which prohibits a state from passing any law impairing the obligation of contracts.

In the discussion of this proposition many topics will come under examination; all, however, connected with it, and all resulting in the affirmance or denial of it.

By the preamble to the plaintiffs' charter, which was passed on the 9th of March, 1785, incorporating the plaintiffs, it appears, that the bridge is to be erected " in the place where the ferry between Boston and Charlestown is now kept;" and by the 5th section of the act it is provided, that " after the said toll shall commence, the said proprietors or corporation, shall annually pay to Harvard college or university, the sum of two hundred pounds, during the said term of forty years.

The plaintiffs' charter, therefore, upon the face of it, shows that certain transactions took place between the legislature, the college, and the grantees.

The ferry that belonged to the college is to be extinguished, and a bridge is to be erected in its place: an obligation is imposed upon the grantees to pay to the college the sum of two hundred pounds annually; and there is a recognition of a right in the college to compensation for the loss of the ferry, after the plaintiffs' charter has expired.

All this leads to an examination of the ferry, and its legal history, as it appears by various colonial ordinances; together with the nature and extent of such a franchise, at common law.

[Charles River Bridge v. Warren Bridge et al.]

On the 9th of November, 1630, the colonial government make an offer of a ferry to any one who will undertake to set it up, between Boston and Charlestown, and fix the rates of ferriage, &c.

On the 5th of November, 1633, Richard Brown is allowed to keep a ferry over Charles river, against his house, and the rates are there stated. It does not appear where this ferry was, or whether it was ever set up.

On the 2d day of the 9th month, 1637, this ordinance was passed.

"The ferry between Boston and Charlestown is referred to the governor and treasurer to let, at forty pounds per annum, for three years."

On the 13th of the 3d month, 1640, it is referred to Samuel Shephard and others to let the ferry between Boston and Charlestown, when the time of Edward Converse is expired, &c.

On the 7th of the 8th month, the ferry was granted to the college in these words:

"The ferry between Boston and Charlestown is granted to the college."

By this ordinance, which, with others, relating to ferries, will be found in the 56th and 57th pages of the record; it appears, that the lease to Converse was about to expire, and that there was, at that time, no other ferry in existence between Boston and Charlestown.

At a session of the court, held on the 30th of the 8th month, 1644, it is provided, that magistrates, with their *necessary attendants*, shall have free passage over all ferries that have not been granted or leased to any; and their passage shall be paid by the country.

On the 6th of May, 1646, an ordinance was passed, explaining the foregoing ordinance, and declaring what is intended by *necessary attendants*, for the satisfaction of the ferrymen; and making magistrates passage free, over all ferries.

This ordinance exempts magistrates at all ferries, contrary to the act of 1644; and is the only one, during a period of one hundred and forty-five years, which, in the smallest degree, affects the income of the ferry. Whether the amount to be charged to the country was found to be too trifling to keep an account of, or whether the exemption at all ferries, was claimed by the magistrates, after royal example, and as being the representatives of the royal authority, does not appear.

It appears by the ancient charters, that the college was incorporated in May, 1650.

[Charles River Bridge v. Warren Bridge et al.]

Various acts were passed, confirming the original grant to the college, both before and after the act of incorporation.

By the ordinance of 1642, Ancient Charters, page 77, the "revenue of the ferry between Boston and Charlestown," was given to the college.

In the act passed on the 15th October, 1650, it is provided, that for the ferry of Charlestown, when the lease is expired, it shall be in the liberty and power of the president, in the behalf and for the behoof of the college, to dispose of the said ferry, by lease or otherwise, making the best and most advantage thereof to his own content, &c. &c.

The act passed on the 18th October, 1654, speaks of the "ferry formerly granted to the college;" and the act of 27th June, 1710, speaks of the "profits and revenues of the said ferry being granted to Harvard college, in Cambridge."

Thus it appears, that the original grant of this ferry, in 1640, was confirmed in 1642, in 1650, in 1654, and in 1710.

Various acts regulating ferries were passed by the colonial government, and several regulating the ferry between Boston and Charlestown. They relate to the duties of the ferrymen, the convenience of the ferry-ways, the number of boats, &c. &c. The act passed in 1781, provides, that whenever the corporation of Harvard college shall make any alteration in the rates of ferriage, they shall publish the rates by them established.

In 1713, there was a project for building a bridge where the ferry was kept, and a committee was appointed by the corporation of the college, to "insist on the right which the college hath in and to the profits of the said ferry;" and the government, at the same time, appointed Dr. Clark, to confer with the president and fellows upon the affair of a bridge in place of the ferry.

Thus, then, it appears that the college held this ferry for one hundred and forty-five years, with all the common law rights of ferries; subject only to such regulations as the colonial and state governments saw fit, from time to time, to make.

First, the ferry itself was granted; afterwards, its profits, revenues, &c. &c.

If one grants the profits of his land, the land itself passeth. Comyn. tit. Grant, E. 5.

In order to understand the nature and extent of this franchise, resort must be had to the common law; and this has been uniform.

from the time of Henry VI. to the present time. It is also the law of this country, except in cases where it can be shown that it has been overruled by adjudged cases, or modified by statute.

In the Terms de Ley, 338, a ferry is called a liberty, by prescription, or the king's grant, to have a boat for a passage upon a great stream, for carrying of horses and men for reasonable toll.

It is called an incorporeal hereditament, and is either founded in grant, or prescription, which supposes a grant. In the one case, the extent of the franchise is ascertained by usage; in the other, by the terms of the grant. Dane's Abr. 2 vol. 683; Stark v. M'Gowan, 1 vol. Nott & M'Cord's Reports.

It may belong to the government, to a corporation, or to an individual; the *property* may be *private*, though the *use* is *public*.

In 10 vol. Petersdorf, 53, it is said that these franchises, which are various, may be "vested either in the natural person, or bodies politic; in one man, or in many; but the same *identical franchise* that has been granted to one, cannot be bestowed on another, for that would *prejudice* the former *grant*." Also Viner's Abr. vol. 13, 513.

In a note to the case of Blisset v. Hart, Willes' Reports, 512, it is said: "A ferry is *publici juris:* it is a franchise, that no one can erect without the king's license; and when one is erected, another cannot be erected without an *ad quod damnum.* If a second is erected without license, the crown has a remedy by quo warranto; and the former grantee by action."

If the ferry be not well repaired, it is *popular*, and in the nature of a highway, &c. It is to be reformed by presentment or information. This differs from the case of *mills, bake houses*, &c., which are grounded on customs, and of a private nature. Hardres' Rep. 163.

Every owner of a ferry must have a right to land, to take in his passengers. He need not own the soil, but he must have a right to use it. 12 East. 330. 6 Barnwell & Creswell, 703. The general doctrine is laid down in 22 Henry VI,, 15, 16.

"If I have a ferry by prescription, and another is erected *so near* as to impair my ferry, it is a nuisance to me; for I am bound to sustain and repair the ferry for the use of the king's lieges; otherwise, I may be grievously amerced." In Rolle's Abr. 140, Nuisance G, line 20, the same doctrine is stated with reference to a fair or market.

Hale, in a note to Fitzherbert's Nat. Bre. 428, says:—"If the

market be on the same day, it shall be intended a nuisance; but if it be on a different day, it shall not be so intended; and therefore it shall be put in issue, whether it be so or not." Cites 11 Henry IV. 5, 6.

If a ferry be erected with license, another cannot erect a ferry to the nuisance of it. Comyn. Dig. tit. Piscary, B. He states the same doctrine in another place. "Title action on the case for nuisance, A." "So if one erect a ferry so near my ancient ferry." Blackstone's Com. vol. 3, 219; Nott & M'Cord, vol. 1, 387.

It is the usual practice in England, to issue the writ of *ad quod damnum*, before the patent for a fair or market is granted. But as the execution of this judicial process does not, and cannot always ascertain what will be the effect of the proposed market or fair; the doctrine seems to be well settled, that in case it does prove to be injurious to any existing market or fair, the patent may be repealed upon proof of the fact. In other words, the writ of *ad quod damnum*, executed, is not conclusive. 6 Modern Rep. 229; 2 Ventris, 344; 3 Levinz, 220; Hale de Port. Maris; Hargrave's Tracts, 59; Comyn. Dig. Patent, F. 4, 5, 6, 7; 2 vol. Williams' Saunders, Note 4, p. 72; 2 Institute, 406.

It is thus stated by Chitty in his Prerogatives of the Crown, 10 ch. 2 sec.

It is most important to remember that the king does not grant a market or fair, without a writ of *ad quod damnum* being first executed; *even if that be done,* the crown cannot enable a subject to erect a market or fair *so near* to that of another person, as to affect his interest therein, &c. &c.

The owners of ferries are under liabilities and obligations, which may be enforced against them by individuals, or the public. These franchises are declared to be *publici juris;* and the law gives a remedy in all cases of negligence or injury, by presentment, information, or action on the case. Paine v. Partridge, Salkeld, 717; Willes' Rep. 512; 3 Salkeld, 198. They have also rights which can be maintained at law; by action on the case for a disturbance; by action of assize; by distress; &c. &c. 2 Saunders, Williams' ed. 114; 4 Term Reports, 666; 2 vol. Dane's Ab. 683; Bacon. Ab. tit. Distress, F. pl. 6; Croke. Eliz. 710; 6 Term Rep. 616; Huzzy v. Field, Law Journal, 13 No. 239.

All these franchises, as of fairs, markets, ferries and bridges, are

founded on good and sufficient consideration; such as the expenditure of money in establishing and maintaining them, for the convenience and safety of the public. They are all *publici juris*, and from the rights, liabilities, and duties of which they are compounded, results the notion of property in them. The toll, or right to demand and receive money for the use and enjoyment of these franchises, of which the toll is part and parcel; is recognised as property, and protected as property, both by the law of England, and of this country. A grant of these vests in the grantee a beneficial interest, which may be demised, leased, or mortgaged. Popham's Rep. 79; Moore's Rep. 474; Webb's Case, 8 Coke, 92; Gunning on Tolls, 106, 110; 6 Barnwell & Creswell, 703; 5 Barnwell & Creswell, 875; 3 Maule & Selwyn, 247; 1 vol. Crompton & Jervis, Rep. 57; in the Exchequer, 400.

The franchise of a bridge or turnpike may be taken on execution in payment of debt, by the law of Massachusetts. In Chadwick's case, an action was brought at common law, and sustained by the court, for compensation for the loss of his ferry, by the erection of a bridge. 2 vol. Dane's Ab. 686; also Judge Putnam's opinion, 7th Pickering.

As to the local extent of this franchise of a ferry, an attempt has been made to limit it to the ferry-ways; and the case of "Ipwich v. Brown," Saville, Rep. 11, 14, is cited; where it is said, that a "ferry is in respect of the landing place, and not in respect of the water, that the water may be in one, and the ferry in another;" it is also said in this case, that the owner of the ferry must own the soil on both sides.

This last part of the case is expressly overruled in 6 Barnwell & Creswell, 703. And as to the other part of the case, it means nothing more than this, that a ferry must have ferry-ways, or landing places.

The case in Hardres Rep. 162, was this; one owning land on both sides of the Thames, set up a ferry three quarters of a mile from an ancient ferry, at Branford. A bill was brought in the Exchequer to suppress it, as coming too near a monopoly. The reporter adds, *sed quære de ceo;* for contrary to the books of 22 Henry VI. and to precedents in like cases in this Court.

Afterwards another bill being filed for the same matter; the Court on the 7th of April, Lord Hale presiding in it, decreed that the new

ferry should be suppressed, and that the defendants should not have liberty to use any ferry boat to the annoyance of the plaintiff's ancient ferry.  2 Anstruther Rep. 608.

In the case of the Newburgh Turnpike Company v. Miller, 5 Johnson's Chancery Cases, 101; the principle is clearly stated and applied.  The plaintiffs in this case, had erected a bridge, as part of their road across the Wallkill; the defendants erected another free bridge eighty rods distant; purchased a strip of land adjoining the bridge, and had a road laid out by commissioners as a public highway, for the purpose of avoiding the toll gate of the plaintiffs.  Kent, Chancellor, said—The *quo animo* is not an essential inquiry in the case; whatever may have been the intention of the defendants, the new road and bridge do *directly* and *materially impair* the use and value of the plaintiff's franchise.

No rival road, bridge, ferry, or other establishment, of a similar kind, and for like purposes, can be tolerated so near to the other as materially to affect or take away its custom.  It operates as a fraud upon the grant, and goes to defeat it.  The consideration by which individuals are invited to expend money upon great expensive and hazardous public works, such as roads, bridges; and to become bound to keep them in constant and good repair, is the grant of a *right to an exclusive toll.*  This right, thus purchased for a valuable consideration, cannot be taken away by *direct* or *indirect* means.  Also, cited " Ogden v. Gibbons," 4 Johnson's Chancery Rep. 150.

It appears from the ancient charters of the colony of Massachusetts, page 110, 111, that the same notions of an exclusive right in ferries prevailed there, that have always prevailed in England.  For as early as 1641, near the time when the " ferry between Boston and Charlestown was granted to the college," this ordinance was passed.  " It is ordered by this court, and the authority thereof, that whosoever hath a ferry granted, shall have the *sole* liberty of transporting passengers," &c.

Here is a direct assertion of an exclusive right in the owner of a ferry; and is worthy of notice as a cotemporaneous exposition; and can it be reasonably doubted, that Edward Converse, under his lease from the government, of " the ferry between Boston and Charlestown," had the sole and exclusive right of transporting passengers between those *termini?*

All, therefore, which the plaintiffs claim in the case at bar, is an

exclusive right between Boston and Charlestown; and if they have any exclusive right, it must have some local extent beyond the ferry-ways, or the planks of the bridge, otherw: ა it would not be exclusive. If any one at his pleasure could have lawfully carried passen-gers from Boston to Charlestown, and landed them within two feet of the ferry-ways of Converse, he would not have had the sole right of carrying between those two points. No other ferry or bridge could be erected between those *termini*, without " being near in a positive sense;" which is the form of expression in which Chief Justice Parker lays down the rule; without being *so near*, in the language of Blackstone, as to draw away the custom of the elder ferry or bridge; or without producing, in the language of Chancellor Kent, *ruinous* competition.

With this extent, therefore, the college held the ferry on the 9th of March, 1785, when the act passed, making the plaintiffs a corporation for the purpose of erecting a bridge in the place where the ferry was kept; and the view we take of this transaction is this, that the corporation created by this act became the assignees, in equity, of this franchise, or it was surrendered to their use by operation of law. 2 Thomas' Coke Litt. 553; 6 Barnwell & Creswell, 703.

A bridge, in place of the ferry over Charles river, is deemed by the legislature to be a matter of public utility; and they are disposed to grant a liberal charter to such persons as are willing to undertake so hazardous an enterprise. The college are ready to part with their ferry for an annuity, equal to their then income; and Thomas Russell and his associates, are willing to make the first experiment in this country, of throwing a bridge, fifteen hundred feet in length, over navigable waters, for the tolls to be granted them, for the period of forty years.

The ancient ferry, then, is to be extinguished; which could not be done without the authority of the government, nor without the consent of the college; 3 Modern Rep. 294.

The petitioners are to pay two hundred pounds annually, to the college, for forty years, as a compensation for the loss of the ferry; and to this agreement the college became a party, by its assent given at the time, and its subsequent acceptance of the annuity; Record, 122, 124.

The right to keep up a ferry at this place is extinguished, but the beneficial interest of the college is not; for in the act there is a

" saving to the college of a reasonable and annual compensation for the annual income of the ferry."

It is said that the government seized the franchise of the ferry. If this were so, then it passed with the grant of a right to build a bridge "in the place where the ferry was kept;" agreeably to the doctrine in Palmer's case, Popham's Rep. 78; 9 Coke, 26; 10 Coke, 64, 5. But there is no evidence that the government did, or intended to seize the franchise, as private property, for public use, in the exercise of the eminent domain. There was no necessity or motive for doing this; because the petitioners for the bridge had agreed to pay the college for the surrender of their ferry for the forty years; and their act of incorporation confirmed and executed that agreement. The whole transaction shows, that it was a matter of previous arrangement between the three parties; and the terms and conditions of the bargain were made obligatory of the act.

Now, it is obvious, that if the government had given the college an authority to build a bridge " in the place where the ferry was kept;" it would have had the same local extent of franchise that the ferry had. Or if the proprietors of Charles River Bridge had first purchased the ferry of the college, and afterwards had obtained a charter to build a bridge " in the place where the ferry was kept;" the result would have been the same.

The beneficial interest vested in the owners of the ferry and of the bridge, is the same, to wit: a right to demand and receive a certain rate of toll from all persons passing from one town to the other; the place the same; the object the same; the mode only different.

The power of regulating all these franchises, which are *publici juris*, is in the government. It is an incident of sovereignty. In the case of ferries it extends to the number and place of the ferryways, the number and kind of boats, the times of putting off from each side; reaching to all those details which concern the convenience and safety of passage and transportation.

In the case of a bridge, this power of regulation in the government is exerted at the time the charter is granted. The place where the bridge is to be built; its dimensions, materials, lights, draws and other details, are all prescribed and settled by the act: and the government act upon the corporation, by holding them to a strict performance of all the duties imposed.

The charter of 1785 and its extension in 1792:

The first grant was of a right to build a bridge over a navigable river. It was an exercise of the sovereign power of the state over certain public rights.

By the severance of the empire, and the consequent independence of the states, all public property and public rights, vested in the states, as successors to the crown and government of the parent country. The power of Massachusetts in the year 1785, was, therefore, as ample and complete over these as it had ever been before the separation.

Such rights as these, have always been held in England by grant or prescription, *exclusively* as private property; such as fisheries in arms of the sea; ferries and bridges over navigable rivers or arms of the sea, subject only to such regulations as public convenience required.

In grants that abridge public rights, it is generally held that a consideration must be shown; Hargrave's Law Tracts, " De jure maris," 18 to 36; Angel on Tide Waters, 106–7.

In " Carter v. Thurcot," 4 Burrows, 2161, Lord Mansfield says, " on rivers not navigable, the proprietors of the adjoining land own *ad filum medium aquæ;* not so in arms of the sea; but if he can show a right by grant, or prescription which supposes a grant, he may have an *exclusive right* in an arm of the sea or navigable river." In the following cases the same doctrine is clearly laid down: 4 Durnford and East, 439; 2d vol. Bosanquet and Puller, 472; 1 Durnford and East, 669; 1 Modern Rep. 105; 4 Durnford and East, 668. Such is the law of England.

It is the law of Connecticut. In 1st vol. Connecticut Rep. 382, the Court say, " that the right of fishing, by the common law, in the ocean, in arms of the sea, and in navigable rivers, below high water mark, is common to all; and the *state only can grant exclusive right.* The public may grant an exclusive right of fishing in a navigable river; and if it may be granted, it may be prescribed for."

It is the law of New York. See People v. Platt, 17 Johnson, 195.

It is the law of Massachusetts. In the 6th vol. of Mass. Rep. Chief Justice Parsons states the common law doctrine, and the alterations it has undergone since the first settlement of the country.

Commonwealth v. Inh. Charlestown, 1 Pickering, 180. With regard to riparian owners of land upon streams, not navigable, the

common law has not been modified; they own, as in England, to the middle of the stream.

But, with regard to the owners of land bounding on the sea shore, or arms of the sea; they own, by the law of Massachusetts, to *low* water mark, where the tide does not ebb more than one hundred rods: though, by the common law, they could hold only to *high* water mark, for all below belonged to the king. Yet they might hold by grant or prescription against the king. 1 Mass. Rep. 231; 17 do. 289; 4 do. 140; Angel on Tide Waters; 4 Mass. Rep. 522.

An act of the legislature of Massachusetts, touching public property or public rights, has the same force and effect as an act of parliament in England.

There is, then, no restraint or limitation upon the power of the grantor over the subject matter of this grant: none in the constitution of Massachusetts: none in the act itself that interferes with the possession of an exclusive right by grantees.

The rule of construction applicable to this charter:

It was said by a learned judge, in the court below, that the general rule of law was, that in governmental grants, nothing passed *by implication*. Where, I would ask, is any such general rule to be found? Not in the books, surely; nor can it be inferred from adjudged cases. All those cited in support of the rule are cases of crown or prerogative grants; and these, as strongly intimated by Chief Justice Eyre, 2 Henry's Blackstone, 500, stand on a different footing from grants by acts of parliament. But, with regard even to these crown grants, where the royal prerogative is entitled to the most indulgence, and where the grant is made at the suit of the grantee; there are a variety of cases where valuable rights, privileges and franchises, pass by *necessary implication*. Bacon's Abr. title Prerogative, F. 2; Plowden, 336, 7; Rex v. Twine, Croke. Jac. 179; 9 Coke Rep. 30; Dyer's Rep. 30; Saville, 132; 1 Ventris, 409; Whistler's case, Rep. 64, 5.

The general rule is thus laid down by Chitty on Prerogative, chap. 16, sec. 3, 391.

In ordinary cases, between subject and subject, the principle is, that the grant shall be construed, if the *meaning* be *doubtful*, most strongly against the grantor; who is presumed to use the most cautious words for his own advantage and security: but, in the case of the king, whose grants chiefly flow from his royal grace and bounty, the rule is otherwise; and crown grants have at all times

[Charles River Bridge v, Warren Bridge et al.]

been construed most favourably for the king, where a *fair doubt* exists as to. the *real meaning* of the *instrument.*

But there are limitations and exceptions even to this rule:

1st. No strained or extravagant construction is to be made in favour of the king; if the intention be obvious, royal grants are to receive a *fair* and liberal interpretation.

2d. The construction and leaning shall be in favour of the subject, if the grant show that it was not made at the solicitation of the grantee; but *ex speciali gratia, certa scientia, et mero motu regis,* 10 Coke, 112; Comyn. Dig. Grant, C. 12.

3d. If the king's grants are upon a valuable consideration, they shall be construed *strictly for the patentee.*

The grants of the king, when valid, in general bind him, though *without consideration,* as subjects are bound by their grants; ch. 16, sec. 5.

There are cases in which it is said, that when those things, which are said to be parcel of the flowers of the crown, such as the goods of felons, waifs, estrays, &c., come into the king's possession, they are merged in the crown, and do not pass without express words; but even these will pass, if they can be made certain by reference. The case of the Banne, which has been cited, is explained by Justice Bailey in this way in the case of the "Duke of Somerset v. Fogwell," 5 Barnwell and Creswell, 875.

There is, then, no foundation in law for the supposed analogy between crown grants in England, and grants by legislative acts in this country. But if the act of 1785 were subjected to the strictest rules applicable to crown grants, it would be entitled to a liberal construction for the grantees; for it is upon a good, a valid, an adequate, and a meritorious consideration.

The state of Massachusetts is as much bound by *necessary implication* in its grants, as individuals are. This is decided in the case of "Stoughton v. Baker," 4 Mass. Rep. 522.

The true notion of prerogative in this country, is well stated by Parsons, (arguendo), in 1 Mass. Rep. 356, as distinguished from prerogative in England.

In England prerogative is the cause of one against the *whole;* here it is the cause of *all* against *one.* In the first case the feelings, the vices, as well as the virtues, are enlisted against it; in the last in favour of it: and, therefore, here it is more important that the ju-

[Charles River Bridge v. Warren Bridge et al.]

dicial courts should take care that the claim of prerogative should be more strictly watched.

In the opinion of a learned judge in the court below, we are told, that if the king makes a grant of lands, and the *mines* therein contained, *royal mines* shall not pass: and why not? Because, says the same authority, the king's grants shall not be taken to a *double intent;* and the most obvious intent is, that they should only pass the *common mines*, which are grantable to a common person. That is, the grant shall not draw after it what can be separated, and what is not grantable to a common person, but is a special royalty, a crown inheritance : and yet this case, and others like it, are cited in support of the pretended rule, that in governmental grants nothing passes by implication.

What is the consideration of the case in the grant at bar? The grantors themselves furnish the highest evidence of its merit. In the act incorporating the proprietors of the West Boston Bridge in the year 1792, they say, "Whereas the erection of Charles River Bridge was a work of hazard and public utility, and another bridge in the place proposed for the West Boston Bridge, may diminish the emoluments of Charles River Bridge; therefore, for the encouragement of enterprise," &c. &c.

It was hazardous, for no attempt at that time had been made to carry a bridge over tide waters ; and so doubtful were the subscribers of its stability, that a number of them insured their interest in it. The hazard was all their own; and so great was it thought to be, that upon the breaking up of the ice, persons assembled on the shore to see it carried away. It has stood, however, against time and the elements; it has stood against every thing but *legislation*. It was opened with processions, and every demonstration of a general rejoicing; and was considered, at the time, as an enterprise of great patriotism, as well as of utility.

This charter is to receive a judicial construction, and the words of grant are to be subjected to a judicial analysis. What relations do the words raise? What rights are extinguished; what required; and what covenants are implied?

In the case of Fletcher and Peck, 6 Cranch's Rep., the grant in that case is said to be a contract executed; the rights of the grantor are said to be forever extinguished; and a contract implied never to reassert his right; but none of these things appear upon the face of the deed.

VOL. XI.—3 K

[Charles River Bridge v. Warren Bridge et al.]

It is said, there is a mode of writing with sympathetic ink, which cannot be read till it is held up to the light. So words of grant, must be held up to the light of judicial interpretation. When the relations which the words give rise to, are unfolded, the rights that are extinguished; and the rights that are required, and the covenants that are implied, all become clear and legible.

In examining the charter of 1785, I shall consider,

1st. What is granted by express words.

2d. What by necessary implication.

In the third section of the charter are these words: " And be it further enacted by the authority aforesaid, that, for the purpose of reimbursing the said proprietors the money expended or to be expended, in building and supporting the said bridge, *a toll be and hereby is granted* and established for the sole benefit of the said proprietors."

Upon the authorities already cited, and upon the strong reason of the case, these words vest, absolutely, in the grantees a franchise, without condition and without reservation; and this franchise is property, recognised as such, and protected as such, both by the law of England and by the law of this country. In order, then, to make this protection which the law affords, available, it must be exclusive to some extent; enough, at least, to keep down ruinous competition.

All this is conferred upon and vested in the proprietors of Charles River Bridge, by these few words of the charter.

In the first volume of Jervis and Crampton's Reports, 57, and 400 in the Exchequer; it appears that a charter was granted to the Corporation of Stamford, in the 13th of 2 Anne, with a right *to take toll*, without saying how much. Chief Baron Alexander says, " We think that where a grant of tolls is found in a charter, the word ought to have some meaning, and the charter some operation; and that it can receive operation only by being construed to mean a reasonable toll." He goes on to say, " If we were to decide against this charter upon the principles contended for, we should *shake the security of a vast mass of property;* which has been enjoyed, undisturbed, for perhaps ages."

Again, it is declared expressly, that this toll shall continue for and during the period of forty years. What is the meaning of this limitation? The bridge is to remain, and be delivered to the government in good repair, at the end of the term. If the corporation are merely tenants at will of this franchise; if the legislature can eject

[Charles River Bridge v. Warren Bridge et al.]

them at pleasure; if they can rightfully shorten the term, when they please, and as much as they please; the limitation to forty years, expressed in the charter, becomes absurd and contradictory. It must, however, be construed to mean something; and it can have no reasonable or consistent meaning, but that of an absolute, unconditional grant of tolls for forty years.

Again, the maintenance of the bridge, and the annuity to the college, run with the charter; and the grant of tolls is made, in express words, for these two objects. Here, then, are two obligations imposed by the charter; one to support the bridge, which amounts, upon an average, to about five thousand dollars a year; and the other to pay to the college two hundred pounds a year; and a toll is granted as the means, and the only means, of fulfilling these obligations: and yet the legislature, the grantors of this charter, claim and exercise the right of wholly withdrawing these means from the corporation, by an indirect act, and leaving these obligations upon them in their full force. Does not this, if any thing can, impair the obligation of a contract?

Whence is derived the power or the right to do this? Is it to be found in the charter? No. That grants a toll for forty years, absolutely, without condition or reservation. What, then, is the nature of this mysterious power of the government, that can lawfully resume its own grants; destroy its own contracts; disregard the obligations of good faith; and trample upon every principle of equity and justice?

In the case of Wales v. Stetson, in the 2d Mass. Rep., Chief Justice Parsons says, "We are also satisfied, that the rights legally vested in this or in any corporation, cannot be *controlled* or *destroyed*, by any subsequent statute; unless a power for that purpose be reserved to the legislature, in the act of incorporation."

This case, like the one at bar, was a grant of a franchise; and here we have the solemn judgment of the supreme court of Massachusetts, upon its inviolability, in the absence of any such reserved power.

In the case of the East India Company v. Sandys, reported in the seventh volume of State Trials, 556, it appears, that there was this condition inserted in the charter, "That if it should hereafter appear to his majesty, or his successors, that *that* grant or the continuance thereof, in whole or in part, should not be profitable to his majesty, his heirs, and successors, or to this realm, it should, after notice, &c.

be void." Thus, it appears, that even in the opinion of Lord Chief Justice Jeffries, no feeble supporter of royal prerogative, a charter could not be repealed or annulled, unless a power for that purpose was reserved in it to the grantor.

Thus far the case at bar stands upon the very words of the grant; upon the legal and obvious construction of the act itself, without resort to those necessary implications which arise from the nature of the grant.

2d. What is granted by necessary implication?

The general rule of law is thus laid down in Coke Litt. 56, a. " When the law doth give any thing to one, it giveth impliedly whatsoever is *necessary* for the taking and enjoying the same." Plowden's Case of the Mines, 317.

" For the ore of gold and silver is the king's; and if it is, the law gives him means to come to it, and that is by digging; so that the power of digging is incidental to the thing itself."

If one grant to another all the minerals in a certain parcel of land; the grantee has a right to go upon the land, and dig, and carry away the ores.

In one thing all things following shall be included: *lessee* of land has a right of way of lessor's land: *grantee* of trees, growing in a close, may come upon the land to cut them: &c. &c. Finch, 45, Rule, 100.

The grant of a thing carries all things included, without which the thing granted cannot be had. Hobart Rep. 234; also 5 Coke, Saunder's case; 11 Coke, 52, Lifford's case; and 1 Williams' Saun. 322.

Upon these authorities the only question is, are tolls necessary or essential to the enjoyment of this franchise? Just as necessary and essential as air is to the support of animal life. They are part and parcel of the franchise itself; its very essence, substance and life.

What is our franchise without tolls ?

It is compounded of certain rights and certain obligations. The rights are: to be a corporation, with the usual powers incident to corporations; such as the right to have a common seal; to sue and be sued; to maintain a bridge over navigable waters; to demand toll of all persons passing over the bridge, &c.

The obligations are: to maintain the bridge at an expense of five thousand dollars a year; to pay Harvard college two hundred pounds a year; and to deliver up the bridge in good repair, at the end of forty years.

The rights are without value, utterly barren and fruitless: the obligations are oppressive and lasting as the charter. Yet a learned judge, in the court below, says, " that a trader or inn-holder, has as good a right to be protected in the enjoyment of the profits of his store or inn, as the plaintiffs have to be protected in the enjoyment of their tolls." Is a trader's shop or a taverner's license *a franchise?*

Since the first Wednesday of March last, the Warren Bridge has been free; and the necessary consequence has followed, viz., the entire destruction of the plaintiff's franchise. One thing more remains to be done, and then the work will be finished. The attorney general will be directed to file a *quo warranto* against the corporation, for a noncompliance with some of its public duties; and a decree of forfeiture of the franchise will be obtained. This must inevitably happen, unless it can be presumed that this corporation will continue to maintain the bridge at their own private expense, for the public accommodation. The government will then have got into their possession *two bridges,* without the expenditure of a dollar: one having been paid for out of the fruits of the franchise of Charles River Bridge; and the other obtained by a decree of forfeiture, for not complying with its obligations.

In the mean time, the proprietors of Charles River Bridge may well look upon the proceedings of the government with amazement. But a few years since, and they held a property in this franchise, which cost them three hundred thousand dollars; *and where is it now?* "They are charged with no fault, neglect of duty, or breach of any condition. No judicial process has ever been issued against them; and yet, without a cent of compensation, they are stripped of this property by the mere force of legislation. By what transcendental logic can such a result be justified upon any principles of law, equity, or good faith."

Among the various pretences that have been put forth in justification of the act complained of, is this, to wit: that the charter is nothing more than a license to obstruct navigable waters.

In the 15th vol. Viner's Ab. p. 94, License, E, it is said, if a certain time is limited, it is not revocable, though the thing is not done. License executed is not countermandable.

The same law is, if one license me and my heirs to come and hunt in his park, it is necessary for me to have this license in writing; for

something passes by the license in perpetuity: but if the license be to me to hunt once in his park, this is good without writing, for no inheritance passes. 11 Henry VII, p. 9.

There is a great diversity between a license in fact, which giveth an *interest*, and a license in fact, which giveth only an authority, or dispensation; for the one is not to be countermanded, but the other is.

A license is revocable unless a certain time is fixed. Sir William Webb v. Paternoster, Popham Rep. 151; Taylor v. Waters, Taunton's Rep. 374; Liggins v. Inge, 5 Moore and Paine, 712.

So it appears, that if a license is in writing to one and his heirs, it is not revocable. 2d. If it passes an interest, it is not revocable: and 3d. If it is for a time limited, it is not revocable. The case at bar embraces all these: it is in writing; it passes an interest; and is for a time limited.

The grant to the proprietors of the Charles River Bridge, both by express words and by necessary implication, vests in them absolutely, a franchise, a beneficial interest, for forty years; and this interest consists of a right to levy money according to certain fixed rates, upon the line and course of travel between Charlestown and Boston.

But it is said, that a line of travel is uncertain, and cannot be defined; that it often changes, according to the exigences of society. And this to some extent, is doubtless true; and it is also true that from the changes that are constantly taking place in human affairs, a bridge or ferry may be subjected to incidental injuries. It sometimes happens, that a consequential damage may be suffered by one, arising out of the lawful use of property by another. The grant of the West Boston Bridge and of the Canal Bridge, affected in some degree the income of Charles River Bridge; but these were between different *termini*, opening new avenues into the country, and giving better accommodation to a large amount of population. They were grants of similar franchises, called for by public exigences; and not directly and apparently, intentionally interfering with former grants. The revival of Winnisemmit Ferry has somewhat diminished the travel through Charlestown; but it is between Boston and Chelsea, and is coeval with the ancient ferry between Boston and Charlestown. Whatever damage, therefore, is suffered, arising from the changes or progress of society; from political or commercial arrangements; from the natural course of business or industry, is regarded,

and must be borne as merely incidental. But the voluntary, direct, and fatal action of the government upon its own former grant, is not incidental, and does not belong to cases of consequential damage.

The facts in the case at bar are peculiar, and distinguish it from all other cases of a similar nature. The abutments of the two bridges are two hundred and sixty feet apart on the Charlestown side; and the avenues to them meet in Charlestown Square, at the distance of about four hundred feet from the abutments. On the Boston side, the abutments of the two bridges are about nine hundred feet apart, and the avenues to them meet in Boston, at the distance of about fourteen hundred feet. The distance from Charlestown Square to all the business parts of Boston, over these bridges, is within a few feet the same; so that the same accommodation is afforded by both bridges. Now, as all the roads leading into and from Charlestown, terminate, or cross each other in this square, it follows, that all the travel which now goes over the Warren Bridge would, with equal convenience, have gone over Charles River Bridge; if that had been the only avenue between Boston and Charlestown. The new bridge has connected no new line of travel with the old; it has not shortened the distance between the two *termini*, nor given any other additional accommodation, than two parallel bridges give over one. Of the necessity of two bridges, some judgment may be formed from this fact: about three thousand foot passengers passed over Charles River Bridge in one day, and about seven hundred and fifty vehicles of all descriptions, as appears by the record; about eighty thousand foot passengers, and four thousand vehicles go over London bridge every day.

The travel, therefore, from Charlestown to Boston is a unit; it is now, and always has been, and always must be, the same line of travel. The grant of the Warren Bridge, therefore; which, while it was a toll bridge, diverted two-thirds of this travel from Charles River Bridge, and since it has become free, diverts the whole; is a *grant of the same franchise.* It is, in its effect and operation, the entire destruction of property, held by an older title; the resumption of a grant, which this Court has declared to be a contract executed; by which the rights of the grantor are forever extinguished, and a covenant implied on his part never to reassert his rights. But in the case at bar, the grantor has reasserted his right over this franchise; and has thus impaired the obligation of his contract.

A learned judge in the court below, in commenting upon the ex-

[Charles River Bridge v. Warren Bridge et al.].

tent of the franchise of the bridge; remarks, that it is either confined to the planks, or in other words, has no local extent; or else, extends to the old bridge in Cambridge, a distance of some three or four miles.

Now, it is a little remarkable, that the proprietors of the Charles River Bridge, do not now, and never have claimed any such local extent: all they have ever claimed, or do now claim, is an exclusive right between Charlestown and Boston. Yet, in order to make the claim odious, it is represented as extending over the whole river.

But how does the learned judge get at his conclusion that the extent of this franchise is either every thing or nothing? Not surely from the declarations of the proprietors, for they have uniformly limited their right in the manner stated; not from the books of common law, for in them, the rule is stated with great uniformity and precision, and runs through the whole current of authorities, from *Henry* the sixth to the present time. The rule of the common law is, that if a rival market, bridge, or ferry, is erected *so near* an existing one as to *draw away its custom*, essentially to *impair* its *value*, *materially* to *diminish* its *income* or *profits; near* in a positive sense, so near as to produce *ruinous competition;* &c. &c., it shall be deemed a nuisance.

But it is asked, what and where are the boundaries of these rights? And because they cannot put their finger on the precise spot in the river, where private right ends and public right begins, they have no right at all: because the common law does not, unhappily, furnish a pair of compasses to measure the exact local extent of this franchise, it has no extent at all: because it does not cover the whole river, it is confined to the width of the bridge.

Does the law, or do learned judges deal with nuisances on the land in this way? How near to a dwelling house may one establish a noisome or unwholesome manufactory? Does the common law measure the distance, and say, here it shall be deemed a nuisance; and there it shall not? And how is it to be determined whether it be a nuisance or not, but by the fact? It is a matter of evidence, and is to be proved like any other fact. Is the atmosphere filled with a noxious effluvia? Are the comfort and value of the dwelling impaired by this establishment? Then it is a nuisance, whether it be at the distance of ten rods or half a mile. So in the case at bar; it is the fact rather than the distance, that is to determine whether a rival bridge is a nuisance or not. Does it greatly impair the value

of the elder franchise? Does it essentially diminish its profits? Does it wholly ruin it? These are all matters of evidence; facts to be proved; and courts and juries, in the exercise of a sound discretion, upon all the facts and circumstances of each particular case, will give a reasonable protection to the property in these franchises, by giving them a reasonable extent.

But it is argued, that when the charter of Charles River Bridge was extended for thirty years, in the year 1792, notice was given to all the world by a legislative act, that the proprietors had no exclusive right; and that inasmuch as they took their extended charter, with this notice, it is now too late to set up any such right.

The act incorporating the proprietors of the West Boston Bridge, was passed on the 9th of March, 1792; and in the 8th section of that act, it is enacted, that the proprietors of Charles River Bridge shall continue to be a corporation and body politic, for and during the term of seventy years, to be computed from the day that said Charles River Bridge was completed and opened for passengers, subject to all the conditions and regulations prescribed in the act, entitled "an act, incorporating certain persons for the purpose of building a bridge over Charles river, between Boston and Charlestown, and supporting the same, during the term of forty years, and during the aforesaid term of seventy years, the said proprietors of Charles River Bridge shall, and may continue to collect and receive all the toll granted by the aforesaid act for their use and benefit." There is then a proviso, that the proprietors shall relinquish the additional toll on the Lord's day, and shall continue to pay the annuity to the college, &c. &c.

This extension of the charter of Charles River Bridge was made, as set forth in the preamble to the grant.

Whereas, the erection of Charles River Bridge was a work of hazard and utility, and another bridge in the place proposed for the West Boston Bridge, may diminish the emoluments of Charles River Bridge, therefore, &c.

The notice referred to, is contained in the report of a committee, to whom had been referred the petition for the West Boston Bridge, and the remonstrance of Charles River Bridge, and is in these words: "The committee further report; that after attending to the memorial of the proprietors of Charles River Bridge, and hearing them fully on the subject, they are of the opinion, that there is no ground to maintain that the act incorporating the proprietors for the purpose of

[Charles River Bridge v. Warren Bridge et al.]

building a bridge from Charlestown to Boston, is an exclusive grant of the right to *build over the waters of that river.*"

Such is the *opinion* of a committee; and supposing it to have been adopted by the legislature, it would then be the *opinion* of that body, and nothing more. How then can this *opinion* affect or control the rights of the proprietors, held by them under a former grant? If, instead of being an opinion merely, it had been a declaratory act; still all the rights vested in the proprietors, by their charter of 1785, would have remained in full force and effect; and the charter of 1792 is merely a continuance of the first, with all its rights, &c. &c.; and subject to all its obligations. As this declaration of the legislature makes no part of the act of 1792, all the rights which belonged to the proprietors in 1785, belonged to them equally in 1792. If such a declaration had been inserted in the act itself, extending the term to seventy years, and the act had been accepted; the proprietors might have been bound by it.

But the import and meaning of this opinion have been mistaken. It does not deny any claim made by the plaintiffs, but is entirely consistent with it. It does not deny that the proprietors have an exclusive right between Boston and Charlestown; but does deny that they have an exclusive right over the whole river. There was a petition before this committee for another bridge; not from Charlestown to Boston, but from Cambridge to Boston; and the committee say to the remonstrants, your exclusive right does not extend to Cambridge, a distance of two miles; it is not an "*exclusive right to build over the waters of Charles river;*" but inasmuch as the proposed bridge may affect your emoluments, we recommend an extension of your charter. It was seen that the proposed bridge would cause a consequential damage to Charles River Bridge; and it was on that ground that the proprietors appealed to the equity of the legislature; and it was on that ground alone, as they expressly declare, that the legislature granted an extension of their charter for thirty years.

In the following cases, an exclusive right in ferries is fully maintained. Churchman v. Tunstal, Hardres' Rep. 162; Tripp v. Frank, 4 Term Rep. 666; Chadwick's case, 2 Dane's Abr. 683. The case of Huzzey v. Field, recently decided in the exchequer, is reported in the 2d vol. of Crampton, Mason & Roscoe, 432; and also in the 13th No. Law Journal, 239. In this case, Lord Abinger reviews the whole doctrine in relation to this franchise; beginning with the earliest cases, and confirming all the principles which are necessary to

the support of the case at bar. The case of the Islington market, recently reported in the 131st No. of the Legal Examiner; in which the opinion of the nine judges is given upon a series of questions touching the franchise of a market, put to them by the house of lords; reviews and confirms all the doctrines advanced in support of the plaintiffs' claim in this case; and shows, most conclusively, what the law of England is at this present time. The law there, is essentially and truly, now, what it was three centuries ago, in relation to all these franchises; and unless it can be shown that this law has been overruled by adjudged cases, or modified by statute, it is now the law of this country.

Much has been said in the course of this controversy of monopolies, and exclusive privileges; and these have been fruitful themes of declamation. And what is a monopoly, but a bad name, given to any thing for a bad purpose. Such certainly has been the use of the word in its application to this case. It is worth a definition.

A monopoly then is an exclusive privilege conferred on one, or a company, to trade or traffic in some particular article; such as buying and selling sugar or coffee, or cotton, in derogation of a common right. Every man has a natural right to buy, and sell these articles; but when this right which is common to all, is conferred on one, it is a monopoly, and as such is justly odious. It is then, something carved out of the common possession and enjoyment of all, and equally belonging to all, and given exclusively to one. But the grant of a franchise is not a monopoly, for it is not part or parcel of a common right. No man has a right to build a bridge over a navigable river, or set up a ferry, without the authority of the state. All these franchises, whether public property or public rights, are the peculiar property of the state. They belong to the sovereign, and when they are granted to individuals or corporations, they are in no sense monopolies; because they are not in derogation of common right.

But it is said, that the legislature has a right in its discretion to grant ferries, bridges, turnpikes, and rail roads, whenever public convenience requires it; and that of this convenience or necessity, they are the exclusive judges. I state the proposition as broadly as it has ever been laid down, because I have no wish to avoid its just consideration.

It is admitted then, that the legislature has a general authority over these subjects; but it is nevertheless a limited authority. It

is not omnipotent like that of the British parliament, but is subject-
ed to many restraints and limitations. A state legislature can do
wrong, and has done wrong; and this Court has corrected their
errors, and restored the rights which had, inadvertently, of course,
been invaded or taken away.

The people in forming their constitutions of government have im-
posed many restraints upon the exercise of the legislative power.
They have inserted in many of their constitutions, certain fundamen-
tal principles, which were intended to limit, or wholly withdraw
them from the power of the legislature. They cannot abridge the
liberty of speech or of the press; pass *ex post facto* laws; suspend
the writ of habeas corpus; or take private property for public use,
without compensation.

These limitations and restraints upon the exercise of legislative
power, in Massachusetts, are imposed by its own constitution.

There are restraints imposed by the constitution of the United
States upon all state legislation; and one very important restraint, a
disregard of which, in the opinion of the plaintiffs, has brought this
cause before this Court; is, that no state shall pass any law impairing
the obligation of contracts. The power conferred on this Court by
the constitution of the United States, of controlling, in certain spe-
cific cases, state legislation, has given, and was intended to give, in
the language of this Court, "*a bill of rights to the people of each
state.*" The exercise of this ultimate conservative power, consti-
tutes one of the highest functions of this Court. The wise men
who framed this constitution, clearly discerned in the multiform ope-
rations of human passions and interests, the necessity for some calm,
controlling power; and in conferring it upon this Court, they exhi-
bited the most profound wisdom, guided by human experience.

The legislative power is restrained and limited by the principles of
natural justice.

In the case of Calder v. Bull, 3 Dallas' Rep., Judge Chase says,
"There are certain vital principles in our free republican govern-
ments, which will determine and overrule an apparent and flagrant
abuse of legislative power; as to authorize manifest injustice by posi-
tive law; or to take away that security for personal liberty or pri-
vate property, for the protection whereof government was established.
An act of the legislature, for I cannot call it a law, contrary to the
first great principles of the social compact, cannot be considered a
rightful exercise of legislative authority. The obligation of a law,

in governments established on express compact, and on republican principles; must be determined by the nature of the power on which it is founded. A few instances will be sufficient to explain what I mean. A law that punishes a citizen for an innocent action, or, in other words, which when done, was in violation of no existing law; a law that destroys or impairs lawful private contracts; a law that makes a man a judge in his own case; or a law that takes property from A. and gives it to B: it is against all reason and justice, for a people to entrust a legislature with such power; and therefore it cannot be presumed, that they have done it. The genius, the nature, and the spirit of our state governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them: the legislature may enjoin, permit, forbid, and punish; they may declare new crimes, and establish rules of conduct for all their citizens in future cases; they may command what is right, and prohibit what is wrong; but they cannot change innocence into guilt, or punish innocence as a crime; or violate the right of an antecedent lawful private contract, or the right of private property."

In the case of Flecher v. Peck, 6 Cranch's Rep. the Court say: When, then, a law is in its nature a contract; when absolute rights have vested under that contract; a repeal of that law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community.

It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation.

To the legislature, all legislative power is granted; but the question, whether the act of transferring the property of an individual to the public, be in the nature of the legislative power, is well worthy of serious reflection.

Regarding the practical operation and effect of the Warren Bridge charter, upon the rights and property of the plaintiffs; the case at bar comes clearly within the scope of the remarks cited from Dallas and Cranch. In point of fact, it takes the property of the plaintiffs, and gives it to the public. It is, in its operation, an act of confiscation. It violates all those distinctions of right and wrong, of justice and

[Charles River Bridge v. Warren Bridge et al.]

injustice, which lie at the foundation of all law, and of all govern-
ment; and if men were to deal with each other as this act deals
with the plaintiffs, the very frame-work of our civil polity would be
broken down; all confidence would be destroyed; and all sense of
security for the rights of persons and property would be lost.

Again, the legislative power is restrained and limited by its own
former grants. In Chitty's Prerogatives of the Crown, page 132, he
says: " It is a principle of law, that the king is bound by his own and
his ancestors' grants; and cannot therefore, by his mere prerogative,
take away vested rights, immunities, or privileges." The same
identical franchise which has been granted to one, cannot be granted
to another. The grant of a franchise is as much a grant of property
as a grant of land; and if a grant of a franchise can be resumed or
annulled, so can a grant of land. Both are portions of the public
property; both vest in the grantees a property, a beneficial interest;
and in both, the grant is a contract executed.

Since this suit has been pending, a very important case has been
decided in the supreme court of appeals in the state of Maryland.
It is the case of the "Canal Company v. The Rail Road Company;"
and is reported in the 4th vol. of Gill and Johnson's Reports.

The Canal Company's was the prior grant. Surveys of the route
for each of these great internal works had been made; and it was
found that they approached so near each other at a place called the
Point of Rocks, that there was not room enough for both between the
rocks and the river. In making these surveys, the Rail Road Com-
pany had preceded the other company; they had located their route;
purchased and condemned the land necessary for their purpose;
when their progress was arrested by an injunction, at the instance of
the Canal Company, who found it to be impracticable to construct
their canal by the side of the rail road. And the question was, which
had the prior right; and the court, in a very elaborate opinion, de-
cided it in favour of the prior grant. This case is before the court,
and many of the points discussed and determined in the case, are
among the important points to be decided in this.

Within all these distinctions, there was, and always will be ample
room for the legislature to provide every convenience and accommo-
dation that public exigencies may require. And this can be done
without resuming former grants; or taking private property without
compensation.

They might have seized the plaintiffs' franchise in the exercise of

[Charles River Bridge v. Warren Bridge et al.]

the eminent domain.    All the property in the state, under whatever title it may be held, may be thus taken for public use; but upon the simple condition of making a reasonable compensation for it.    The legislature, however, did not proceed in the exercise of this high power to provide for the public accommodation; but they took the property without paying for it.

Or they might have accepted the offer of the plaintiffs, as set forth in their memorial on the twentieth page of the record.    By a vote of the proprietors, the corporation offered, if the legislature would give them the necessary authority, to make the avenues to the bridge of any given width; to construct a circular draw, so that passengers should not be delayed, when vessels were passing through; to make the bridge itself, as much wider as should be deemed convenient; to construct a spurr bridge, and even to build a new bridge: thus submitting the whole matter to the judgment of the legislature, and pledging themselves to do all and whatsoever they should authorize and direct them to do, in providing for the public accommodation.

This offer was declined, and no reasons given; and it is admitted, that they were not absolutely bound to accept it, or to give reasons for their refusal; but it is certainly open to such inferences as the facts of their case will warrant.

But it is repeated, again and again, that the legislature had found the fact, that the convenience of the public required another avenue from Charlestown to Boston.    What then?    Does the finding of this fact justify any and all sorts of legislation?    Is it any excuse or justification for the resumption of a franchise; for the annihilation of a vast amount of property without compensation?    The fact may be made the basis of legislation, but affords no excuse for unjust or unconstitutional legislation.

In the case of the Islington market, before cited, the house of lords found the fact, that public convenience required an enlargement of the old market, or the establishment of a new one.    A bill was pending for a new market, and the house of lords, instead of proceeding to pass the act, thought it proper to put a series of questions relating to the matter, to the nine judges.    They inquired of the judges what was the law; what they could do touching this market, consistently with the existing rights of others?    The answers are given at large; and if the law, which is there declared to be the law of England, had been applied to the plaintiffs' case, when the

act establishing the Warren Bridge was pending, it never would and never could have passed.

But the legislature proceeded to authorize the bridge to be built, and granted a toll, out of which the whole expense was to be paid. Accordingly, the bridge was built, and paid for out of the tolls received. That being done, the functions of the legislature ceased. They had provided another avenue, and paid for it; and there their duty to the public ended.

Was it a matter of common convenience, or of public necessity, that the government, after paying for the bridge out of the tolls, should put twenty thousand dollars a year into the public treasury, or which is the same thing, give it to the public? Is any man bold enough to vindicate the act upon this ground? With the same right, the government might have repealed the plaintiffs' charter, or passed an act requiring the tolls to be paid into the public treasury. The indirect way in which the franchise has been destroyed, does not alter the principle; for what cannot lawfully be done directly, cannot be done indirectly.

The sole basis of the proceeding was, that public convenience required another bridge, and it was justified by its advocates on this ground alone: the moment therefore, that the government began to fill its coffers from the tolls, it lost its original character, and assumed a new one. It then became a matter of speculation and profit, and not of public convenience or necessity.

After all, the government have entirely failed to accomplish their only lawful purpose, to wit: providing some further accommodation for the public travel; for there is, at this moment, but one travelled avenue between Boston and Charlestown. Since the Warren Bridge was made free, all the travel is over that bridge; to which, if we now add the increase of travel for the last twelve years, and the amount drawn from the other bridges, it will be found that the travel over this one bridge is nearly double what it ever was over Charles River Bridge. Yet the inconveniences and dangers of passing over Charles River Bridge, twelve years ago, were so great, that the legislature, out of tender regard for the safety of the people, granted another avenue. Now, though there is nearly twice as much travel over this new avenue, no inconvenience is experienced; and no complaint is made.

The ground upon which the plaintiffs have always rested their cause, was this; that their rights and their duties were commensu-

rate; they have always claimed an exclusive right between Charlestown and Boston; and they have always stood ready to fulfil all the obligations which that right imposed. Such is the law of England with regard to these franchises, as it is clearly stated in the cases of Tripp v. Frank, Huzzy v. Field, already cited in relation to ferries; and the cases of Prince v. Lewis, 5 Barn. & Cres. and Mosely v. Walker, 7 Barn. & Cres. in relation to markets. The memorial of the plaintiffs is founded upon this reciprocity of rights and duties; and all the English cases go upon the principle, that the extent of the one, is the measure of the other.

I do not go into any argument to prove that the plaintiffs' charter is a contract; but merely refer the Court to the following cases. Flecher v. Peck, 6 Cranch, 87; New Jersey v. Wilson, Ib. 164; Terret v. Taylor, 9 Cranch, 49; 4 Wheat. 516; 8 Ib. 84; Ib. 50.

But it is said, that if the legislature of Massachusetts has taken private property for public use, without compensation; the remedy is in the courts of the state. It is possible, that the case here supposed, may happen; although it is not the case at bar. Whatever may be the abuses of legislative power; whatever injuries may be inflicted upon the rights of persons or of property; still, if the obligation of a contract is not impaired, or some one of the specific provisions of the constitution of the United States, imposing restraints and prohibitions upon the states, is not violated; this Court has no jurisdiction; 2 Pet. 412, 13.

If property held under a grant from the state is taken, in the exercise of the eminent domain, provision for compensation is always made in the act: and in such cases no questions can arise; as the property is taken by a paramount authority, and paid for. But, if property thus held, is taken, and no compensation is provided, it does give this Court jurisdiction; because this grant is declared to be a contract executed; the rights of the grantor are said to be forever extinguished, and a covenant implied never to reassert them. When therefore, this property thus held, is resumed or destroyed by the grantor; the obligation of the contract is impaired, the implied covenant is broken, and the jurisdiction of this Court attaches.

Now what is the aspect of the case at bar, in relation to this matter? What issues do the pleadings present for the decision of this Court? The allegation in the plaintiffs bill is, that the act of 12th March, 1828, is repugnant to the constitution of the United States; because it impairs the obligations of a contract. The defendants in

their answer deny this; and thus the only issue is formed upon which this Court can found a decree. The plaintiffs no where affirm that private property has been taken for public use, by the state, in the exercise of the *eminent domain;* nor do the defendants allege it, nor do the court below; on the contrary, Chief Justice Parker says, 7 Pickering, 530, that there will be a decree against the plaintiffs, in order that they may avail themselves of the right secured to them by the constitution and laws, of a revision by the Supreme Court of the United States; where it is highly proper that this question, depending, as I think it does, mainly upon the constitution of the United States, should be ultimately decided." The decree of the court below also asserts, that no private property has been taken for public use.

It is also apparent from the act itself, that the legislature did not intend to seize the franchise of the plaintiffs by virtue of the eminent domain; for they made no provision in the act for compensation. Now, it is the settled law of Massachusetts, that in all cases where private property is taken for public use, provision for compensation must be made in the act itself. But in the case at bar, it appears that the legislature carefully avoided the open and avowed intention of exerting this high power, confided to them by the constitution, by making provision for compensation, only in cases where real estate should be taken. The constitution says, that where *property* is taken for public use, compensation shall be made; the legislature say in this act, that where *real estate* is taken, compensation shall be made. Now this franchise of the plaintiffs is not *real estate,* although it is property; and by this exclusion of the word *property,* it is most manifest, that the legislature did not intend, and did not in fact, seize the franchise as private property for public use. They proceeded on the ground of right to make the grant in question, without compensation; this right is denied on the ground that it resumes or destroys a former grant, and thus impairs the obligation of a contract. This, then, presents the issue, and the only one of which this Court has jurisdiction.

It is admitted that the right of eminent domain is an incident of sovereignty, and cannot be alienated. And it is also admitted, that all the property of the citizens of the state is liable to the exercise of this paramount authority. No matter by what title it is held, it is all alike subject to be taken for public use. The exercise of this power, however, is restricted by an express provision in the state

constitution; that compensation shall be made. This fundamental law is inserted in the constitution of the United States, as well as in that of many of the states; and the following cases show how fully this principle has been recognised and acted upon, by the judicial tribunals of the country; 2 Dall. 304; 9 Cranch, 43; 2 Pet. 655; 1 Kent's Commentaries, 425; 2 Johnson's Chancery Cases, 162; 12 Mass. Rep. 468; 7 Mass. Rep. 395.

The doctrine of consequential damages, sometimes referred to in the court below, can have no application to the case at bar: except on the ground that the grant of the Warren Bridge does not impair the former grant; or if it does, that the plaintiffs are not entitled to compensation. In making the grant, it is assumed *that* the legislature merely granted what was its own; and if the plaintiffs have suffered by the exercise of a lawful power, it is a case of *damnum absque injuria*, for which the law gives no remedy. This argument, as applied to the case in the court below by a learned judge, assumes the whole matter in dispute, and need not therefore be further pursued; but I would merely ask, whether any case can be found, to which this doctrine has been applied in justification, in which the consequential injury has been not partial and incidental, *but total.*

It has been often repeated, that the plaintiffs have received more than a million of dollars, in the course of about fifty years; and it is urged, that this is a sufficient consideration for building and maintaining the bridge; and that no injustice is done by cutting off twenty years of the term. Even a learned judge in the court below, says, that the consideration should be in "*some measure adequate.*" And is not a good, a valid, a meritorious consideration, in *some measure* adequate? Was it not, at the time of the contract, fully adequate? And can one of the parties rescind it now, because it has turned out to be more beneficial than was anticipated by either?

I will not further trespass upon the patience of the Court, by showing that an inquiry by a committee of the legislature is not equivalent to a writ of *ad quod damnum* executed, which is a judicial process; because I have already shown, that, even such a process in England, is not conclusive upon the rights of the parties. If, therefore, it were equivalent, it would settle nothing: but it has no resemblance to it, and is not worthy of further notice.

Upon the validity of this act of the 12th of March, 1828, this Court have now to pronounce a final judgment, which must decide

the title to a vast amount of property. This property has been held under a grant from the state, for nearly half a century: it has been bought and sold in open market, under the eye of the government: it has been taken in payment of debts and legacies: distributed in every form, in the settlement of estates, without notice, or even a suspicion, that the title was bad. It has been for many years sought for as a safe and profitable investment, by guardians, trustees, charitable institutions, and such other persons as are obliged to entrust their property to the management of others, in whom they place confidence. And yet these owners of this property, who have purchased, or taken it, at its market value, and who have not received more than the legal interest of their money; are represented as odious monopolists, exacting enormous profits upon a capital which has been repaid to them over and over again. The original stockholders are all dead; or, if any of them are still living, the property has long since passed out of their hands: but if they were now living, and holders of this property, they would not have gained more, nor so much, by their purchase, as those who bought real estate at that period, and kept it till the present time.

At length, however, the grantor finds that these owners have no good title to this property; and without judicial process or inquiry, confiscates the whole to the use of the public.

But the principles to be established by the judgment of the Court, in this case, will decide the title to more than ten millions of dollars, in the state of Massachusetts alone. If that judgment shall decide that the legislature of Massachusetts has the constitutional power to pass the act in question; *what* and *where* is the security for other corporate property? More than four millions of dollars have been invested in three rail-roads, leading from Boston, under charters granted by the legislature. The title to these franchises is no other, and no better, than that of the plaintiffs. The same means may be employed to accomplish the same ends; and who can say that the same results will not follow? Popular prejudice may be again appealed to; and popular passions excited by passionate declamations against tribute money, exclusive privileges, and odious monopolies: and these, under skilful management, may be combined, and brought to bear upon all chartered rights, with a resistless and crushing power. Are we to be told that these dangers are imaginary? That all these interests may be safely confided to the equity and justice of the legislature? That a just and paternal regard for the rights of

property, and the obligations of good faith, will always afford a reasonable protection against oppression or injustice? I answer all such fine sentiments, by holding up the charter of Charles River Bridge; once worth half a million of dollars; and now not worth the parchment it is written upon.

I have as much respect for, and confidence in legislative bodies as reason and experience will warrant: but I am taught by both, that they are not the safest guardians of private rights. I look to the law; to the administration of the law: and, above all, to the supremacy of the law, as it resides in this Court, for the protection of the rights of persons and property; against all encroachment, by the inadvertent legislation of the states. So long as this Court shall continue to exercise this most salutary and highest of all its functions, the whole legislation of the country will be kept within its constitutional sphere of action. The result will be general confidence; and general security.

I have thus attempted to satisfy the Court, that, by virtue of an assignment in equity, or a surrender at law, of an ancient ferry, and the act of 1785, incorporating the plaintiffs, a franchise or beneficial interest was absolutely, and without condition or reservation, vested in them for the time limited; that the franchise so vested is recognised as property, and protected as property, both by the law of England and of this country; that, in order to make this protection available, it must, of necessity, have some local extent, sufficient, at least, to keep down ruinous competition; or, in other words, that it must be exclusive between Charlestown and Boston. That the grants of 1785 and 1792, constituting the charter of the plaintiffs, being made on good, valid, adequate and meritorious considerations, are entitled to a liberal construction for the grantees; that these grants, according to the decisions of this Court, constitute a contract: that the act of March 12th, 1828, establishing the Warren Bridge Corporation, impairs the obligation of this contract, by resuming this franchise, and divesting the plaintiffs of this property, without compensation: and that their only remedy is in this Court, under the constitution of the United States.

Mr. Greenleaf, for the defendants, argued,

1st. That the present situation of the cause presented insuperable objections to any decree in favour of the plaintiffs. The Warren Bridge, which is the subject of complaint, has now become the pro-

perty of the commonwealth, by the terms of the original charter. The defendants were merely authorized to indemnify themselves, for the cost of the erection of the bridge, by collecting tolls for a period not exceeding six years from the commencement. They were afterwards constituted the agents of the commonwealth, by special statutes, to receive tolls for its use two years longer; but those statutes having expired, the bridge has become free.

The general objects of the plaintiffs' bill are, first; to obtain reimbursement of the tolls already diverted from their bridge, and received at the Warren Bridge; and, secondly, to prevent the use of the latter, as a public way. In the decision of this cause, this Court will exercise no larger jurisdiction than was possessed by the supreme judicial court of Massachusetts; and will render no other decree than ought to have been rendered by that tribunal. It is well known that the people of that state, in the grant of equity powers, have manifested great reluctance; and a decided preference for the common law remedies; intending to preserve the jurisdiction of the common law, " in all cases where that is capable of affording substantial and adequate relief;" 6 Pick. 397. Now, for the mere diversion of tolls, there is " a plain, adequate, and complete remedy at law," by an action of the case; and, therefore, by the rules which the courts of that state have prescribed to themselves, there is none in equity. The only ground on which this part of the claim could be sustained in equity, would be by charging the defendants as trustees. But it has been held in Massachusetts, that the equity powers of the supreme judicial court extend only to cases expressly designated by statute; 6 Pick. 395; and that no trusts were cognizable there, except those arising under deeds, and which are *expressly* declared in writing; Dwight v. Pomeroy, 17 Mass. 327; Safford v. Rantoul, 12 Pick. 233; Given v. Simpson, 5 Greenl. 303.

The only ground, therefore, on which the Court can deal with the tolls, is, that having possession of the bill for the purpose of injunction, it may extend its decree over all the incidental equities of the cause. But this Court can make no decree which can relieve the complainants, because there are no parties before it capable of obeying an injunction. The bridge having become the property of the state, these defendants have neither right nor power to prevent the use of it as a way. The commonwealth is the only party whose rights are to be affected by whatever decree may be made in regard to the bridge; and no injunction can be issued against one not party

to the suit: Fellows v. Fellows, 4 Johns. Ch. 25.   The general doctrine of equity is, that all who are necessary to the relief, or are materially interested in the subject matter, must be joined; Sangosa v. The East India Company, 2 Eq. Ca. Abr. 170; Davoue v. Fanning, 4 John. Ch. 199; 2 Mad. Ch. 179.   It is true, that the interest of other persons, not parties, is no valid objection where the Court can make a decree, as between those already before it, without affecting the rights of those who are not called in; Mallow v. Hinde, 12 Wh. 193; Ward v. Arredondo, 1 Paine, 410.   It is also true, that if the absent parties in interest are without the jurisdiction ·of the Court, it will, in some cases, in its discretion, proceed without them; provided their rights are separable from those of the defendants, and will not be irrevocably concluded by the decree; West v. Randall, 2 Mason, 190, 196.   But if the rights of such absent parties are inseparably connected with those of the parties present, no decree will be made till they are called in; Redesdale's Pl. 133, 146; Wiser v. Blackley, 1 Johns. Ch. 437.   And this Court has declared that it will not make a final decree upon the merits of a case, unless all the persons, whose interests are essentially affected, are made parties to the suit;. though some of those persons are not within the jurisdiction of the Court; Russell v. Clark, 7 Cranch, 69, 98.   The fact that the absent party in interest is a sovereign state, makes no difference.   The language of the Court in Osborne v. The United States Bank, 9 Wheat. 738, does not apply to a case like the present; but only to that of a public officer who has collected money for the state, which he still holds, and has been notified not to pay over; the constitutionality of the exaction being denied.   But however that doctrine might apply to the tolls received, if that subject were cognizable in equity by the supreme judicial court of Massachusetts; it cannot apply to the bridge itself, which is real property, not belonging in equity to these plaintiffs; and is, in no sense, in the hands of the defendants.   To retain jurisdiction here, is to sue the state, and virtually to effect a judicial repeal of the constitutional provision on this subject.   The Court, by its decree, can only effect so much of the bridge as constitutes the nuisance complained of; and this is, not the existence of the bridge, in its present position, but the use of it as a way.   Such a decree these defendents cannot execute; and it therefore can afford the plaintiffs no relief.

2. The ferry, of which the plaintiffs claim to be assignees, extended no farther than the landing places, and was subject to the control of

[Charles River Bridge v..Warren Bridge et al.]

the state.    The policy of Massachusetts, from its first settlement, has been to retain all ferries within its own control; the ferrymen having nothing but a license to take tolls, during the public will.    The well known principles and sentiments of the pilgrims, were strongly opposed to every thing in the shape of monopoly.    Hence, as early as 1635, after a ferry had been set up by Brown, between Boston and Charlestown, another ferry, as it is termed, but between the same landing places, was ordered to be set up; to be kept by a person, resident in Boston; clearly showing, that in the estimation of the general court, the existing ferryman had no exclusive rights there.    In 1641, the limits of all ferries were expressly defined by statute, as extending from the place where the ferry was granted, " to any other ferry place, where ferry boats use to land." and in the same year, an act was passed, in the nature of a constitutional declaration, that no monopolies should be granted, or allowed in the colony.    With this declaration before them, and with such principles in view, the legislature, in 1650, confirmed the ferry rent to the college; meaning not to repeal the acts of 1641, but to permit the college to receive such tolls, as might be collected at the ferry, subject to any further order of the legislature.    On the same principles, successive statutes were passed, in 6 W. & M; 8 W. 3; 4 Geo. 1; 13 Geo. 1; and 33 Geo. 2; regulating this, and other ferries: and authorizing the court of sessions to set up ferries, in any place whatever, at its discretion.    If, then, it be true, that the history and situation of a state may be resorted to, in order to expound its legislative intentions, as was said in Preston v. Bowden, 1 Wheat. 115; and that charters are to be expounded, as the law was understood, when the charters were granted; 2 Inst. 282; it was never the intention of the legislature, in permitting this ferry to be set up, to grant any thing more, than the right to run boats from one landing to the other, during its pleasure, and subject to its control.    The ferry right was coextensive only with the obligations of the boatmen; who were bound, merely to convey from one landing to the other.    In the exercise of this right of the state, it has granted toll bridges at pleasure, in the place of nearly, or quite, every ancient ferry in the commonwealth ; to the utter annihilation of the ferry, and without indemnity to the ferrymen.    No claim has ever been set up, except by these plaintiffs, adverse to the public right.

The argument, that the ferry franchise extends so far as to put down all injurious competition, is erroneously applied in this case:

as it supposes the opening of a new avenue, by the state, to be a mere private competition.    The authorities on this subject, apply only to a private ferry, set up without license.    Yard v. Ford, 2 Saund. 172; Ogden v. Gibbons, 4 Johns. Ch. 160; Stark v. M'Gowen, 1 Nott & M'C. 387; Newburg Turnpike Co. v. Miller, 5 Johns. Ch. 101. Blissett v. Hart, Willes, 508.

In the present case, the public not being accommodated, the legislature has merely done its duty in providing for the public convenience, which the plaintiffs had not the legal power to do.    Moseley v. Walker, 7 B. & C. 40, 55; Macclesfield v. Pedley, 4 B. & A. 397.

3.  But whatever may have been the extent of the ferry, it never passed to the plaintiffs, but was taken by the state, for public use; and was thereby extinguished, in the paramount rights of the sovereign power, by which it was resumed.    17 Vin. Abr. 83. Prerog. I. b. 4. Id. 163. Prerog. X. c. 5.    The King v. Capper, 5 Price, 217; Atto. Gen. v. Marq. of Downshire, Ib. 269.    The documents in the case, negative the idea that the transaction of 1785 amounted to a purchase of the franchise from the college; the object of the tolls being declared to be not only an indemnity to the plaintiffs, but for a revenue to the college.    It is no purchase from the college, because the legal evidence, a deed, is wanting.    Rex v. North Duffield, 3 M. & S. 247;  Peter v. Kendall, 6 B. & C. 703.

4.  Neither the grant of the ferry, whatever it was, nor the plaintiffs' charter, contained any thing exclusive of the public right to open a new avenue in the neighborhood of Charles River Bridge; for in a public grant, nothing passes by implication.    The right thus said to be parted with, is one which is essential to the security and well being of society; entrusted to the legislature for purposes of government and general good: and such rights are never presumed to be conveyed or restricted.    Nothing passes by a charter, or legislative grant, except well known, and essential corporate powers, where a corporation is created; unless it is contained in express words.    Rex v. Abbott of Reading, 39 E. 3. 21; 17 Vin. Abr. 136. Prerog. E. c. 5; 8 H. 4, 2; Ford & Sheldon's case, 12 Co. 2; Chancellor, &c. of Cambridge v. Walgrave, Hob. 126; Stanhope v. Bp. of Lincoln, Hob. 243;  Case of Mines, Plowd. 310, 336, 337; Case of the Royal Fishery of the Baune, Dav. 149, 157; Case of Customs, Dav. 45; Atto. Gen. v. Farmen, 2 Lev. 171; Finch's Law, 100; Blankley v. Winstanley, 3 T. R. 379;  The King v. Capper, 5 Price, 258; Id. 269; Parmeter v. Gibbs, 10 Price, 456, 457; Stourbridge

Canal v. Wheeley, 2 B. & Adol. 792; Leeds & Liv. Canal v. Hustler, 1 B. & C. 424; Dock Co. v. La Marche, 8 B. & C. 42; The Elsebe, 5 Rob. Adm. 155, 163; The Joseph, 1 Gall. 555; Jackson v. Reeves, 3 Caines, 303, 306; M'Mullen v. Charleston, 1 Bay, 46, 47; Zylstra v. Charleston, Id. 382; 2 Cranch, 167; Wilkinson v. Leland, 2 Pet. 657; Lansing v. Smith, 4 Wend. 9. The cases where the king's grant has received a construction like a private grant, are all cases of grants of his private property; and not of things held as sovereign, in right of his crown. Upon this ground, the plaintiffs' charter gave them a franchise coextensive with the bridge itself; it authorized them to erect a bridge, and to take tolls of such persons as might pass over it; but nothing more.

5. If a contract to that effect should be implied, it would be void for want of authority in the legislature to make such a surrender of the right of eminent domain. Every act of a public functionary is merely an exercise of delegated power, entrusted to him by the people, for a specific purpose. The limits of the power delegated to the legislature, are to be sought, not only in the constitution, but in the nature and ends of the power itself, and in the objects of government and civil society. 6 Cranch, 135; 3 Dall. 387, 388; 1 Bay, 62. And the acts of legislators, are the acts of the people, only while within the powers conferred upon them. 6 Cranch, 133. Among the powers of government, which are essential to the constitution and well being of civil society, are; not only the power of taxation, and of providing for the common defence, but that of providing safe and convenient ways for the public necessity and convenience; and the right of taking private property for public use. All these are essential attributes of sovereignty, without which no community can well exist; and the same necessity requires, that they should always continue unimpaired. They are entrusted to the legislature, to be exercised, not bartered away; and it is indispensable that each legislature should assemble, with the same measure of sovereign power, that was held by its predecessors. In regard to public property, the power of the legislature to alienate it, is conceded. The limitation now contended for, extends only to those sovereign powers, which are deemed essential to the constitution of society. In regard to these, any act of the legislature disabling itself from the future exercise of its trust for the public good, must be void; being, in substance, a covenant to desert its paramount duty to the people. Such, it is apprehended, would be a covenant not to erect a fortress on a par-

ticular tract of land sold; or, not to provide ways for the public travel, however great the necessity, either in a particular place, or for a specified time. It is not necessary that such exclusive contracts be made, in order to induce men to adventure in a new and hazardous undertaking for the public good; for, upon the positive assurance of remuneration, in some other form, capital and enterprise can always be commanded.

The true distinction between those acts of future legislatures which may, and those which may not be restrained, is conceived to lie, not in the kind of legislation, whether general or special, but in the nature of the power proposed to be restrained. Thus, a covenant not to erect a fortress on a particular spot, is a covenant in restraint of special legislation; yet it would manifestly be void. And, by a similar enumeration and description of particular places, the right to provide rail roads, bridges and canals, in every part of the state, might be alienated to individuals. The example of land exempted from taxation is not to the purpose; such exemption is presumed to be purchased by the payment of a sum in gross, instead of an annual tax, which all are bound to pay. The owner of the land does not buy up a portion of the sovereign power; he only pays off, at once, a debt which was due by instalments. Other examples are given in the agreement not to charter another bank; and the like. But these contracts do not abridge any powers essential to civil society. The state must be governed and defended; and the people must have facilities for common travel; and to these necessities the power of each legislature must be adequate. But the existence of a bank is not of similar necessity; it stands wholly upon considerations of policy and convenience.

The existence of some limit to the exercise of powers thus delegated in trust, and their inalienable nature, is no new doctrine; but is familiar to public jurists: Domat Pub. Law, book 1, tit. 6, sec. 1, par. 12, 14, 16; Puffend. de Jure Nat. et Gent. lib. 8, cap. 5, sec. 7; 17 Vin. Abr. Prerog. M. b. pl. 20; Chitty on Prerog. 385; Att. Gen. v. Burridge, 10 Price, 350. The same doctrine has been recognised here, in the case of political corporations: Presb. Church v. City of New York, 5 Cow. 538; Gozler v. Georgetown, 6 Wh. 593: Auburn Academy v. Strong, 1 Hopk. ch. 278.

6. The grant of the charter of Warren Bridge, is no breach of any contract with the plaintiffs, they having originally accepted their charter, subject to the paramount right of eminent domain: and

having, also, in 1792, accepted its extension, with a distinct submission and assent to an express assertion, on the part of the state, of a right to make new grants, at its discretion. All property held by individuals, is charged with the *jus publicum*, which belongs to all men; Hale, de Port. Mar. cap: 6; 10 Price, 460. One branch of this *jus publicum* is the right of way, to be designated by the legislature. This is said to be one of the principal things which ought to employ the attention of government to promote the public welfare, and the interests of trade; and that nothing ought to be neglected to render them safe and commodious; Vattel, b. 1, ch. 9, sec. 101, 103; Domat, b. 1, tit. 8, sec. 1, 2. The power to do this, is as much inherent and inalienable, as the rights of taxation; which, it is said, resides in the government, and needs not be reserved expressly, in any grant of property or franchises, to individuals or corporations; Providence Bank v. Billings, 4 Pet. 560, 561, 563. Ferries, turnpikes, rail roads, toll bridges and common roads, are equally public ways; differing only in the manner of their creation. Each act of location is an exercise of sovereign power; and the easement thus acquired is paid for by the people; either directly, from the public chest, or indirectly, by tolls. But the laying out of a common road has never been supposed to violate the charter of a neighbouring turnpike, however it may impair its tolls; nor has the establishment of one kind of public road, whether by charter or otherwise, ever been considered as an injury, in legal contemplation, to another of a different kind. And if not to another of a different kind, why should it be to another of the same kind? If a turnpike may be rendered useless by a rail road, or a common highway, why not by another turnpike? Beekman v. The Saratoga Rail Road Co. 3 Paige, 45; Irvin v. The Turnpike Co. 2 Penn. R. 466; Green v. Biddle, 8 Wh. 88, 89. This Court has never gone so far as to hold the statute of a state void, as violating its implied contract. The cases to this point are all cases of express contract; Vanhorne v. Dorrance, 2 Dall. 320; Fletcher v Peck, 6 Cranch, 87; New Jersey v. Wilson, 7 Cranch, 164; Terrett v. Taylor, 9 Cranch, 43; Dartmouth College v. Woodward, 4 Wh. 518; Green v. Biddle, 8 Wh. 1. On the contrary, this Court has refused to imply a contract, in a case similar in principle to the present; and has declared, that where there is no express contract, the remedy of the party was in the wisdom and justice of the legislature; Jackson v. Lamphire, 3 Pet. 289; Prov. Bank v. Billings, 4 Pet. 563; U. States v. Arredondo, 6 Pet. 729.

. But this point stands not on general reasoning alone. By stat. 33, Geo. 2, the courts of sessions in Massachusetts were expressly authorized to establish ferries, in all places, at their discretion. This is a clear assertion of the public right to make new avenues, by water, wherever public convenience may require; and the statute was in full force in 1785, when the plaintiffs' received their charter, and is to be taken into the elements of its exposition. It continued in force, in 1792, when West Boston bridge was chartered; and the same provision was revised and re-enacted in 1797, and continued in force, in 1828, when the charter of Warren Bridge was granted. If, then, it was lawful to establish one kind of public avenue by the side of the plaintiffs' bridge; it was equally lawful to establish any and every kind. If any doubts could arise on this point, it is made clear by reference to the transactions of 1792. The plaintiffs, at that time, remonstrated against the grant of the charter of West Boston Bridge, on the ground of their exclusive right; first, as purchasers of the ferry; and, secondly, by their charter of 1785. The whole subject was referred to a committee of the legislature, before whom all parties were fully heard. The great question was, whether the legislature had a right, at its discretion, to make new avenues over Charles river to Boston; and whether the plaintiffs' charter gave them any exclusive privileges. The committee reported strongly in favour of the right of the state, and against the existence of any exclusive right in the plaintiffs; but recommended an extension of the term of continuance of the plaintiffs' charter, on grounds of public expediency, as a mere gratuity; and it was done.

This extension of the charter, together with this contemporaneous exposition, the plaintiffs accepted in the same year; and again in 1802, without protest or objection. It is absurd to suppose that the legislature intended to grant exclusive privileges, in the same breath in which their existence was denied. The general principle that the legislative history of the passage of a statute furnishes no rule for its exposition, is admitted. But it applies only to the exposition of statutes as such. Private statutes, regarded as contracts, are to be expounded as contracts; in which all the *res gestæ*, or surrounding circumstances, are to be regarded. The report of the committee, therefore, was a cotemporary document between the same parties, relating to the same subject matter; and in a case between private persons, it would be received; in equity, either to interpret or reform the agreement. If the acts of parties expound their intentions,

much more a solemn transaction like this. Blankley v. Winstanley, 3 T. R. 279; Gape v. Handley, Id. 288, note; Hunter v. Rice, 15 East. 100; Saville v. Robertson, 4 T. R. 720; Cook v. Booth, Cowp. 819, asserts the same doctrine; though its application to express covenants has been denied. The charter, extended on these principles, and coupled with such declarations, was accepted by the plaintiffs, in 1802, unconditionally, and without objection. On the application for Canal bridge, in 1807, the plaintiffs again opposed the grant, and were again heard; and the state again denied their exclusive right, and asserted its own, to open avenues at its discretion. And the plaintiffs again, in 1826, in a more solemn manner, accepted the renewed charter; without any denial of the right asserted by the state.

It is objected that the state, by an act which annihilates the plaintiffs' tolls, has virtually resumed its own grant. To this it is replied, that the principle which forbids the resumption of one's own grant, does not apply to the exercise of the eminent domain. Thus, a turnpike road may be appropriated, to make a canal; Rogers v. Bradshaw, 20 Johns. 735. It is further objected, that though the original outlays may have been reimbursed, with interest, from the tolls; yet that the act of 1828, has ruined the property of subsequent innocent stockholders, who have made their investments at a high price. But all such are purchasers with notice. The statute of 33 Geo. 2, was fair notice, beforehand, of the public right to open new avenues, over waters, at discretion. This right, in regard to bridges over Charles river, was expressly asserted in 1792; it was acted upon in the subsequent grant of the Middlesex canal; it was again expressly asserted in 1807, upon the granting of the charter of the Canal bridge; and was more recently acted upon in the charter of the Lowell rail road.

7. If the plaintiffs have sustained any damages not anticipated nor provided for, they are merely consequential, for which no remedy lies against these defendants; nor is it a case for the interference of this Court; but it is only a ground of application to the commonwealth of Massachusetts. That the defendants were mere public agents in the erection of Warren Bridge, was conceded in the argument of this cause, in 6 Pick. 388. And it is equally clear, that the remedy, at common law, for the damages of which the plaintiffs complain, if the act of the defendants were unjustifiable, must have been by an action of the case, and not in trespass. For the gravamen is,

not that their property has been directly invaded; but that an act has been done in another place, in consequence of which the income of that property is reduced. Their damages, therefore, are strictly consequential. In regard to such damages, the constitution of Massachusetts, art. 10, has already received an authoritative exposition, in Callender v. Marsh, 1 Pick. 418; deciding that to those damages it does not apply. So in Pennsylvania, Shrunk v. Schuylkill Navigation Company, 14 Serg. and Raw. 71, 83. And in New York, Varick v. New York, 4 Johns. 53. Statutes enabling agents to effect a great and beneficial public object, ought to be benignly and liberally expounded, in favour of those agents. Jerome v. Ross, 7 Johns. Ch. 328. And they, therefore, are held not liable for any consequential damages, resulting from acts done under and within the terms of a statute. Spring v. Russell, 7 Greenl. 273; Custis v. Lane, 3 Munf. 579; Lindsay v. Charleston, 1 Bay. 252; Stevens v. Middlesex Canal, 12 Mass. 468; Rogers v. Bradshaw, 20 Johns. 744, 745; Governor, &c. Cast Plate Manuf. v. Meredith, 4 T. R. 790; Sutton v. Clarke, 1 Marsh. 429; 6 Taunt. 29, S. P; 6 Pick. 406. It is only when agents exceed the powers conferred on them by the act, that they become trespassers. Belknap v. Belknap, 2 Johns. Ch. 463; Shand v. Henderson, 2 Dow's P. C. 519. If the property is taken for public use, the state is bound to make compensation; and trespass does not lie. If it is consequentially impaired in value, by the prosecution of public works, it is *damnum absque injuria*, at law; and addresses itself only to the consideration of the legislature.

If here is no violation of contract, the question whether a state law violates a state constitution, is not to be raised in this Court. Jackson v. Lamphire, 3 Pet. 289. There are cases, in which it has been gratuitously thrown out that the constitutional right to trial by jury extends to cases of property taken for public uses. Perige v. Wilson, 7 Mass. 393; Callender v. Marsh, 1 Pick. 418; Vanhorne v. Dorrance, 2 Dall. 304. But each of these cases stood on other grounds; and in neither of them was this the point necessarily in judgment. In other cases, it has been held, that this constitutional right applies only to issues of fact, in the ordinary course of civil and criminal proceedings. Livingston v. New York, 8 Wend. 85; Beekman v. Saratoga and Schenectady Rail Road Company, 3 Paige, 45. No state has gone so far as to hold, that the money must be paid before the title of the owner is divested. On the contrary, in

Massachusetts, in the location of roads, the title of the owner is divested as soon as the return is accepted; though the amount of compensation may be litigated for years.    In Kentucky, in certain cases, a private bond is held sufficient to effect a similar purpose. Jackson v. Winn, 4 Littel, 327; and in Pennsylvania it is effected by the mere giving of a right of action; whether against the state, Evans v. Commonwealth, 2 Serg. & Raw. 441; Commonwealth v. Sheppard, 3 Penn. 509; or against a private corporation, Bertsch v. The Lehigh Coal and Navigation Company, 4 Raw. 130.    Now the faith of the state, pledged expressly in its constitution, is at least as valuable as any right of action, whether against an individual, or the state itself; and ought to be equally effectual to divest the title of the owner.

The general principle of public law is, that any private property may be taken for public use, or may be destroyed, or private rights sacrificed, whenever the public good requires it.    This eminent domain extends over all the acquisitions of the citizen, and even to his contracts and rights of action.    Grotius de Jure Belli, &c., l. 2, ch. 14, sect. 7; and l. 3, c. 19, sect. 7, 14, 15; and c. 20, sect. 7; Vattel, b. 1, ch. 20, sect. 244; Puffend, de Jure Nat. &c., l. 8, c. 5, sect. 7; Bynkershoeck, Quæst. l. 2, c. 15, ¶ 2, 3, 6, 10; 3 Dall. 245.

All these writers agree that compensation ought to be made; but no one has intimated that the taking is not lawful, unless the compensation is simultaneously and especially made or provided for.    On the contrary, they all suppose that the property is first taken, and afterwards paid for, when, and as soon as the public convenience will permit; and this, without regard to the urgency of the cause for which it was taken; nor, whether in war or peace.    It is obvious, that in a large proportion of the public exigencies, the compensation must necessarily be provided for, after the property is taken; Commonwealth v. Fisher, 1 Penn. 465.    Our constitutional provisions on this subject, seem nothing more than an express recognition of the right to compensation; and more probably inserted in consequence of the arbitrary impressments of property, made during the war of the revolution. 1 Tucker's Bl. Com. part 1, app. 305.    The passage in 1 Bl. Com. 138, 139, amounts only to this; that the legislature obliges the party to sell, and fixes the price; 4. T. R. 797.    But the constitution applies to property directly taken, and not to cases where its value is only consequentially impaired; and so it has been expounded by Massachusetts, in her general road laws, and in all her charters

[Charles River Bridge v. Warren Bridge et al.]

for public ways, whether bridges, roads, or canals. The residue of the subject of eminent domain, not having been touched by the constitution, remains among the great principles of public law, having an imperative force on the honour and conscience of the sovereign; and the objection is not to be tolerated in a court of law, that a sovereign state, in the exercise of this power, will not do what justice and equity may require; Tippets v. Walker, 4 Mass. 597; Commonwealth v. Andre, 3 Pick. 224; 2 Dall. 445.

If Massachusetts has taken the property of the plaintiffs for public use, her honour is solemnly pledged in her constitution, to make adequate compensation. If their rights have been sacrificed, for higher public good, the laws of nations equally bind her to restitution. From these obligations she could not seek to escape, without forfeiting her *caste*, in this great family of nations. Her conduct in this matter, has been uniformly dignified and just. The plaintiffs have never yet met her, except in the attitude of stern and uncompromising defiance. She will listen with great respect, to the opinion and advice of this honourable Court; and if her sovereign rights were to be submitted to arbitration, there is doubtless, no tribunal to whose hands she would more readily confide them. If she has violated any *contract* with the plaintiffs, let them have ample reparation by a decree. But if not, and they are merely sufferers by the ordinary vicissitudes of human affairs, or by the legitimate exercise of her eminent domain, let it be *presumed here*, that a sovereign state is capable of a just regard to its own honour, and that it will pursue, towards its own citizens, an enlightened and liberal policy.

Let it not be said that, in the American tribunals, the presumption and intendment of law is, that a state will not redeem its pledges, any further than it is compelled by judicial coercion: that it is incapable of discerning its true interests, or of feeling the force of purely equitable considerations: and that its most solemn engagements are worth little more than the parchment on which they are written. Let such a principle be announced from this place, and it is easy to foresee its demoralizing effects on our own community. But proclaim it to Europe, and we shall hear its reverberations, in tones louder than the thundering echoes of this capitol; with the bitter taunt, that while the unit monarch of the old world, is the dignified representative of national honour; the monarch-multitude of the new. is but the very incarnation of perfidy.

Vol. XI.—3 O

Mr. Davis, also of counsel for the defendants.

I approach this case with unaffected diffidence and distrust of my capacity to aid my employers, or enlighten the Court. It has been long pending; has excited great interest; has drawn to its investigation, the intellect and learning of many distinguished men and eminent jurists. The whole ground has been so thoroughly explored, that little is left untouched which is worthy of examination, or can excite curiosity. If others had not exhausted the subject, my worthy and learned associate has brought such untiring industry into the case, that nothing remains to me, but a method of my own, less perfect than his; and a mere revision of the subject under that arrangement.

Both parties are corporations.

Both created by the state legislature.

Both claim rights across a navigable river.

Both, therefore, claim something from the eminent domain of the state.

The plaintiffs claim to be first in time, and for that reason to override the defendants' title. They assert an exclusive right over the river; which greatly affects the public, as well as the defendants.

The question to be decided is, therefore, one of grave moment; because it involves great interests and rights in Massachusetts, and, possibly, principles which may affect the prosperity and convenience of other densely populated communities.

The value of property on the part of the plaintiffs has been stated, here, to be five hundred thousand dollars. Their bridge, costing originally about forty-six thousand dollars, has grown into this importance from the large annual income, having yielded to the proprietors, as the plaintiffs state, over twelve hundred thousand dollars; and advanced from one hundred pounds a share, to two thousand dollars.

The question in one form is, has the commonwealth so parted with its sovereign right over this river, and vested it in the plaintiffs, that they shall continue these exactions, and the public be without further accommodation, whatever may be the inconveniences, until their charter expires; and *forever after*, if the plaintiffs have the right to the ferry, as they contend; for upon their view of the case, the ferry will revert to the college, and the tolls be continued after the charter of the bridge company expires.

If the people of the commonwealth have thus parted with their

[Charles River Bridge v. Warren Bridge et al.]

sovereign rights to corporators, and are thus tied down, so that new ways cannot be opened for their accommodation; it is matter of profound regret.

The learned counsel for the plaintiffs, in opening the case, seemed studious to have it understood by the Court, that the actual parties in interest, are the plaintiffs and the commonwealth; and I have no objection to this view of the case; for the public interest, I agree, far transcends in importance the property involved. The public, therefore, may be said to stand on one side, and the plaintiffs on the other.

On one side then are the rights to private property, sacred and inviolable, as far as they can be established; but claimed in the form of a burdensome tax on the public, and therefore entitled to no favour beyond strict right.

On the other stands the public, complaining that they are the tributaries to this great stock of private wealth, and subjected to inconveniences still more burdensome, from the want of suitable accommodations for intercommunication across the river, if this bridge is to be shut up; and denying that such claims of exclusive right can be justly or lawfully set up by the plaintiffs.

This public, in the argument, has been represented as devoid of natural justice, selfish, avaricious, tyrannical.

Some things are certain in this conflict of opinion.

We all know that the sole control and power over this navigable water, was once in the public. It was theirs, and how far have they been divested of it?

If it has gone out of the public, and is in the plaintiffs; they must show to what extent, and show it *clearly:* for such rights, as I shall prove, do not pass by presumption, but upon some decided expression of public assent.

The loss of tolls, which has been earnestly dwelt upon, has no tendency to prove it.

The great increased value of the bridge, has no tendency to prove it.

The severe hardship, which has been a prominent feature of the argument, does not prove it.

All these matters are by no means inconsistent with the right to establish other ways across the river; and therefore only prove that the plaintiffs are making less money, not that their rights are invaded.

[Charles River Bridge v. Warren Bridge et al.]

I will then examine their allegations in the bill, and the arguments by which they claim to establish their conclusions.

1. They set up an exclusive right to the travel, between Boston and Charlestown, come from where it may.

2. They aver that the act of 1828, under which the defendants claim is incompatible with, and repugnant to their vested rights, and doth impair the obligations of contract; and is therefore void by the constitution of the United States.

3. They aver that the legislature is restrained from revoking or annulling its own grant, or divesting title, except where it takes property for public use; and then it can only do it under the provisions of the bill of rights of the commonwealth, which requires, that compensation shall be made in such cases: and they further aver, that their property is taken, and no provision for compensation is made, and therefore the act of 1828 is void.

The case has been chiefly argued under the second and third heads.

The first raises a question under the constitution of the United States. That instrument provides in the fifth amended article, that no state shall pass a law impairing the obligation of contracts.

The plaintiffs call the act of 1785, under which they claim, a contract; and argue, that the act of 1828 impairs their grant, and as it is done by legislation of the state, the act of 1828 is void.

The second raises a question under the tenth article of the bill of rights of Massachusetts; a question very proper for the courts of Massachusetts; but as I shall contend, not brought here by this writ of error: but finally settled there, and beyond the reach of this jurisdiction, as the bill of rights does not, and cannot, constitute any part of the act of 1785, and therefore is no part of the supposed contract.

These two issues do not entirely harmonize in another respect. One denies absolutely the right to take for public use, the property of the plaintiffs, because the state cannot, even in the exercise of its eminent domain, divest this right of property.

The other admits the right to take for public use, by making compensation.

I shall examine both, and the arguments urged in support of them.

To make out these issues, they contend

1. That they are the grantees of the college, in and to the ferry between Boston and Charlestown.

2. That the state authorized the erection of their bridge, by the act of 1785; in which there is an implied covenant not to divert the travel, by new ways.

3. That these two titles vest in them a control over Charles river, to exclude injurious competition, which right they hold to be irrevocable; but if revocable, then the act which authorizes the interference must provide compensation for all loss occasioned by the diversion of travel.

In examining these positions, I shall

1. Deny that they are the grantees of the college, or have any interest in the ferry.

2. I shall deny that they have any covenant or engagement, express, or implied, by the act of 1785, authorizing them to claim damages for a diversion of travel by a new and authorized way; and shall also attempt to prove that no legislative body can perpetually alienate its sovereignty in regard to making ways for the public convenience; so that a new way may not at any time, when the public exigency demands it, be laid over any property whatever, whether belonging to individuals, or to corporations created by legislative acts, and whether it be real estate or a franchise, unless the state has agreed, in express terms, to exempt such property.

3. I shall maintain, that the power to provide ways for the public, resides, of necessity, always in the commonwealth; is part of the sovereignty: and all property is held subject to the exercise of that right; which is a condition annexed to all title to property, whether derived from the state, or from individuals.

4. I shall maintain, that taking property in pursuance of this sovereign right, is not, in itself, an act impairing the obligation of contracts, but consistent with it; for the property is held subject to this right; and all the party can demand, is compensation under the bill of rights.

5. I shall maintain that this Court has no jurisdiction over the question of compensation for property taken for a way; unless the party can show that he holds it under the state, and the state has expressly agreed not to take it for that purpose, without providing compensation: for in all other cases the party relies on our bill of rights, and this Court is not the tribunal to expound that instrument.

In maintaining these positions, I am constrained to examine most of the grounds assumed in the very elaborate argument of the opening counsel; though I have a conviction which I cannot surrender,

that all this labour upon the ferry will be a useless effort, for the plaintiffs can never succeed in establishing any kind of equitable or legal claim 'to it. Following, however, the order designated, I will first look to this ferry, and inquire

1. What rights belonged to the ferry?

2. Are these rights vested in the plaintiffs?

3. If they are, do they tend to establish the claim now set up over the waters of the river?

This ferry lies in grant, and we must go to the ancient colonial or-dinances to ascertain its extent, and the probable meaning and intent of the colonial government, which is to be gathered from them.

They are as follows:—

Orders relating to Charlestown ferry, extracted out of the old book in the council chamber, Ann. 1630. It is further ordered that who-soever shall first give in his name to Mr. Gouvernour, that he will undertake to set up a ferry between Boston and Charlestown, and shall begin the same at such time as Mr. Gouvernor shall appoint, shall have one penny for each person, and one penny for every hun-dred weight of goods he shall so transport. Page 65.

1631. Edward Converse hath undertaken to set up a ferry betwixt Boston and Charlestown, for which he is to have two pence for every single person, and one penny apiece, if there be two or more. Page 80.

1633. Mr Richard Brown is allowed by the Court to keep a ferry over Charles river against his house, and is to have two pence for every single person he so transports, and one penny apiece if there be two or more. Page 105.

1635. It is ordered, that there shall be a ferry set up on Boston side, by Windmill Hill, to transport men to Charlestown and Win-nesimet, upon the same rates that the ferry men at Charlestown and Winnesimet transport men to Boston. Page 150.

1637. The ferry between Boston and Charlestown is referred to the Governor and Treasurer, to let, at forty pounds per annum, begin-ning the first of the tenth month, and from thence for three years. Page 204.

1638. Edward Converse appearing, was admonished to be more careful of the ferry, and enjoined to man two boats, one to be on the one side, and the other on the other side, except the wind were so high that they were forced to put four men to man one boat, and

then one boat to serve, only he is enjoined to pay Mr. Rawson's fine, and so is discharged. Page 223.

1640. Mr. Treasurer, Mr. Samuel Shepherd and Lieut. Sprague, have power to let the ferry between Boston and Charlestown, to whom they see cause, when the time of Edward Converse is expired, at their discretion. Page 276.

1640. The ferry between Boston and Charlestown is granted to the college. Page 288.

Such are the principal acts or ordinances of the court of assistants, and the general court, in regard to this ferry; and I shall ask the Court to gather the intent of these public functionaries from this record, and the cotemporaneous history.

In 1630, the colony, under the distinguished, and I may say, illustrious John Winthrop, governor, came over; and not being satisfied with Salem, where their predecessors had located, they came up to the head of the bay, or to what is now the harbour of Boston. Here they found the peninsula of Charlestown, formed by Charles river on the west, and south-west, and Mystic river on the north-east, projecting into the harbour from the north-west to the south-east; and the peninsula of Boston projecting towards it from the south-west to the north-east, and formed by Charles river on the north and west; which spreads above the point into a large basin, discharging itself between these peninsulas and the bay or harbour of Boston, on the other side. Winthrop, with his friends, occupied these two peninsulas; and in Boston, was established under him, the colonial government of the company, which, in truth, was only a company of adventurers in trade and speculation, so far as the charter went. Out of this humble beginning has sprung the commonwealth, and, I might almost say, this federal government itself.

Thus situated, intercommunication between these two places was indispensable; and hence it is, that while the smokes of only a few log cabins ascended from the spot where a great city and a large town have since risen up, the subject of a ferry came thus early under consideration. And in giving construction to these simple ordinances, it is a fair inquiry, whether the colonists were providing for present emergencies, means suitably adapted to that end; or were, as the plaintiffs contend, making a perpetual exclusive grant of the right of travel over Charles river, for all time to come.

The first act, in 1630, makes no grant to any one, but proposes to have a ferry " *set up.*"

[Charles River Bridge v. Warren Bridge et al.]

In 1631, a ferry was *set up* by Edward Converse, and the toll established.

In 1633, Richard Brown *is allowed* to keep *a ferry* over Charles river, against his house, &c. Here is the first evidence of a specific location, "over the river against his house;" that is, what they call a ferry, was *over* or across the river, from bank to bank, opposite to Brown's house; a way merely.

In 1635, a ferry was *set up* from Windmill Hill, in Boston, to Chelsea; and another from Boston to Charlestown, to run on the same line or way as the one already *set up*, only it was to belong to Boston, instead of Charlestown. Thus, one ferry was granted upon another; if these ordinances are to be treated as perpetual grants, and if the word ferry carries a franchise, then one franchise upon another. They show rather what is intended by the words *set up*, and that they simply authorized the running of a boat from place to place. In the first act, any person giving in his name, was to *set up a ferry; Converse did set it up*. The thing set up, then, was not by public act, but by individual act. This shows the limited sense in which the word ferry is used. After the location, in 1833, it is called *the ferry*.

In 1637, the ferry is referred to the governor and treasurer to let. Mr. Savage testifies that he had seen the original, or what he believed to be such, of a memorandum of agreement, or lease, in this year, signed by Converse, which begins thus : " The governour and treasurer, by order of the general court, did demise to Edward Converse, the ferry between Boston and Charlestown, to have the sole transporting of passengers and cattle from one side to the other, for three years," &c. Now the demise is of " the ferry between Boston and Charlestown," but he is *to have* the sole transporting, &c. The term *ferry*, as then understood, (for this instrument is in the handwriting of the governor,) did not carry any sole or exclusive right to travel and transportation; but it was necessary to insert other strong and express terms, to convey that right. This is another proof that the word had not the enlarged signification now given to it.

In 1640, the treasurer, Mr. Sprague and Mr. Shepherd, were authorized to let *the ferry*. Thus far there had been but two kinds of action on the part of the colony. First, to establish a ferry, and second, to lease and regulate it. There were plainly no privileges or exclusive rights appended to it, but they speak of it as a thing to be *set up* by another; and when leased, they gave for a limited

period, certain well defined privileges to go with it; but those privileges were not embraced in what was called the ferry, but stood separate and distinct from it, and were at an end with the lease.

In the same year, 1640, the record says, " *The ferry* between Boston and Charlestown is granted to the college."

This is the charter, the whole title of the college. What by fair construction is granted? The ferry—nothing more—the thing set up. No privileges such as are specifically enumerated in the lease of Converse—no line of travel, such as is now claimed—no covenant not to divert travel, or not to establish other ways, or not to impair the income. There is nothing which looks at such privileges. It is a ferry—a naked ferry. What is a ferry? All the books, Tomlin, Dane, Woolrych, Petersdorf, &c. define it to be a highway, and the word, ex vi termini, means no more. The term ferry, therefore, in and of itself, implies no special privileges, such as are often connected with a ferry by special grant or prescription. The colonists so understood it; and in making a charitable gratuity to the college, had no purpose of placing the control of the ferry, or the waters of the river beyond their reach. The income, they doubtless meant, should go to the college; but they actually retained the possession and management till 1650, and always determined the rate of tolls, and how the public should be accommodated.

The doctrine of ferries, as found in the English books, and applied to this case, is full of confusion and uncertainty; so much so, that the plaintiffs have, under it, varied and remodelled their claims of right; reducing them from the whole river, to the travel between Boston and Charlestown: and before I have done, I shall ask them again, what is the extent of their claim, and where the authority which defines that extent. Let us look at the cases, and see how the doctrine stands.

1. The old class of cases, in which is found the doctrine that "*you cannot impair my franchise, or my ferry*," and "*I may exclude all injurious competition*;" and which has been many times repeated in the argument, with great apparent approbation; asserts rights which I will show cannot be maintained in England, or any where, at this day. The monopoly is too bold for even a government of privileges. There was, therefore, a necessity for narrowing down a doctrine so repugnant to all improvement, and so inconvenient to all who had occasion to travel. The principle was, if one owning an old ferry, could show that a new ferry, or way, however

remotely, diverted travel, or caused a diminution of tolls, an action would lie, and the new ferry, or way, was held a nuisance.

This gave rise to the doctrine set up in Yard v. Ford, 2 Saund. Blissett v. Hart, Willes R., and in the case of Sir Oliver Butler, 3 Lev. Here the distinction was taken, and appears since to have been adhered to, that one setting up a ferry, without license from the king, would be liable for any injury happening to an old ferry thereby; whereas, if he had first obtained a license, he would not have been liable. Those who acted under a license, were placed on a different footing from those who acted without, although the license was procured without paying any compensation to the old ferry. A careful analysis of these cases will produce this result. The conclusion then is, that under a license, granted after an ad quod damnum, a ferry may be continued, though injurious, so far as to entitle the owner of an old ferry to damage, if no license had been granted. The cases of Blissett v. Hart, and Sir O. Butler, fully maintain this conclusion. The ad quod damnum, which gives of course no damage, has been manifestly used to evade the rigorous old rule, and to narrow down the franchises of ferries, markets, &c. under a return upon such writs, that new ferries, or new markets may be granted, because the public need them, and the old ones will not be greatly injured thereby. The reporter in Butler's case, alleges, that the new market was granted because the public convenience demanded it. It is, I agree, absurd to return no damage, when there is damage.

But if this be not so, why is a license a protection; for if a ferry is where it does no injury, then it needs no protection. The idea of protection, therefore, necessarily implies that without the license, the party would be liable, because he does injury. The process of ad quod damnum and license, is therefore used as a shield against the liability, and to cut down this kind of franchise.

Next came the doctrine in Tripp v. Frank, 4 T. R., which struck more effectually at the doctrine of the old ferry franchises, and brought them into comparatively circumscribed limits.

The plaintiff, claiming all the travel from Kingston to Barton, on the Humber, sued the defendant for transporting persons from Kingston to Barrow, some distance below Barton, on the same side of the river. The travel from Kingston to Barrow, had usually passed through Barton, and therefore went by the plaintiff's ferry. He prescribed and established his right to all the travel between Kingston and Barton; and maintained, that under the old authorities,

which forbid the right to set up injurious competition, or to impair the ferry of another, he was entitled to damage; for if the defendant had not transported passengers directly to Barrow, they would have passed over to Barton in the plaintiff's boats, and therefore he lost his toll. His line of travel, as it is here called, was broken, and a part of it diverted. But the court nonsuited the plaintiff, on the ground that he had only an exclusive right between Kingston and Barton. They disregarded the circumstance that his accustomed travel was lessened, and his tolls diminished. This, therefore, was an unequivocal inroad upon the doctrine, that one shall not set up injurious competition against another, or impair his ferry; for it is undeniable, that the toll was diminished, and the value of the ferry lessened. The franchise which formerly reached all injurious competition, was here limited to an exclusive right between the two towns where the landing places were. This was a most material modification of the old doctrine; and was so considered in a late case in the court of exchequer by baron Parke.

The next case of importance, for I pass over many where the learning of the courts has been put in requisition, is a late case in the court of exchequer, reported in an English periodical, called the Law Journal; and introduced to the notice of the court by the plaintiff's counsel. Here again the learned barons took time to advise and consider what the law relating to ferries was. After a fresh research it is declared, that the franchise consists in an exclusive right between place and place, town and town, ville and ville; and the competition must be brought to bear on these points, or it is lawful. Hence the defendant was justified in landing a person at Hobbs' Point, a place intermediate between Nayland and Pembroke, though near the latter place, and the passenger was going to Pembroke. This was no infringement of plaintiff's ferry between Nayland and Pembroke. This is the case, as I remember it from a hasty perusal.

What are we to gather from it? Would a ferry from London to Southwark across the Thames, be from place to place, town to town, or ville to ville, so that the vast population on each bank could have no other accommodation? What connexion have the arbitrary lines of towns, or cities, or parishes, with the public travel, or the public accommodation? From one county to another, in most of the United States, is from place to place; for there are the smallest political organized communities in many states. Two counties may stretch up

and down a river upon opposite banks many miles; and is any ferry to have an exclusive franchise the whole of the distance, because the two places stretch so far? This, and all the authorities cited, are only so many proofs of a constant struggle on the part of the courts to ascertain what the franchise of a ferry is in law; and to bring it down to more limited dimensions than the old cases assigned to it.

Am I not justified then in declaring, that the doctrine is manifestly confused and vacillating; and that the courts, without much seeming ceremony, have modified the law to suit the temper of the times, and to appease the just complaints of the public.

But if the law is to undergo change, I prefer it should be in our own courts, and adapted to our condition. Let it be done here, instead of in king's bench, or the exchequer.

This, however, is not the course to pursue, for it furnishes no safe and sound principle to rest upon.

It seems to me, if we analyze prescription, on which all these English rights rest; for all the cases of ferries will be found to lie in prescription; we shall find a ground of interpretation of right which will be satisfactory, and show that these cases have no tendency to establish the doctrine contended for by the plaintiffs.

They cite them to prove that a ferry has, as appurtenant to it, a franchise which excludes injurious competition from the waters above and below it. I have already shown, that the term ferry has no such extended signification; and I will now show that these cases do not conflict with that position, and that they furnish nothing to aid this notion of constructive and implied rights; but every ferry is limited strictly to what is granted without the aid of implication.

Prescription and grants in writing, differ only in the mode of proof. The writing proves its own contents, and the extent of the grant is gathered from the terms employed to express the meaning.

Prescription is allowed to take the place of a writing supposed to be lost. Equity permits the party to produce evidence to prove what he has claimed, what he has enjoyed, and how long; and if the period of enjoyment be sufficient, the law presumes that he had a writing which has been lost, that would by its contents, prove a grant coextensive with the proof. In the case of Tripp v. Frank, for example, the plaintiff proved that he had an exclusive right to transport all travellers passing between Kingston and Barton. The law therefore presumed, that if his written title could have been pro-

duced in court, it would, in so many words, have given him such an exclusive right.

Cases of prescription, therefore, afford no countenance to *implied* or *constructive* rights; but stand on precisely the same footing as titles which lie in writing. Usage can never enlarge or diminish title, for one is not obliged to exercise all his rights to preserve them; nor does usurpation in theory enlarge right. The usage only goes to show what the law supposes to have been written.

Before, then, the plaintiffs can use these cases of prescription to establish implied franchises, they must show that the lost title is not to be held to be commensurate with the proof: but something is implied beyond what is supposed to be written. This they will find it difficult to accomplish.

It follows from this, if I am correct in the reasoning adopted, that ferries, eo nomine, have no particular privileges belonging to them. They are what authors define them to be, water highways; and each franchise is more or less extensive, according to the terms of the grant creating it. It may be very limited or very broad.

The confusion in the English cases, does not arise from any uncertainty in this principle; but from the uncertainty of proof, where the right lies in prescription.

With these explanations, which, I fear, have been unnecessarily minute, I come to the inquiry: what was granted to the college? And I answer, the ferry; the same thing set up in 1681, by Converse; the way over the river, against the house of Brown, established in 1633; a road from bank to bank; for this is all a ferry over the river means. It was an accommodation adapted to a few inhabitants in the wilderness.

If the franchise was broader, where does it extend to? The terms of the grant indicate no privileges up or down stream. Will the plaintiffs tell us where their bounds are? Do they know? Is there any rule of implication which assigns them any privileges which they can define? If there is, then, I call on them to put down the boundaries; to show the Court the limits. It is not enough to show that the terms of the grant, if literally and strictly construed, may, under possible circumstances, render their property of little or no value. This only proves they may have made a bad contract, but has no tendency to establish in them undefined and unmeasured rights.

Let it be remembered that the plaintiffs in 1792 remonstrated against the grant of West Boston bridge, alleging that it would divert half their tolls; and the opening counsel said they got compensation for the erection of this bridge, which was from Cambridge Port to Boston. Again, they remonstrated against Canal bridge, alleging it interfered with their franchise, and this run from Lechmere's Point to Boston.

Now they say their franchise does not reach either of these bridges, but is limited to Boston and Charlestown; and the case of Huzzy v. Field is quoted to sustain it.. This is certainly proof, very conclusive, that the law has been so uncertain that the plaintiffs have not been able to show the extent of their own rights, as they understand them, or to make uniform claims.

Understanding the old cases as I have represented them, they asserted the right to arrest all injurious competition; and as the English courts have cut down the privilege of franchise, from time to time, so their claims have diminished till they lie between Boston and Charlestown alone.

But it is said the franchise must be reasonable; and what is reasonable? They deemed it reasonable to assert an exclusive privilege, and to deny the right to open any new ways over the tide water of Charles river which might divert any travel which would otherwise reach them. Opposition to all new bridges has been deemed reasonable. But why is any enlargement of the grant reasonable? What you give to the ferry you take from the public; and the public cannot spare it without inconvenience.

In a word, is it reasonable, or right, to traverse the regions of conjecture in this matter? To make laws which shall assign boundaries to this franchise, when the plaintiffs can show no manner of title to what they set up?

They urge that Warren Bridge is a clear interference, because it takes away their tolls. So is West Boston and Canal bridges, for the same reason; for the travel would go over the plaintiffs' bridge if these competitors were away. The proof is no more decisive in the Warren, than in the other bridges. The diversion of travel is not evidence of wrong. The English cases, cited, clearly show that; see Tripp v. Frank. The wrong, if any, consists in invading the plaintiffs' grant. And I again ask them, if they affirm, as they do, that we are on it, to point out its bounds. Show us some certain evidence that we are trespassers. You once contended that West

[Charles River Bridge v. Warren Bridge et al.]

Boston bridge would be a nuisance, because it would, as it did, take half your travel. You urged the same argument against Canal bridge, which had the same effect; but you now admit them both to be lawful, because they are not on your franchise. This admission not only proves that you are uninformed as to the rights you claim, but that a great portion of your accustomed travel may be lawfully diverted. I therefore again repeat, that the diversion of travel is, of itself, no evidence of a trespass on your rights. You must, therefore, produce some other proof that your franchise reaches our bridge, than the loss of tolls.

You do not show it by the terms of the grant, nor by any established rule of construction, which authorizes such an implied right. It is not the business of courts to make or alter contracts, but to interpret them. Is there any thing in the words, "the ferry between Boston and Charlestown is granted to the college," which looks like granting an exclusive control over Charles river, or any part or portion of it, except the way or line of that ferry?

I shall hereafter adduce conclusive proof to show, that in England, contracts of this character are rigidly construed in favour of the public, and against corporators. No countenance is given to implication, beyond what is made manifest by the clearest and most explicit terms. Stourbridge Canal Co. v. Whaley. 2 Barn. and Adol. 792.

The franchise of the ferry, then, which has been interposed against all improvements across Charles river, when brought to the scrutiny of law, will be found to be a very limited right, confined to the path of the boats across the river.

This reasoning is strongly corroborated by the condition of the colony at the time of the establishment of the ferry, as I have already suggested.

As a further proof of public sentiment, the colonists, in 1641, almost simultaneously with the grant to the college, and before it took effect, (for the college was not incorporated till 1650,) passed an act prohibiting all monopolies, except for inventions.

The great and wise policy of Massachusetts, in respect to free highways, was established in 1639; and with modifications, has been continued to this time; Ann. Ch. 126, 267; L. of M. 178, ch. 67. Under these acts, a power to construct free ways has at all times been exercised so largely, that Massachusetts owes to it the best roads that can be found in any state in the Union; and they have, at all times,

been established, regardless of turnpikes, bridges, canals, railways, or any other improvements. The consequence has been, as is well known, that many of the turnpikes have been abandoned to the public.

Such has been the action of public sentiment, and such its results; and this is the first instance in which the right to establish new ways has been questioned.

All these considerations lead to one conclusion, which is, that neither the language of the grant, nor the great current of public opinion, give any countenance to the claims set up by the plaintiffs, founded on this ferry, for an exclusive franchise extending up and down the river.

The late lamented and distinguished chief justice of Massachusetts, in his opinion, in the 7th Pick., in this case, expresses his convictions strongly on this point; that the ordinance did not give an exclusive right between the two towns to the ferry, and in construing it, that the cotemporaneous history ought to be considered, as it tends to explain the probable intent of the colony.

If then, the Court confine themselves to the language and the existing circumstances, both of the country and the college, at the times of adopting the several ordinances; they will probably arrive at the following conclusions, as distinctly indicated in the case. The colonists meant to establish a ferry, suited to the then emergencies of the country; but not to establish a broad franchise. They needed a public seminary for the education of youth, and found, by the income of this ferry, they could aid this object. They therefore meant to secure the revenue of the ferry as a gratuity to the college, but nothing more. And while they did this, they intended to retain in themselves the unqualified right to control, manage, regulate, and govern the ferry at pleasure. To make the income much or little; and to make just such provision for the public travel as they might deem expedient. This is the conclusion which is forced upon the mind, by reading the numerous acts upon the subject. The college was then esteemed the child of the government; and that government manifestly considered itself standing in that relation with the power to exercise parental authority. Now, what effect the Court will give to this state of things, in law, remains to be seen; but there is little difficulty in understanding the actual relation of the parties.

One thing I apprehend, however, is clear; namely, that neither the ordinances, or the history, afford any evidence of an intent to create

[Charles River Bridge v. Warren Bridge et al.]

such a franchise as is now claimed. If, therefore, the plaintiffs have this ferry right, it cannot aid their present claims.

They grasp at too much; all the river: or if not, they can assign no limits, either by the law or the facts. The public is not to be deprived of its sovereignty over a navigable river, upon such indefinite, uncertain pretensions.

But suppose we are erroneous in all this reasoning, in regard to the franchise of ferries; then I propose another objection for the solution of the plaintiffs.

The doctrine applicable to ferries, belongs to ferries alone among highways. It is feudal in its origin, and has never been applied to turnpikes, bridges, canals, railways, or any other class of public ways.

I have attentively observed the progress of this case, and the learning and laborious research of the plaintiffs brought to its aid. No books, ancient or modern, seem to be left unexplored. Even foreign periodicals, fresh from the press, are on the table; and yet they have shown the Court no case where this doctrine which they set up, has been applied to any class of ways, except to ferries.

The Chesapeake and Ohio Canal Company v. The Baltimore and Ohio Rail Road Company, in Gill and Johnson, has been quoted; but surely not for the purpose of showing an exclusive franchise, for these works are allowed to run side by side, actually infringing upon each other, though direct competitors.

England is covered with canals, railways, bridges, &c.; but not a case has been adduced applying this doctrine to them; and the honour of extending a feudal right to such works is saved for the courts here, if it is to be maintained at all. These feudal rights are well known to have originated in the very spirit of cupidity; which aggregated to itself all privileges which increased the mass of wealth in the feudal lords, at the expense of the public. These rights grew up to be law from the force of circumstances; but it is hardly worth while at this day to enlarge such provisions, or to push ourselves ahead of Great Britain, in giving sanction to them. Under this notion of special privileges, the same doctrine extended to mills, markets, &c. Whoever had a market or a mill might keep down injurious competition. We have clearly thrown the law as to markets and mills overboard; for no such privileges exist in Massachusetts: and the doctrine of *constructive franchises* in ferries ought to follow.

It is emphatically the doctrine of privilege against public right: I speak of those vague, indefinite appendants and appurtenants which are said to belong to ferries by construction and implication; not of what is granted in terms, or by necessary and irresistible implication. This doctrine ought not to be received, unless it is the imperative law of the land, and can be shown to be so beyond all doubt; and this the plaintiffs have failed to establish.

I come now to a very important inquiry in regard to this ferry. Are the plaintiffs the owners of the right, be it what it may? If they are not; it is a question of no importance, whether the franchise is broad or narrow. The facts here, will, if I do not mistake their character, relieve the Court from all embarrassment.

I agree with the plaintiffs' counsel, that the commonwealth has the power and the right to take any property for public use; and therefore also agree with them that she had a right to take the ferry for the site of a bridge. How could the plaintiffs controvert this proposition, when their bridge is on the ferry ways, and the ferry path under it? But it by no means follows, if the commonwealth had the right to take for the public use a franchise, that she has granted it to the plaintiffs. This must depend on proof. Let us see what the franchise is claimed to be, and what has been done with it.

It is asserted by the plaintiffs, that the franchise was an exclusive right to transport persons, &c. between Boston and Charlestown. This is an interest issuing from the realty. It is a possessory right, so far as the right to exclude transportation across the river goes; though I am aware that it is incorporeal. It seems to me, therefore, by the laws of Massachusetts that it could only be transferred by deed; Am. Ch. 18, Laws, 1783, ch. 37. Courts of equity have no power to construe away these provisions. But the plaintiffs have no deed.

Again, they have no vote or act of the college corporation, or any of its officers implying any purpose, or thought of conveying this interest.

Again, the plaintiffs produce no vote, or act of their own, evincing any desire on their part to become the owners of the ferry. The petition for their charter is among the papers, and it does not even name the college; but passing over its head, as not worth regarding, it asks for the right to build a bridge " *in the place where the ferry is now kept.*" There is nothing in the case to show, that the

[Charles River Bridge v Warren Bridge et al.]

thought of owning the ferry, ever entered the minds of the petitioners. They had no difficulty in demanding a grant of the ferry-ways themselves, for the site of a bridge, without proposing any compensation for it. Those great and sacred private rights, which now figure so largely in this case, seem to have been no serious obstacle to the introduction of a more convenient way; but a change of interest, has, probably, wrought a change of opinion.

There is then no evidence of any purpose on the part of the college to sell, or of the plaintiffs to buy; and if the property has been transferred, it has been done without the act, or the assent of either party. This would seem difficult, if not impossible; still it is strenuously insisted upon, because the act of 1785 requires the plaintiffs to pay out of their tolls two hundred pounds a year to the college.

This, it is said, is a good consideration, and draws after it, in equity, the title to the ferry franchise. The conclusion is not apparent from the premises. If being required to pay two hundred pounds a year, makes them the owners of the ferry; then why is not the corporation of West Boston bridge an owner, for they are required to pay four hundred pounds a year to the college? Canal bridge would also come in for a share, as they too, if my memory serves me, were required to pay something. The plaintiffs would probably object to these copartners. But is there any foundation for this pretended consideration? Who has paid it? Let the facts answer. The legislature granted a toll for passing the bridge, so liberal, not to say extravagant, that for an outlay of forty-six thousand dollars, the plaintiffs have received a return of over one million two hundred thousand dollars, as they admit; and their shares, which cost one hundred pounds, have been sold for two thousand dollars. The two hundred pounds a year have, therefore, been paid by a tax upon the public travel, collected by the plaintiffs under the authority of the legislature. The tolls appear to have been set very high, to cover this expense, and to give the plaintiffs an early indemnity; as the public might have occasion to make new ways, and diminish the amount of travel. This contingency was doubtless in view when the rates were established. There can, therefore, be no reasonable ground for saying the plaintiffs have ever paid a cent of compensation. It would be extraordinary, if they, without any conveyance, or any purpose to convey, and without any consideration, could set up a title to a valuable property.

But they suggest further, that the state has conveyed the ferry

franchise to them. The act of 1785 will be searched in vain for the intimation of any such purpose.

Moreover, the state has no power to take the property of one, and convey it to another. They may condemn so much as is necessary for public use, but nothing more. To test this matter, suppose the bridge were taken away, can the plaintiffs set up a ferry? I think no one can hesitate what answer to give. They are authorized to maintain a bridge, and no other kind of way.

The conclusion of the matter is, that the legislature authorized the plaintiffs to set up a bridge upon the ferry-ways, and took upon themselves to quiet the college, which neither assented or dissented, but relied on the commonwealth, which had always been its great patron and protector, that eventual injustice should not be done to it.

The learned judges, three to one, reached, substantially, this result in Massachusetts. It is therefore plain, that the plaintiffs are not grantees of the ferry, and have not, and never had any interest therein. The ferry franchise, therefore, whatever it may be, is of no importance to the decision of this case, as the plaintiffs can claim nothing under it. The plaintiffs having failed to show any contract in regard to the ferry, and the legislature having passed no law touching the ferry; for the act of 1828 does not name or allude to it; nothing has been done by the state to impair the obligation of a contract, or to violate the constitution of the United States. The discussion, however, may not be wholly useless, as some principles have been examined, that are applicable to other parts of the case.

I shall now proceed to examine the act of 1785, under which the plaintiffs acquire the right to build the bridge, and all other rights which they have. This act is so barren in those provisions which are necessary for a feudal franchise, that a great effort has been made to build up a claim upon the vague doctrine of ferry rights. Nothing is more reluctantly surrendered than inordinate profits.

The provisions of this act are, substantially, as follow:

Sec. 1, creates a corporation.

Sec. 2, provides for its organization.

Sec. 3, gives a toll for forty years.

Sec. 4, relates to the dimensions, &c. of the bridge.

Sec. 5, gives £200 a year to the college.

These are all the provisions.

They had a right granted for what they asked, namely, to erect a bridge in the place where the ferry was then kept, and to take toll

of such as passed over.   This is all the franchise provided for in the act.   There is not a word about any other rights and exclusive privileges.   Nothing restraining the power to make new bridges.   No covenant, that there shall be no diminution of travel, or diversion of it.   No line of travel guarantied—Nothing said of the travel between the two towns.   Not a word about making compensation, if any of their property should be taken for public use.   You will look in vain for any such provisions; and if the plaintiffs have any such rights growing out of this act, they must be implied, for they are not secured by express stipulations.   Here the question recurs, what is the rule of construction applicable to such acts?   I shall ask attention to but one authority: the case of Stourbridge Canal Co. v. Wheeley, 2 Barn. & Adol. 792, to which I have referred.   Lord Tenterden says: Such an act, that is an act of parliament incorporating the plaintiffs to make a canal, is a bargain between the public and the adventurers, the terms of which are contained in the act.   He affirms, that the rule of construing such acts is well established to be in favour of the public, and against the adventurers; which is exactly opposed to the rule so elaborately laid down by the learned counsel in this case. His lordship distinctly and emphatically declares, that whatever is doubtful, or ambiguous, or whatever is capable of two constructions, must be construed favourably for the public, and against the adventurers.   This case seems to run on all fours with the one under consideration, in many of its features—both sets of plaintiffs are corporators, created by acts of legislation; both own ways, and each claims a franchise.   The general characteristics are therefore alike; and clearly the rules of law applicable to both, as regards the construction of the charters, ought to be alike; and if so, the plaintiffs can take nothing but what is clearly and distinctly granted to them, either in words, or by plain and necessary inference.   The question then arises, is it a necessary and irresistible inference, from the terms of this act; a thing so plain as to admit of no doubt; that the legislature did intend to grant to the plaintiffs a roving franchise, to which they can assign no limits: which, in 1792, was above West Boston bridge, but is now limited to Boston and Charlestown? If the plaintiffs cannot give body and shape to the thing to be inferred, if they cannot assign to it limits; in a word, if they cannot tell what it is; how can it be said to be either a plain or a necessary inference?   It can neither be the one or the other; and the very doubt thrown over it, forbids the making of the inference, according to the principles so clearly asserted

[Charles River Bridge v. Warren Bridge et al.]

by lord Tenterden. . Implication cannot go beyond what is certain, and irresistibly necessary; especially where an act is capable of an obvious construction, consistent with its general purpose, without such implication. This act is of that character. The legislature granted the right to construct and maintain a bridge, and to take tolls for forty years—but this right of taking toll does not go beyond the privilege of demanding it of such persons as voluntarily pass over. This is all that is guarantied, and these rights have not been touched. Whether another bridge should be erected, so near as to divert the travel, is a matter which they did not bind themselves not to do, but retained in themselves the right to exercise their discretion, as they pleased; in case, in their judgment, the public needed new accommodations. They asserted the right, and diverted nearly half the travel, when West Boston bridge was set up—again, when Canal bridge was set up—again, when Prison Point bridge was set up—and lastly, when Warren Bridge was erected.

The commonwealth has, nevertheless, exercised this power sparingly; and only when pressed by strong emergencies. The plaintiffs asked, in their petition, to be indemnified for their expenses, and they have been suffered to go on until they have been remunerated in a most princely manner. The commonwealth having, at all times, the right to set up interfering bridges, has foreborne to do it, in a most becoming spirit of liberality, and little merits the denunciations now loaded upon her. Such seems to me to be the plain import, and the obvious meaning of the act, and no forced construction or implication is necessary to ascertain the rights of the parties. The plaintiffs seem to suppose a diversion of travel is an invasion of their property. This is a mistake. They have no property in travel, for nobody is obliged to travel over their bridge; and they now admit that bridges may be erected any where, except between Boston and Charlestown, however much travel they may divert.

They affirm that a grant of toll for forty years means nothing, unless it be absolute and unconditional, securing the travel. Might it not be granted on the express condition that other bridges should be erected, if deemed expedient? Not granting away a power, is equivalent to retaining it; and the legislature never surrendered the right to build new bridges. The plaintiffs have, therefore, enjoyed their privileges, subject to this right. Their tolls have been diminished; but neither by wrong, or any violation of their rights under the act;

nor has any injustice been done to the corporation, as I purpose to prove, before I leave this point.

But they again claim a reasonable construction. Why is not this construction reasonable? The plaintiffs make less money; but are they not indemnified? Would it be more reasonable to permit them to exact an endless tribute, and to subject the public to other great inconveniences and delays in their business? What were the large tolls granted for, unless to give a speedy indemnity, that the public might have new accommodations when needed? What would be the plaintiffs' judgment of what is reasonable? They told you, in 1792, it was an unqualified control over all the important portion of the river. You must not, they said, *impair* our bridge. Any construction would be deemed unreasonable, which should diminish the toll.

Again, it is said there are stockholders who are great sufferers, having bought in at two thousand dollars a share. I will not deny this, for I am uninformed as to the holders of stock; but I will prove that this consideration is entitled to little weight, even in equity: for I will show that the commonwealth gave the most unequivocal notice, to all persons, of her construction of the act of 1785; and when she renewed it in 1792, she placed upon record a solemn and public legislative declaration, that she acknowledged no such rights vested by that act, as are claimed here.

In 1792, Oliver Wendall, and others, petitioned for leave to erect what is called West Boston bridge, about a mile above the plaintiffs' bridge. The plaintiffs sent in their remonstrance, objecting, that it would impair their property, by reducing their tolls one-half.

The petition and remonstrance were committed to a joint committee of both houses, who heard evidence and counsel in behalf of the parties; and after a most full investigation, they reported in favour of the new bridge.

This report was so amended by the two houses, as eventually to contain *all* the provisions of the act of 1792; and in this form it was *accepted* by both houses. In this report, thus adopted as the basis of this law, is contained this declaration:—" There is no ground to maintain that the act incorporating the proprietors for the purpose of building a bridge from Charlestown to Boston, is an exclusive grant of the right to build over the waters of that river; but considering the erection of Charles River Bridge was a work of *magnitude* and *hazard*, and that great benefits have arisen to the public

from the success of that enterprise," &c.; " it is reasonable and proper that a further time of thirty years be granted to said proprietors, to receive and collect, for their benefit, the toll now established by law for passing said bridge," &c.

The legislature being apprized of the broad claim set up on the trial before the committee, took this occasion to say, in connexion with the extended grant of tolls, that the plaintiffs had no such rights; and that in giving the extension, they meant to give countenance to no such thing, but simply to reward, most liberally, a commendable spirit of enterprise.

When the charter of the defendants was granted in 1828, the forty years had expired; and the plaintiffs had entered upon the extended period provided for, by the act of 1792, or the charter of West Boston Bridge Company.

This declaration, and the passage of this law, being concurrent acts, the meaning of the legislature cannot be mistaken. They put their explicit denial, upon the right to raise implied covenants not to erect new bridges; and declare, that they extend the right of tolls, because, among other reasons, the plaintiffs had no such exclusive privilege. The plaintiffs have accepted the provision for them in the act of 1792; claim the benefits of it, and plainly ought to be bound in equity by this exposition.

It was a distinct notice to all persons, who were, or might be concerned in the property, that the denial of the right of the state to make new bridges, would not be regarded; and whatever might by construction, be their privileges, under the act of 1785, its renewal in 1792, was on condition, that no such pretension against the power of the state should be set up.

It has been said, that this is only found in the report, and is not, therefore, obligatory. But to this I answer, that the report was the subject of distinct, deliberate legislation, in both branches. It was accepted by both, acting in their constitutional capacity. It is part of the records and files. The law is only an echo of it, embodying the matter in the accustomed forms of legislation. We offer this report, not to explain away or to alter any provisions of the act, but to refute an inference made on presumption; to negative an *implied* engagement which is attempted to be enforced; to show that the legislature did not mean what the plaintiffs attempt to force upon us by *construction:* and most assuredly it is competent for this purpose; it is competent to overthrow a presumption which it positively

refutes.  It is therefore conclusive upon the plaintiffs; and has the same restraining effect on their presumptions that it would have if it had been embodied in the act.  How can they, then, show the effect of it ?  The counsel replies, that they do not claim a franchise extending to West Boston bridge, for they only claim between Boston and Charlestown; and there is no distinct larger claim set up in their remonstrance of 1792.  If they did not consider the West Boston project an interference, why did they remonstrate; and why represent that it would take away half their travel, and ask a refusal of the grant desired by the petitioners ?  But suppose, if you can, that they really did not mean to assert that such a bridge would be an interference, the *declaration*, which is *an answer to the remonstrance*, only becomes the more pointed and explicit; for it is then saying, in so many words, you have no exclusive rights between Boston and Charlestown, and we admonish you of it, and renew your charter with the express understanding that you are to so consider it.  View it then in any aspect in which it may be presented, and the declaration still stands unshaken and cannot be construed away.  It clings every where, as a condition of the renewal, not to be explained away.

What right then have the purchasers of stock to complain?  They are bound to notice the terms of the charter, and to regard its provisions; and surely ought not to demand relief from an inconsiderate or rash contract at the expense of the public.

But the Court has been asked, with considerable emphasis, if the plaintiffs would have accepted a charter, with power left in the legislature to erect bridges at pleasure?

The answer has already been given.  They did accept it, after all the deliberation they saw fit to make, and with this unequivocal notice before them.

We ask, in turn, if the legislature would have granted to any company such privileges as they claim, if the privileges had been set forth in plain and intelligible language in the act?  Would they have given an exclusive right over the river to any body?

The answer is again at hand.  No sooner were such claims set up, than they denied their validity, and refused to recognise them.  They again, in 1807, when Canal Bridge Company was incorporated, renewed the declaration against them in a formal manner; and again, when Warren Bridge was established.  They have, at all times, earnestly protested against all such claims.  The views of the legisla-

tors and of the people, are not doubtful on this point. They have not misled the plaintiffs by silence, or for a moment favoured their pretensions.

But much is said of the hardship. Their property, which is of great value, it is said, is rendered worthless; it has been taken from them and given to others. Here the plaintiffs mistake their rights, and reason from false premises. They suppose they had a property in the public travel, when they had none. There cannot be any property in public travel, because no one is under any obligation to pay toll, unless he passes the bridge, and that is an optional act. If the act of 1785 imposes no restrictions upon the legislature, and they had a right to authorize the new bridge; then nothing is taken from the plaintiffs, if all the travel passes over it. All that can be said is, that while the legislature forbore to exercise its lawful rights, they made a vast deal of money by an exclusive enjoyment; and now they make less, not because any thing is taken from them which was theirs by contract or grant, but because a lawful competition is set up. Their case of hardship differs in nothing from those of frequent occurrence.

Suppose A sells to B a tavern, having a large custom, and makes conveyance. A then erects another house near by, and the custom follows him, whereby B is ruined. B has no remedy, unless A has covenanted expressly not to do this act.

Again, one has a tavern, store, or other place of business, dependent on public travel for its custom. A new road is established, which diverts all travel from it, and renders this property worthless; the owner has no remedy, but must bear the loss with what patience he may. These are matters of frequent occurrence, and present cases of much greater hardship than the plaintiffs are called upon to endure; for they have reaped too rich harvests to be great sufferers.

The owners of real estate on the avenues to their bridge, will, if the travel is discontinued, or greatly impaired, probably suffer more severely than the plaintiffs; but what remedy have they? The plaintiffs, therefore, if they should hereafter receive less tolls, will be in no extraordinary position. It will doubtless turn out that their property is far from worthless, as it may be applied to other uses.

But what if there is hardship? Is that to be relieved by making a new contract here, or by altering an old one? Shall the commonwealth, to relieve the plaintiffs, be made a party to stipulations that she never entered into? This would be more unjust than any losses

or inconveniences which can occur to the plaintiffs.  Presumptions got up to relieve hardship, are too often the parents of the greatest injustice.

The plaintiffs seem to think it is incredible that any of the large privileges which they have enjoyed, should rest on the forbearance of the commonwealth.  They treat the idea that they should hold any thing at her will, as preposterous.  To be at the mercy of the state is absurd; and so irreconcilable with just reasoning, that it is not to be entertained in giving construction to this act of 1785.  We must arrive, they think, at any conclusion but this; though the very terms of the act force us into this position.

Either the state or the plaintiffs have the control of this river; and whoever has, excludes the other from a sole enjoyment.  In order to free themselves from control, the plaintiffs would bring the state to their feet, and place her at their mercy.  This would be the measure of justice meted out by their construction.  I will leave it to the Court to determine which would be the most becoming posture, and which would best subserve the ends of public justice; to place the plaintiffs at the mercy of the state, or, the state at their mercy.

They demand, when they say they have a right to exclude injurious competition, that the travel shall be arrested on the north bank of the river, and driven by circuitous and inconvenient ways over their bridge, and shall, in addition, pay tribute perpetually; not to indemnify for the enterprise, but to add to the mass of wealth already accumulated.  If the state is tied down to this burden, be it so ; but let us see decisive proof of it.  Let it not be by presumptions, or implications.

If the plaintiffs wish for equity, let them do equity; that is a first principle.  Let them frankly admit that they had notice of the limited terms on which their act was renewed in 1792 ; and not try to shut that all important fact out of sight.

The honour of the state is untarnished, and her reputation fully vindicated.  There has been much false rumour in this matter; much mistake and unjust imputation.  The state has made no attempt to resume her grants, or to seize private property, by violent and revolutionary measures, for public use.  She has not acted arbitrarily, illiberally, or ungenerously, toward any one; but, on the contrary, has forborne to use her lawful power, until she saw those who had done a valuable public service, not only reimbursed, but enriched in a manner surpassing all ordinary acquisitions.  She then listened to

the demand of the public for further accommodations, and not till then. There is no blot upon her escutcheon, nor stain on her garments, in this matter.

In proof of this, I fearlessly assert that the counsel are mistaken when they say that a decision in favour of the defendants will be fatal to future enterprise. This case has stood decided in their court for several years; and the history of Massachusetts can exhibit no period that will compare with it in investments for internal improvements. Confidence in the integrity and good faith of the state never stood higher, nor did capitalists ever go forward with greater resolution and courage.

I feel, therefore, justified in affirming that the honour and faith of the state is untarnished, and she stands blameless in her conduct.

I come, then, to the conclusion, for all these reasons; that the act of 1785 is incapable of the construction put upon it by the plaintiffs:

That its meaning is plain, and it gives no franchise beyond the bridge:

That in 1792 this construction was given to it by the legislature, and it was then extended thirty years, upon condition that it should be so construed:

That the stockholders can complain of no injustice, for forty-six thousand dollars has returned them over one million two hundred thousand dollars; and if any one is a loser by giving a great price for the stock, he must impute it to his negligence in not regarding the construction given by the legislature to the act:

That the rule adopted by the legislature, and the rule of the common law, are concurrent; and, therefore, if the notice should be ruled out of the case it will not change the result.

All this, I contend, is in full accordance with the policy of the state.

1st. Her system of free road laws has, at all times, been active, and by its operation has rendered many turnpikes worthless.

2d. The statute books will show that numerous bridges have been granted at or near old ferries, without compensation.

3d. Rail-ways and canals have been granted, in many directions, regardless of old franchises, or of their injurious consequences to old lines of travel; but of this, more hereafter.

Since, therefore, nothing is taken from the old bridge by the law of 1828, but the proprietors are left in full possession and enjoy-

[Charles River Bridge v. Warren Bridge et al.]

ment of every thing granted to them; and since their only complaint is . of a diversion of travel, and a consequent diminution of tolls, I am not able to perceive that they have any contract which has been violated, or had its obligation impaired: and, therefore, the constitution of the United States has not been violated. The act of 1828 does not rescind, alter, or modify any of the provisions of the act of 1785; but leaves the plaintiffs in the full enjoyment of them, and in the undisturbed control of their bridge.

I will now answer, more particularly, some of the arguments of the learned counsel. Most of the reasoning is founded on premises which will fail, if we have sound views of the law; or is designed to overthrow positions which we have never assumed.

He says, for example, that the legislature has no power to resume a grant. Our answer is, that they have not attempted it; and therefore, that question is not raised in the case. We contend for no such power.

What they claim as their property was never granted to them; and the mistake is, that they do not own what they suppose has been taken away. They must establish their title, before they talk about the resumption of grants, and the taking away of their property. They must remember, that this right of property is the very matter in litigation; and one of the great points to be settled is, whether they show any title that can stand the test of legal scrutiny. If they do, we do not claim it without an equivalent.

It is said, the franchise is to be ascertained by the facts, and is to be reasonable. It seems to me, that it is to be ascertained, as lord Tenterden says, by the terms of the bargain; and these are to be found in the act. What is deemed reasonable, we have seen is co-extensive with the selfish desires of making money. When the plaintiffs depart from the act, they can find no standard for what is reasonable. To-day, the exclusive claim is between Boston and Charlestown; yesterday it embraced Canal bridge; and the day before West Boston bridge. If the plaintiffs can show no rule to settle reasonable limits, how can they hope the Court will relieve them from the embarrassment? When we go in search of what is not apparent in the act, we grope in the dark; and hence, the well established rule laid down in Stourbridge Canal Company v. Whaley, that you shall not build up claims on presumption.

The plaintiffs could find no authority to rest upon for making Boston and Charlestown the boundaries of their franchise, until they

fell upon the late case in the exchequer of Huzzy v. Field. What assurance have we, when the law as to ferries shall again come under consideration, that it will not receive a new modification, and their franchise then take new boundaries?

But again, another and different rule is laid down by the counsel, which undoubtedly is considered reasonable; though in its application it rests on quite different principles.

The counsel, in treating of what is reasonable, asks, how do you settle what is a nuisance where the air is corrupted? Not by bounds, not by distance or measure; but wherever the noxious atmosphere is, there is the nuisance: so with the plaintiffs' case, where the injury is, there is the nuisance. Whatever takes away their tolls, invades their franchise; for this is the injury of which they complain.

This view brings us back at once to the old doctrine; "you shall not impair my franchise;" and proves in the most conclusive manner, that all the bridges above theirs are nuisances, for the travel which passes over them would chiefly go over their bridge, if the others were closed up.

It is too plain, that the learned counsel, in his able argument, has, whenever he has expounded the law, or undertaken to show what is reasonable, fallen back upon this rule as the only resting place he can find. He began, by saying, what is reasonable must be ascertained by the facts; and ended by showing, that the only fact necessary to be inquired into, is, does the injury complained of, lessen the tolls? If it does, it impairs the franchise, and is a nuisance. If this is to be the end of the inquiry, the reasonableness, or unreasonableness of the franchise set up, is not a matter of investigation. The inquiry is not into that fact, but whether the tolls are diminished. And, I think, this will be found to be the only standard the plaintiffs have ever set up. Indeed, if you admit that some injury may be lawfully done, where is the limit? Let us then dismiss this wandering inquiry after a reasonable franchise, and go back to the act of 1785, and hold to that, instead of building up a new contract; for the plaintiffs have professedly ceased to claim a right to put down all competition that lessens their tolls.

It is admitted, says the counsel, that the legislature has the control over public ways; and their judgment as to the necessity for them, is final and conclusive. But he adds, that it is not like the British parliament, omnipotent, for this Court has a right to correct its errors.

The power of this Court, allow me to say, also, is not omnipotent; and it can acquire no jurisdiction over an act of the legislature, unless such act *impairs* the obligation of contract. I may add, speaking it with great deference and respect, that while I repose great confidence in this tribunal, I feel no cause for distrust in those of our commonwealth. I, therefore, do not feel that we are unsafe without such a corrective; as we in truth are safe, in most matters upon which our courts adjudicate. I can see no more impropriety or hazard in resting final jurisdiction there, than here; for I am not aware of any proneness there to error or excess, which demands a corrective. Indeed, it cannot be desirable, nor is it the purpose of the federal constitution to carry this jurisdiction over the constitutions and laws of the states. The system would manifestly be insupportable; and I shall, before I leave the case, attempt to show, that the jurisdiction of this Court does not reach this case, because it falls exclusively within the constitution and laws of Massachusetts. I shall endeavour to make it appear, even if property has been taken for public use, it is no violation of contract to do it; and the question of compensation must be decided, finally, by our own court.

Again, the learned counsel says, " the legislature is limited by the principles of natural justice ;" and I agree that it ought to be, and that it ought not to take property without compensation: but the constitution of the United States no where gives this Court a right to inquire whether the legislature, and the state courts have disregarded the principles of natural justice. I would respectfully ask if this Court is to be the corrective in such cases?

But I am not willing the reproach of violating the principles of natural justice, should rest on the state. Did the state ask the plaintiffs to build the bridge? Did she ask them to accept the act after it was made a law? They sought the privilege, and accepted the act, after taking all the time they desired to consider its provisions; and have had, and may continue to have the full benefit of them. The supposed violation of natural justice does not consist in interfering with the provisions of the act; but in refusing to recognise claims not enumerated in it—rights unauthorized by it—privileges not intended to be granted. We cannot find in the act certain provisions of which they claim the benefit. Is it a violation of natural justice, to refuse them the right to add what they please to the fact?

Again, they state to the Court, to prove their disposition to accomodate the public, that they proposed to the legislature to enlarge the

bridge and the avenues, and to make other alterations to meet the public emergencies; and so they did: but is it not too plain that this offer came when they must have known it could not be accepted? They had contested the right to build a new bridge again and again, before committees, and the legislature. The corporation voted to make the proposals on the 25th of February, and the law was approved on the 12th of \March following. There is little doubt, therefore, that they were made after the report of the committee, and during the pendency of the bill before the legislature. It is hardly reasonable to suppose, that propositions made, thus apparently with reluctance, and in that late stage of the proceeding, could be any otherwise viewed, than as measures for delay—than as counter plans to defeat the measure. But whether that be so or not, they came too late.

But further, it seems they considered themselves as having no authority to erect suitable accommodations for the public. They could not enlarge the bridge, or the avenues, if insufficient for the travel, without a grant of power from the legislature. Is this consistent with the claim of exclusive right over the river? If the Court will look into the cases quoted in regard to markets, it will be found, that the public are under no obligation to respect the franchise, unless suitable accommodations for the business is afforded; and that the exclusive right, and the obligation, go together.

Is it true that the plaintiffs hold this exclusive privilege, and yet have no power to open a way suited to the public travel? Does not this limitation of power prove a limited franchise? Their power to enlarge does not reach beyond the planks of the bridge; and why? Because the act of 1785 will carry them no further. By what rule, then, will it carry their franchise further? If they can imply a franchise; then may they imply a power to enlarge, but this I think they will not venture upon, since they admit the act of 1785 gives no countenance to it.

These are some of the leading arguments which remained unnoticed, and I shall not detain the Court longer in pursuing this kind of inquiry, for I shall occupy more of their time if I follow out the various positions taken, in an argument of nearly three days, than I think myself justified in consuming. I will therefore pass to the next great division of the case, which constitutes in the pleadings, the second issue.

If we are right in the legal positions we have assumed, our labour

[Charles River Bridge v. Warren Bridge et al.]

here is unnecessary, for the plaintiffs have no case; but as we cannot know how the minds of the Court will run in this matter, we must investigate the point.

The question is, if property has been taken for public use, under the act of 1828, and no compensation has been made, is it a violation of the rights of the plaintiffs so as to impair the obligation of contract, and thus conflict with the constitution of the United States?

I shall contend, that, whatever may be the constitution and laws of Massachusetts, and whatever obligations they may impose on the legislature, to provide compensation, where property is taken for public use; the omission to do it, in the act of 1828, is no violation of a contract which impairs its obligation within the meaning of the constitution of the United States; and therefore this Court has no jurisdiction in the matter.

To establish this conclusion, I shall attempt to maintain the following positions :

1. That the power to provide public highways, is an attribute of sovereignty, necessarily residing at all times in a state.

This is apparent; for without this power, all intercommunication would be interrupted, and each person confined in matter of right to his own estate. It is an element of sovereignty, as much as the power of taxation; and political organization cannot exist without it.

2. This power necessarily implies the right to take private property for public use. The territory of a state is owned by individuals, and roads must run over this territory; therefore they cannot be authorized against consent, without the right to appropriate private property to public use. The alternative is, that the government must have this power, or the public can have no roads.

3. All property in Massachusetts, including franchises, is held and enjoyed, subject to this right of sovereignty, resting upon it as an incumbrance.

I know of no property in the state exempted from this liability; and in the 4 Pick. 460, Com. v. Breed, the court allege, that it has always been taken when needed, be it what it may; and mentions, as illustrative of the extent of this right, that the legislature have at pleasure obstructed navigable rivers, which are public highways. The plaintiffs' bridge was built upon the very ways of the ferry. and the court in 7th of Pick. considers this as lawful.

This right is co-existent with the colony, and as far as my knowledge extends, has never been questioned. The legislature are the

sole and final judges of the necessity of taking property in this manner; on the ground that it is their duty, as the representatives of the people, to provide for the public wants.　Ibid.

4. As this right to provide ways lies among the elements of government, and has always been exercised, and asserted in its broadest terms; it follows, that the right to take private property for this purpose, is equally broad; and that the mere taking and appropriation of it to public use, can never of itself impair the obligation of contract, or violate the constitution of the United States; for the fundamental laws of the state authorize the taking, and all property is always held on condition that it may be so taken and applied.　The right rests as an incumbrance upon it, as much as the right of taxation.

This principle is sustained, if it needs authority, in 4 Pet. 514; Billings v. Providence Bank; where it is said, in substance, that if a franchise be taxed to its ruin, by the very power that created it, this is no violation of contract, for the right to tax is an abiding public right covering all property.　To refuse to make compensation may violate the constitution of Massachnsetts, but not of the United States.

The right to make war, to impose embargoes, and non-intercourse acts, to change public policy, to regulate intercourse with foreign countries, and to do and perform many other things; all which may subject the people to great hazards and losses; has never, and can never be questioned, whatever may be their influence upon trade or individual property.　But however disastrous such acts may be, and whatever losses may be sustained, the citizens are without remedy. These mutations make one poor, and another rich; but they are incident to the social and political condition of mankind.　Public policy, and public laws, cannot be made to bear upon all alike.　New ways, for example, must be provided.　In doing this, the property of one which is not touched, is nearly ruined by being abandoned by the travel, while that of another is benefited by the passage of the new way over it.　But all who hold property, hold it subject to the right to make these changes, for the public good demands it; and the right to do it, must, I think, stand unquestioned.　It is one of those attributes of sovereignty, which must be constantly exercised; and such property, be it what it may, must be taken as is necessary to meet the exigencies of the public for ways.

It is plain, therefore, that no property is exempt from this liability

to be taken, unless the state has agreed to exempt it; and it may well be doubted whether the legislature of a state has any authority to bind the state to a contract to exempt property from this liability beyond the pleasure of the state.    This power bears a strong resemblance to the taxing power; and in Billings v. Providence Bank, the right to perpetually exempt property from taxation, is considered doubtful.    If the sovereign right to make roads, can be alienated as to a small territory, it may be as to a large; and thus the state might, by legislative power, be dispossessed of one of its most necessary and essential powers forever.    The sovereignty of a state seems to me to be an unfit matter for bargain and sale, in perpetuum; and hence the right is acknowledged, whenever the public exigency demands it, to lay new ways over ways already granted, as in the case before us, by compensating for the property taken.

When a way is laid over property, but two questions can arise; is the property exempt from liability to this public burden? and is compensation provided for such as is taken for public use?    The first of these questions is not raised in this; for it is not urged that the defendants' bridge touches any thing exempt from being taken for public use.    The second, as I have intimated, I shall by and by attempt to prove, does not fall within this jurisdiction, but belongs to the local courts.

The plaintiffs raise another question, which I must first consider, for it meets me here in its natural order: they allege, that the act of 1828 impairs the obligation of contract, and therefore violates the constitution of the United States; and this they must establish before they can give this Court jurisdiction.    I come therefore to the fifth inquiry, has the state agreed to make compensation to the Charles River Bridge Company, for the privilege of running another bridge or way across the river, which diminishes their tolls?    If the state has made such a contract, let her abide by it; if not, then let the plaintiffs show some right to bring us here.

No such provision can be found in the act of 1785; nor is there any thing in the act which would lead one to suppose, that any such purpose, was, or could have been within the intent or meaning of the legislature.

It would, therefore, be a forced, unnatural inference.    But under the rule of construction applicable to such acts, I deny the right of the Court to raise an implication which is not a clear and necessary inference from the terms of the act.    If the inference be at all

doubtful, or if the act is fairly capable of another construction, then the implication cannot be raised. I submit to the Court, with much confidence, that such an obligation does not spring naturally from the language or general tenor of the act; and one can scarcely fail to be confirmed in that opinion, when he turns to the bill of rights prefatory to the constitution of Massachusetts; and there finds, in the 10th article, provision made for compensation in cases where property is taken for public use.

The plaintiffs, if they thought of the matter at all, doubtless relied on this provision in the fundamental law. They had no motives, then, for other provisions in the act; for the constitution of the United States was not made or ratified till 1789, four years subsequent to the passage of the act of 1785. It seems to me hardly to admit of a doubt, that when the act of 1785 was passed, all relied on the bill of rights for indemnity, in case public emergency called for an appropriation of the franchise for public use.

This being the state of things, I will inquire, first, what provision has been made to satisfy the constitution of Massachusetts? And second, whether that of the United States has been violated? On the first point I will only add to what has been said, that I shall not contend, but where property is taken for public use, the bill of rights does not impose a peremptory obligation to compensate for it.

The act of 1828 provides an indemnity for all real estate taken for the bridge.

The plaintiffs complain, that a part of their franchise is taken. What is it? An incorporeal hereditament, but issuing from real estate; a right to exclude other interfering ways. Now, if they have such a right spreading over the river in the nature of an easement, and can show that the new bridge is within their limits, why is not a sufficient remedy provided by the act? Is it because they cannot define this franchise, or give any reasonable account of its dimensions, that they omitted to put in their claim for damages? If the new bridge does not touch this right, then, by the laws of Massachusetts, they can have no claim for damage, however much they may suffer.

The doctrine is well settled in Callender and Marsh, and many other cases; and the rules applied to the bill of rights are these:

Where property is actually taken for public use, there the party injured may have his damage.

Where property is not touched, however much the owner may

suffer, he has, under the bill, no remedy, for nothing is taken for public use; and it is damnum absque injuria; what is merely consequential, is, therefore, without remedy. If the right of exclusion does not reach up the river above the new bridge, then the defendants are not liable, whatever may be the diversion of tolls; for they do not touch the property of the plaintiffs. I have shown, I trust, very clearly, that a diversion of tolls is not necessarily, of itself, any invasion of the plaintiffs' rights. They admit this, because they now admit that Canal bridge and West Boston bridge were both lawfully erected, and yet both diverted tolls to the extent of travel over them. Nothing is more plain than that they have no property in the travel, or any line of travel; for if they had, these diversions from their line would be aggressions upon their rights. There cannot be a property in what one neither has in possession, nor any right to reduce to possession. The plaintiffs can compel no one to go over their bridge.

The injury, therefore, which the plaintiffs sustain, if any, is because the defendants have come within the limits of their franchise, and erected a bridge, and caused a diversion of toll, which, under these circumstances, must be unlawful.

Our answer to this is, that they have utterly failed to establish any such exclusive right or title, as the act of 1785 gives no countenance to it; and they are forbid making such an unnecessary and unnatural implication of right. The damage which they suffer, then, is merely consequential, and falls within the principles of the case of Callender and Marsh, in 1 Pickering.

But suppose we are erroneous in this reasoning, and the new bridge actually falls within their exclusive right, and thus becomes unlawfully injurious; how is the case brought within the jurisdiction of this Court?

I repeat, the plaintiffs must show a violation of the constitution of the United States before they can make this jurisdiction attach.

They allege, that the act of 1828, being an act of the state, impairs the obligation of a contract, and therein violates the constitution of the United States; because it forbids the making of such a law.

But what contract does it impair? What obligation does it violate? I have heard much discussion about the injuries sustained by the plaintiffs in consequence of the act of 1828; but have they pointed out the contract, or the obligation of a contract, which has been violated? If so, where is it? The contract, if any, is the act

of 1785. It is a contract with the state itself; but this, in no respect, changes the character of the case, for the constitution is no more applicable to a contract with the state, than to any other contract. What has the state undertaken to do which it has refused to do? What has it agreed not to do which it has done? I hope the Court will look into the act, and see if they can find any provision there which has been violated. The state authorized the erection and continuance of a bridge, and the right to take toll during the period of seventy years. It has not revoked, annulled, or altered, any of these powers. It has not disturbed their possession or right to take toll. It has not altered a letter of the act. But it is urged that the state has authorized the erection of a bridge which greatly diminishes the tolls; and this is true; and the question here is, did she agree not to do it, in and by the acts of 1785 or 1792? If so, point out the agreement. The state, it is admitted on all hands, has an undoubted right to make new bridges, even if they do destroy the franchises of other bridges; but when she takes property for public use, she must compensate for the damage. And where arises the obligation to do this? Not in the act of 1785 or 1792, but in the bill of rights. Here lies the obligation, and no where else. There is nothing in the act of 1785 in regard to the duty of compensation.

The question here arises, is the bill of rights a part of the contract? If it is not, I humbly contend, that this Court cannot entertain jurisdiction, for its jurisdiction reaches only the constitution and laws of the United States; and this case cannot be brought under that constitution, unless a contract can be shown, which is impaired by the act of 1828.

The laws and constitutions of the states belong solely to the state courts to expound; Jackson v. Lamphire, 3 Pet. 280.

The bill of rights is part of the constitution of Massachusetts; and is not, and cannot be any part of a contract, unless expressly made so by agreement. The laws of a state may be used to expound and explain, but never to supersede or to vary a contract; Ogden v. Saunders, 12 Wheat. 213; 3 Story's Com. 249.

If this provision of the bill of rights should be added to the act of 1785, it would both supersede and vary the contract from what it now is.

These principles seem to be settled, beyond question. I consider it also well settled, that a contract with a state stands on ground in no respect differing from all other contracts; and the constitution of

the United States has, in its provisions, no reference specially to such contracts. The state is bound by no higher obligation to abstain from violating its own contracts by law, than to abstain from violating all other contracts. All citizens stand on the same footing in this respect, with the same measure of redress, and the same extent of rights.

If the bill of rights can be engrafted upon this contract as a condition, because it was a public law, of which all must take notice, when the act of 1785 was passed; then, for the same reason, it becomes a condition of every contract; and whoever has his property taken for public use, may appeal to this Court, and it would thus open its jurisdiction to revise a very extensive branch of jurisprudence, hitherto considered, as exclusively belonging to the states. Is the Court prepared for this? Did the framers of the constitution anticipate it? Will the public be satisfied with it? Not only matters of this kind will be brought here, but many other things. Why may not one who claims a right to vote in Massachusetts, and is denied the privilege, claim that the obligation of contract is impaired, for his right rests on the constitution? Why may not all officers whose qualifications, prescribed by the constitution, are drawn in question, and the rights, they claim denied to them, come here for redress? Why may not a judge, who is legislated out of office, by taking away his salary, appeal to this Court? Such a construction would open an alarming jurisdiction, and make this Court preside over the constitution and laws of the states as well as those of the United States; for this would be the result of making the constitution a part of contracts. The road laws alone, would take more than the whole time of the Court.

But I will not dwell on this aspect of the case, for this pretension has not been set up; and I am sure, the decisions of this Court are decisive of the question.

What then becomes of the jurisdiction, even admitting that the act of 1828 did violate the bill of rights? Is it not plain, that no contract or obligation of a contract is impaired, and therefore, that the constitution of the United States does not reach the case?

The courts of Massachusetts have acted upon the matter, and whether for good or evil, right or wrong, their decision is final.

I might add, that where property is taken for public use, it is not taken under, or by virtue of any contract, but in the necessary exercise of a great and essential element of sovereignty. It is a right,

that necessarily rides over all property, and can never be questioned. It is the duty of every government to make compensation where it is taken; and Massachusetts has made what she deems adequate and suitable provision by her fundamental law, and it is no part of the business of this government to inquire into the sufficiency or insufficiency of that provision, nor what exposition is put upon it by her courts. The thing does not lie in contract, but in public law; and this Court has never gone further than to declare private acts, contracts. Public acts, in the nature of things, cannot be contracts, but a rule of action.

This case, therefore, bears little, if any resemblance to Fletcher and Peck, New Jersey and Wilson, Dartmouth College and Woodward. In all these cases, and all the others quoted, the parties affected held rights under private acts, which the states of Georgia, New Jersey, and New Hampshire attempted, respectively, to repeal, after rights had vested. The question raised in each case was, whether a state, where it had conveyed property and rights to an individual, could annul its own act. If a state, for example, conveys land to an individual, nothing can be more absurd, than to suppose it can annul its title and resume the property; for such grants are irrevocable. So, also, in the case of Sturgis and Crowninshield, it was decided, that if one promises to pay money to another, a state cannot by a law, release him from his contract without payment. In all these cases, there is a manifest impairing of the obligation of contract, for the whole benefit is taken away, and the contract abrogated.

But in this case, it is admitted, that the state has a right to take any property whatever, for highways; and, that the franchise of Charles River Bridge is as liable as any other property to be seized for this purpose. The taking, therefore, for public use is no wrong.

It is no violation of the act of 1785, for it has always been held under that act, subject to this right. If it has been taken, therefore, that act is both right and lawful; for it is consistent with the contract, instead of a breach of it.

The only matter which can be complained of, is, that no compensation has been made. This right to compensation does not spring up under the contract, but is derived from public law. The bill of rights alone gives it; and on that alone can the claim be sustained, if sustained at all. Over that branch of law, I repeat, this Court has

no jurisdiction, and redress must be sought in the tribunals of Massachusetts, and in no other place.

Such is the necessary result, if property has been taken. On this point, therefore, we discover no error which can be corrected here.

But the plaintiffs are in no worse condition, and have no higher claim to indemnity, than a large class of citizens who suffer by public improvements. Rail roads, perhaps, generally, supersede the highways near them; and render stages, wagons, and other property to a great extent less valuable. They frustrate the views, and lessen the income of all who depend on the public travel for patronage and support. The business of large communities, and the value of real estate is seriously diminished, but there could be no indemnity for such losses. It is a mere misfortune, for such persons have no right over, or interest in the public travel which can be the subject of legal claim. The public convenience demands such improvements, and they are not to be obstructed from such causes.

I must be permitted, before I leave this subject, to declare distinctly, that it is no part of my purpose to urge any change, or modification of the laws; nor to advance the opinion that the strong arm of the public may seize individual property, and sacrifice it to the public convenience. I am aware that much has been said of this case; and that it has been said, there is no ground for the defence to stand on, short of a revolution of principles which will unsettle private rights, and subject them to public caprice. I am not unconscious of the dangers which surround such doctrines; and I am equally sensible to the folly of urging vested rights, as they are denominated, to such extremes as to make them felt as grievous burdens, and onerous inconveniences, by the public. Many of the feudal institutions which still have acknowledged force in England, have been repudiated here; and I cannot think there is much wisdom in attempting to engraft any of them upon our institutions, beyond where they have been distinctly recognised to be the law of the land.

But while I say this, I am fully impressed with the vital importance of giving steady, unceasing protection to private rights. The great elements of public liberty, lie in the firm protection of private rights. The great end of political association in a free government, is to obtain a firm, unwavering protection of our persons, and honest earnings. If a government fails to do this, it is of little value; for we scarcely want it for any other purpose. Liberty consists chiefly in freedom from arbitrary restraint and exactions; and no one can feel

more sincerely anxious for the preservation of these great principles, than I do. I am fully sensible that the constitution and the laws are the shield under which we take shelter. They are our place of refuge—the sanctuary to which we must cling, if we would preserve public liberty. I am not, therefore, for laying rude hands upon them—I am not for tearing away these great barriers of right.

I wish it, therefore, to be distinctly understood, that I place our case within the pale of the law, and invoke no violence in its aid. I ask for no new principles or rules, but for a fair and just exposition of the laws; and this, I know, is all we shall obtain.

Our case stands on what is called, by this Court, a contract; and I only contend that this contract, when construed by the rules of law, as I understand them, after careful research and consideration, will sustain no such exclusive rights and privileges as the plaintiffs claim. I see no great constitutional question involved in this matter; for it is not a matter of constitutional law, whether the act of 1785 gives a wide, or a narrow franchise, but a simple inquiry into the meaning of that act. The case involves nothing else. If I do not mistake the weight of authority, I have shown that in England such grants are strictly construed in favour of the public. This is the rule in a grant of privileges and monopolies; and I hope the public here is entitled to as favourable a consideration. All I ask is that this rule shall be applied to the act of 1785. It is due to public justice, and public policy, that it should be. I can see no objection to it, while I do see much to object to in the opposite course. I have never had but one opinion in this matter, and all investigation has tended to strengthen it. Some may suffer by a decision in favour of the defendants, and this I regret; but it affords no reason, whatever, for establishing unsound rules of construction, or for denying to the public the accommodation of a lawful way.

Mr. Webster, for the plaintiffs* in error, stated that the question before the Court was one of a private right; and was to be determined by the fair construction of a contract.

Much had been said to bring the claims of the plaintiffs in error into reproach. This course of remark does not affect their right to their property, if this Court shall consider that property has been

* The reporter was disappointed, in what he believed a well founded expectation of receiving a full statement of Mr. Webster's argument, made out by himself; or his notes, from which, with other aids, he could have given the argument more at large.

taken from them by proceedings which violate a contract; and in a case where this Court has a constitutional right to interpose for its protection and restoration.

It is said that the proprietors of Charles River Bridge have been repaid for the advances made by them in building the bridge. But this is not the question upon which the Court has to decide. It is a question of contract; and if it is so, where is the necessity to inquire whether the plaintiffs have laid out a million, or nothing. If there was a contract, the question is not what was the amount of profit to be derived from it, but what was its provisions; however advantageous to those with whom it was made. It is a contract for the annual receipt of tolls for a specified period of time; and it is said the state, which by its law brought the company into existence, by allowing these tolls, may break the contract, because the amount of the tolls is large; and by a legislative act, say, that, for a portion of the time granted, the contract shall not be in force!

The case has been argued before; once in the superior court of the state of Massachusetts, and once in this Court: and without any disrespect to the counsel who argued it before the present hearing, it has been exhibited on new and enlarged grounds.

It has been said, in the argument, that the right of eminent domain cannot be granted away by a legislative act; and if granted, the same may be resumed, against the express terms of the grant. The necessity of the existence of this right in a sovereign state, has been asserted to be shown by a reference to many cases; as the grant of a right to construct a turnpike, which, if it gave an exclusive right of making all communications between two places, to a corporation, or to an individual, would operate to prevent the introduction of improved modes of intercourse, as by rail roads; and thus be most extensively injurious to the interests, and stay, to a fatal extent, the prosperity of the community.

The plaintiffs in error deny this position. They hold that the obligation of a contract is complete; and that other means than by its violation, may protect the interests of the community. Such a violation of a contract would be fatal to the confidence of the governed in those who govern; and would destroy the security of all property, and all rights derived under it.

The localities of the two bridges, "the Charles River Bridge," and "the Warren Bridge," are well understood by the Court. They accommodate the same line of travel, and either of them furnishes

all the convenience, and all the facilities the line of travel requires. That one is sufficient, is shown by the fact, which is not denied, that since the Warren Bridge has become free, all travellers pass over it, and no tolls are received by the proprietors of the Charles River Bridge.

When the act authorizing the Warren Bridge was passed, and the company was about to erect the bridge, the plaintiffs applied to the superior court of Massachusetts for an injunction to prevent the work going on. This was refused, on grounds that nothing had been done by the company which presented the question of the unconstitutionality of the law. Before the Warren Bridge was in the actual receipt of tolls, the bill now before the Court was filed; and afterwards a supplemental bill, the proprietors of the Warren Bridge being in the actual receipt of tolls; claiming that the charter under which they acted was a violation of the contract of the state, with the proprietors of the Charles River Bridge, and was therefore against the constitution of the United States. The case is now before this Court, on this question.

It is said that Boston has many of such bridges as that constructed by the plaintiffs. This must necessarily be so. Boston is an exception in the ocean. She is almost surrounded by the waters of the sea, and is approached every where, but in one part, by a bridge. It is said that those numerous bridges have given rise to no litigation. This is so, but the just inference is, that by no one of these has a right been interfered with. In fact, in all the cases where rival bridges, or bridges affecting prior rights have been put up; it is understood that there has been agreements with those who were or might be affected by them. This was the case with West Boston bridge. It was purchased by those who sought to make a free bridge which would interfere with it.

It has been said, in argument, that the ferry franchise, which was the property of Harvard college, was seized by the legislature when they authorized the erection of the Charles River Bridge. But this was not so. A compensation was allowed for the use of the franchise or its interruption; and no objection was ever made to it by that institution. The just inference is, that a previous agreement had been made with the college; and that the sum annually paid by the proprietors of Charles River Bridge, was entirely satisfactory to that corporation.

Mr. Webster then went into an examination of the circumstances

which had attended the erection of other bridges from the main land to Boston; and he contended, that in all the cases, compensation had been made to those who were injuriously affected by them. In the case of the Cambridge bridge, the legislature, in the act authorizing it, extended the charter of the proprietors of the Charles River Bridge, as a compensation for the erection of another bridge. This was a compensation for the tolls taken by diverting the line of travel. In none of these cases was there an appeal to prerogative, and to its all superseding powers.

The history of the Warren Bridge exhibits an entirely different state of things. It was undertaken on different principles, and under a different temper. It began with a clamour about monopoly! It was asserted, that the public had a right to break up the monopoly which was held by the Charles River Bridge Company; that they had a right to have a free bridge. Applications were frequently made to the legislature on those principles and for that purpose, during five years, without success; and the bill, authorizing the bridge, when it was first passed by the legislature of Massachusetts, was rejected by the veto of the governor. When the charter was actually granted, it passed the legislature by a majority of as many members as there were hundreds in the body.

If it had not been for the provision in the constitution of the United States, under which the plaintiffs now ask for the protection of this Court, it is believed the law would not have been enacted. Members of the legislature consented to the law, on the ground that if it interfered with chartered rights, this Court would set it aside. The argument was, that if the law was a violation of the charter, it would be of no avail.. Thus it passed.

But since its passage, there is an appeal to the right of eminent domain to sustain it. It is said, take care! You are treading on burning embers! You are asking to interfere with the rights of the state to make rail roads, and modern improvements, which supersede those of past times by their superiority! You prevent the progress of improvements, essential to the prosperity of the community!

It would then appear that the existence of the provision of the constitution of the United States, which this Court is now called upon to apply, has been the whole cause of the injury done to the plaintiffs, by the passage of the law authorizing the Warren Bridge. But for the belief that the rights of plaintiffs would be restored by the appeal to that provision, the law would not have existed.

[Charles River Bridge v. Warren Bridge et al.]

The learned gentleman who first argued the case for the defendants, went the whole length of asserting the power of the legislature to take away the grant, without making compensation. The other gentleman asks if the plaintiffs are not yet satisfied with exactions on the public? What are exactions? They are something unjust. The plaintiffs have taken tolls for passing the bridge; but this they had a right to do by their charter.

It is said the tolls were oppressive; but is it oppression, when the right was given by the charter to take them as the stipulated income for capital laid out under the charter? It is said that the public are on one side, and the plaintiffs are on the other; that if the case is decided one way, a thousand hands will be raised, to one, should the decision be different; but this is not correct. The public sentiment, in this case, is not on one side. It is not with the defendants. The representatives of Boston, never voted for the Warren Bridge. They thought there were existing vested rights, which ought not to be disregarded. The city of Boston would have purchased the right of the Charles River Bridge, if they had been asked. The property, or stock in the bridge, was dispersed through the community; it was not a monopoly.

The honour of Massachusetts will stand unblemished in this controversy. The plaintiffs impute no dishonour to her, or to her legislature. Massachusetts only wants to know if the law in favour of the Warren Bridge, has infringed upon the vested rights of the plaintiffs; and if this is so, she will promptly make compensation.

The plaintiffs say, the act authorizing the Warren Bridge has violated the constitution of the United States; and if this Court shall so declare, the state of Massachusetts will do full justice to those who have been injured by her authority.

The counsel for the defendants have said that the plaintiffs have sustained no loss but that of their golden prospects. They have lost all their property; a property worth three hundred thousand dollars before the new bridge was built, and now not worth thirty dollars.

The rights of the plaintiffs are no monopoly. They are the enjoyments of the property for which they had paid in advance; and which, by a contract made by the law, they were entitled to enjoy for twenty years yet to come. They are called rapacious monopolists; when they claim to hold what they have purchased. Those who have assailed this property, have taken it from them; have

taken all from them without compensation. Where, and with whom is the rapacity to be found in the transaction?

The provisions of the law of Massachusetts against monopolies, are taken from the English statutes of James the first. They were so taken, for it follows that statute in terms, and contains the same exceptions in favour of useful inventions. Thus the Massachusetts law is the same with that of England, which has never been considered as extending to such cases as this before the Court. The language of the law is " monopolies;" but this is a " franchise," and not a monopoly; and thus the clamour which was raised has no application to the property of the plaintiffs in error. It is unjust, and without application.

The record presents the only questions in the case. What are they?

The original bill was filed in 1828, and after the answer of the defendants was put in, the amended bill was filed, only to put in issue the questions of law and fact, presented in the original bill.

The courts of Massachusetts proceeded in this case according to the equity rules of this Court; and this case is fully exhibited, so that the whole of the issues of law can be decided here.

The original bill founded the rights of the plaintiffs:

1st. On the act of the legislature of Massachusetts of 1785.

2d. On the purchase, by the plaintiffs, of the ferry right, which had belonged to Harvard college.

3d. On the consideration paid for the charter to build the bridge, and the prolongation of the charter for twenty years, by the act of 1792.

The plaintiffs say the act for the erection of the Warren Bridge, violates the constitution of the United States; and that the act takes the property of the plaintiffs for public use, without making compensation for it. They rest on their charter.

The defendants, in their answer, do not say the property has been taken for public use, but they rest on their charter: and they say that the legislature had a right to pass the act, as it does not infringe the property of the complainants.

This presents the question, whether the constitution of the United States is violated? There is no other issue made on this record.

This state of the pleadings excludes much of the matter which has been presented by the counsel for the defendants. They do not present the question of eminent domain. The plaintiffs might have

presented that question in the court of Massachusetts. They might have said that their property was taken by the law, for public use; and was taken under the right of eminent domain. This would have been a Massachusetts question; and one which could not have been brought before this Court. It is admitted that if the legislature of Massachusetts takes private property for public use, under the power of eminent domain, this Court cannot take cognizance of the case. If the case had been so put before the superior court of Massachusetts, that court could have decided that the complainants were entitled to compensation, and that the defendants were bound to make it.

It is the law of this Court, that the parties must be confined to the questions on the record. The only issue here is the question whether the defendants have infringed the rights of the plaintiffs, and have violated the constitution of the United States.

While this case was in progress through the courts of Massachusetts, and depending in this Court, it appeared that one half of the tolls of the plaintiffs' bridge was taken away. Now the whole tolls are gone! This has occurred since the Warren Bridge has become a free bridge.

The legislature of Massachusetts have given to the plaintiffs the right to the franchise of a bridge at Charlestown; and the question is, whether this is such a right as that it can be violated or infringed? The franchise is a thing which lies in grant, and is, therefore, a contract: and if, by the charter to the Warren Bridge, it has been infringed, it comes within the prohibition of the constitution relative to contracts. The question is, whether the plaintiffs had such a franchise? This is the only question in the record.

A preliminary objection to the right of this Court to proceed in this case, has been made, on the suggestion that the case is one against the state of Massachusetts; as the state of Massachusetts is now the only party interested in the cause, the bridge having become her property; and it is said, against the state, this Court can grant no relief. A state cannot be brought into this Court, in a suit by individuals, or a corporation.

The state is not a party to the cause. The bill is against the persons who built the Warren Bridge; and it is from them relief is sought, and required; and those persons stand as trespassers, if the law, under which they acted, is unconstitutional. But after a suit is lawfully commenced, it goes on against all who afterwards make

themselves parties to it.  There is no effect on the rights of the plaintiffs by a change of this kind, as a wrong-doer cannot excuse himself by parting with his property.

The plaintiffs ask a decree against the proprietors of the Warren Bridge, John Skinner and others; and a decree is asked against no others.  The question which is raised by the objection to the jurisdiction of this Court in this case, is, whether the Court can proceed in a case in which a state has an interest?  This cannot be asserted with success.  If such were the law, the exclusion of jurisdiction would extend to all cases of lands granted by the United States; for, in cases of such grants, if no title has been given, the United States are bound to make compensation.  Such a doctrine would overrule the judicial structure of the government, and prevent the administration of its most important functions.

This question has been decided in this Court, in the case of Osborn v. The Bank of the United States; 9 Wheat. 857; 5 Peters' Condensed Reports, 768.

This is precisely the same question with that in the case referred to.  The state of Ohio claimed the money in the hands of Osborn, as a tax on the funds of the bank of the United States, imposed by an act of the legislature of the state.  The state of Massachusetts claim the tolls of the bridge, derived from a law of the state.  This Court, in the case cited, expressly declare it to be one in which the state is a party.  So in Fletcher v. Peck, where Georgia had declared a deed given by the state for lands, void; but the parties to the case were those on the record, although the decision directly vacated the proceedings of the legislature of Georgia, yet the Court had jurisdiction.  In this case, no judgment will be pronounced against the state of Massachusetts.  On these pleadings, if the constitutional question were out of the case, could any action of the Court affect the state?  She is, in fact, no party in this cause.  She cannot be a party to blow up a suit, and not be subjected to its final result.  Suppose a state should coin money, congress would not prohibit its being done, it is prohibited by the constitution; and a law could not do more.  Could the law be carried into effect?  Proceedings under it would be brought before this Court, by an action against the agents of the state, or by a suit against the party issuing it, or making a contract for the money so coined.  If you cannot, by a suit against an individual, question the unconstitutional acts of a party, the whole of the powers

of the constitution, upon its great and vital provisions for the preservation of the government are defeated.

It has been said, the Court can do no justice to the parties who have sought its protection, because the superior court of Massachusetts has only a limited jurisdiction in cases of equity.

It is admitted, that the equity jurisdiction of the courts of Massachusetts is limited; but it has all the jurisdiction over the subject, to which its powers extend, as any other court of equity. The law of Massachusetts gives full equity powers to the court, in all cases which are made subject to its jurisdiction; 6 Pickering's Rep. 395. The law of 1827, gave this jurisdiction in all cases of waste and nuisance.

This bill prays for general relief. This Court may abate the nuisance, and decree a repayment of the tolls; and do all in the case, that, according to law and equity, may appertain to it. In equity, a court may enjoin against the nuisance, and decree a compensation.

But all this discussion about the power of the court of Massachusetts to make a suitable decree, has no place here. This Court can, in their decree, declare, whether the act of 1828 does impair the contract of 1785. This is all the Court can do; and it is nothing to them what will be done in the case, by the court to which the case will be remanded. In conformity with the provisions of the judiciary act of 1789, this Court remands a case when further proceedings are necessary in the court from which it may have been brought; when nothing else is required in that court, this Court will give a final judgment.

In this case, the Court are bound down by the record, to the single question of the validity of the law, under which the defendants acted.

To proceed to the main questions in the cause:

1. The plaintiffs claim to set up a bridge, exclusively, between Boston and Charlestown; or, if they are not entitled to this, they claim to put down all such other bridges as interfere with the profits and enjoyments of their privileges.

It is not contended that the termini include or exclude all within the place. Every person must keep so far off, as not to do a direct mischief to the plaintiffs' rights. The plaintiffs say, that the ferry right gave them the privilege of excluding rivals. That by the charter, they have a franchise which gives them rights, which cannot be violated by the proceedings of a subsequent legislature.

[Charles River Bridge v. Warren Bridge et al.]

It is in vain to attempt to derive any thing from the ferry right, if it is what the defendants say it is. They say, that a ferry is a path over a river; and that the English law relating to ferries never was in force in Massachusetts. This position is denied by the plaintiffs. In support of this assertion, they give a bead roll of ferries, which have been taken away; and bridges built wherε they before existed. This is statement.

The law of Massachusetts has always been the common law of England. Is there any authority for the contrary, in any of the decisions of her courts? There may be such, but it is hoped not, and it is believed not. Have the ancient fathers of the profession of the law; the Parsons, the Sedgwicks, the Danes, taught other doctrine? Has the contrary been sustained by these men; by their opinions? In the case referred to by the counsel for the defendants, a distinguished lawyer of Massachusetts allowed a ferry right according to the common law of England. Every judge in Massachusetts has held a ferry right to be an indefeasible inheritance; a vested right, like any other property. Let us see if this is not the fact.

But before this is done, a reference will be made to acts in the early history of Massachusetts which are on the record.

There is a grant of a ferry for twenty-one years.

" At generall corte held at Boston, 7th day of 8th month, 1641. It is ordered, that they, that put boats between Cape Ann and Annisquam, shall have liberty to take sufficient toale, as the court shall think meete."

Is this the grant merely of a path across the river? So, also, there is a grant of an inheritance in a ferry, on condition that it shall be submitted to the general court. This grant is cotemporaneous with the grant of the ferry over Charles river.

" At a general corte of election at Boston, the 10th of the 3d month, A. 1648.

Upon certain information given to this generall corte, that there is no fferry kept upon Naponset ryver, between Dorchester and Braintree, whereby all that are to pass that way, are forced to head the river, to the great prejudice of townes that are in those partes, and that there appears no man that wil keepe it, unlesse he be accommodated with house, land, and a boate, at the charge of the country: It is therefore ordered, by the authority of this corte, that Mr. John Glover shall, and hereby hath, full power given him, either to grant it to any person, or persons, for the tearme of seaven yeares,

so it be not any way chargeable to the country, or else to take it himselfe and his heires, as his own inheritance forever; provided that it be kept in such a place, and at such a price, as may be most convenient for the country, and pleasant to the general courte."

In the record there is a copy of a grant of a bridge over Charles river, near Watertown; the terms of which are, on the condition of making the bridge, the tolls are granted for ever. This was in 1670.

This is the early statute law of Massachusetts. The later acts of the legislature are of the same character. The instances of such legislation were cited from 7 Pick. Rep. 446, 447, 448, 511, 521, 523. In all these cases, the judges hold the common law of England as to ferries to be the law of Massachusetts; and that a ferry is an indefeasible interest, and a franchise and property.

Mr. Webster then stated a number of cases, in which, when a bridge had been erected in the place of an existing ferry, compensation had been made to the owners of the ferry. He insisted, that upon these authorities, a ferry was as much a property, as much the object of legal protection, as any thing known to the laws of the land.

The plaintiffs obtained their property as a purchase of some extent up and down the river. It is not required now to determine how far the purchase extended; for the rival bridge erected by the de-defendants, is alongside of the Charles River Bridge, and is an interruption to the profits derived from it. It is not necessary now to fix the limits of the franchise. That the interference is direct and certain, is not denied. Difficulties may arise hereafter in fixing these limits, but it is not necessary to go to a distance to establish them, before a certain, and admitted interference, shall be examined.

It is submitted, that in London no bridge has been erected over the river without compensation having been made to those whose interests may have been injured. The evidence of this will be found in many works on the subject. Those treatises show the minute attention of the British parliament, in all cases in which private rights may be affected by the enactment of a statute. All persons who may be interested, have notice from parliament of the application; and compensation is made, where any injury is done.

It is said, that the distinguished honour of maintaining principles which will arrest the progress of public improvements, is left to the plaintiffs in this case. This is not so. All that is asked, is, that the franchise shall be protected. Massachusetts has not made any im-

provement of her own, although she has subscribed liberally to those which have been undertaken by individuals and corporations. In all these cases, private rights have been respected; and except in the case now before the Court, Massachusetts has kept her faith. Recent and previous acts by her legislature show this. In every case, but this, compensation has been made in the law, or provided for.

The plaintiffs do not seek to interrupt the progress of improvements, but they ask to stay revolution; a revolution against the foundations on which property rests; a revolution which is attempted on the allegation of monopoly: we resist the clamour against legislative acts which have vested rights in individuals on principles of equal justice to the state, and to those who hold those rights under the provisions of the law.

It is true, that before the legislature the rights of the plaintiffs were examined, and still the Warren Bridge charter was given; but the decision of a committee of the legislature was not a judicial action. The plaintiffs have a full right to come before this Court, notwithstanding their failure before the legislature.

In reply to some remarks of the counsel of the defendants, Mr. Webster stated, that the proceedings in England under writs of ad quod damnum, did not affect private rights. The writ of ad quod damnum issued for the honour of the king. It issues before a grant is made, and for the protection of the king. Private persons may claim the protection of the law in favour of their rights, notwithstanding such a proceeding. Questions of nuisance, are always questions of fact, and must be tried by a jury; but no jury can assess the amount of injury until the facts are ascertained. These principles are sustained in 3 Black. Com. 219.

Is it the liberal construction of charters to interpret them against the rights of individuals, against the enactments of the law? The course has been to construe them in favour of the grantees, and to enlarge their provisions for his benefit. The whole of the course is changed, if an opposite principle is adopted. But the plaintiffs ask no more than a fair judicial construction of the law; no more is required but what they are entitled to, under a judicial interpretation of it.

It has been said, in the argument for the defendants, that although the holder of a franchise may maintain an action against a stranger who interferes with it, without a license; but he may not against one who has a license from the state. This is without authority. If he

can claim against a stranger, it is because of his property in the franchise, and this will protect him in proceeding against any one. This right is complete against all, and the state can give no privilege to interfere with it.

In the case of Bonaparte v. The Camden and Amboy Rail Road Company, Mr. Justice Baldwin, sitting in the circuit court of New Jersey, says:

" The privilege of exemption of the principal is not communicated to the agent, though the principal is a state which cannot be sued at law or in equity; and the agent, a public officer acting in execution of the law of the state, and the subject matter of the suit was money actually in their treasury, in the custody of the defendant for the use of the state." 1 Bald. Rep. 217.

The proprietors of the Charles River Bridge, purchased the ferry franchise from Harvard college, and it became their property for the purpose of erecting a bridge upon its site, with all the rights and advantages to be derived from it. It was purchased, and the consideration for it was the annual payment of the sum of two hundred pounds. This, by the charter, was to be absolutely paid; and no accident to the bridge, no deficiency of tolls, will excuse the non-payment of the sum so stipulated to be paid.

Suppose, while the bridge was building it had been profitable to use the ferry, would not the tolls have belonged to the proprietors of the Charles River Bridge? There is no ground to suppose the college meant to retain any thing out of the franchise. Nothing appears, which will authorize the supposition that the state meant to take a transfer of the franchise, or any part of it; and allowed the use of it to the bridge, to the extent of putting up the abutments, at the places where the ferry was carried on. The bridge is the successor of the college, in the franchise; the company purchased it, to its full extent, and the state, by the charter, ratified the purchase.

The erection of the bridge was an undertaking of great hazard, and the result of the effort to construct it, was considered exceedingly doubtful. It cannot, therefore, be supposed that the franchise was to be diminished, and its enjoyment to be limited. Nothing of this is expressed, and nothing so unreasonable can be implied. It is in evidence, on the record, that the college was a party to the building of the bridge. The president stated that the college had assented to it. According to the course of decisions in Massachusetts, the franchise was an indefeasible inheritance. In that state, the manage-

ment of ferries was with the general court. As to this franchise, from 1640, to 1785, it was respected by the local authorities of Middlesex, and Sussex. It would then appear, that it was held under a legislative grant, which transcended all other rights.

The franchise which was obtained from the college, was not extinguished by compact: and it cannot, therefore, be disturbed by any action of the legislature.

It is deemed important, and is the truth of the case, to consider the rights of the Charles River Bridge Company, in connection with those of the college. The college had, and still have, an interest in it; and the use of the franchise by the company, is essential to all the purposes, and to more than those for which it was held by the college. The pontage furnished by the bridge, was the substitute for the passage by the ferry; and it was not, therefore, only for location at the place where the bridge was built, that the rights of the college were obtained. All the privileges enjoyed as a part of the ferry franchise were acquired. When the bridge was put up on the same place as the ferry had been, and for all the ends of the ferry, it is but just and reasonable, that the extent of the right shall be in the hands of the Bridge Company, equal to that which it was when held by the college.

The views which have been taken, fully show that the state of Massachusetts made, in the full and rightful exercise of her legislative powers, a grant to the proprietors of the Charles River Bridge, and the grant was a contract. As such, by no subsequent legislation, could it be impaired: a right vested, cannot be divested. Cited 2 Dall. 297, 304; 9 Cranch, 52; Green v. Biddle, 8 Wheat. 1; Fletcher v. Peck, 6 Cranch, 136.

If a power of revocation existed, it was no contract. The state cannot make such a contract; as the power of revocation is incompetent to will the existence of a contract.

Can a stronger case be imagined, than that which gave rise to the controversy in Fletcher v. Peck? The contract had been made in fraud; in morals, it was just to burn it; in policy, it was equally so, as a large part of the domain of the state of Georgia was granted for no adequate consideration. But this Court decided in that case, that the legislature of Georgia had no power to annul the grant; and the grant was maintained by the judgment of this Court.

The difficulty in which this case is involved, and upon which the defendants expect success, arises from considering two things alike, which are different. The power of making public grants, because

the interests of the community requires they should be made, and the right of eminent domain.

Where property is taken for public purposes, compensation is given; this is the exercise of eminent domain. The legislature are not the judges of the extent of their powers; and the question now before the Court is, whether they had the power which has been exercised in this particular case.

By the act of the legislature authorizing the Warren Bridge, two injuries were done to the plaintiffs. First, by the damage they sustained from a rival bridge. Secondly, the infringement of their right of pontage. The toll had been originally granted for forty years, and this excluded rivalship. By the interruption of the receipt of their full tolls, the proprietors of the bridge sustained heavy losses; and by the erection of the Warren Bridge, now a free bridge, their beneficial right of pontage has been destroyed. In these, have the contract of the state of Massachusetts been broken. Thus the case is entirely within the provision of the constitution of the United States.

What is the meaning of the assertion, that in a grant by a government nothing passes by implication? How is it in grants of land? Does a patent from the United States carry less than a grant by an individual? They are the same—a grant of " land" carries " *mines.*" The principle, that nothing passes by implication, arose in early times, when the grants of the crown were greater than now; when they were made to favourites, and the power was abused;—and when their extravagance induced courts to restrain them to their words. Hence the insertion of " mero motu" " certa scientia." Hence the principle, that the grant of one thing shall not carry another. The doctrine that nothing can be carried by implication in a royal grant, does not apply to grants by parliament, or of franchises, 2 H. Bl. 500: no case but one from 2 Barnwell and Alderson's Reports, 792, has been cited to sustain the position. That case is not authority here. But if the whole of that case is taken together, it is in favour of the plaintiffs in this cause. The decision is right; although there is too much strictness in some of the opinions of lord Tenterden.

Franchises are complex in their nature, and all that may be necessary for their enjoyment must pass with them, although things separate do not pass; whatever is incident to them, does not require implication to pass such incidents. Thus the grant of the ferry to the college, gave the right to take toll; to keep boats: cited 1 Nott and M'Cord, 393.

[Charles River Bridge v. Warren Bridge et al.]

It has been said, that this may be good law as to individuals, but that it will not operate in the case of a state—authorities for this position are required. If a grantee of a franchise can sustain an action against an individual, for an injury to his property, or an interference with his property; why may he not against the grantee of the government, who thus interposes? The case is stronger against the government, than against a stranger. The government has received the consideration for the grant; and there is an implied obligation to protect the enjoyment of it.

Ferries are property. They may be seized for rent; they may be devised by will; they may be sold: and yet it is said the government may take them away from their proprietors, for their grantors. Let us see some principle which will allow such property to be taken; and which yet regards private property, and respects private rights, and public faith.

The right of a ferry carries tolls; and it also carries, for its protection, the principles of justice and of law, that the grantee may keep down injurious competition. It is vain to give him one, without the other. Both must be given, or none is given. The grant is intended as a benefit, as a remuneration for risks, and for advances of capital, not as a mere name. The ordinary means of compensation for such advances are not sufficient. The franchise necessarily implies exclusive and beneficial privileges.

It was under this law of ferries the plaintiffs took their charter. They considered that under it they held the whole extent of the ferry franchise. There was then but one ferry between Charlestown and Boston. It had the whole ferry rights, and this they acquired; this they have paid for. If a grant refers to another grant, it carries all which is contained in both. But suppose there had been no reference to any other; it would carry the same rights, and to the same extent, or more. The expense of erecting a bridge, and keeping it in order, is much greater than that attending the setting up and keeping in order a ferry.

The promotion of public accommodation is no reason for taking away a privilege, held under a legal grant. It cannot be done unjustly to the rights of others. These rights must be respected. The income derived from these rights shall not be diminished. Suppose the bridge had been erected, without an act of the legislature to authorize it; would a subsequent act protect it? How can a grant to A be lawfully impaired, or injuriously affected by a subsequent grant

to B, which interferes with the enjoyment of the prior grant? Once granted, always granted.

What position would a judicial tribunal assume, that would construe a grant differently, according to the parties to it. Can you raise an implication against it, and not do so against the government? Implication is construction—construction is meaning—and when a thing is in the deed, it is the meaning, and force, and purpose of the instrument. If the parties are changed, these cannot be changed. To allow another bridge to be built, was to take away the tolls of the first bridge. In support of the position, that this was a violation of the rights of the plaintiffs, the opinions of all the judges of the court of Massachusetts, from which the case is brought, are appealed to. They all say, that the charter granted by the legislature is binding on it, and cannot be impaired; and they say, that, to whatever extent the grant goes, it must be supported; 2 Mass. Rep. 146. But the Warren Bridge does impair the charter, for it takes away the tolls. What then becomes of the reserved rights of the legislature? This is a solemn adjudication of the court of Massachusetts. Then there is no reservation.

There is implication in government grants. This has been so held in Massachusetts; 4 Mass. Rep. 522. It is also the law of this Court; Dartmouth College Case, 4 Cond. Rep. 549.

The court below held, in this case, that whatever was granted belonged to the grantee; that the ferry at Charlestown was granted to the college, and that the law of England relating to ferries, prevails in Massachusetts; that nothing can be taken for public use without compensation; that public grants are always to be so construed as to convey what is essential to the enjoyment of the thing granted, and cannot be superseded, or the grant impaired. In support of these positions, Mr. Webster read parts of the opinions of the judges of the superior court of Massachusetts, delivered in this case.

The proposition is stated, that grants of the character of this which is held by the plaintiffs contain a power of revocation. This cannot be. Being grants, they cannot be treated or considered as mere laws; being grants, they are contracts. In this case, the grant was intended to be beneficial to the grantees, and it contained a covenant that it should continue for forty, and afterwards for seventy years. For this a consideration was paid, and is now paid; to the public, by the large expenditure for constructing the bridge; to Harvard college, by the sum of two hundred pounds annually. But the legisla-

[Charles River Bridge v. Warren Bridge et al.]

ture have now done every thing to make the grant unproductive; to deprive the holders of all advantage from it.

Necessarily, the grant to the proprietors of the Charles River Bridge contained a guarantee of their enjoyment of the privileges contained in it. Any other construction would be against every principle upon which the rights of property, derived from public acts, rests. Suppose, after the grant of a ferry, with a right to take tolls, and the establishment of it by the grantee, at the expense of boats; a free ferry had been erected at the same place, or so contiguous as to destroy the profits of the first ferry, by a ruinous competition; would this be proper? It is said that still the right to take tolls remains in the first franchise. This is true; and it is then inquired, what injury has been done? No franchise, it is said, is taken away; all the rights granted remain; the tolls remain.

It is true, the counsel for the defendants admit that all will pass over the free ferry; but yet they say the toll dish of the first grantees is not touched by the hands of those who have opened the free ferry; the notice of the rates of tolls to be paid, yet remains.

But to all this the plaintiffs oppose the simple fact. Under the plaintiffs grant of a franchise, they possess the constitutional right to keep down all competition, during the whole time of the charter.

This has been established by an unbroken chain of authorities, for many years; and this applies to all grants alike, here, as well as in England. It is a franchise; and every dollar of toll taken at the Warren Bridge, since its erection, and the temporary use as a toll bridge, is a part of the legal and proper profits of our franchise; and thus the guarantee, conveyed in grant, (as guarantees are interpreted by the Massachusetts courts,) has been broken.

Mr. Webster then went into a further examination of the argument of the counsel for the defendants, and into a notice of the observations which had fallen from them in the defence.

The plaintiffs, it is said, have received compensation enough; their profits have been already very large; they have had a reasonable compensation. This is not so. Nothing is reasonable but the fulfilment of the contract. It is not reasonable that one party should judge for themselves, as to compensation; and depart from the terms of the contract, which is definite and plain in its meaning.

There was no extinction, it is argued, of the franchise. The answer is, that the act authorizing the second bridge expressly extends the charter, adding thirty years to it; and recites the consideration

the public had received for the same. In this there is a guarantee that the state shall pass no law to impair the contract. It is not true that we can have no property in the line of travel, if by that is meant, in the franchise granted by Gov. Winthrop and others, the right of transporting passengers from Boston to Charlestown. The franchise is valuable, because the transportation was concentrated at the points at which the plaintiffs' bridge was erected.

The construction of the grant to us, which we demand, it is said, is not valuable. The plaintiffs say otherwise, and the issue is with this Court.

It is held up as a cause of alarm that the plaintiffs claim a perpetual right to this franchise; and that when the charter of their bridge has expired, they will fall back upon their claim to the ferry. We do no such thing. When that time comes, it becomes the property of the state again. Theirs then it is, "King, Cawdor, Glamis, all!" And it were to have been wished, that the defendants could have been content to wait until that time had arrived.

The analogies of the rights of a tavern, a street, a mill, &c., have been put in the course of the argument for the defence. But all these were false analogies. They were not franchises. Not in the grant of the government.

Then there is a long argument, based on the alleged policy of Massachusetts, in regard to public highways. There is nothing, Mr. Webster argued, in the situation of such matters, in that state, requiring the adoption of any particular line of policy. The roads are numerous and excellent; and no trouble is experienced in maintaining them so. There are no cases requiring any peculiar policy, nor any great or broad power to be exercised over them.

This particular case, formed an exception to the usual caution exercised by Massachusetts, in legislating upon matters of this kind. Ever since this act passed, nay, within these two years, the legislature has granted a charter to a company for the erection of "The Hancock Free Bridge," near the West Boston bridge, from Boston to Cambridge; between that avenue and Canal bridge, lower down. The act prescribes the width; the obligation to attend the draw, &c.; makes the bridge a free one; the corporation to keep it in order, &c. For all this, they look for their compensation in the advanced value of their contiguous property. And in this very act, that corporation are directed to make compensation to all owners of real estate, whose property is liable to injury by the erection of the said bridge; ap-

praisers are to be appointed according to a mode pointed out in the act, and if not made according to their appraisement, then by the decision of a jury of the country. And a section of the act provides that its provisions are to be void, if, before a certain period, the proprietors of the West Boston bridge shall sell out their bridge, according to the estimate of appraisers to be appointed by the parties. The language is, if such proprietors, " will sell out their bridge and franchise." Now, can this be set off by metes and bounds, as required of us, in relation to our " franchise?" And so much for the " policy" and understanding of the legislature of Massachusetts, as to franchises!

Again, it is pretended and argued, that the plaintiffs have not always been uniform in the interpretation of their own rights. On the contrary, answered Mr. Webster, this same right was set up on building the bridge to the franchise of the ferry, and was then acknowledged: and the same principle has ever since been recognised and acted upon, by the legislature, and by the plaintiffs.

And there was one other subject, which, though it had no bearing upon the case at bar whatever, had been made a great deal of, in the argument of defendants' counsel. Some observations upon it had been advanced, by way of connecting it with the case, of so novel a kind, as to require, however, some notice. And this was, that in chartering the Warren Bridge, the legislature did but exercise its power over the eminent domain of the state. This power is described as being inalienable, and that the state cannot abandon it; nor by its own covenant, or grant, bind itself to alienate or transfer it in any way. That it cannot tie up its hands in any wise, in regard to its eminent domain.

In the course of the arguments for the defendants, one of their honours (Mr. Justice Story), had put a case to the learned counsel (Mr. Greenleaf), like the following: Suppose a rail road corporation receive a charter at the hands of the state of Massachusetts, in which an express provision was inserted, that no other road should be granted during the duration of the charter, within ten miles of the proposed road. The road is built and opened. Did he hold, that, notwithstanding that covenant, a subsequent legislature had the power to grant another road, within five rods of the first, without any compensation, other than the faith, thus given by their charter, of the state of Massachusetts? And the learned counsel had replied, that he did so say, and did so hold! This struck him, as it must have struck the Court, as most startling doctrine.

[Charles River Bridge v. Warren Bridge et al.]

[Mr. Greenleaf here stated, that in such a case, the faith of the state of Massachusetts was pledged to indemnify the parties; by making full compensation for whatever property the state might take, and for all the injury which should be done to private rights. It would not be presumed by this Court, that the faith of the state would be broken.]

Mr. Webster proceeded to say, that the first question he wished to put, in relation to the position of the defendants' counsel, was, how can this power of eminent domain, as thus construed, be limited to the two sides, merely, of the road? Why should it not fall upon the road itself, and no compensation follow to the grantees? It is all alike part and parcel of the same "eminent domain." And so, in the case at bar, if that power gives the right to erect another bridge beside our own, why does it not give an equal right to take the latter, also?

Eminent domain is a part of sovereignty, and resides in the sovereign—in the people; what portion of it is granted to the legislature, belongs to them; and what is not granted, remains with the people. Is not the power of eminent domain as well restricted as any other power? It is restricted by the constitution of the state, which contains a surrender of it to the government erected by that constitution. It may be as well regulated and restrained by provisions in the constitution, as any other power originally in the people; and its exercise must be according to such provisions.

It is necessary to have a clear idea of what this same power of eminent domain actually is. What then do the counsel for the defendants mean, when they say that the state cannot transfer its eminent domain? They certainly do not mean its domains, its territory, its lands? And here he cited the case of the government land in the west and northwest, as a proof that that could not be the meaning of the counsel. They were the eminent domain in one sense, of the country; and in that sense the government can, and does pass them away. But the other sense was, the power, rule, dominion of the state over its territory. These two ideas must not be blended in this investigation. The power of the state over its eminent domain, means the power of government over property, public or private, under various rules and qualifications. What is meant by the government's inability to part with its eminent domain? It can part with the thing, and reserve the power over it, to the extent of those qualifications already adverted to. Taking public or private pro-

[Charles River Bridge v. Warren Bridge et al.]

, for public benefit, by the state, is an exercise of the power of the state over its eminent domain. But granting a franchise is not an exercise of that power; Cited Vattel, page 173, sec. 244; page 70, sec. 45.

The legislature may grant franchises. This is done by its sovereign power. What may it do with those franchises? What power has it over them after they have been granted? It may do just what it is limited to do, and nothing more. It is restrained by the same instrument which gave it existence from doing more.

The question is, what restrictions on this power are found in the constitution of Massachusetts: and by a reference to it, the limitation of legislative powers will be found. The power may be exercised by taking property, on paying for it. In the constitution it is expressly declared, that property shall not be taken by the public without its being paid for.

In Baldwin's Circuit Court Reports, it is said, that it is incident to the sovereignty of every government, that it may take private property for public use; but the obligation to make compensation is concomitant with the right; Bonaparte v. The Camden and Amboy Rail Road Company, 1 Baldwin's Rep. 220.

How then can this ground, which has been taken for the defendants be maintained? The whole pleadings show that the right of eminent domain was not involved in this case, when before the court of Massachusetts. It is too late now to present it. There is no allegation that the property of the plaintiffs have been taken, and compensation made for it.

The defendants seem to say, that if the property of the proprietors of the Charles River Bridge has been taken under the right of eminent domain, the case is without a remedy. But this is denied: The taking under the privilege of eminent domain, is limited by the provision; that compensation shall be made. Nor is it true, that the legislature may not part with a portion of its right of eminent domain. Thus, in Wilson's case, the right to tax lands in the state of New Jersey, was surrendered by the legislature. The State of New Jersey v. Wilson, 7 Cranch Rep. 164; 2 Peters' Con. Rep. 457.

In conclusion, Mr. Webster said, the plaintiffs have placed their reliance upon the precedents and authority established by this honourable Court, in the course of the last thirty years, in support of that constitution which secured individual property against legislative assumption: and that they now asked the enlightened conscience

[Charles River Bridge v. Warren Bridge et al.]

of this tribunal, if they have not succeeded in sustaining their complaint upon legal and constitutional grounds: if not, they must, as good citizens of this republic, remain satisfied with the decision of the Court.

Mr. Chief Justice TANEY delivered the opinion of the Court.

The questions involved in this case are of the gravest character, and the Court have given to them the most anxious and deliberate consideration. The value of the right claimed by the plaintiffs is large in amount; and many persons may no doubt be seriously affected in their pecuniary interests by any decision which the Court may pronounce; and the questions which have been raised as to the power of the several states, in relation to the corporations they have chartered, are pregnant with important consequences; not only to the individuals who are concerned in the corporate franchises, but to the communities in which they exist. The Court are fully sensible that it is their duty, in exercising the high powers conferred on them by the constitution of the United States, to deal with these great and extensive interests with the utmost caution; guarding, as far as they have the power to do so, the rights of property, and at the same time carefully abstaining from any encroachment on the rights reserved to the states.

It appears, from the record, that in the year 1650, the legislature of Massachusetts, granted to the president of Harvard college " the liberty and power," to dispose of the ferry from Charlestown to Boston, by lease or otherwise, in the behalf and for the behoof of the college: and that, under that grant, the college continued to hold and keep the ferry by its lessees or agents, and to receive the profits of it until 1785. In the last mentioned year, a petition was presented to the legislature, by Thomas Russell and others, stating the inconvenience of the transportation by ferries, over Charles river, and the public advantages that would result from a bridge; and praying to be incorporated for the purpose of erecting a bridge in the place where the ferry between Boston and Charlestown was then kept. Pursuant to this petition, the legislature, on the 9th of March, 1785, passed an act incorporating a company, by the name of " The Proprietors of the Charles River Bridge," for the purposes mentioned in the petition. Under this charter the company were empowered to erect a bridge, in " the place where the ferry was then kept;" certain tolls were granted, and the charter was limited to

[Charles River Bridge v. Warren Bridge et al.]

forty years, from the first opening of the bridge for passengers; and from the time the toll commenced, until the expiration of this term, the company were to pay two hundred pounds, annually, to Harvard college; and at the expiration of the forty years the bridge was to be the property of the commonwealth; " saving (as the law expresses it) to the said college or university, a reasonable annual compensation, for the annual income of the ferry, which they might have received had not the said bridge been erected."

The bridge was accordingly built, and was opened for passengers on the 17th of June, 1786. In 1792, the charter was extended to seventy years, from the opening of the bridge; and at the expiration of that time it was to belong to the commonwealth. The corporation have regularly paid to the college the annual sum of two hundred pounds, and have performed all of the duties imposed on them by the terms of their charter.

In 1828, the legislature of Massachusetts incorporated a company by the name of " The Proprietors of the Warren Bridge," for the purpose of erecting another bridge over Charles river. This bridge is only sixteen rods, at its commencement, on the Charlestown side, from the commencement of the bridge of the plaintiffs; and they are about fifty rods apart at their termination on the Boston side. The travellers who pass over either bridge, proceed from Charlestown square, which receives the travel of many great public roads leading from the country; and the passengers and travellers who go to and from Boston, used to pass over the Charles River Bridge, from and through this square, before the erection of the Warren Bridge.

The Warren Bridge, by the terms of its charter, was to be surrendered to the state, as soon as the expenses of the proprietors in building and supporting it should be reimbursed; but this period was not, in any event, to exceed six years from the time the company commenced receiving toll.

When the original bill in this case was filed, the Warren Bridge had not been built; and the bill was filed after the passage of the law, in order to obtain an injunction to prevent its erection, and for general relief. The bill, among other things, charged as a ground for relief, that the act for the erection of the Warren Bridge impaired the obligation of the contract between the commonwealth and the proprietors of the Charles River Bridge; and was therefore repugnant to the constitution of the United States. Afterwards, a supplemental bill was filed, stating that the bridge had then been so far

Vol. XI.—3 Y

completed, that it had been opened for travel, and that divers persons had passed over, and thus avoided the payment of the toll, which would otherwise have been received by the plaintiffs.   The answer to the supplemental bill admitted that the bridge had been so far completed, that foot passengers could pass; but denied that any persons but the workmen and the superintendents had passed over with their consent.   In this state of the pleadings, the cause came on for hearing in the supreme judicial court for the county of Suffolk, in the commonwealth of Massachusetts, at November term, 1829; and the court decided that the act incorporating the Warren Bridge, did not impair the obligation of the contract with the proprietors of the Charles River Bridge, and dismissed the complainants' bill: and the case is brought here by writ of error from that decision.   It is, however, proper to state, that it is understood that the state court was equally divided upon the question; and that the decree dismissing the bill upon the ground above stated, was pronounced by a majority of the court, for the purpose of enabling the complainants to bring the question for decision before this Court.

In the argument here, it was admitted, that since the filing of the supplemental bill, a sufficient amount of toll had been received by the proprietors of the Warren Bridge to reimburse all their expenses, and that the bridge is now the property of the state, and has been made a free bridge; and that the value of the franchise granted to the proprietors of the Charles River Bridge, has by this means been entirely destroyed.

If the complainants deemed these facts material, they ought to have been brought before the state court, by a supplemental bill; and this Court, in pronouncing its judgment, cannot regularly notice them.   But in the view which the Court take of this subject, these additional circumstances would not in any degree influence their decision.   And as they are conceded to be true, and the case has been argued on that ground, and the controversy has been for a long time depending, and all parties desire a final end of it; and as it is of importance to them, that the principles on which this Court decide should not be misunderstood; the case will be treated in the opinion now delivered, as if these admitted facts were regularly before us.

. A good deal of evidence has been offered to show the nature and extent of the ferry right granted to the college; and also to show the rights claimed by the proprietors of the bridge at different times,

by virtue of their charter; and the opinions entertained by committees of the legislature, and others, upon that subject. But as these circumstances do not affect the judgment of this Court, it is unnecessary to recapitulate them.

The plaintiffs in error insist, mainly, upon two grounds: 1st. That by virtue of the grant of 1650, Harvard college was entitled, in perpetuity, to the right of keeping a ferry between Charlestown and Boston; that this right was exclusive; and that the legislature had not the power to establish another ferry on the same line of travel, because it would infringe the rights of the college; and that these rights, upon the erection of the bridge in the place of the ferry, under the charter of 1785, were transferred to, and became vested in " the proprietors of the Charles River Bridge;" and that under, and by virtue of this transfer of the ferry right, the rights of the bridge company were as exclusive in that line of travel, as the rights of the ferry. 2d. That independently of the ferry right, the acts of the legislature of Massachusetts of 1785, and 1792, by their true construction, necessarily implied that the legislature would not authorize another bridge, and especially a free one, by the side of this, and placed in the same line of travel, whereby the franchise granted to the " proprietors of the Charles River Bridge" should be rendered of no value; and the plaintiffs in error contend, that the grant of the ferry to the college, and of the charter to the proprietors of the bridge, are both contracts on the part of the state; and that the law authorizing the erection of the Warren Bridge in 1828, impairs the obligation of one or both of these contracts.

It is very clear, that in the form in which this case comes before us; being a writ of error to a state court; the plaintiffs in claiming under either of these rights, must place themselves on the ground of contract, and cannot support themselves upon the principle, that the law divests vested rights. It is well settled by the decisions of this Court, that a state law may be retrospective in its character, and may divest vested rights; and yet not violate the constitution of the United States, unless it also impairs the obligation of a contract. In 2 Peters, 413; Satterlee v. Mathewson; this Court, in speaking of the state law then before them, and interpreting the article in the constitution of the United States which forbids the states to pass laws impairing the obligation of contracts, uses the following language. " It (the state law) is said to be retrospective; be it so. But retrospective laws which do not impair the obligation of contracts,

or partake of the character of ex post facto laws, are not condemned or forbidden by any part of that instrument," (the constitution of the United States). And in another passage in the same case, the Court say; "the objection, however, most pressed upon the Court, and relied upon by the counsel for the plaintiff in error, was, that the effect of this act was to divest rights which were vested by law in Satterlee. There is certainly no part of the constitution of the United States, which applies to a state law of this description; nor are we aware of any decision of this, or of any circuit court, which has condemned such a law upon this ground, provided its effect be not to impair the obligation of a contract." The same principles were reaffirmed in this Court, in the late case of Watson and others v. Mercer, decided in 1834, 8 Pet. 110; "as to the first point, (say the Court,) it is clear that this Court has no right to pronounce an act of the state legislature void, as contrary to the constitution of the United States, from the mere fact that it divests antecedent vested rights of property. The constitution of the United States does not prohibit the states from passing retrospective laws, generally; but only ex post facto laws."

After these solemn decisions of this Court, it is apparent that the plaintiffs in error cannot sustain themselves here, either upon the ferry right, or the charter to the bridge; upon the ground that vested rights of property have been divested by the legislature. And whether they claim under the ferry right, or the charter to the bridge, they must show that the title which they claim, was acquired by contract, and that the terms of that contract, have been violated by the charter to the Warren Bridge. In other words, they must show that the state had entered into a contract with them, or those under whom they claim, not to establish a free bridge at the place where the Warren Bridge is erected. Such, and such only, are the principles upon which the plaintiffs in error can claim relief in this case.

The nature and extent of the ferry right granted to Harvard college, in 1650, must depend upon the laws of Massachusetts; and the character and extent of this right has been elaborately discussed at the bar. But in the view which the Court take of the case before them, it is not necessary to express any opinion on these questions. For assuming that the grant to Harvard college, and the charter to the Bridge company, were both contracts, and that the ferry right was as extensive and exclusive as the plaintiffs contend for; still they

[Charles River Bridge v. Warren Bridge et al.]

cannot enlarge the privileges granted to the bridge, unless it can be shown, that the rights of Harvard college in this ferry have, by assignment, or in some other way, been transferred to the proprietors of the Charles River Bridge, and still remain in existence, vested in them, to the same extent with that in which they were held and enjoyed by the college before the bridge was built.

It has been strongly pressed upon the Court, by the plaintiffs in error, that these rights are still existing, and are now held by the proprietors of the bridge. If this franchise still exists, there must be somebody possessed of authority to use it, and to keep the ferry. Who could now lawfully set up a ferry where the old one was kept? The bridge was built in the same place, and its abutments occupied the landings of the ferry. The transportation of passengers in boats, from landing to landing, was no longer possible; and the ferry was as effectually destroyed, as if a convulsion of nature had made there a passage of dry land. The ferry then, of necessity, ceased to exist, as soon as the bridge was erected; and when the ferry itself was destroyed, how can rights which were incident to it, be supposed to survive? The exclusive privileges, if they had such, must follow the fate of the ferry, and can have no legal existence without it—and if the ferry right had been assigned by the college, in due and legal form, to the proprietors of the bridge, they themselves extinguished that right, when they erected the bridge in its place. It is not supposed by any one, that the Bridge company have a right to keep a ferry. No such right is claimed for them, nor can be claimed for them, under their charter to erect a bridge—and it is difficult to imagine how ferry rights can be held by a corporation, or an individual, who have no right to keep a ferry. It is clear, that the incident must follow the fate of the principal, and the privilege connected with property, cannot survive the destruction of the property; and if the ferry right in Harvard college was exclusive, and had been assigned to the proprietors of the bridge, the privilege of exclusion could not remain in the hands of their assignees, if those assignees destroyed the ferry.

But upon what ground can the plaintiffs in error contend that the ferry rights of the college have been transferred to the proprietors of the bridge? If they have been thus transferred, it must be by some mode of transfer known to the law; and the evidence relied on to prove it, can be pointed out in the record. How was it transferred? It is not suggested that there ever was, in point of fact, a deed of con-

veyance executed by the college to the Bridge company. Is there any evidence in the record from which such a conveyance may, upon legal principle, be presumed? The testimony before the Court, so far from laying the foundation for such a presumption, repels it in the most positive terms. The petition to the legislature, in 1785, on which the charter was granted, does not suggest an assignment, nor any agreement or consent on the part of the college; and the petitioners do not appear to have regarded the wishes of that institution, as by any means necessary to ensure their success. They place their application entirely on considerations of public interest and public convenience, and the superior advantages of a communication across Charles river by a bridge, instead of a ferry. The legislature, in granting the charter, show, by the language of the law, that they acted on the principles assumed by the petitioners. The preamble recites that the bridge " will be of great public utility;" and that is the only reason they assign, for passing the law which incorporates this company. The validity of the charter is not made to depend on the consent of the college, nor of any assignment or surrender on their part; and the legislature deal with the subject, as if it were one exclusively within their own power, and as if the ferry right were not to be transferred to the Bridge company, but to be extinguished and they appear to have acted on the principle, that the state by virtue of its sovereign powers and eminent domain, had a right to take away the franchise of the ferry; because, in their judgment, the public interest and convenience would be better promoted by a bridge in the same place; and upon that principle they proceed to make a pecuniary compensation to the college, for the franchise thus taken away: and as there is an express reservation of a continuing pecuniary compensation to the college, when the bridge shall become the property of the state, and no provision whatever for the restoration of the ferry right, it is evident that no such right was intended to be reserved or continued. The ferry, with all its privileges was intended to be forever at an end, and a compensation in money was given in lieu of it. The college acquiesced in this arrangement, and there is proof, in the record, that it was all done with their consent. Can a deed of assignment to the Bridge company which would keep alive the ferry rights in their hands, be presumed under such circumstances? Do not the petition, the law of incorporation, and the consent of the college to the pecuniary provision made for it in perpetuity, all repel the notion of an assignment of its rights to the Bridge

company, and prove that every party to this proceeding, intended that its franchises, whatever they were, should be resumed by the state, and be no longer held by any individual, or corporation? With such evidence before us, there can be no ground for presuming a conveyance to the plaintiffs. There was no reason for such a conveyance. There was every reason against it; and the arrangements proposed by the charter to the bridge, could not have been carried into full effect, unless the rights of the ferry were entirely extinguished.

It is however said, that the payment of the two hundred pounds a year to the college, as provided for in the law, gives to the proprietors of the bridge an equitable claim to be treated as the assignees of their interest; and by substitution, upon chancery principles, to be clothed with all their rights.

The answer to this argument is obvious. This annual sum was intended to be paid out of the proceeds of the tolls, which the company were authorized to collect. The amount of the tolls, it must be presumed, was graduated with a view to this incumbrance, as well as to every other expenditure to which the company might be subjected, under the provisions of their charter. The tolls were to be collected from the public, and it was intended that the expense of the annuity to Harvard college should be borne by the public; and if is manifest that it was so borne, from the amount which it is admitted they received, until the Warren Bridge was erected. Their agreement, therefore, to pay that sum, can give them no equitable right to be regarded as the assignees of the college, and certainly can furnish no foundation for presuming a conveyance; and as the proprietors of the bridge are neither the legal nor equitable assignees of the college, it is not easy to perceive how the ferry franchise can be invoked in aid of their claims, if it were even still a subsisting privilege; and had not been resumed by the state, for the purpose of building a bridge in its place.

Neither can the extent of the pre-existing ferry right, whatever it may have been, have any influence upon the construction of the written charter for the bridge. It does not, by any means, follow, that because the legislative power in Massachusetts, in 1650, may have granted to a justly favoured seminary of learning, the exclusive right of ferry between Boston and Charlestown, they would, in 1785, give the same extensive privilege to another corporation, who were about to erect a bridge in the same place. The fact that such a right

was granted to the college, cannot by any sound rule of construction, be used to extend the privileges of the Bridge company beyond what the words of the charter naturally and legally import. Increased population longer experienced in legislation, the different character of the corporations which owned the ferry from that which owned the bridge, might well have induced a change in the policy of the state in this respect; and as the franchise of the ferry, and that of the bridge, are different in their nature, and were each established by separate grants, which have no words to connect the privileges of the one with the privileges of the other; there is no rule of legal interpretation, which would authorize the Court to associate these grants together, and to infer that any privilege was intended to be given to the Bridge company, merely because it had been conferred on the ferry. The charter to the bridge is a written instrument which must speak for itself, and be interpreted by its own terms.

This brings us to the act of the legislature of Massachusetts, of 1785, by which the plaintiffs were incorporated by the name of "The Proprietors of the Charles River Bridge;" and it is here, and in the law of 1792, prolonging their charter, that we must look for the extent and nature of the franchise conferred upon the plaintiffs. Much has been said in the argument of the principles of construction by which this law is to be expounded, and what undertakings, on the part of the state, may be implied. The Court think there can be no serious difficulty on that head. It is the grant of certain franchises by the public to a private corporation, and in a matter where the public interest is concerned. The rule of construction in such cases is well settled, both in England, and by the decisions of our own tribunals. In 2 Barn. & Adol. 792; in the case of the Proprietors of the Stourbridge Canal against Wheely and others, the court say, " the canal having been made under an act of parliament, the rights of the plaintiffs are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute; and the rule of construction in all such cases, is now fully established to be this; that any ambiguity in the terms of the contract, must operate against the adventurers, and in favour of the public, and the plaintiffs can claim nothing that is not clearly given them by the act." And the doctrine thus laid down is abundantly sustained by the authorities referred to in this decision. The case itself was as strong a one, as could well be imagined, for giving to the

canal company, by implication, a right to the tolls they demanded. Their canal had been used by the defendants, to a very considerable extent, in transporting large quantities of coal. The rights of all persons to navigate the canal, were expressly secured by the act of parliament; so that the company could not prevent them from using it, and the toll demanded was admitted to be reasonable. Yet, as they only used one of the levels of the canal, and did not pass through the locks; and the statute, in giving the right to exact toll, had given it for articles which passed "*through any one or more of the locks*," and had said nothing as to toll for navigating one of the levels; the court held that the right to demand toll, in the latter case, could not be implied, and that the company were not entitled to recover it. This was a fair case for an equitable construction of the act of incorporation, and for an implied grant; if such a rule of construction could ever be permitted in a law of that description. For the canal had been made at the expense of the company; the defendants had availed themselves of the fruits of their labours, and used the canal freely and extensively for their own profit. Still the right to exact toll could not be implied, because such a privilege was not found in the charter.

Borrowing, as we have done, our system of jurisprudence from the English law; and having adopted, in every other case, civil and criminal, its rules for the construction of statutes; is there any thing in our local situation, or in the nature of our political institutions, which should lead us to depart from the principle where corporations are concerned? Are we to apply to acts of incorporation, a rule of construction differing from that of the English law, and, by implication, make the terms of a charter in one of the states, more unfavourable to the public, than upon an act of parliament, framed in the same words, would be sanctioned in an English court? Can any good reason be assigned for excepting this particular class of cases from the operation of the general principle; and for introducing a new and adverse rule of construction in favour of corporations, while we adopt and adhere to the rules of construction known to the English common law, in every other case, without exception? We think not; and it would present a singular spectacle, if, while the courts in England are restraining, within the strictest limits, the spirit of monopoly, and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given to them in their charter; the courts of this country should be found enlarging

these privileges by implication; and construing a statute more unfavourably to the public, and to the rights of the community, than would be done in a like case in an English court of justice.

But we are not now left to determine, for the first time, the rules by which public grants are to be construed in this country. The subject has already been considered in this Court; and the rule of construction, above stated, fully established. In the case of the United States v. Arredondo, 8 Pet. 738, the leading cases upon this subject are collected together by the learned judge who delivered the opinion of the Court; and the principle recognised, that in grants by the public, nothing passes by implication.

The rule is still more clearly and plainly stated in the case of Jackson v. Lamphire, in 3 Pet. 289. That was a grant of land by the state; and in speaking of this doctrine of implied covenants in grants by the state, the Court use the following language, which is strikingly applicable to the case at bar:—" The only contract made by the state, is the grant to John Cornelius, his heirs and assigns, of the land in question. The patent contains no covenant to do, or not to do any further act in relation to the land; and we do not feel ourselves at liberty, in this case, to create one by implication. The state has not, by this act, impaired the force of the grant; it does not profess or attempt to take the land from the assigns of Cornelius, and give it to one not claiming under him; neither does the award produce that effect; the grant remains in full force; the property conveyed is held by his grantee, and the state asserts no claim to it."

The same rule of construction is also stated in the case of Beatty v. The Lessee of Knowles, 4 Pet. 168; decided in this Court in 1830. In delivering their opinion in that case, the Court say:—" That a corporation is strictly limited to the exercise of those powers which are specifically conferred on it, will not be denied. The exercise of the corporate franchise being restrictive of individual rights, cannot be extended beyond the letter and spirit of the act of incorporation."

But the case most analogous to this, and in which the question came more directly before the Court, is the case of the Providence Bank v. Billings & Pittmann, 4 Pet. 514; and which was decided in 1830. In that case, it appeared that the legislature of Rhode Island had chartered the bank, in the usual form of such acts of incorporation. The charter contained no stipulation on the part of the state, that it would not impose a tax on the bank, nor any reservation of the right to do so. It was silent on this point. Afterwards, a law

[Charles River Bridge v. Warren Bridge et al.]

was passed, imposing a tax on all banks in the state; and the right to impose this tax was resisted by the Providence Bank, upon the ground, that if the state could impose a tax, it might tax so heavily as to render the franchise of no value, and destroy the institution; that the charter was a contract, and that a power which may in effect destroy the charter is inconsistent with it, and is impliedly renounced by granting it.  But the Court said that the taxing power was of vital importance, and essential to the existence of government; and that the relinquishment of such a power is never to be assumed.  And in delivering the opinion of the Court, the late Chief Justice states the principle, in the following clear and emphatic language.  Speaking of the taxing power, he says, "as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear."  The case now before the Court, is, in principle, precisely the same.  It is a charter from a state.  The act of incorporation is silent in relation to the contested power.  The argument in favour of the proprietors of the Charles River Bridge, is the same, almost in words, with that used by the Providence bank; that is, that the power claimed by the state, if it exists, may be so used as to destroy the value of the franchise they have granted to the corporation.  The argument must receive the same answer; and the fact that the power has been already exercised so as to destroy the value of the franchise, cannot in any degree affect the principle.  The existence of the power does not, and cannot depend upon the circumstance of its having been exercised or not.

It may, perhaps, be said, that in the case of the Providence Bank, this Court were speaking of the taxing power; which is of vital importance to the very existence of every government.  But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created.  And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth; new channels of communication are daily found necessary, both for travel and trade; and are essential to the comfort, convenience, and prosperity of the people.  A state ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in pre-

serving it undiminished. And when a corporation alleges, that a state has surrendered for seventy years, its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass; the community have a right to insist, in the language of this Court above quoted, "that its abandonment ought not to be presumed, in a case, in which the deliberate purpose of the state to abandon it does not appear." The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation; and the functions it was designed to perform, transferred to the hands of privileged corporations. The rule of construction announced by the Court, was not confined to the taxing power; nor is it so limited in the opinion delivered. On the contrary, it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power or any other affecting the public interest, the same principle applies, and the rule of construction must be the same. No one will question that the interests of the great body of the people of the state, would, in this instance, be affected by the surrender of this great line of travel to a single corporation, with the right to exact toll, and exclude competition for seventy years. While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation.

Adopting the rule of construction above stated as the settled one, we proceed to apply it to the charter of 1785, to the proprietors of the Charles River Bridge. This act of incorporation is in the usual form, and the privileges such as are commonly given to corporations of that kind. It confers on them the ordinary faculties of a corporation, for the purpose of building the bridge; and establishes certain rates of toll, which the company are authorized to take. This is the whole grant. There is no exclusive privilege given to them over the waters of Charles river, above or below their bridge. No right to erect another bridge themselves, nor to prevent other persons from erecting one. No engagement from the state, that another shall not be erected; and no undertaking not to sanction competition, nor to make improvements that may diminish the amount of its income. Upon all these subjects the charter is silent; and no-

thing is said in it about a line of travel, so much insisted on in the argument, in which they are to have exclusive privileges. No words are used, from which an intention to grant any of these rights can be inferred. If the plaintiff is entitled to them, it must be implied, simply, from the nature of the grant; and cannot be inferred from the words by which the grant is made.

The relative position of the Warren Bridge has already been described. It does not interrupt the passage over the Charles River Bridge, nor make the way to it or from it less convenient. None of the faculties or franchises granted to that corporation, have been revoked by the legislature; and its right to take the tolls granted by the charter remains unaltered. In short, all the franchises and rights of property enumerated in the charter, and there mentioned to have been granted to it, remain unimpaired. But its income is destroyed by the Warren Bridge; which, being free, draws off the passengers and property which would have gone over it, and renders their franchise of no value. This is the gist of the complaint. For it is not pretended, that the erection of the Warren Bridge would have done them any injury, or in any degree affected their right of property; if it had not diminished the amount of their tolls. In order then to entitle themselves to relief, it is necessary to show, that the legislature contracted not to do the act of which they complain; and that they impaired, or in other words, violated that contract by the erection of the Warren Bridge.

The inquiry then is, does the charter contain such a contract on the part of the state? Is there any such stipulation to be found in that instrument? It must be admitted on all hands, that there is none— no words that even relate to another bridge, or to the diminution of their tolls, or to the line of travel. If a contract on that subject can be gathered from the charter, it must be by implication; and cannot be found in the words used. Can such an agreement be implied? The rule of construction before stated is an answer to the question. In charters of this description, no rights are taken from the public, or given to the corporation, beyond those which the words of the charter, by their natural and proper construction, purport to convey. There are no words which import such a contract as the plaintiffs in error contend for, and none can be implied; and the same answer must be given to them that was given by this Court to the Providence Bank. The whole community are interested in this inquiry, and they have a right to require that the power of promoting their

comfort and convenience, and of advancing the public prosperity, by providing safe, convenient, and cheap ways for the transportation of produce, and the purposes of travel, shall not be construed to have been surrendered or diminished by the state; unless it shall appear by plain words, that it was intended to be done.

But the case before the Court is even still stronger against any such implied contract, as the plaintiffs in error contend for. The Charles River Bridge was completed in 1786. The time limited for the duration of the corporation by their original charter, expired in 1826. When, therefore, the law passed authorizing the erection of the Warren Bridge, the proprietors of Charles River Bridge held their corporate existence under the law of 1792, which extended their charter for thirty years; and the rights, privileges, and franchises of the company, must depend upon the construction of the last mentioned law, taken in connection with the act of 1785.

The act of 1792, which extends the charter of this bridge, incorporates another company to build a bridge over Charles river; furnishing another communication with Boston, and distant only between one and two miles from the old bridge.

The first six sections of this act incorporate the proprietors of the West Boston Bridge, and define the privileges, and describe the duties of that corporation. In the seventh section there is the following recital: " And whereas the erection of Charles River Bridge was a work of hazard and public utility, and another bridge in the place of West Boston bridge may diminish the emoluments of Charles River Bridge; therefore, for the encouragement of enterprise," they proceed to extend the charter of the Charles River Bridge, and to continue it for the term of seventy years from the day the bridge was completed; subject to the conditions prescribed in the original act, and to be entitled to the same tolls. It appears, then, that by the same act that extended this charter, the legislature established another bridge, which they knew would lessen its profits; and this, too, before the expiration of the first charter, and only seven years after it was granted; thereby showing, that the state did not suppose that, by the terms it had used in the first law, it had deprived itself of the power of making such public improvements as might impair the profits of the Charles River Bridge; and from the language used in the clauses of the law by which the charter is extended, it would seem, that the legislature were especially careful to exclude any inference that the extension was made upon the ground of com-

promise with the Bridge Company, or as a compensation for rights impaired.

On the contrary, words are cautiously employed to exclude that conclusion; and the extension is declared to be granted as a reward for the hazard they had run, and " for the encouragement of enterprise."[1] The extension was given because the company had undertaken and executed a work of doubtful success; and the improvements which the legislature then contemplated, might diminish the emoluments they had expected to receive from it. It results from this statement, that the legislature in the very law extending the charter, asserts its rights to authorize improvements over Charles river which would take off a portion of the travel from this bridge and diminish its profits; and the Bridge Company accept the renewal thus given, and thus carefully connected with this assertion of the right on the part of the state. Can they, when holding their corporate existence under this law, and deriving their franchises altogether from it; add to the privileges expressed in their charter an implied agreement, which is in direct conflict with a portion of the law from which they derive their corporate existence? Can the legislature be presumed to have taken upon themselves an implied obligation, contrary to its own acts and declarations contained in the same law? It would be difficult to find a case justifying such an implication, even between individuals; still less will it be found where sovereign rights are concerned, and where the interests of a whole community would be deeply affected by such an implication. It would, indeed, be a strong exertion of judicial power, acting upon its own views of what justice required, and the parties ought to have done; to raise, by a sort of judicial coercion, an implied contract, and infer it from the nature of the very instrument in which the legislature appear to have taken pains to use words which disavow and repudiate any intention, on the part of the state, to make such a contract.

Indeed, the practice and usage of almost every state in the Union, old enough to have commenced the work of internal improvement, is opposed to the doctrine contended for on the part of the plaintiffs in error. Turnpike roads have been made in succession, on the same line of travel; the later ones interfering materially with the profits of the first. These corporations have, in some instances, been utterly ruined by the introduction of newer and better modes of transportation, and travelling. In some cases, rail roads have rendered the turnpike roads on the same line of travel so entirely useless, that the

franchise of the turnpike corporation is not worth preserving. Yet in none of these cases have the corporations supposed that their privileges were invaded, or any contract violated on the part of the state. Amid the multitude of cases which have occurred, and have been daily occurring for the last forty or fifty years, this is the first instance in which such an implied contract has been contended for, and this Court called upon to infer it from an ordinary act of incorporation, containing nothing more than the usual stipulations and provisions to be found in every such law. The absence of any such controversy, when there must have been so many occasions to give rise to it, proves that neither states, nor individuals, nor corporations, ever imagined that such a contract could be implied from such charters. It shows that the men who voted for these laws, never imagined that they were forming such a contract; and if we maintain that they have made it, we must create it by a legal fiction, in opposition to the truth of the fact, and the obvious intention of the party. We cannot deal thus with the rights reserved to the states; and by legal intendments and mere technical reasoning, take away from them any portion of that power over their own internal police and improvement, which is so necessary to their well being and prosperity.

And what would be the fruits of this doctrine of implied contracts on the part of the states, and of property in a line of travel by a corporation, if it should now be sanctioned by this Court? To what results would it lead us? If it is to be found in the charter to this bridge, the same process of reasoning must discover it, in the various acts which have been passed, within the last forty years, for turnpike companies. And what is to be the extent of the privileges of exclusion on the different sides of the road? The counsel who have so ably argued this case, have not attempted to define it by any certain boundaries. How far must the new improvement be distant from the old one? How near may you approach without invading its rights in the privileged line? If this Court should establish the principles now contended for, what is to become of the numerous rail roads established on the same line of travel with turnpike companies; and which have rendered the franchises of the turnpike corporations of no value? Let it once be understood that such charters carry with them these implied contracts, and give this unknown and undefined property in a line of travelling; and you will soon find the old turnpike corporations awakening from their sleep, and calling

[Charles River Bridge .v. Warren Bridge et al.]

upon this Court to put down the improvements which have taken their place.   The millions of property which have been invested in rail roads and canals, upon lines of travel which had been before oc-. cupied by turnpike corporations, will be put in jeopardy.   We shall be thrown back to the improvements of the last century, and obliged to stand still, until the claims of the old turnpike corporations shall be satisfied; and they shall consent to permit these states to avail themselves of the lights of modern science, and to partake of the benefit of those improvements which are now adding to the wealth and prosperity, and the convenience and comfort, of every other part of the civilized world.   Nor is this all.   This Court will find itself compelled to fix, by some arbitrary rule, the width of this new kind of property in a line of travel; for if such a right of property exists, we have no lights to guide us in marking out its extent, unless, indeed, we resort to the old feudal grants, and to the exclusive rights of ferries, by prescription, between towns; and are prepared to decide that when a turnpike road from one town to another, had been made, no rail road or canal, between these two points, could afterwards be established.   This Court are not prepared to sanction principles which must lead to such results.

Many other questions, of the deepest importance, have been raised and elaborately discussed in the argument.   It is not necessary, for the decision of this case, to express our opinion upon them; and the Court deem it proper to avoid volunteering an opinion on any question, involving the construction of the constitution, where the case itself does not bring the question directly before them, and make it their duty to decide upon it.

Some questions, also, of a purely technical character, have been made and argued, as to the form of proceeding and the right to relief.   But enough appears on the record to bring out the great question in contest; and it is the interest of all parties concerned, that the real controversy should be settled without further delay: and as the opinion of the Court is pronounced on the main question in dispute here, and disposes of the whole case, it is altogether unnecessary to enter upon the examination of the forms of proceeding, in which the parties have brought it before the Court.

The judgment of the supreme judicial court of the commonwealth of Massachusetts, dismissing the plaintiffs' bill, must, therefore, be affirmed, with costs.

Vol. XI.—4 A

Mr. Justice M'LEAN.

This suit in chancery was commenced in the supreme court of Massachusetts, where the bill was dismissed by a decree, pro forma, the members of that court being equally divided in opinion; and a writ of error was taken to this Court, on the ground, that the right asserted by the complainants, and which has been violated under the charter of the respondents, is protected by a special provision in the federal constitution.

The complainants' right is founded on an act of the legislature of Massachusetts, passed March 9th, 1785; which incorporated certain individuals, and authorized them to erect a bridge over Charles river, a navigable stream between Boston and Charlestown, and an amendatory act, passed in 1791, extending the charter thirty years.

As explanatory of this right, if not the ground on which it in part rests, a reference is made to an ancient ferry, over the same river, which was held by Harvard college; and the right of which was transferred, it is contended, in equity, if not in law, to the Bridge Company.

The wrong complained of, consists in the construction of a new bridge, over the same river; under a recent act of the legislature, within a few rods of the old one, and which takes away the entire profits of the old bridge.

The act to establish the Charles River Bridge required it to be constructed within a limited time, of certain dimensions, to be kept in repair, and to afford certain specified accommodations to the public. The company were authorized to charge certain rates of toll; and they were required to pay, annually, two hundred pounds to Harvard college. The first charter was granted for forty years.

The facts proved in the case show that a bridge of the description required by the act of 1785, was constructed within the time limited; that the annual peyment has been made to the college; and that, in every other respect, the corporation has faithfully performed the conditions and duties enjoined on it.

It is contended that the charter granted to the respondents, violates the obligation of that which had been previously granted to the complainants; and that, consequently, it is in conflict with that provision of the constitution which declares, that no " state shall pass any law impairing the obligation of contracts."

In the investigation of this case, the first inquiry which seems na-

turally to arise is as to the nature and extent of the right asserted by the complainants.

As early as the year 1631, a ferry was established across Charles river by the colonial government of Massachusetts Bay. In 1640, the general court say, " that the ferry is granted to the college." From this time the profits of the ferry were received by the college, and it was required by various statutes, under certain penalties, to keep certain boats, &c., for the accommodation of the public. This duty was performed by the college; and it continued to occupy the ferry until the Charles River Bridge was constructed.

From the above act of the general court, and others which have been shown, and the unmolested use of the ferry for more than one hundred and forty years, by the college, it would seem, that its right to this use had received all the sanctions necessary to constitute a valid title. If the right was not founded strictly on prescription, it rested on a basis equally unquestionable.

At the time this ferry was established, it was the only public communication between Boston and Charlestown. These places, and especially the latter, were then small; and no greater accommodation was required than was afforded by the ferry. Its franchise was not limited, it is contended, to the ferry ways; but extended to the whole line of travel between the two towns.

It cannot be very material to inquire whether this ferry was originally public or private property; or whether the landing places were vested in the college, or their use only, and the profits of the ferry. The beneficial interest in the ferry was held by the college, and it received the tolls.

The regulation of the ferry, it being a matter of public concern, belonged to the government. It prescribed the number of boats to be kept, and the attendance necessary to be given; and on a failure to comply with these requisitions, the college would have been subjected to the forfeiture of the franchise, and the other penalties provided by statute.

Was this right of ferry, with all its immunities, transferred to the Charles River Bridge Company?

It is not contended that there is any express assignment of this right by deed or otherwise; but the complainants claim that the evidence of the transfer is found in the facts of the case. Before the charter was granted, the college was consulted on the subject; so soon as the bridge was constructed, the use of the ferry ceased;

and the college has regularly received from the complainants the annuity of two hundred pounds. This acquiescence, it is contended, taken in connection with the other facts in the case, goes to establish the relinquishment of the right to the ferry for the annual compensation required to be paid under the charter.

That there was a substitution of the bridge for the ferry, with the consent of the college, is evident; but there seems to have been no assignment of the rights of the ferry. The original bridge charter was granted for forty years; at the expiration of which period, the property of the bridge was to revert to the commonwealth, "saving to the college a reasonable and annual compensation for the annual income of the ferry, which they might have received, had not said bridge been erected."

Had the bridge been destroyed by fire or otherwise, there was no investiture of right to the ferry in the complainants, that would have enabled them to keep up the ferry, and realize the profits of it.

On the destruction of the bridge, the college, it is presumed, might have resumed all the rights and responsibilities attached to the ferry. At least, it is very clear, that these rights and responsibilities would not have devolved on the complainants. They stipulated to afford a different accommodation to the public. If then these rights could not have been claimed and exercised by the complainants, under such circumstances; how can they be considered as enlarging, or in any way materially affecting the franchise under the charter of 1785?

That the franchise of a ferry at common law, and in the state of Massachusetts, extends beyond the landing places, is very clear from authority. 10 Petersdorf, 53; 13 Vin. 513; Willes' Rep. 512, note; 12 East, 330; 6 Barn. & Cres. 703; Year Book, Hen. 6, 22; Rolles' Ab. 140; Fitz. 428. n; Com. Digest, Market, C. 2; Piscary, B. Action on the Case, A; 3 Blk. 219; Nott & M'Cord, 387; 2 Saund. 172; 6 Mod. 229; 2 Vent. 344; 3 Levinz. 220; Com. Dig. Patent, F. 4, 5, 6, 7; 2 Saund. 72, n. 4; 2 Inst. 406; Chit. Pre. 12 chap. 3; 10 chap. 2; 3 Salk. 198; Willes, 512; 4 Term, 666; Saund. 114; Croke, E. 710.

The annuity given to the college was a compensation for the profits of the ferry; and shows a willingness by the college to suspend its rights to the ferry, during the time specified in the act. And if indeed it might be construed into an abandonment of the ferry, still it was an abandonment to the public, on the terms specified, for a better accommodation.

[Charles River Bridge v. Warren Bridge et al.]

The bridge was designed not only to answer all the purposes of the ferry, but to enlarge the public convenience. · The profits contemplated by the corporators, were not only those which had been realized from the ferry, but such as would arise from the increased facilities to the public.

If there was no assignment of the ferry franchise to the complainants, its extent cannot be a matter of importance in this investigation: nor is it necessary to inquire into the effect of an assignment, under the circumstances of the case, if it had been made.

There is no provision in the act of incorporation vesting the company with the privileges of the ferry. A reference is made to it merely with the view of fixing the site of the bridge. The right and obligations of the complainants must be ascertained by the construction of the act of 1785.

This act must be considered in the light of a contract, and the law of contracts applies to it. In one sense it is a law, having passed through all the forms of legislation, and received the necessary sanctions; but it is essentially a contract, as to the obligations imposed by it, and the privileges it confers.

Much discussion has been had at the bar, as to the rule of construing a charter or grant, and many authorities have been referred to on this point. In ordinary cases, a grant is construed favourable to the grantee, and against the grantor. But it is contended, that in governmental grants, nothing is taken by implication.

The broad rule, thus laid down, cannot be sustained by authority. If an office be granted by name, all the immunities of that office are taken by implication. Whatever is essential to the enjoyment of the thing granted, must be taken by implication. And this rule holds good, whether the grant emanate from the royal prerogative of the king in England, or under an act of legislation in this country.

The general rule is, that " a grant of the king, at the suit of the grantee, is to be construed most beneficially for the king, and most strictly against the grantee;" but grants obtained as a matter of special favour of the king, or on a consideration, are more liberally construed. Grants of limited political powers are construed strictly. Com. Dig. tit. Grant, E. 5; 2 Dane's Ab. 683; 1 Nott & M'Cord, Stark v. M'Gowan; Pop. 79; Moore, 474; 8 Coke, 92; 6 Barn. & Cres. 703; 5 Ib. 875; 3 M. & S. 247; Hargrave, 18 to 23; Angel on Tide Water, 106, 7; 4 Burr. 2161; 4 Durn. & East. 439; 2 Bos.

& Pul. 472; 1 Term, 669; 1 Con. Rep. 382; 17 Johns. 195; 3 M. & S. 247; 6 Mass. 437; 1 Mass. 231; 17 Mass. 289; Angel, 108; 4 Mass. 140, 522; Bac. Pre. T. 2; Plow. 336, 7; 9 Coke, 30; 1 Vent. 409; Croke. J. 179; Dyer, 30; Saville, 132; 10 Coke, 112; Com. Dig. Grant, 9, 12; Bac. tit. Prerog. 2; 5 Barn. & Cres. 875; 1 Mass. 355.

Where the legislature, with a view of advancing the public interest by the construction of a bridge, a turnpike road, or any other work of public utility, grants a charter, no reason is perceived why such a charter should not be construed by the same rule that governs contracts between individuals.

The public, through their agent, enter into the contract with the company; and a valuable consideration is received in the construction of the contemplated improvement. This consideration is paid by the company, and sound policy requires, that its rights should be ascertained and protected, by the same rules as are applied to private contracts.

In the argument, great reliance was placed on the case of the Stourbridge Canal v. Wheeley and others; 2 Barn. & Ald. 792.

The question in this case was, whether the plaintiffs had a right to charge toll in certain cases; and lord Tenterden said, " the canal having been made under the provisions of an act of parliament, the rights of the plaintiff are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers, and the public, the terms of which are expressed in the statute; and the rule of construction in all such cases, is now fully established to be this—that any ambiguity in the terms of the contract must operate against the adventurers, and in favour of the public; and the plaintiffs can claim nothing, which is not clearly given to them by the act."

This is relied on to show, that nothing is taken, under such a grant, by implication or inference. His lordship says, the right must be clearly given—he does not say expressly given, which would preclude all inference. In another part of the same opinion, his lordship says, " Now it is quite certain that the company have no right, *expressly* given, to receive any compensation, except the tonnage paid for goods carried through some of the locks on the canal, or the collateral cuts; and it is therefore incumbent upon them to show that they have a right, *clearly given by inference,* from some of the

other clauses." May this right be shown by *inference;* and is not this implication?

The doctrine laid down in this case, is simply this; that the right to charge the toll, must be given expressly, or it must be clearly made out by inference. Does not this case establish the doctrine of implication, as applied to the construction of grants? Is not the right to pass by-laws incident to a corporation? A right cannot be claimed by a corporation, under ambiguous terms. It must clearly appear to have been granted, either in express terms, or by inference, as stated by lord Tenterden.

A corporate power to impose a tax on the land of the company, as considered in the case of Beatty v. The Lessee of Knowles, 4 Peters, 168, must, in its nature, be strictly construed; and so in all cases where corporate powers, in the nature of legislation, are exercised. In that case, the directors were authorized to impose a tax under certain circumstances; and the Court held that they had no power to impose the tax under other circumstances.

Charles river being a navigable stream, any obstructions to its navigation, by the erection of a bridge, or any other work, would have been punishable, unless authorized by law.

By the act of 1785, the complainants were authorized to build the bridge, elect their officers, &c. and charge certain rates of toll. The power to tax passengers, was the consideration on which the expense of building the bridge, lighting it, &c. and keeping it in repair, was incurred. The grant then of tolls, was the essential part of the franchise.

That course of reasoning which would show the consideration to consist in any thing short of this power to tax, and the profit arising therefrom, is too refined for practical purposes. The builders of the bridge had no doubt a desire to increase the public accommodation: but they looked chiefly to a profitable investment of their funds; and that part of the charter which secured this object, formed the consideration on which the work was performed.

But it is said, there was no exclusive right given; and that consequently the legislature might well cause another bridge to be built, whenever, in their opinion, the public convenience required it.

On the other hand, it is insisted that the franchise of the bridge was as extensive as that of the ferry; and that the grant of this franchise having been made by the legislature, it had no power to grant a part of it to the new bridge.

That this part of the case presents considerations of great impor-
tance, and of much difficulty, cannot be denied.   To inquire into the
validity of a solemn act of legislation is at all times a task of much
delicacy; but it is peculiarly so, when such inquiry is made by a
federal tribunal, and relates to the act of a state legislature.   There
are cases, however, in the investigation of which such an inquiry
becomes a duty; and then no court can shrink, nor desire to shrink
from its performance   Under such circumstances. this duty will
always be performed with the high respect due to a branch of the
government, which, more than any other, is clotned with discre-
tionary powers, and influenced by the popular will.

The right granted to the Charles River Bridge Company, is, in its
nature, to a certain extent, exclusive; but to measure this extent,
presents the chief difficulty.   If the boundaries of this right could be
clearly established, it would scarcely be contended by any one, that
the legislature could, without compensation, grant to another com-
pany the whole or any part of it.

As well might it undertake to grant a tract of land, although an
operative grant had been previously made for the same land.   In
such a case the second grant would be void, on the ground that the
legislature had parted with the entire interest in the premises.   As
agent of the public it had passed the title to the first grantee; and
having done so, it could convey no right by its second grant.

The principle is the same in regard to the question under conside-
ration.   If the franchise granted to the complainants extended be-
yond the new bridge; it was as much above the power of the legis-
lature to make the second grant, as it would be to grant a part of a
tract of land for which a patent had been previously and regularly
issued.

The franchise, though incorporeal in legal contemplation, has body
and extension; and having been granted, is not less scrupulously
guarded by the principles of law than an interest in the soil.   It is
a substantive right in law, and can no more be resumed by the legis-
lature, when once granted, than any other right.

But would it not be unsafe, it is suggested, for the judicial autho-
rity to interpose and limit this exercise of legislative discretion?

The charter of the Warren Bridge, it is said, was not hastily
granted; that all the circumstances of the case, year after year, were
duly examined by the legislature; and at last the act of incorporation
was passed, because, in the judgment of the legislature, the public

[Charles River Bridge v. Warren Bridge et al.]

accommodation required it; and it is insisted that the grant to the complainants was necessarily subject to the exercise of this discretion.

It is undoubtedly the province of the legislature to provide for the public exigencies, and the utmost respect is always due to their acts; and the validity of those acts can only be questioned judicially, where they infringe upon private rights. At the time the Charles River Bridge was built, the population of Boston and Charlestown was small in comparison with their present numbers; and it is probable that the increase has greatly exceeded any calculation made at the time. The bridge was sufficient to accommodate the public; and it was, perhaps, believed that it would be sufficient, during the time limited in the charter. If, however, the increased population and intercourse between these towns and the surrounding country, required greater accommodation, than was afforded by the bridge, there can be no doubt that the legislature could make provision for it.

On the part of the complainants' counsel it is contended, if increased facilities of intercourse between these places were required by the public, the legislature was bound in good faith to give the option to the Charles River Bridge Company, either to enlarge their bridge, or construct a new one, as might be required. And this argument rests upon the ground that the complainants' franchise included the whole line of travel between the two places.

Under this view of their rights, the company proposed to the legislature, before the new charter was granted to the respondents, to do any thing which should be deemed requisite for the public accommodation.

In support of the complainants' right, in this respect, a case is referred to in 7 Barn. and Cres. 40; where it is laid down, that the lord of an ancient market may, by law, have a right to prevent other persons from selling goods in their private houses, situated within the limits of his franchise: and also to 5 Barn. and Cressw. 363. These cases show, that the grant to the lord of the market is exclusive; yet, if the place designated for the market is made too small by the act of the owner, any person may sell in the vicinity of the market, without incurring any responsibility to the lord of the market.

Suppose the legislature had passed a law requiring the complain-

ants to enlarge their bridge; or construct a new one, would they have been bound by it? Might they have not replied to the legislature, we have constructed our bridge of the dimensions required by the charter; we have, therefore, provided for the public all the accommodation which we are bound to give. And if the legislature could not require this of the complainants, is it not clear that they cannot assert an exclusive claim to the advantages of an enlarged accommodation. In common with other citizens, they submitted propositions to the legislature, but they could urge no exclusive right to afford any accommodation beyond what was given by their bridge.

When the Charles River Bridge was built, it was considered a work of great magnitude. It was, perhaps, the first experiment made to throw a bridge of such length over an arm of the sea; and in the construction of it great risk and expense were incurred. The unrestricted profits contemplated, were necessary to induce or justify the undertaking. Suppose within two or three years after the Charles River Bridge had been erected, the legislature had authorized another bridge to be built alongside of it, which could only accommodate the same line of travel. Whether the profits of such a bridge were realised by a company or by the state, would not the act of the legislature have been deemed so gross a violation of the rights of the complainants, as to be condemned by the common sense and common justice of mankind?

The plea, that the timbers or stone of the new bridge did not interfere with the old one, could not, in such a case, have availed. The value of the bridge is not estimated by the quantity of timber and stone it may contain, but by the travel over it. And if one-half or two-thirds of this travel, all of which might conveniently have passed over the old bridge, be drawn to the new one, the injury is much greater than would have been the destruction of the old bridge. A reconstruction of the bridge, if destroyed, would secure to the company the ordinary profits; but the division or destruction of the profits, by the new bridge, runs to the end of the charter of the old one. And shall it be said, that the greater injury, the diversion of the profits, may be inflicted on the company with impunity; while for the less injury, the destruction of the bridge, the law would give an adequate remedy?

I am not here about to apply the principles which have been long established in England, for the protection of ancient ferries, markets,

[Charles River Bridge v. Warren Bridge et al.]

lairs, mills, &c. In my opinion, this doctrine, in its full extent, is not adapted to the condition of our country. And it is one of the most valuable traits in the common law, that it forms a rule of right, only in cases and under circumstances adapted to its principles.

In this country there are few rights founded on prescription. The settlement of our country is comparatively recent; and its rapid growth in population and advance in improvements have prevented, in a great degree, interests from being acquired by immemorial usage. Such evidence of right is found in countries where society has become more fixed, and improvements are in a great degree stationary. But without the aid of the principles of the common law, we should be at a loss how to construe the charter of the complainants, and ascertain their rights.

Although the complainants cannot fix their franchise by showing the extent of the ferry rights; yet, under the principles of the common law, which have been too long settled in Massachusetts, in my opinion, to be now shaken; they may claim their franchise beyond the timbers of their bridge. If they may go beyond these, it is contended that no exact limit can be prescribed. And because it my be difficult, and perhaps impracticable, to designate with precision the exact limit; does it follow that the complainants' franchise is as narrow as their bridge.

Is it more difficult to define, with reasonable certainty, the extent of this right, than it is, in many other cases, to determine the character of an offence against the laws, from established facts. What shall constitute a public or private nuisance? What measure of individual wrong shall be sufficient to convict a person of the latter? And what amount of inconvenience to the public shall constitute the former?

Would it be more difficult to define the complainants' franchise, than to answer these questions? And yet public and private nuisances are of daily cognizance in courts of justice. How have ferry rights, depending upon the same principles, been protected for centuries in England?

The principles of the common law are not applied with that mathematical precision, of which the principles of the civil law are susceptible. But if the complainants' franchise cannot be measured by feet and inches, it does not follow that they have no rights.

In determining upon facts which establish rights or wrongs, pub-

lic as well as private, an exercise of judgment is indispensable; the facts and circumstances of each case are considered, and a sound and legal conclusion is drawn from them.

The bridge of the complainants was substituted for the ferry; and it was designed to accommodate the course of travel between Boston and Charlestown. This was the view of the legislature in granting the charter, and of the complainants in accepting it. And if it be admitted that the great increase of population has required the erection of other bridges than that which is complained of in this suit, over this arm of the sea, that can afford no protection to the defendants. If the interests of the complainants have been remotely injured by the construction of other bridges, does that give a license to the defendants to inflict on them a more direct and greater injury? By an extension of the complainants' charter, thirty years, an indemnity was given and accepted by them for the construction of the West Boston bridge.

The franchise of the complainants must extend a reasonable distance above and below the timbers of their bridge. This distance must not be so great as to subject the public to serious inconvenience, nor so limited as to authorize a ruinous competition. It may not be necessary to say, that for a remote injury the law would afford a remedy; but where the injury is ruinous, no doubt can exist on the subject. The new bridge, while tolls were charged, lessened the profits of the old one about one-half, or two-thirds; and now that it is a free bridge by law, the tolls received by the complainants are merely nominal. On what principle of law can such an act be sustained? Are rights acquired under a solemn contract with the legislature, held by a more uncertain tenure than other rights? Is the legislative power so omnipotent in such cases, as to resume what it has granted without compensation? It will scarcely be contended, that if the legislature may do this, indirectly, it may not do it directly. If it may do it through the instrumentality of the Warren Bridge Company, it may dispense with that instrumentality.

But it is said that any check to the exercise of this discretion by the legislature, will operate against the advance of improvements. Will not a different effect be produced? If every bridge or turnpike company were liable to have their property wrested from them, under an act of the legislature, without compensation; could much value be attached to such property? Would prudent men expend their funds in making such improvements?

Can it be considered as an injurious check to legislation, that private property shall not be taken for public purposes, without compensation? This restriction is imposed by the federal constitution, and by the constitutions of the respective states.

But it has been urged that the property of the complainants has not been taken, as the tolls in anticipation cannot be denominated property. The entire value of the bridge consists in the right of exacting toll. Is not this right property, and cannot its value be measured? Do not past receipts and increased intercourse, afford a rule by which future receipts may be estimated? And if the whole of these tolls are taken under an act of the legislature, is not the property of the complainants taken?

The charter of the complainants has been compared to a bank charter, which implies no obligation on the legislature not to establish another bank in the same place. This is often done; and it is contended, that for the consequential injury done the old bank by lessening its profits, no one supposes that an action would lie, nor that the second charter is unconstitutional. This case bears little or no analogy to the one under consideration. A bank may wind up its business, or refuse its discounts, at the pleasure of its stockholders and directors. They are under no obligation to carry on the operations of the institution, or afford any amount of accommodation to the public. Not so with the complainants. Under heavy penalties they are obliged to keep their bridge in repair, have it lighted, the gates kept open, and to pay two hundred pounds annually to the college. This the complainants are bound to do, although the tolls received should scarcely pay for the oil consumed in the lamps of the bridge.

The sovereign power of the state has taken the tolls of the complainants, but it has left them in possession of their bridge. Its stones and timbers are untouched, and the roads that lead to it, remain unobstructed.

One of the counsel in the defence, with emphasis, declared, that the legislature can no more repeal a charter, than it can lead a citizen to the block. The legislature cannot bring a citizen to the block; may it open his arteries? It cannot cut off his head; may it bleed him to death? Suppose the legislature had authorized the construction of an impassable wall, which encircled the ends of the bridge, so as to prevent passengers from crossing on it. The wall may be

as distant from the abutments of the bridge as the Warren Bridge. Would this be an infringement of the plaintiffs' franchise? On the principles contended for, how could it be so considered? If the plaintiffs' franchise is limited to their bridge, then they are not injured by the construction of this wall; or, at least, they are without remedy. This wall would be no more injurious to the plaintiffs than the free bridge. And the plaintiffs might be told, as alleged in this case, the wall does not touch your bridge. You are left in the full exercise of your corporate faculties. You have the same right to charge toll as you ever had.

The legislature had the same right to destroy the plaintiffs' bridge by authorizing the construction of the wall, as they had by authorizing the construction of a free bridge. In deciding this question we are not to consider what may be the law on this subject in Pennsylvania, Maryland, Virginia or Ohio; but what it is in Massachusetts. And in that state, the doctrine has been sanctioned that associations of men to accomplish enterprises of importance to the public, and who have vested their funds on the public faith, are entitled to protection. That their rights do not become the sport of popular excitement, no more than the rights of other citizens. The case under consideration forms, it is believed, a solitary exception to this rule; whether we look to the action of the legislature, or the opinions of the distinguished jurists of the state, on the bench, and at the bar.

The expense of keeping up the bridge, and paying the annuity to the college, is all that is left by the state to the complainants. Had this been proposed, or any thing which might lead to such a result soon after the construction of the complainants' bridge, it is not probable, that it would have been sanctioned; and yet it might as well have been done then as now. A free bridge then, could have been no more injurious to the plaintiffs than it is now. No reflection is intended on the commonwealth of Massachusetts, which is so renowned in our history for its intelligence, virtue and patriotism. She will not withhold justice, when the rights of the complainants shall be established.

Much reliance is placed on the argument, in the case reported in 4 Peters, 560, in which it was decided, that a law of the state of Rhode Island, imposing a tax upon banks, is constitutional. As these banks were chartered by the state, it was contended that there was no implied obligation on the legislature not to tax them. That if

this power could be exercised, it might be carried so far as to destroy the banks. But this Court sustained the right of the state to tax. The analogy between the two cases is not perceived. Does it follow, because the complainants' bridge is not exempt from taxation, that it may be destroyed, or its value greatly impaired by any other means? The power to tax extends to every description of property held within the state, which is not specially exempted; and there is no reason or justice in withholding from the operation of this power, property held directly under the grant of the state.

The complainants' charter has been called a monopoly; but in no just sense can it be so considered. A monopoly is that which has been granted without consideration; as a monopoly of trade; or of the manufacture of any particular article, to the exclusion of all competition. It is withdrawing that which is a common right, from the community, and vesting it in one or more individuals to the exclusion of all others. Such monopolies are justly odious, as they operate not only injuriously to trade, but against the general prosperity of society. But the accommodation afforded to the public by the Charles River Bridge, and the annuity paid to the college, constitute a valuable consideration for the privilege granted by the charter. The odious features of a monopoly do not, therefore, attach to the charter of the plaintiffs.

The 10th article of the declaration of rights in the constitution of Massachusetts, provides; "Whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." And in the 12th article it is declared, that, "no subject shall be deprived of his property, immunities, privileges or estate, but by the judgment of his peers or the law of the land." Here is a power recognised in the sovereignty, and is incident to it, to apply private property to public uses by making for it a just compensation. This power overreaches every other, and must be exercised at the discretion of the government; and a bridge, a turnpike road, a tract of land, or any other property, may be taken in whole, or in part, for public purposes, on the condition of making compensation.

In the case of Chadwick v. The Proprietors of the Haverhill Bridge, reported in Dane's Abridgment, it appears that a bridge was built under a charter within forty rods of the plaintiff's ferry, and over the same water. By an act of the legislature, commissioners were authorized to ascertain the damages sustained by the plain-

tiff; but he preferred his action at law, which was prosecuted, and adequate damages were recovered. It is true, this matter was referred to-arbitrators; but they were men of distinguished legal attainments and great experience; and they, after determining, that the plaintiff could sustain his action, assessed the damages. This award was sanctioned by the court. Under the circumstances of this case, at least as great a weight of authority belongs to it, as if the decision had been made by a court on the points involved. The case presented by the complainants is much stronger than Chadwick's; and if he was entitled to reparation for the injury done, no doubt can exist of the complainants' right.

In the extension of the national road through the state of Ohio, a free bridge was thrown across a stream by the side of a toll-bridge, which had some ten or fifteen years of its charter to run. The new bridge did not in the least obstruct the passage over the old one; and it was contended, that as no exclusive right was given under the first grant, the owner of the toll bridge was entitled to no compensation. It was said on that occasion, as it has been urged on this, that the right was given subject to the discretion of the legislature, as to a subsequent grant; and that the new bridge could not be objected to by the first grantee, whether it was built under the authority of the state, or federal government.

This course of reasoning influenced a decision against the claimant in the first instance; but a reconsideration of his case, and a more thorough investigation of it, induced the proper authority to reverse the decision, and award an indemnity for the injury done. The value of the charter was estimated, and a just compensation was made. This, it is true, was not a judicial decision, but it was a decision of the high functionaries of the government, and is entitled to respect. It was dictated by that sense of justice which should be felt on the bench, and by every tribunal having the power to act upon private rights.

It is contended by the respondents' counsel, that there was not only no exclusive right granted in the complainants' charter, beyond the timbers of the bridge; but the broad ground is assumed, that the legislature had no power to make such a grant; that they cannot grant any part of the eminent domain, which shall bind a subsequent legislature. And a number of authorities were cited to sustain their position; 1 Vattell, ch. 9, sec. 101; 4 Litt. R. 327; Domat. Book 1, tit. 6, sec. 1; 17 Vin. 88; Chitt. on Prer. 81; 10 Price, 350; Puff.

ch. 5, sec. 7; 5 Cowen, 558; 6 Wheat. 593; 20 Johns. R. 25; Hargrave's Law Tracts, 36; 4 Gill. and Johns. 1.

If this doctrine be sustainable, as applied to this case, it is not perceived why an exception should be made in favour of the plaintiffs, within the timbers of their bridge. It is admitted, that their grant is good to this extent; and if the legislature may grant a part of the eminent domain to this extent, why may it not go beyond it? If it may grant any part of the eminent domain, must not the extent of the grant be fixed at its discretion? In what other mode can it be determined, than by a judicial construction of the grant?

Acts of incorporation, when granted on a valuable consideration, assume the nature of contracts; and vested rights under them are no more subject to the legislative power than any other vested rights. In granting the charter to the Charles River Bridge Company, the legislature did not divest itself of the power to grant similar charters. But the thing granted passed to the grantee; and can no more be resumed by the legislature, than it can resume the right to a tract of land which has been granted. When land is granted, the state can exercise nc acts of ownership over it, unless it be taken for public use; and the same rule applies to a grant for a bridge, a turnpike road, or any other public improvement. It would assume a bold position to say, that a subsequent legislature may resume the ownership of a tract of land. which had been granted at a preceding session; and yet the principle is the same in regard to vested rights, under an act of incorporation. By granting a franchise, the state does not divest itself of any portion of its sovereignty; but to advance the public interests, one or more individuals are vested with a capacity to exercise the powers necessary to attain the desired object. In the case under consideration, the necessary powers to construct and keep up the Charles River Bridge were given to Thomas Russell and his associates. This did not withdraw the bridge from the action of the state sovereignty, any more than it is withdrawn from land which it has granted. In both cases the extent of the grant may become a question for judicial investigation and decision; but the rights granted are protected by the law.

It is insisted that, as the complainants accepted the extension of their charter in 1792, under an express assertion of right by the legislature to make new grants at its discretion, they cannot now object to the respondents' charter. In the acceptance of the extended charter, the complainants are bound only by the provisions of that

charter. Any general declarations, which the legislature may have made, as regards its power to grant charters, could have no more bearing on the rights of the complainants than on similar rights throughout the state. There was no reservation of this power in the prolonged charter, nor was there any general enactment on the subject. Of course, the construction of the charter must depend upon general and established principles.

It has been decided by the supreme court of New York, that unless the act making the appropriation of private property for public use, contain a provision of indemnity, it is void. Where property is taken under great emergencies, by an officer of the government, he could hardly be considered, I should suppose, a trespasser; though he does not pay for the property at the time it is taken.

There can be no doubt, that a compensation should be provided for in the same act which authorizes the appropriation of the property, or in a cotemporaneous act. If, however, this be omitted, and the property be taken, the law unquestionably gives a remedy adequate to the damages sustained. No government which rests upon the basis of fixed laws, whatever form it may have assumed, or wherever the sovereignty may reside, has asserted the right, or exercised the power of appropriating private property to public purposes, without making compensation.

In the 4th section of the act to establish the Warren Bridge, there is a provision that the corporation shall make compensation for any real estate that may be taken for the use of the bridge. The property of the complainants, which was appropriated under the new charter, cannot strictly be denominated real estate; and consequently this special provision does not reach their case. In this respect the law must stand as though no such provision had been made.

But was the complainants' property appropriated under the charter granted to the respondents, for public purposes? If the new bridge were deemed necessary, by the legislature, to promote the general convenience, and the defendants were consequently authorized to construct it, and a part of the plaintiffs' franchise were granted to the defendants; it was an appropriation of private property for public use. It was as much an appropriation of private property for public use, as would have been an appropriation of the ground of an individual, for a turnpike, or a rail road, authorized by la

By the charter of the Warren Bridge, so soon as the company should be reimbursed the money expended in the construction of the bridge, the expenses incurred in keeping it up, and five per cent.

interest, per annum, on the whole amount, the bridge was to become the property of the state; and whether these sums should be received or not, it was to become public property in six years from the time it was completed. The cost of construction, and the expenses, together with the five per cent. interest, have been reimbursed, and in addition, a large sum has been received by the state from the tolls of this bridge. But it is now, and has been since March last, it is admitted, a free bridge.

In granting the charter of the Warren Bridge, the legislature seem to recognise the fact that they were about to appropriate the property of the complainants for public uses, as they provide, that the new company shall pay annually to the college, in behalf of the old one, a hundred pounds. By this provision, it appears that the legislature has undertaken to do what a jury of the country only could constitutionally do; assess the amount of compensation to which the complainants are entitled.

Here, then, is a law which not only takes away the property of the complainants, but provides, to some extent, for their indemnity. Whether the complainants have availed themselves of this provision or not, does not appear, nor is it very material. The law, in this respect, does not bind them; and they are entitled to an adequate compensation for the property taken. These considerations belong to the case, as it arises under the laws and constitution of Massachusetts.

The important inquiry yet remains, whether this Court can take jurisdiction in the form in which the case is presented. The jurisdiction of this Court is resisted on two grounds. In the first place, it is contended that the Warren Bridge has become the property of the state, and that the defendants have no longer any control over the subject; and also, that the supreme court of Massachusetts have no jurisdiction over trusts.

The chancery jurisdiction of the supreme court of Massachusetts, is admitted to be limited; but they are specially authorized in cases of nuisances, to issue injunctions; and where this ground of jurisdiction is sustained, all the incidents must follow it. If the law incorporating the Warren Bridge Company was unconstitutional, on the ground that it appropriated to public use the property of the complainants, without making compensation; can there be any doubt, that the supreme court of Massachusetts had jurisdiction of the case? And having jurisdiction, is it not clear that the whole matter in controversy may be settled by a decree, that the defendants shall

account to the complainants for moneys received by them after they
had notice of the injunction?

It is also insisted, that the state is the substantial party to this suit,
and as the Court has no jurisdiction against a sovereign state, that
they can sustain no jurisdiction against those who act as agents under
the authority of a state. That if such a jurisdiction were asserted by
this Court, they would do indirectly, what the law prohibits them
from doing directly.

In the case of Osborn et al. v. Bank United States, 9 Wheat. 733,
this Court says, " The circuit courts of the United States have juris-
diction of a bill in equity, filed by the Bank of the United States
for the purpose of protecting the bank in the exercise of its franchises,
which are threatened with invasion and destruction under an un-
constitutional state law; and as the state itself cannot be made a de-
fendant, it may be maintained against the officers and agents of the
state who are appointed to execute such law."

As it regards the question of jurisdiction, this case, in principle, is
similar to the one under consideration. Osborn acted as the agent,
or officer of the state of Ohio, in collecting from the bank, under an
act of the state, a tax or penalty unconstitutionally imposed: and if
in such a case jurisdiction could be sustained against the agent of
the state, why can it not be sustained against a corporation acting as
agent under an unconstitutional act of Massachusetts, in collecting
tolls which belong to the plaintiffs?

In the second place, it is contended, that this Court cannot take
jurisdiction of this case under that provision of the federal constitu-
tion, which prohibits any state from impairing the obligation of con-
tracts, as the charter of the complainants has not been impaired. It
may be necessary to ascertain, definitely, the meaning of this provi-
sion of the constitution; and the judicial decisions which have been
made under it.

What was the evil against which the constitution intended to pro-
vide, by declaring, that no state shall pass any law impairing the
obligation of contracts? What is a contract, and what is the ob-
ligation of a contract?

A contract is defined to be an agreement between two or more
persons to do or not to do a particular thing. The obligation of a
contract is found in the terms of the agreement, sanctioned by moral
and legal principles.

The evil which this inhibition on the states was intended to pre

vent, is found in the history of our revolution. By repeated acts of legislation in the different states, during that eventful period, the obligation of contracts was impaired. The time and mode of payment were altered by law; and so far was this interference of legislation carried, that confidence between man and man was well nigh destroyed. Those proceedings grew out of the paper system of that day; and the injuries which they inflicted, were deeply felt in the country at the time the constitution was adopted. The provision was designed to prevent the states from following the precedent of legislation, so demoralizing in its effects, and so destructive to the commercial prosperity of a country. If it had not been otherwise laid down in the case of Fletcher v. Peck, 6 Cranch, 125; I should have doubted, whether the inhibition did not apply exclusively to executory contracts. This doubt would have arisen as well from the consideration of the mischief against which this provision was intended to guard, as from the language of the provision itself.

An executed contract is the evidence of a thing done; and it would seem, does not necessarily impose any duty or obligation on either party to do any act or thing. If a state convey land which it had previously granted, the second grant is void; not, it would seem to me, because the second grant impairs the obligation of the first, for in fact it does not impair it: but because, having no interest in the thing granted, the state could convey none. The second grant would be void in this country, on the same ground that it would be void in England, if made by the king. This is a principle of the common law; and is as immutable as the basis of justice. It derives no strength from the above provision of the constitution; nor does it seem to me to come within the scope of that provision.

When we speak of the obligation of a contract, the mind seems necessarily to refer to an executory contract; to a contract, under which something remains to be done, and there is an obligation on one or both of the parties to do it. No law of a state shall impair this obligation, by altering it in any material part. This prohibition does not apply to the remedy, but to the terms used by the parties to the agreement, and which fix their respective rights and obligations. The obligation, and the mode of enforcing the obligation, are distinct things. The former consists in the acts of the parties, and is ascertained by the binding words of the contract. The other emanates from the law-making power, which may be exercised at the discretion of the legislature, within the prescribed limits of the constitu-

tion. A modification of the remedy for a breach of the contract, does not, in the sense of the constitution, impair its obligation. The thing to be done, and the time of performance, remain on the face of the contract in all their binding force upon the parties; and these are shielded by the constitution, from legislative interference.

On the part of the complainants, it is contended that on the question of jurisdiction, as in reference to any other matter in controversy, the Court must look at the pleadings, and decide the point raised in the form presented. The bill charges that the act to establish the Warren Bridge, purports to grant a right repugnant to the vested rights of the complainants, and that it impairs the obligation of the contract between them and the commonwealth; and, being contrary to the constitution of the United States, is void. In their answer, the respondents deny that the act creating the corporation of the Warren Bridge, impairs the obligation of any contract set forth in the bill of the complainants.

The Court must look at the case made in the bill, in determining any questions which may arise; whether they relate to the merits or the jurisdiction of the Court. But in either case, they are not bound by any technical allegations or responses, which may be found in the bill and answer. They must ascertain the nature of the relief sought, and the ground of jurisdiction, from the tenor of the bill.

In this case, the question of jurisdiction under the constitution is broadly presented; and may be examined free from technical embarrassment.

Chief Justice Parker, in the state court, says, in reference to the charter of the complainants, " The contract of the government is, that this right shall not be disturbed or impaired, unless public necessity demand; and if it shall so demand, the grantees shall be indemnified." Such a contract, he observes, " is founded upon the principles of our constitution, as well as natural justice; and it cannot be impaired without a violation of the constitution of the United States: and I think, also, it is against the principles of our state constitution."

In the conclusion of his opinion, Mr. Justice Putnam says, in speaking of the defendants' charter, " It impairs the obligation of the grants before made to the plaintiffs. It takes away their property for public uses without compensation, against their consent, and without a provision for a trial by jury. It is therefore void."

Mr. Justice Wilde, and Mr. Justice Morton, did not consider the

new charter as having been granted either in violation of the constitution of the state, or of the United States.

In their decree, the court say, "That no property belonging to the complainants was taken and appropriated to public use, within the terms and meaning of the 10th article of the declaration of rights prefixed to the constitution of this commonwealth."

This decree can, in no point of view, be considered as fixing the construction of the constitution of Massachusetts, as it applies to this case. The decree was entered, pro forma, and is opposed to the opinion of two members of the court.

But if that court had deliberately and unanimously decided that the plaintiffs' property had not been appropriated to public use, under the constitution of Massachusetts; still, where the same point becomes important on a question of jurisdiction before this Court, -they must decide for themselves. The jurisdiction of this Court could, in no respect, be considered as a consequence of the decision of the above question by the state court, in whatever way the decree might have been entered. But no embarrassment can arise on this head, as the above decree was made, as a matter of form, to bring the case before this Court.

To sustain the jurisdiction of this Court, the counsel for complainants place great reliance upon the fact, that the right, charged to be violated, is held directly from the state; and they insist, that there is an implied obligation on the state, that it will do nothing to impair the grant. And that, in this respect, the complainants' right rests upon very different grounds from other rights in the community, not held by grant directly from the state.

On the face of the complainants' grant there is no stipulation that the legislature will do nothing that shall injure the rights of the grantees; but it is said that this is implied; and on what ground does the implication arise? Does it arise from the fact, that the complainants are the immediate grantees of the state?

The principle is admitted, that the grantor can do nothing that shall destroy his deed; and this rule applies as well to the state as to an individual. And the same principle operates with equal force on all grants, whether made by the state or individuals.

Does an implied obligation arise on a grant made by the state, that the legislature shall do nothing to invalidate the grant, which does not arise on every other grant or deed in the commonwealth?

The legislature is bound by the constitution of the state, and it

cannot be admitted, that the immediate grantee of the state has a stronger guarantee for the protection of his vested rights against unconstitutional acts, than may be claimed by any other citizen of the state. Every citizen of the state, for the protection of his vested rights, claims the guarantee of the constitution. This, indeed, imposes the strongest obligation on the legislature not to violate those rights. Does the legislature give to its grantee, by virtue of its grant, an additional pledge that it will not violate the constitution of the state? Such an implication, if it exist, can scarcely be considered as adding any thing to the force of the constitution. But this is not, it is said, the protection which the complainants invoke. In addition to their property having been taken without compensation, they allege that their charter has been impaired by the Warren Bridge charter; and, on this ground, they ask the interposition of this Court.

The new charter does not purport to repeal the old one, nor to alter it in any material or immaterial part. It does not, then, operate upon the complainants' grant, but upon the thing granted. It has, in effect, taken the tolls of the complainants and given them to the public. In other words, under the new charter, all that is valuable under the charter of the complainants has been appropriated to public use.

It is urged, that the legislature did not intend to appropriate the property of the complainants; that there is nothing in the act of the legislature, which shows an intention by the exercise of the eminent domain, to take private property for public use; but that, on the contrary, it appears the Warren Bridge charter was granted in the exercise of a legislative discretion, asserted and sustained by a majority of the legislature.

In this charter provision is made to indemnify the owners of real estate, if it should be taken for the use of the bridge; and the new company is required to pay, in behalf of the Charles River Bridge Company, one-half of the annuity to the college.

This would seem to show an intention to appropriate private property, if necessary, for the establishment of the Warren Bridge; and also an intention to indemnify the complainants, to some extent, for the injury done them. There could have been no other motive than this, in providing that the new company should pay the hundred pounds.

But the Court can only judge of the intention of the legislature

by its language; and when, by its act, the franchise of the complainants is taken, and, through the instrumentality of the Warren Bridge Company, appropriated to the public use, it is difficult to say that the legislature did not intend to do, what in fact it has done. Throughout the argument the counsel for the complainants have most ably contended that their property had been taken and appropriated to the public use without making compensation; and that the act was consequently void, under the constitution of Massachusetts.

If this be the character of the act; if, under its provisions the property of the complainants has been appropriated to public purposes; it may be important to inquire whether it can be considered as impairing the obligation of the contract, within the meaning of the federal constitution.

That a state may appropriate private property to public use, is universally admitted. This power is incident to sovereignty, and there are no restrictions on its exercise, except such as may be imposed by the sovereignty itself. It may tax at its discretion, and adapt its policy to the wants of its citizens; and use their means for the promotion of its objects under its own laws.

If an appropriation of private property to public use impair the obligation of a contract within the meaning of the constitution, then every exercise of this power by a state is unconstitutional. From this conclusion there is no escape; and whether compensation be made or not, cannot vary the result.

The provision is not, that no state shall pass a law impairing the obligation of contracts, unless compensation be made; but the power is absolutely inhibited to a state. If the act of the state come within the meaning of the provision, the act is void. No condition which may be annexed to it, no compensation that can be made, can give it validity. It is in conflict with the supreme law of the land, and is therefore a nullity.

Can a state postpone the day fixed in an obligation for payment, or provide that a bond for the payment of money shall be discharged by the payment of any thing else than money? This no one will contend can be done, because such an act would clearly impair the obligation of the contract; and no compensation, which the state could give, would make the act valid.

The question is asked whether the provision implied in the constitution of Massachusetts, that private property may be taken by making compensation, is not impliedly incorporated in every con-

[Charles River Bridge v. Warren Bridge et al.]

tract made under it; and whether the obligation of the contract is not impaired, when property is taken by the state without compensation?

Can the contract be impaired within the meaning of the federal constitution, when the action of the state is upon the property? The contract is not touched, but the thing covered by the contract is taken under the power to appropriate private property for public use. If taking the property impair the obligation of the contract, within the meaning of the constitution, it cannot be taken on any terms. The provision of the federal constitution, which requires compensation to be made when private property shall be taken for public use, acts only upon the officers of the federal government. This case must be governed by the constitution of Massachusetts.

Can a state, in any form, exercise a power over contracts which is expressly prohibited by the constitution of the Union? The parties making a contract may embrace any conditions they please, if the conditions do not contravene the law, or its established policy. But it is not in the power of a state to impose upon contracts which have been made, or which may afterwards be made, any condition, which is prohibited by the federal constitution. No state shall impair the obligation of contracts. Now, if the act of a state, in appropriating private property to public use come within the meaning of this provision, is not the act inhibited, and, consequently, void? This point would seem to be too plain for controversy. And is it not equally clear, that no provisions contained in the constitution of a state, or in its legislative acts, which subject the obligation of a contract to an unconstitutional control of the state, can be obligatory upon the citizens of the state? If the state has attempted to exercise a power which the federal constitution prohibits, no matter under what form the power may be assumed, or what specious pretexts may be urged in favour of its exercise, the act is unconstitutional and void.

That a state may take private property for public use, is controverted by no one. It is a principle, which, from the foundation of our government, has been sanctioned by the practice of the states, respectively; and has never been considered as coming in conflict with the federal constitution.

This power of the state is admitted in the argument; but it is contended that the obligation of the contract has been impaired, as the property of the complainants has been taken without compensation. Suppose the constitution of Massachusetts provided that no land

[Charles River Bridge v. Warren Bridge et al.]

should be sold for taxes without valuation, nor unless it shall sell for two-thirds of its value, due notice being given in some newspaper; and suppose a law of the legislature should direct land to be sold for taxes, without a compliance with these requisites; would this act impair the obligation of the grant by which the land is held, within the meaning of the constitution? The act would be clearly repugnant to the state constitution, and, consequently, all proceedings under it would be void. But it would not be repugnant to the constitution of the Union. And how does this case differ, in principle, from the one under consideration? In both cases, the power of the legislature is unquestionable; but, by the constitution of the state it must be exercised in a particular manner; and, if not so exercised, the act is void. Now, if, in either case, the obligation of the contract under which the property is held is impaired, then it must follow that every act of a state legislature which affects the right of private property, and which is repugnant to the state constitution, is a violation of the federal constitution.

Can the construction of the federal constitution depend upon a reference to a state constitution, and by which, the act complained of is ascertained to be legal or illegal? By this doctrine, the act, if done in conformity to the state constitution, would be free from objections under the federal constitution; but if this conformity do not exist, then the act would not be free from such objection. This, in effect, would incorporate the state constitution in, and make it a part of the federal constitution. No such rule of construction exists.

Suppose the legislature of Massachusetts had taken the farm of the complainants for the use of a poor house, or any asylum for lunatics, without making adequate compensation; or, if, in ascertaining the damages, the law of the state had not been strictly pursued: could this Court interpose its jurisdiction through the supreme court of the state, and arrest the power of appropriation? In any form, in which the question could be made, would it not arise under the constitution of the state, and be limited between citizens of the same state to the local jurisdiction? Does not the state constitution, which declares that private property shall not be taken for public purposes, without compensation, afford a safe guarantee to the citizens of the state against the illegal exercise of this power; a power essential to the well-being of every sovereign state, and which is always exercised under its own rules?

Had an adequate compensation been made to the complainants,

under the ·charter of the Warren Bridge, would this question· have
been raised? Can any one doubt, that· it was in the power of the
legislature of Massachusetts to take the whole of the complainants'
bridge for public use, by making compensation? Is there any power
that can control the exercise of this discretion by the legislature? I
know of none, either in the state or out of it; but it must be exer-
cised in subordination to the provisions of the constitution of the
state. And if it be not so exercised, the judicial authority of the
state only,. between its own citizens, can interpose and prevent the
wrong, or repair it in damages.

· In all cases where private property is taken by a state for public
use, the action is on the property; and the power, if it exist in the
state, must be above the contract. It does not act on the contract,
but takes from under it vested rights. And this power, when exer-
cised by a state, does not, in the sense of the federal constitution, im-
pair the obligation of the contract. Vested rights are disturbed, and
compensation must be made; but this is a subject which belongs to ·
the local jurisdiction. Does this view conflict with the established
doctrine of this Court? A reference to the points adjudged will
show that it does not.

The case of Satterlee v. Mathewson, 2 Peters, 380, presented the
following facts. Satterlee was the tenant of Mathewson, who claimed
at the time of the lease under a Connecticut title, in Luzerne county,
Pennsylvania. Afterwards, Satterlee purchased a Pennsylvania title
for the same land. An· ejectment was brought by Mathewson for ·
the land, and the court of common pleas decided that as Satterlee
was the tenant of the plaintiff, he could not set up a title against his
landlord. On a writ of error, this judgment was reversed by the
supreme court, on the ground that the relation of landlord and tenant
could not exist under a Connecticut title. Shortly afterwards, the
legislature of Pennsylvania passed a law, that, under such a title the
relation of the landlord and tenant should exist, and the supreme
court of the state having decided that this act was valid, the question
was brought before this Court by writ of error. In their opinion,
the Court say, "We come now to the main question in the cause. Is
the act, which is objected to, repugnant to any provision of the con-
. stitution of the United States? It is alleged to be particularly so,
because it impairs the obligation of the contract between. the state of
Pennsylvania and the plaintiff, who claims under her grant, &c." 
The grant vested a fee simple in the grantee, with all the rights,

privileges, &c.  " Were any of these rights disturbed or impaired by the act under consideration?  It does not appear from the record, that they were in any instance denied, or ever drawn in question."

The objection most pressed upon the Court was, that the effect of this act was to divest rights which were vested by law in Satterlee. " There is certainly no part of the constitution of the United States," the Court say, " which applies to a state law of this description; nor are we aware of any decision of this, or any circuit court which has condemned such a law upon this ground, provided its effect be not to impair the obligation of the contract."  And the Court add, that in the case of Fletcher v. Peck, it is no where intimated, that a state statute, which divests a vested right, is repugnant to the constitution of the United States.  There is a strong analogy between this case and the one under consideration.

The effect of the act of Pennsylvania was, to defeat the title of Satterlee, founded upon the grant of the state.  It made a title valid, which, in that very case, had been declared void by the Court, and which gave the right to Mathewson, in that suit, against the prior grant of the state.  And this Court admit that a vested right was divested by the act; but they say it is not repugnant to the federal constitution.  The act did not purport to affect the grant which was left with its covenants untouched; but it created a paramount right, which took the land against the grant.

In the case under consideration, the Warren Bridge charter does not purport to repeal or in any way affect the complainants' charter. But, like the Pennsylvania act, in its effects it divested the vested rights of the complainants.  Satterlee was not the immediate grantee of the state; but that could not affect the principle involved in the case.  He claimed under the grant of the state, and the fact that there was an intermediate grantee between him and the state, could not weaken his right.

In the case of Fletcher v. Peck, 6 Cranch, 87, the legislature of Georgia attempted to annul its own grant.  The law, under which the first grant was issued, was attempted to be repealed; and all grants under it were declared to be null and void by the second act. Here the state acted directly upon the contract; and the case comes within the rule, that to impair the obligation of the contract, the state law must act upon the contract.

The act of the legislature, complained of in the case of Sturgis v. Crowninshield, 4 Cond. Rep. 409, had a direct bearing upon the con-

tract.   The question was, whether under the bankrupt law of New
York a debtor was discharged from his obligation by a surrender of
his property: and so in the case of The Trustees of Dartmouth Col-
lege, v. Woodward, 4 Cond. Rep. 426, the question was, whether the
legislature could, without the consent of the corporation, alter its
charter in a material part, it being a private corporation.

In the case of Terret and others v. Taylor and others, 9 Cranch,
52, the uncontroverted doctrine is asserted, that a legislature cannot
repeal a statute creating a private corporation, and thereby destroy
vested rights.

The case of Green et al. v. Biddle, 8 Wheat. 1, has also been cited
to sustain the jurisdiction of the Court in this case.   The Court de-
cided in that case, that the compact, which guarantied to claimants
of land lying in Kentucky under titles derived from Virginia, their
rights as they existed under the laws of Virginia, prohibited the state
of Kentucky from changing those rights.   In other words, that Ken-
tucky could not alter the compact.   And when this Court were
called on to give effect to the act of Kentucky, which they consi-
dered repugnant to the compact, they held the provisions of the
compact paramount to the act.

After a careful examination of the questions adjudged by this
Court, they seem not to have decided in any case that the contract
is impaired, within the meaning of the federal constitution, where
the action of the state has not been on the contract.   That though
vested rights have been divested under an act of a state legislature,
they do not consider that as impairing the grant of the state, under
which the property is held.   And this it appears is the true distinc-
tion; and the one, which has been kept in view in the whole current
of adjudications by this Court, under the above clause of the consti-
tution.

Had this Court established the doctrine that where an act of a
state legislature affected vested rights held by a grant from the state,
the act is repugnant to the constitution of the United States, the
same principle must have applied to all vested rights.   For, as has
been shown, the constitution of a state gives the same guarantee of
their vested rights to all its citizens, as to those who claim directly
under grant from the state.   And who can define the limit of a ju-
risdiction founded on this principle?   It would necessarily extend
over the legislative action of the states; and control, to a fearful ex-
tent, the exercise of their powers.

[Charles River Bridge v..Warren Bridge et al.]

The spirit of internal improvement pervades the whole country There is perhaps no state in the Union, where important public works, such as turnpike roads, canals, rail roads, bridges, &c. are not either contemplated, or in a state of rapid progression. These cannot be carried on without the frequent exercise of the power to appropriate private property for public use. Vested rights are daily divested by this exercise of the eminent domain. And if in all these cases this Court can act as a court of supervision for the correction of errors, its power may be invoked in numberless instances. If to take private property impairs the obligation of the contract under which it is held, this Court may be called to determine in almost every case where the power is exercised; as well where compensation is made, as where it is not made. For, if this Court can take jurisdiction on this ground, every individual whose property has been taken has a constitutional right to the judgment of this Court; whether compensation has been made in the mode required by the constitution of the state.

In ascertaining the damages, the claimant has a right to demand a jury, and that the damages shall be assessed in strict conformity to the principles of the law. To revise these cases would carve out for this Court a new jurisdiction, not contemplated by the constitution, and which cannot be safely exercised.

These are considerations which grow out of our admirable system of government, that should lead the judicial tribunals both of the federal and state governments to mutual forbearance, in the exercise of doubtful powers. The boundaries of their respective jurisdictions can never, perhaps, be so clearly defined on certain questions, as to free them from doubt. This remark is peculiarly applicable to the federal tribunals, whose powers are delegated, and consequently limited. The strength of our political system consists in its harmony; and this can only be preserved by a strict observance of the respective powers of the state and federal government. Believing that this Court has no jurisdiction in this case; although I am clear that the merits are on the side of the complainants; I am in favour of dismissing the bill for want of jurisdiction.

Mr. Justice STORY, dissenting.

This cause was argued at a former term of this Court, and having been then held under advisement by the Court for a year, was,

[Charles River Bridge v. Warren Bridge et al.]

upon a difference of opinion among the judges, ordered to be again argued; and has accordingly been argued at the present term.

The arguments at the former term, were conducted with great learning, research and ability; and have been renewed with equal learning, research and ability, at the present term. But the grounds have been, in some respects, varied; and new grounds have been assumed, which require a distinct consideration. I have examined the case with the most anxious care and deliberation, and with all the lights which the researches of the years, intervening between the first and last argument, have enabled me to obtain; and I am free to confess, that the opinion which I originally formed after the first argument, is that which now has my most firm and unhesitating conviction. The argument at the present term, so far from shaking my confidence in it, has at every step served to confirm it.

In now delivering the results of that opinion, I shall be compelled to notice the principal arguments urged the other way; and as the topics discussed and the objections raised have assumed various forms; some of which require distinct, and others the same answers; it will be unavoidable that some repetitions should occur in the progress of my own reasoning. My great respect for the counsel who have pressed them, and the importance of the cause, will, I trust, be thought a sufficient apology for the course which I have, with great reluctance, thought it necessary to pursue.

Some of the questions involved in the case are of local law. And here, according to the known principles of this Court, we are bound to act upon that local law, however different from, or opposite to the jurisprudence of other states it either is, or may be supposed to be. Other questions seem to belong exclusively to the jurisdiction of the state tribunals, as they turn upon a conflict, real or supposed, between the state constitution and the state laws. The only question, over which this Court possesses jurisdiction in this case, (it being an appeal from a state court and not from the circuit court,) is, as has been stated at the bar, whether the obligation of any contract within the true intent and meaning of the constitution of the United States has been violated, as set forth in the bill. All the other points argued, are before us only as they are preliminaries and incidents to this.

A question has, however, been made as to the jurisdiction of this Court to entertain the present writ of error. It has been argued that this bridge has now become a free bridge, and is the property

[Charles River Bridge v. Warren Bridge et al.] -

of the state of Massachusetts; that the state cannot be made a party defendant to any suit to try its title to the bridge; and that there is no difference between a suit against the state directly, and against the state indirectly, · rough its servants and agents. And in further illustration of this argument it is said, that no tolls can be claimed in this case under the notion of an implied trust; for the state court has no jurisdiction in equity over implied trusts, but only over express trusts; and, if this Court has no jurisdiction over the principal subject matter of the suit, the title to the bridge, it can have none over the tolls, which are but incidents.

My answer to this objection will be brief. In the first place, this is a writ of error from a state court, under the twenty-fifth section of the Judiciary Act of 1789, ch. 20; and in such a case, if there is drawn in question the construction of any clause of the constitution of the United States, and the decision of the state court is against the right or title set up under it, this Court has a right to entertain the suit, and decide the question; whoever may be the parties to the original suit, whether private persons, or the state itself. This was decided in the case of Cohens v. The State of Virginia; 6 Wheat. R. 264. In the next place, the state of Massachusetts is not a party on the record in this suit, and therefore the constitutional prohibition of commencing any suit against a state does not apply; for that clause of the constitution is strictly confined to the parties on the record. So it was held in Osborn v. The Bank of the United States, 9 Wheat. Rep. 738; and in the Commonwealth Bank of Kentucky v. Wister, 2 Pet. R. 319, 323. In the next place, it is no objection to the jurisdiction, even of the circuit courts of the United States, that the defendant is a servant or agent of the state, and the act complained of is done under its authority, if it be tortious and unconstitutional. So it was held in the cases last cited. In the next place, this Court, as an appellate court, has nothing to do with ascertaining the nature or extent of the jurisdiction of the state court over any persons, or parties, or subject matters, given by the state laws; or as to the mode of exercising the same; except so far as respects the very question arising under the twenty-fifth section of the act of 1789, ch. 20.

There are but few facts in this case which admit of any controversy. The legislature of Massachusetts, by an act passed on the 9th of March, 1785, incorporated certain persons by the name of the proprietors of the Charles River Bridge, for the purpose of building

[Charles River Bridge v. Warren Bridge et al.]

a bridge over Charles river, between Boston and Charlestown; and granted to them the exclusive toll thereof, for forty years from the time of the first opening of the bridge for passengers. The bridge was built and opened for passengers, in June, 1786. In March, 1792, another corporation was created by the legislature, for the purpose of building a bridge over Charles river, from the westerly part of Boston to Cambridge; and on that occasion the legislature, taking into consideration the probable diminution of the profits of the Charles River Bridge, extended the grant of the proprietors of the latter bridge to *seventy* years from the first opening of it for passengers. The proprietors have, under these grants, ever since continued to possess and enjoy the emoluments arising from the tolls taken for travel over the bridge; and it has proved a very profitable concern.

'In March, 1828, the legislature created a corporation, called the Proprietors of the Warren Bridge, for the purpose of erecting another bridge across Charles river, between Boston and Charlestown. The termini of the last bridge; (which has been since erected, and was, at the commencement of this suit, in the full receipt of toll, and is now a free bridge;) are so very near to that of Charles River Bridge, that for all practical purposes, they may be taken to be identical. The same travel is accommodated by each bridge, and necessarily approaches to a point, before it reaches either, which is nearly equidistant from each. In short, it is impossible, in a practical view, and so was admitted at the argument, to distinguish this case from one where the bridges are contiguous from the beginning to the end.

The present bill is filed by the proprietors of Charles River Bridge, against the proprietors of Warren Bridge, for an injunction, and other relief; founded upon the allegation, that the erection of the Warren Bridge, under the circumstances, is a violation of their chartered rights, and so is void by the constitution of Massachusetts, and by the constitution of the United States. The judges of the supreme judicial court of Massachusetts, were (as is well known) equally divided in opinion upon the main points in the cause; and, therefore, a pro formâ decree was entered, with a view to bring before this Court the great and grave question, whether the legislature of Massachusetts, in the grant of the charter of the Warren Bridge, has violated the obligation of the constitution of the United States? If the legislature has done so, by mistake or inadvertence, I am quite sure that it will be the last to insist upon maintaining its own act. It has that stake in the Union, and in the maintenance of the con-

stitutional rights of its own citizens, which will, I trust, ever be found paramount to all local interests, feelings and prejudices; to the pride of power, and to the pride of opinion.

In order to come to any just conclusion in regard to the only question which this Court, sitting as an appellate court; has a right to entertain upon a writ of error to a state court; it will be necessary to ascertain what are the rights conferred on the proprietors of Charles River Bridge by the act of incorporation. The act is certainly not drawn with any commendable accuracy. But it is difficult, upon any principles of common reasoning, to mistake its real purport and object. It is entitled, "an act for incorporating certain persons, for the purpose of building a bridge over Charles river, between Boston and Charlestown, and supporting the same during the term of forty years." Yet it no where, in terms, in any of the enacting clauses, confers any authority upon the corporation, thus created, to build any such bridge; nor does it state in what particular place the bridge shall commence or terminate on either side of the river, except by inference and implication from the preamble. I mention this at the threshold of the present inquiry, as an irresistible proof that the Court must, in the construction of this very act of incorporation, resort to the common principles of interpretation; and imply and presume things, which the legislature has not expressly declared. If the Court were not at liberty so to do, there would be an end of the cause.

The act begins by reciting, that "the erecting of a bridge over Charles river, in a place where the ferry between Boston and Charlestown is now kept, will be of great public utility, and Thomas Russell and others, having petitioned, &c. for the act of incorporation, to empower them to build said bridge, and many other persons, under the expectation of such an act, have subscribed to a fund for executing and completing the aforesaid purpose." It then proceeds to enact that the proprietors of the fund or stock shall be a corporation under the name of the Proprietors of Charles River Bridge; and it gives them the usual powers of corporations, such as the power to sue and be sued, &c. In the next section it provides for the organization of the corporation; for choosing officers; for establishing rules and regulations for the corporation; and for effecting, completing, and executing the purpose aforesaid. In the next section, "for the purpose of *reimbursing* the said proprietors the money expended in building and supporting the said bridge," it provides, that a

toll be, and thereby is granted and established, for the *sole benefit of the proprietors*, for *forty* years from the opening of the bridge for travel, according to certain specified rates.  In the next section, it provides, that the bridge shall be well built, at least forty feet wide, of sound and suitable materials, with a convenient draw or passage way for ships and vessels, &c.; and "that the same shall be kept in *good, safe,* and *passable repair* for the term aforesaid, and, at the end of the said term, the *said bridge shall be left in like repair."*  Certain other provisions are also made, as to lighting the bridge, erecting a toll-board, lifting the draw for all ships and vessels, *without toll* or pay," &c. &c.  The next section declares, that, after the tolls shall commence, the proprietors *"shall annually pay to Harvard college, or university,* the sum of two hundred pounds during the said term of forty years; and, at the end of the said term, the said bridge shall revert to, and be the property of the commonwealth, saving to the said college or university, a reasonable and annual compensation for the annual income of the ferry, which they might have received, had not such bridge been erected."  The next and last section of the act, declares the act void, unless the bridge should be built within three years from the passing of the act.

Such is the substance of the charter of incorporation, which the Court is called upon to construe.  But, before we can properly enter upon the consideration of this subject, a preliminary inquiry is presented as to the proper rules of interpretation applicable to the charter.  Is the charter to receive a strict or a liberal construction?  Are any implications to be made, beyond the express terms?  And if so, to what extent are they justifiable by the principles of law?  No one doubts, that the charter is a contract, and a grant; and that it is to receive such a construction as belong to contracts and grants, as contradistinguished from mere laws.  But the argument has been pressed here, with unwonted earnestness; and it seems to have had an irresistible influence elsewhere, that this charter is to be construed as a royal grant, and that such grants are always construed with a stern and parsimonious strictness.  Indeed, it seems tacitly conceded that unless such a strict construction is to prevail, (and it is insisted on as the positive dictate of the common law,) there is infinite danger to the defence assumed on behalf of the Warren Bridge proprietors.  Under such circumstances, I feel myself constrained to go at large into the doctrine of the common law in respect to royal grants; because I cannot help thinking, that, upon this point very great er-

rors of opinion have crept into the argument. A single insulated position seems to have been taken as a general axiom. In my own view of the case, I should not have attached so much importance to the inquiry. But it is now fit that it should be sifted to the bottom.

It is a well known rule in the construction of private grants, if the meaning of the words be doubtful, to construe them most strongly against the grantor. But it is said that an opposite rule prevails, in cases of grants by the king; for, where there is any doubt, the construction is made most favourably for the king, and against the grantee. The rule is not disputed. But it is a rule of very limited application. To what cases does it apply? To such cases only, where there is a real doubt, where the grant admits of two interpretations, one of which is more extensive, and the other more restricted; so that a choice is fairly open, and either may be adopted without any violation of the apparent objects of the grant. If the king's grant admits of two interpretations, one of which will make it utterly void and worthless, and the other will give it a reasonable effect, then the latter is to prevail: for the reason, (says the common law,) "that it will be more for the *benefit* of the subject, and the *honour* of the king, which is to be more regarded than his profit." Com. Dig. Grant, G. 12; 9 Co. R. 131. a.; 10 Co. R. 67. b; 6 Co. R. 6. And in every case, the rule is made to bend to the real justice and integrity of the case. No strained or extravagant construction is to be made in favour of the king. And, if the intention of the grant is obvious, a fair and liberal interpretation of its terms is enforced. The rule itself is also expressly dispensed with, in all cases where the grant appears upon its face, to flow, not from the solicitation of the subject but from the special grace, certain knowledge, and mere motion of the crown; or, as it stands in the old royal patents, "ex speciali gratiâ, certâ scientiâ, et ex mero motu regis;" (See Arthur Legate's case, 10 Co. R. 109, 112, b.; Sir John Moulin's case, 6 Co. R. 6; 2 Black. Comm. 347; Com. Dig. Grant, G. 12.) 'and these words are accordingly inserted in most of the modern grants of the crown, in order to exclude any narrow construction of them. So the court admitted the doctrine to be in Attorney General v. Lord Eardly, 8 Price, 69. But what is a most important qualification of the rule, it never did apply to grants made for a valuable consideration by the crown; for, in such grants the same rule has always prevailed, as in cases between subjects. The mere grant of a bounty

of the king may properly be restricted to its obvious intent.   But the contracts of the king for value are liberally expounded, that the dignity and justice of the government may never be jeoparded by petty evasions, and technical subtleties.

I shall not go over all the cases in the books, which recognise these principles, although they are abundant.   Many of them will be found collected in Bacon's Abridgment, Prerogative, F. 2, p. 602 to 604; in Comyn's Digest, Grant, G. 12; and in Chitty on the Prerogatives of the Crown, chap. 16, s. 3.   But I shall dwell on some of the more prominent, and especially on those which have been mainly relied on by the defendants; because, in my humble judgment, they teach a very different doctrine from what has been insisted on.   Lord Coke, in his Commentary on the Statute of Quo Warranto, 18 Edw. I., makes this notable remark: "Here is an excellent rule for construction of the king's patents, not only of liberties, but of lands, tenements, and other things, which he may lawfully grant, that they have no strict or narrow interpretation for the overthrowing of them, sed secundum earundum plenitudinem judicentur; that is, to have a liberal and favourable construction, for the making them available in law, usque ad plenitudinem, for the honour of the king."   Surely, no lawyer would contend for a more beneficent or more broad exposition of any grant whatsoever, than this.

So in respect to implications in cases of royal grants, there is not the slightest difficulty, either upon authority or principle, in giving them a large effect so as to include things which are capable of being the subject of a distinct grant.   A very remarkable instance of this sort arose under the Statute of Prerogative, (17 Edw. II, Stat. 2, ch. 15) which declared, that when the king granteth to any a manor or land with the appurtenances, unless he makes express mention in the deed, in writing, of advowsons, &c. belonging to such manor, then the king reserveth to himself such advowsons.   Here, the statute itself prescribed a strict rule of interpretation.*   Yet, in Whistler's case, (10 Co. R. 63) it was held, that a royal grant of a manor with the appurtenances, in as ample a manner as it came to the king's hands, conveyed an advowson, which was appendant to the manor, by implication from the words actually used, and the apparent intent. This was certainly a very strong case of raising an implication from words susceptible of different interpretations, where the statute had furnished a positive rule for a narrow construction, excluding the ad-

* S. P. in Atty. General v. Sitwell, 1 Younge's Rep. 583.

[Charles River Bridge v. Warren Bridge et al.]

vowson: So, it has been decided that if the king grants a messuage and all lands spectantes, aut cum eo dismissas, lands which have been enjoyed with it for a convenient time, pass; 2 Rolle. Abridg. 186. C. 25, 30; Cro. Car. 169; Chitty on the Prerogatives, ch. 16, s. 3, p. 393; Com. Dig. Grant, G. 5. In short, wherever the intent from the words is clear, or possesses a reasonable certainty, the same construction prevails in crown grants, as in private grants; especially where the grant is presumed to be from the voluntary bounty of the crown, and not from the representation of the subject.

It has been supposed, in the argument, that there is a distinction between grants of lands held by the king, and grants of franchises which are matters of prerogative, and held by the crown for the benefit of the public, as flowers of prerogative. I know of no such distinction; and lord Coke in the passage already cited, expressly excludes it; for he insists that the same liberal rule of interpretation is to be applied to cases of grants of liberties, as to cases of grants of lands.

I am aware, that Mr. Justice Blackstone, in his Commentaries, (2 Black. Com. 347) has laid down some rules apparently varying from what has been stated. He says, "the manner of granting by the king does not more differ from that by a subject, than the construction of his grants when made. 1. A grant made by the king, at the suit of the grantee, shall be taken most beneficially for the king and against the party; whereas the grant of a subject is construed most strongly against the grantor, &c. 2. A subject's grant shall be construed to include many things besides what are expressed, if necessary for the operation of the grant. Therefore, in a private grant of the profits of land for one year, free ingress, egress, and regress, to cut and carry away those profits, are also inclusively granted, &c. But the king's grant shall not enure to any other intent, than that which is precisely expressed in the grant. As if he grants land to an alien, it operates nothing; for such a grant shall not enure to make him a denizen, that so he may be capable to take by the grant." Now, in relation to the last position, there is nothing strange or unnatural in holding that a crown grant shall not enure to a totally different purpose from that which is expressed, or to a double intent; when all its terms are satisfied by a single intent. It is one thing to grant land to an alien and quite a different thing to make him a denizen. The one is not an incident to the other, nor does it naturally flow from it. The king may be willing to grant land to an alien, when

he may not be willing to give him all the privileges of a subject. It is well known that an alien may take land by grant, and may hold it against every person but the king, and it does not go to the latter until office found; so that, in the mean time, an alienation by the alien will be good. A grant therefore, to an alien, is not utterly void. It takes effect, though it is not indefeasible. And, in this respect, there does not seem any difference between a grant by a private person, and by the crown; for the grant of the latter takes effect, though it is liable to be defeated. See Com. Dig. Alien, C. 4; 1 Leon. 47; 4 Leon. 82. The question in such cases, is not whether there may not be implications in a crown grant; but whether a totally different effect shall be given to a crown grant from what its terms purport. The same principle was acted upon in Englefield's case; 7 Coke, R. 14, a. There the crown had demised certain lands which were forfeited by a tenant for life by attainder, to certain persons for forty years; and the crown being entitled to a condition which would defeat the remainder over after the death of the person attainted, tendered performance of the condition to the remainder man, who was a stranger to the demise; and he contended, that by the demise the condition was suspended. And it was held, that the demise should not operate to a double intent, viz. to pass the term, and also, in favour of a stranger, to suspend the condition: for (it was said) "the grant of the crown shall be taken according to the express intention comprehended in the grant, and shall not extend to any other thing by construction or implication, which doth not appear by the grant, that the intent did extend to;" though it might have been different in the case of a subject.

In regard to the other position of Mr. Justice Blackstone, it may be supposed that he means to assert, that in a crown grant of the profits of land for a year, free ingress, egress and regress to take the profits, are not included by implication, as they would be in a subject's grant. If such be his meaning, he is certainly under a mistake. The same construction would be put upon each; for otherwise nothing would pass by the grant. It is a principle of common sense, as well as of law, that when a thing is granted, whatever is necessary to its enjoyment is granted also. It is not presumed that the king means to make a void grant; and, therefore, if it admits of two constructions, that shall be followed which will secure its validity and operation. In Comyn's Digest (Com. Dig. Grant E. 11. Co. Litt. 56, a.) a case is cited from the Year Book 1 Hen. 4, 5; (it should be 6, a.) that if there be a grant of land, *cum pertinentiis,*

to which common is appendant, the common passes as an incident, even though it be the grant of the king.    So, it is said in the same case, if the king grant to me the foundation of an abbey, the corody passes.    So, if the king grant to me a fair, I shall have a court of Piepoudre, as incident thereto.    And there are other cases in the books to the same effect.    See Bac. Abridg. Prerogative, F. 2, p. 602; Comyn's Dig. Grant, G. 12; Lord Chandos's case, 6 Co. R. 55; Sir Robert Atkyn's case, 1 Vent. 399, 409; 9 Co. R. 29, 30.    Finch in his treatise on the law, contains nothing beyond the common authorities; Finch's Law, b. 2, ch. 2, p. 24, edit. 1613; Cro. Eliz. 591; Per Popham, C. J. 17 Vin. Abridg. Prerogative, O. c. pl. 13; Com. Dig. Franchise, C. 2; Inst. 282.

Lord Coke, after stating the decision of Sir John Moulin's case, (6 Co. R. 6,) adds these words: "Note the gravity of the ancient sages of the law to construe the king's grants beneficially for his honour, and not to make any strict or literal construction in subversion of such grants."    This is an admonition, in my humble judgment, very fit to be remembered and acted upon by all judges, who are called upon to interpose between the government and the citizen in cases of public grants.    Legat's case (10 Co. R. 109,) contains nothing, that in the slightest degree impugns the general doctrine here contended for.    It proceeded upon a plain interpretation of the very words of the grant; and no implications were necessary or proper, to give it its full effect.

The case of the Royal Fishery of the Banne, decided in Ireland, in the privy council in 8th James 1st, (Davies' Rep. 149,) has been much relied on to establish the point, that the king's grant shall pass nothing by implication.    That case, upon its actual circumstances, justifies no such sweeping conclusion.    The king was owner of a royal fishery in gross, (which is material,) on the river Banne, in navigable waters, where the tide ebbed and flowed, about two leagues from the sea; and he granted to Sir R. M'D. the territory of Rout, which is parcel of the county of Antrim, and adjoining to the river Banne, in that part where the said fishery is; the grant containing the following words, " omnia castra, messuagia, &c. & ., piscarias, piscationes, aquas, aquarum cursus, &c., ac omnia alia hereditamenta in vel infra dictum, territorium de Rout, in comitatu Antrim, exceptis, et ex hac concessione nobis heredibus et successoribus nostris reservatis tribus partibus piscationibus fluminis de Banne."    The question was, whether the grant passed the royal fishery in the

Banne to the grantee? And it was held, that it did not; first, because the river Banne, so far as the sea ebbs and flows, is a royal navigable river, and the fishery there a royal fishery; secondly, because no part of this royal fishery could pass by the grant of the land adjoining, and by the general grant of all the fisheries, [in or within the territory of Rout;] for this royal fishery is not appurtenant to the land, but is a fishery in gross, and parcel of the inheritance of the crown itself; and general words in the king's grant shall not pass such special royalty, which belongs to the crown by prerogative; thirdly, that by the exception in the grant of three parts of this fishery, the other fourth part of this fishery did not pass by this grant; for the king's grant shall pass nothing by implication; and for this was cited 2 Hen. 7, 13.

Now, there is nothing in this case, which is not easily explicable upon the common principles of interpretation. The fishery was a royal fishery in gross, and not appurtenant to the territory of Rout; Ward v. Cresswell, Willes' R. 265. The terms of the grant were of all fisheries in and within this territory; and this excluded any fishery not within it, or not appurtenant to it. The premises, then, clearly did not, upon any just construction, convey the fishery in question, for it was not within the territory. The only remaining question was, whether the exception of three quarters, would, by implication, carry the fourth part which was not excepted; that is, whether terms of exception in a crown grant should be construed to be terms of grant and not of exception. It is certainly no harsh application of the common rules of interpretation to hold, that an implication which required such a change in the natural meaning of the words, ought not to be allowed to the prejudice of the crown. Non constat, that the king might not have supposed, at the time of the grant, that he was owner of three parts only of the fishery, and not of the fourth part. This case of the fishery of the Banne, was cited and commented on by Mr. Justice Bayley in delivering the opinion of the court in the case of the Duke of Somerset v. Fogwell, (5 Barn. and Cress. 875 and 885,) and the same view was taken of the grounds of the decision, which has been here stated: the learned judge adding, that it was further agreed in that case, that the grant of the king passes nothing by implication; by which he must be understood to mean, nothing, which its terms do not, fairly and reasonably construed, embrace as a portion of or incident to the subject matter of the grant.

As to the case cited from 2 Hen. 7, 13, (which was the sole au-

thority relied on,) it turned upon a very different principle. There, the king by letters patent granted to a man that he might give twenty marks annual rent to a certain chaplain to pray for souls, &c.; and the question was, whether the grant was not void for uncertainty, as no chaplain was named. And the principal stress of the argument seems to have been, whether this license should be construed to create or enable the grantee to create a corporation capable of taking the rent. In the argument it was asserted that the king's grants should not be construed, by implication, to create a corporation, or to enure to a double intent. In point of fact, however, I find (Chronica Juridicialia, p. 141,) that neither of the persons, whose opinions are stated in the case, was a judge at the time of the argument, nor does it appear what the decision was; so that the whole report is but the argument of counsel. The same case is fully reported by lord Coke, in the case of Sutton's Hospital, (10 Co. Rep. 27, 28,) who says that he had seen the original record, and who gives the opinions of the judges at large, by which it appears that the grant was held valid. And so says lord Coke, " Note, reader, this grant of the king enures to these intents, viz. to make an incorporation; to make a succession; and to grant a rent." So, that here we have a case, not only of a royal grant being construed liberally, but divers implications being made not at all founded in the express terms of the grant. The reason of which was, (as lord Coke says,) because the king's charter made for the erection of pious and charitable works, shall be always taken in the most favourable and beneficial sense. This case was recognised by the judges as sound law, in the case of Sutton's Hospital. And it was clearly admitted by the judges, that in a charter of incorporation by the crown, all the incidents to a corporation were tacitly annexed, although not named; as the right to sue and be sued; to purchase, hold, and alien lands; to make by-laws, &c. &c. And if power is expressly given to purchase, but no clause to alien, the latter follows by implication, as an incident; Comyn's Dig. Franchise, F. 6, F. 10, F. 15. It is very difficult to affirm in the teeth of such authorities, that in the king's grants nothing is to be taken by implication; as is gravely asserted in the case in Davies' Reports, 149. The case cited to support it is directly against it. In truth, it is obvious, that the learned judges mistook the mere arguments of counsel, for the solemn opinions of the court. And the case, as decided, is a direct authority the other way.

The case of Blankley v. Winstanley, (3 T. R. 279,) has also been relied on for the same purpose. But it has nothing to do with the point. The court there held that by the saving in the very body of the charter, the concurrent jurisdiction of the county magistrates was preserved. There was nothing said by the court, in respect to the implications in crown grants. The whole argument turned upon the meaning of the express clauses.

Much reliance has also been placed upon the language of lord Stowell in the Elsebe, 5 Rob. 173. The main question in that case was, whether the crown had a right to release captured property before adjudication, without the consent of the captors. That question depended upon the effect of the king's orders in council, his proclamation, and the parliamentary prize act; for, independently of these acts, it was clear, that all captured property, jure belli, belonged to the crown; and was subject to its sole disposal. Lord Stowell, whose eminent qualifications as a judge entitle him to great reverence, on that occasion said, "A general presumption arising from these considerations is, that government does not mean to divest itself of this universal attribute of sovereignty conferred for such purposes, (to be used for peace, as well as war) unless it is so clearly and unequivocally expressed. In conjunction with this universal presumption, must be taken, also, the wise policy of our own peculiar law, which interprets the grants of the crown in this respect, by other rules than those which are applicable in the construction of the grants of individuals. Against an individual it is presumed that he meant to convey a benefit, with the utmost liberality that his words will bear. It is indifferent to the public, in which person an interest remains, whether in the grantor or the taker. With regard to the grant of the sovereign, it is far otherwise. It is not held by the sovereign himself as private property, and no alienation shall be presumed, except what is clearly and indisputably expressed." Now, the right of the captors in that case, was given by the words of the king's order in council only. It was *a right to seize and bring in for adjudication.* The *right* to seize then was given, and the *duty* to bring in for adjudication was imposed. If nothing more had existed, it would be clear that the Crown would have the general property in the captures. Then, again, the prize act and prize proclamation gave to the captors a right in the property *after adjudication,* as lawful prize, and not before. This very limitation naturally implied, that *until adjudication* they had no right in the property.

And this is the ground, upon which lord Stowell placed his judgment, as the clear result of a reasonable interpretation of these acts; declining to rely on any reasoning from considerations of public policy. And it is to be considered that lord Stowell was not speaking of an ordinary grant of land, or of franchises, in the common course of mere municipal regulations; but of sovereign attributes and prerogatives, involving the great rights and duties of war and peace, where, upon every motive of public policy, and every ground of rational interpretation, there might be great hesitation in extending the terms of a grant beyond their fair interpretation.

But, what I repeat, is most material to be stated, is, that all this doctrine in relation to the king's prerogative of having a construction in his own favour, is exclusively confined to cases of mere *donation*, flowing from the bounty of the crown. Whenever the grant is upon a valuable consideration, the rule of construction ceases; and the grant is expounded exactly as it would be in the case of a private grant, favourably to the grantee. Why is this rule adopted? Plainly, because the grant is a contract, and is to be interpreted according to its fair meaning. It would be to the dishonour of the government, that it should pocket a fair consideration, and then quibble as to the obscurities and implications of its own contract. Such was the doctrine of my lord Coke, and of the venerable sages of the law in other times, when a resistance to prerogative was equivalent to a removal from office. Even in the worst ages of arbitrary power, and irresistible prerogative, they did not hesitate to declare, that contracts founded in a valuable consideration ought to be construed liberally for the subject, for the honour of the crown; 2 Co. Inst. 496. See also Com. Dig. Franchise, C. F. 6. If we are to have the grants of the legislature construed by the rules applicable to royal grants, it is but common justice to follow them throughout, for the honour of this republic. The justice of the commonwealth will not, (I trust,) be deemed less extensive than that of the crown.

I think that I have demonstrated, upon authority, that it is by no means true, that implications may not, and ought not to be admitted in regard to crown grants. And I would conclude what I have to say on this head, by a remark made by the late Mr. Chief Justice Parsons, a lawyer equally remarkable for his extraordinary genius, and his professional learning. "In England, prerogative is the cause of *one* against the *whole*. Here, it is the cause of *all* against

*one.* In the first case, the feelings and vices, as well as the virtues, are enlisted against it; in the last in favour of it. And, therefore, *here*, it is of more importance that the judicial courts should take care that the claim of prerogative should be *more strictly watched;"* Martin v. Commonwealth, 1 Mass. R. 356.

If, then, the present were the case of a royal grant, I should most strenuously contend, both upon principle and authority, that it was to receive a liberal, and not a strict construction. I should so contend upon the plain intent of the charter, from its nature and objects, and from its burthens and duties. It is confessedly a case of contract, and not of bounty; a case of contract for a valuable consideration; for objects of public utility; to encourage enterprise; to advance the public convenience; and to secure a just remuneration for large outlays of private capital. What is there in such a grant of the crown, which should demand from any court of justice a narrow and strict interpretation of its terms? Where is the authority which contains such a doctrine, or justifies such a conclusion? Let it not be assumed, and then reasoned from, as an undisputed concession. If the common law carries in its bosom such a principle, it can be shown by some authorities, which ought to bind the judgment, even if they do not convince the understanding. In all my researches I have not been able to find any, whose reach does not fall far, very far short of establishing any such doctrine. Prerogative has never been wanting in pushing forward its own claims for indulgence, or exemption. But it has never yet (as far as I know) pushed them to this extravagance.

I stand upon the old law; upon law established more than three centuries ago, in cases contested with as much ability and learning, as any in the annals of our jurisprudence, in resisting any such encroachments upon the rights and liberties of the citizens, secured by public grants. I will not consent to shake their title deeds, by any speculative niceties or novelties.

The present, however, is not the case of a royal grant, but of a legislative grant, by a public statute. The rules of the common law in relation to royal grants have, therefore, in reality, nothing to do with the case. We are to give this act of incorporation a rational and fair construction, according to the general rules which govern in all cases of the exposition of public statutes. We are to ascertain the legislative intent; and that once ascertained, it is our duty to give it a full and liberal operation. The books are full of cases to this

effect; (see Com. Dig. Parliament, R. 10, to R. 28; Bac. Abridg. Statute;) if indeed so plain a principle of common sense and common justice stood in any need of authority to support it. Lord Chief Justi Eyre, in the case of Boulton v. Bull, (2 H. 136, 463, 500,) took notice of the disctinction between the construction of a crown grant, and a grant by an act of parliament; and held the rules of the common law, introduced for the protection of the crown in respect to its own grants, to be inapplicable to a grant by an act of parliament. "It is to be observed" (said his lordship,) "that there is nothing technical in the composition of an act of parliament. In the exposition of statutes, the intent of parliament is the guide. It is expressly laid down in our books (I do not here speak of penal statutes,) that every statute ought to be expounded, not according to the letter, but the intent." Again, he said: "This case was compared to the case of the king being deceived in his grants. But I am not satisfied, that the king, proceeding by and with the advice of parliament, is in that situation, in respect to which he is under the special protection of the law; and that he could on that ground be considered as deceived in his grant. No case was cited to prove that position."

Now, it is to be remembered, that his lordship was speaking upon the construction of an act of parliament of a private nature; an act of parliament in the nature of a monopoly; an act of parliament granting an exclusive patent for an invention to the celebrated Mr. Watt. And let it be added, that his opinion as to the validity of that grant, notwithstanding all the obscurities of the act, was ultimately sustained in the king's bench by a definitive judgment in its favour; see Hornblower v. Boulton, 8 T. R. 95. A doctrine equally just and liberal has been repeatedly recognised by the supreme court of Massachusetts. In the case of Richards v. Daggett, (4 Mass. R. 534, 537,) Mr. Chief Justice Parsons, in delivering the opinion of the court, said; "It is always to be presumed, that the legislature intend the most beneficial construction of their acts, when the design of them is not apparent;" see also Inhabitants of Somerset v. Inhabitants of Dighton, 12 Mass. R. 383; Whitney v. Whitney, 14 Mass. R. 88; 8 Mass. R. 523; Holbrook v. Holbrook, 1 Pick. R.; Stanwood v. Pierce, 7 Mass. R. 458. Even in relation to mere private statutes, made for the accommodation of particular citizens, and which may affect the rights and privileges of others; courts of law will give them a large construction, if it arise from necessary implication; Coolidge v. Williams, 4 Mass. R. 145.

[Charles River Bridge v. Warren Bridge et al.]

As to the manner of construing parliamentary grants for private enterprise, there are some recent decisions, which, in my judgment, establish two very important principles applicable directly to the present case; which, if not confirmatory of the views, which I have endeavoured to maintain, are at least not repugnant to them. The first is, that all grants for purposes of this sort are to be construed as contracts between the government and the grantees, and not as mere laws; the second is, that they are to receive a reasonable construction; and that if either upon their express terms, or by just inference from the terms, the intent of the contract can be made out, it is to be recognised and enforced accordingly. But if the language be ambiguous, or if the inference be not clearly made out, then the contract is to be taken most strongly against the grantor, and most favourably for the public. The first case is The Company of Proprietors of the Leeds and Liverpool Canal v. Hustler, (1 Barn. and Cressw. 424,) where the question was upon the terms of the charter, granting a toll. The toll was payable on empty boats passing a lock of the canal. The court said; "no toll was expressly imposed upon empty boats, &c., and we are called upon to say that such a toll was imposed by inference. Those who seek to impose a burthen upon the public, should take care that their claim rests upon plain and unambiguous language. Here the claim is by no means clear." The next case was the Kingston-upon-Hull Dock Company v. La Marche, (8 Barn. and Cresswell, 42,) where the question was as to a right to wharfage of goods shipped off from their quays. Lord Tenterden, in delivering the judgment of the court in the negative, said; "this was clearly a bargain made between a company of adventurers and the public; and, as in many similar cases, the terms of the bargain are contained in the act: and the plaintiffs can claim nothing which is not clearly given." The next case is the Proprietors of the Stourbridge Canal v. Wheeley, (2 Barn. and Adolph. 792,) in which the question was as to a right to certain tolls. Lord Tenterden, in delivering the opinion of the court, said; "this like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute. And the rule of construction in all such cases is now fully established to be this: That any ambiguity in the terms of the contract must operate against the adventurers, and in favour of the public; and the plaintiffs can claim nothing which is not clearly given to them by the act." "Now, it is quite certain, that the company have no right expressly given to receive any compensation, except, &c.; and there-

[Charles River Bridge v. Warren Bridge et al.]

fore it is incumbent upon them to show, that they have a right, clearly given by inference from some other of the clauses." This latter statement shows, that it is not indispensable, that in grants of this sort, the contract or the terms of the bargain should be in express language; it is sufficient if they may be clearly proved by implication or inference.

I admit, that where the terms of a grant are to impose burthens upon the public, or to create a restraint injurious to the public interest, there is sound reason for interpreting the terms, if ambiguous, in favour of the public. But at the same time, I insist, that there is not the slightest reason for saying, even in such a case, that the grant is not to be construed favourably to the grantee, so as to secure him in the enjoyment of what is actually granted.

I have taken up more time in the discussion of this point than, perhaps, the occasion required, because of its importance, and the zeal, and earnestness, and learning, with which the argument for a strict construction has been pressed upon the Court; as in some sort vital to the merits of this controversy. I feel the more confirmed in my own views upon the subject, by the consideration, that every judge of the state court, in delivering his opinion, admitted, either directly, or by inference, the very principle for which I contend. Mr. Justice Morton, who pressed the doctrine of a strict construction most strongly, at the same time said; "although no distinct thing or right will pass by implication, yet I do not mean to question, that the words used should be understood in their most natural and obvious sense; and that whatever is essential to the enjoyment of the thing granted will be necessarily implied in the grant;" 7 Pick. R. 462. Mr. Justice Wilde said; "in doubtful cases it seems to me a sound and wholesome rule of construction to interpret public grants most favourably to the public interests, and that they are not to be enlarged by *doubtful* implications." "When therefore the legislature makes a grant of a public franchise, it is not to be extended by construction beyond its clear and obvious meaning." "There are some legislative grants, no doubt, that may admit of a different rule of construction; such as grants of land on a valuable consideration, and the like;" 7 Pick. 469. These two learned judges were adverse to the plaintiffs' claim. But the two other learned judges, who were in favour of it, took a much broader and more liberal view of the rules of interpretation of the charter.

An attempt has, however, been made to put the case of legislative

grants upon the same footing as royal grants, as to their construction; upon some supposed analogy between royal grants and legislative grants under our republican forms of government. Such a claim in favour of republican prerogative is new; and no authority has been cited which supports it. Our legislatures neither have, nor affect to have any royal prerogatives. There is no provision in the constitution authorizing their grants to be construed differently from the grants of private persons, in regard to the like subject matter. The policy of the common law, which gave the crown so many exclusive privileges, and extraordinary claims, different from those of the subject, was founded in a good measure, if not altogether, upon the divine right of kings, or at least upon a sense of their exalted dignity and pre-eminence over all subjects, and upon the notion, that they are entitled to peculiar favour, for the protection of their kingly rights and office. Parliamentary grants never enjoyed any such privileges. They were always construed according to common sense and common reason, upon their language and their intent. What reason is there, that our legislative acts should not receive a similar interpretation? Is it not at least as important in our free governments, that a citizen should have as much security for his rights and estate derived from the grants of the legislature, as he would have in England? What solid ground is there to say, that the words of a grant in the mouth of a citizen, shall mean one thing, and in the mouth of the legislature shall mean another thing? That in regard to the grant of a citizen, every word shall in case of any question of interpretation or implication be construed against him, and in regard to the grant of the government, every word shall be construed in its favour? That language shall be construed, not according to its natural import and implications from its own proper sense, and the objects of the instrument; but shall change its meaning, as it is spoken by the whole people, or by one of them? There may be very solid grounds to say, that neither grants nor charters ought to be extended beyond the fair reach of their words; and that no implications ought to be made, which are not clearly deducible from the language, and the nature and objects of the grant.

In the case of a legislative grant, there is no ground to impute surprise, imposition or mistake to the same extent as in a mere private grant of the crown. The words are the words of the legislature, upon solemn deliberation, and examination, and debate. Their purport is presumed to be well known, and the public interests are

watched, and guarded by all the varieties of local, personal and professional jealousy; as well as by the untiring zeal of numbers, devoted to the public service.

It should also be constantly kept in mind, that in construing this charter, we are not construing a statute involving political powers and sovereignty, like those involved in the case of the Elsebe, 5 Rob. R. 173. We are construing a grant of the legislature, which though in the form of a statute, is still but a solemn contract. In such a case, the true course is to ascertain the sense of the parties from the terms of the instrument; and that once ascertained, to give it full effect. Lord Coke, indeed, recommends this as the best rule, even in respect to royal grants. "The best exposition" (says he,) "of the king's charter is, upon the consideration of the whole charter, to expound the charter by the charter itself; every material part thereof [being] explained according to the true and genuine sense, which is the best method." Case of Sutton's Hospital, 10 Co. R. 24, b

But with a view to induce the Court to withdraw from all the common rules of reasonable and liberal interpretation in favour of grants, we have been told at the argument, that this very charter is a restriction upon the legislative power; that it is in derogation of the rights and interests of the state, and the people; that it tends to promote monopolies, and exclusive privileges; and that it will interpose an insuperable barrier to the progress of improvement. Now, upon every one of these propositions, which are assumed, and not proved, I entertain a directly opposite opinion; and, if I did not, I am not prepared to admit the conclusion for which they are adduced. If the legislature has made a grant, which involves any or all of these consequences, it is not for courts of justice to overturn the plain sense of the grant, because it has been improvidently or injuriously made.

But I deny the very ground work of the argument. This charter is not (as I have already said) any restriction upon the legislative power; unless it be true, that because the legislature cannot grant again, what it has already granted, the legislative power is restricted. If so, then every grant of the public land is a restriction upon that power; a doctrine, that has never yet been established, nor (as far as I know) ever contended for. Every grant of a franchise is, so far as that grant extends, necessarily exclusive; and cannot be resumed, or interfered with. All the learned judges in the state

court admitted, that the franchise of Charles River Bridge, whatever it be, could not be resumed, or interfered with. The legislature could not recall its grant, or destroy it. It is a contract, whose obligation cannot be constitutionally impaired. In this respect, it does not differ from a grant of lands. In each case, the particular land, or the particular franchise, is withdrawn from the legislative operation. The identical land, or the identical franchise, cannot be regranted, or avoided by a new grant. But the legislative power remains unrestricted. The subject matter only (I repeat it) has passed from the hands of the government. If the legislature should order a government debt to be paid by a sale of the public stock, and it is so paid, the legislative power over the funds of the government remains unrestricted, although it has ceased over the particular stock, which has been thus sold. For the present, I pass over all further consideration of this topic, as it will necessarily come again under review, in examining an objection of a more broad and comprehensive nature.

Then, again, how is it established that this is a grant in derogation of the rights and interests of the people? No individual citizen has any right to build a bridge over navigable waters; and consequently he is deprived of no right, when a grant is made to any other persons for that purpose. Whether it promotes or injures the particular interest of an individual citizen, constitutes no ground for judicial or legislative interference, beyond what his own rights justify. When, then, it is said, that such a grant is in derogation of the rights and interests of the people, we must understand that reference is had to the rights and interests common to the whole people, as such, (such as the right of navigation,) or belonging to them as a political body; or, in other words, the rights and interests of the state. Now, I cannot understand how any grant of a franchise is a derogation from the rights of the people of the state, any more than a grant of public land. The right, in each case, is gone to the extent of the thing granted, and so far may be said to derogate from, that is to say, to lessen the rights of the people, or of the state. But that is not the sense in which the argument is pressed; for, by derogation, is here meant an injurious or mischievous detraction from the sovereign rights of the state. On the other hand, there can be no derogation from the rights of the people, as such, except it applies to rights common there before; which the building of a bridge over navigable waters certainly is not. If it had been said that

the grant of this bridge was in derogation of the common right of navigating the Charles River, by reason of its obstructing, pro tanto, a free and open passage, the ground would have been intelligible. So, if it had been an exclusive grant of the navigation of that stream. But, if at the same time, equivalent public rights of a different nature, but of greater public accommodation and use, had been obtained; it could hardly have been said, in a correct sense, that there was any derogation from the rights of the people, or the rights of the state. It would be a mere exchange of one public right for another.

Then, again, as to the grant being against the interests of the people. I know not how that is established; and certainly it is not to be assumed. It will hardly be contended that every grant of the government is injurious to the interests of the people; or that every grant of a franchise must necessarily be so. The erection of a bridge may be of the highest utility to the people. It may essentially promote the public convenience, and aid the public interests, and protect the public property. And if no persons can be found willing to undertake such a work, unless they receive in return the exclusive privilege of erecting it, and taking toll; surely it cannot be said, as of course, that such a grant, under such circumstances, is, per se, against the interests of the people. Whether the grant of a franchise is, or is not, on the whole, promotive of the public interests; is a question of fact and judgment, upon which different minds may entertain different opinions. It is not to be judicially assumed to be injurious, and then the grant to be reasoned down. It is a matter exclusively confided to the sober consideration of the legislature; which is invested with full discretion, and possesses ample means to decide it. For myself, meaning to speak with all due deference for others, I know of no power or authority confided to the judicial department, to rejudge the decisions of the legislature upon such a subject. It has an exclusive right to make the grant, and to decide whether it be, or be not, for the public interests. It is to be presumed, if the grant is made, that it is made from a high sense of public duty, to promote the public welfare, and to establish the public prosperity. In this very case, the legislature has, upon the very face of the act, made a solemn declaration as to the motive for passing it; that—"The erecting of a bridge over Charles River, &c., will be of great public utility."

What court of justice is invested with authority to gainsay this

declaration? To strike it out of the act, and reason upon the other words, as if it were not there? To pronounce that a grant is against the interests of the people, which the legislature has declared to be of great utility to the people? It seems to me to be our duty to interpret laws, and not to wander into speculations upon their policy. And where, I may ask, is the proof that Charles River Bridge has been against the interests of the people? The record contains no such proof; and it is, therefore, a just presumption that it does not exist.

Again, it is argued that the present grant is a grant of a monopoly, and of exclusive privileges; and therefore to be construed by the most narrow mode of interpretation. The sixth article of the bill of rights of Massachusetts has been supposed to support the objection; "No man, nor corporation, or association of men, have any other title to obtain advantages or particular and exclusive privileges distinct from those of the community, than what arises from the consideration of services rendered to the public; and this title being in nature neither hereditary nor transmissive to children, or descendants, or relations by blood, the idea of a man born a magistrate, lawgiver, or judge, is absurd and unnatural." Now, it is plain, that taking this whole clause together, it is not an inhibition of all legislative grants of exclusive privileges; but a promulgation of the reasons why there should be no hereditary magistrates, legislators, or judges. But it admits, by necessary implication, the right to grant exclusive privileges for public services, without ascertaining of what nature those services may be. It might be sufficient to say, that all the learned judges in the state court, admitted that the grant of an exclusive right to take toll at a ferry, or a bridge, or a turnpike, is not a monopoly which is deemed odious in law; nor one of the particular and exclusive privileges, distinct from those of the community, which are reprobated in the bill of rights. All that was asserted by the judges, opposed to a liberal interpretation of this grant, was, that it tended to promote monopolies. See the case, 7 Pick. R. 116, 132, 137.

Again; the old colonial act of 1641 against monopolies, has been relied on to fortify the same argument. That statute is merely in affirmance of the principles of the English statute against monopolies, of 21 James I. ch. 3; and if it were now in force, (which it is not) it would require the same construction.

There is great virtue in particular phrases; and when it is once

suggested, that a grant is of the nature or tendency of a monopoly, the mind almost instantaneously prepares itself to reject every construction which does not pare it down to the narrowest limits. It is an honest prejudice, which grew up in former times from the gross abuses of the royal prerogatives; to which, in America, there are no analogous authorities. But, what is a monopoly, as understood in law? It is an exclusive right granted to a few, of something which was before of common right. Thus, a privilege granted by the king for the sole buying, selling, making, working, or using a thing, whereby the subject, in general, is restrained from that liberty of manufacturing or trading, which before he had, is a monopoly; 4 Black. Comm. 159; Bac. Abridg. Prerogative, F. 4.

My lord Coke, in his Pleas of the Crown; 3 Inst. 181; has given this very definition of a monopoly; and that definition was approved by Holt and Treby, (afterwards chief justices of king's bench,) arguendo, as counsel, in the great case of the East India Company v. Sandys; 10 Howell, State Trials, 386. His words are, that a monopoly is "an institution by the king, by his grant, commission, or otherwise, to any persons or corporations, of or for the sole buying, selling, making, working or using of every thing, whereby any persons or corporations are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade." So, that it is not the case of a monopoly, if the subjects had not the common right or liberty before to do the act, or possess and enjoy the privilege or franchise granted, as a common right; 10 Howell, State Trials, 425. And it deserves an especial remark, that this doctrine was an admitted concession, pervading the entire arguments of the counsel who opposed, as well as of those who maintained the grant of the exclusive trade in the case of the East India Company v. Sandys, (10 How. St. Tr. 386,) a case which constitutes, in a great measure, the basis of this branch of the law.

No sound lawyer will, I presume, assert that the grant of a right to erect a bridge over a navigable stream, is a grant of a common right. Before such grant, had all the citizens of the state a right to erect bridges over navigable streams? Certainly they had not; and, therefore, the grant was no restriction of any common right. It was neither a monopoly; nor, in a legal sense, had it any tendency to a monopoly. It took from no citizen what he possessed before; and had no tendency to take it from him. It took, indeed, from the legislature the power of granting the same identical privilege or fran-

## SUPREME COURT.

chise to any other persons. But this made it no more a monopoly, than the grant of the public stock or funds of a state for a valuable consideration. Even in cases of monopolies, strictly so called, if the nature of the grant be such that it is for the public good, as in cases of patents for inventions, the rule has always been to give them a favourable construction in support of the patent, as Lord Chief Justice Eyre said, ut res magis valeat quam pereat; Boulton v. Bull, 2 H. Bl. 463, 500.

But it has been argued, and the argument has been pressed in every form which ingenuity could suggest, that if grants of this nature are to be construed liberally, as conferring any exclusive rights on the grantees, it will interpose an effectual barrier against all general improvements of the country. For myself, I profess not to feel the cogency of this argument; either in its general application to the grant of franchises, or in its special application to the present grant. This is a subject upon which different minds may well arrive at different conclusions, both as to policy and principle. Men may, and will, complexionally differ upon topics of this sort, according to their natural and acquired habits of speculation and opinion. For my own part, I can conceive of no surer plan to arrest all public improvements, founded on private capital and enterprise, than to make the outlay of that capital uncertain, and questionable both as to security, and as to productiveness. No man will hazard his capital in any enterprise, in which, if there be a loss, it must be borne exclusively by himself; and if there be success, he has not the slightest security of enjoying the rewards of that success for a single moment. If the government means to invite its citizens to enlarge the public comforts and conveniences, to establish bridges, or turnpikes, or canals, or railroads, there must be some pledge, that the property will be safe; that the enjoyment will be co-extensive with the grant: and that success will not be the signal of a general combination to overthrow its rights, and to take away its profits. The very agitation of a question of this sort, is sufficient to alarm every stockholder in every public enterprise of this sort, throughout the whole country. Already, in my native state, the legislature has found it necessary expressly to concede the exclusive privilege here contended against; in order to insure the accomplishment of a rail road for the benefit of the public. And yet, we are told, that all such exclusive grants are to the detriment of the public.

But if there were any foundation for the argument itself in a

[Charles River Bridge v. Warren Bridge et al.]

general view, it would totally fail in its application to the present case.    Here, the grant, however exclusive, is but for a short and limited period, more than two-thirds of which have already elapsed; and, when it is gone, the whole property and franchise are to revert to the state.    The legislature exercised a wholesome foresight on the subject; and within a reasonable period it will have an unrestricted authority to do whatever it may choose, in the appropriation of the bridge and its tolls.    There is not, then, under any fair aspect of the case, the slightest reason to presume that public improvements either can, or will, be injuriously retarded by a liberal construction of the present grant.

I have thus endeavoured to answer, and I think I have successfully answered all the arguments, (which indeed run into each other) adduced to justify a strict construction of the present charter. I go further, and maintain not only, that it is not a case for strict construction; but that the charter upon its very face, by its terms, and for its professed objects, demands from the Court, upon undeniable principles of law, a favourable construction for the grantees.   In the first place, the legislature has declared, that the erecting of the bridge will be of great public utility; and this exposition of its own motives for the grant, requires the Court to give a liberal interpretation, in order to promote, and not to destroy an enterprise of great public utility.   In the next place, the grant is a contract for a valuable consideration, and a full and adequate consideration.   The proprietors are to lay out a large sum of money, (and in those times it was a very large outlay of capital,) in erecting a bridge; they are to keep it in repair during the whole period of forty years; they are to surrender it in good repair at the end of that period to the state, as its own property; they are to pay, during the whole period, an annuity of two hundred pounds to Harvard college; and they are to incur other heavy expenses and burthens, for the public accommodation.   In return for all these charges, they are entitled to no more than the receipt of the tolls during the forty years, for their reimbursement of capital, interest and expenses.   With all this they are to take upon themselves the chances of success; and if the enterprise fails, the loss is exclusively their own.   Nor let any man imagine, that there was not, at the time when this charter was granted, much solid ground for doubting success.   In order to entertain a just view of this subject, we must go back to that period of general bankruptcy, and distress and difficulty.   The constitution of

the United States was not only not then in existence, but it was not then even dreamed of. The union of the states was crumbling into ruins, under the old confederation. Agriculture, manufactures and commerce, were at their lowest ebb. There was infinite danger to all the states from local interests and jealousies, and from the appa-. rent impossibility of a much longer adherence to that shadow of a government, the continental congress. And even four years after-wards, when every evil had been greatly aggravated, and civil war was added to other calamities, the constitution of the United States was all but shipwrecked in passing through the state conventions. It was adopted by very slender majorities. These are historical facts which required no colouring to give them effect, and admitted of no concealment to seduce men into schemes of future aggrandize-ment. I would even now put it to the common sense of every man, whether, if the constitution of the United States had not been adopted, the charter would have been worth a forty years' purchase of the tolls.

This is not all. It is well known, historically, that this was the very first bridge ever constructed in New England, over navigable tide waters so near the sea. The rigours of our climate, the dangers from sudden thaws and freezing, and the obstructions from ice in a rapid current, were deemed by many persons to be insuperable obstacles to the success of such a project. It was believed, that the bridge would scarcely stand a single severe winter. And I myself am old enough to know, that in regard to other arms of the sea, at much later periods, the same doubts have had a strong and depressing influence upon public enterprises. If Charles River Bridge had been carried away during the first or second season after its erection, it is far from being certain, that up to this moment another bridge, upon such an arm of the sea, would ever have been erected in Massachusetts. I state these things which are of public notoriety, to repel the notion that the legislature was surprised into an in-cautious grant, or that, the reward was more than adequate to the perils. There was a full and adequate consideration, in a pecuniary sense, for the charter. But, in a more general sense, the erection of the bridge, as a matter of accommodation, has been incalculably beneficial to the public. Unless, therefore, we are wholly to disre-. gard the declarations of the legislature, and the objects of the charter, and the historical facts of the times; and indulge in mere private speculations of profit and loss by our present lights and experience;

it seems to me, that the Court is bound to come to the interpretation of this charter, with a persuasion that it was granted in furtherance, and not in derogation of the public good.

But I do not insist upon any extraordinary liberality in interpreting this charter. All I contend for is that it shall receive a fair and reasonable interpretation; so as to carry into effect the legislative intention, and secure to the grantees a just security for their privileges. I might, indeed, well have spared myself any investigation of the principles upon which royal and legislative grants are ordinarily to be construed; for this Court has itself furnished an unequivocal rule for interpreting all public contracts. The present grant is confessedly a contract; and in Huidekooper's Lessee v. Douglas, (3 Cranch, R. 1; S. C., 1 Peters' Cond. R. 446,) this Court said: "This is a contract, and although a state is a party, it ought to be construed according to those well established principles which regulate contracts generally;" that is, precisely as in cases between mere private persons, taking into consideration the nature and objects of the grant. A like rule was adopted by this Court in the case of a contract by the United States; United States v. Gurney, 4 Cranch, 333; S. C., 2 Peters' Condensed R. 132. And the good sense and justice of the rule seem equally irresistible.

Let us now enter upon the consideration of the terms of the charter. In my judgment, nothing can be more plain than that it is a grant of a right to erect a bridge between Boston and Charlestown, in the place where the ferry between those towns was kept. It has been said that the charter itself does not describe the bridge as between Charlestown and Boston; but grants an authority to erect "a bridge over Charles river, in the place where the old ferry was then kept;" and that these towns are not named, except for the purpose of describing the then ferry. Now, this seems to me, with all due deference, to be a distinction without a difference. The bridge is to be erected in the place where the old ferry then was. But where was it to begin, and where was it to terminate? Boston and Charlestown are the only possible termini, for the ferry ways were there; and it was to be built between Boston and Charlestown, because the ferry was between them. Surely, according to the true sense of the preamble, where alone the descriptive words occur, (for it is a great mistake to suppose, that the enacting clause any where refers, except by implication, to the location of the bridge,) it is wholly immaterial, whether we read the clause, "whereas the erecting of a bridge

over Charles river in the place where the ferry between Boston and Charlestown is now kept;" or "whereas the erecting of a bridge over Charles river between Charlestown and Boston, where the ferry is now kept." In each case the bridge is to be between Boston and Charlestown; and the termini are the ferry ways. The title of the act puts this beyond all controversy; for it is "an act for incorporating certain persons for the purpose of building a bridge over Charles river between Boston and Charlestown, &c." But, then, we are told that no rule in construing statutes is better settled, than that the title of an act does not constitute any part of the act. If by this no more be meant, than that the title of an act constitutes no part of its enacting clauses, the accuracy of the position will not be disputed. But if it is meant to say that the title of the act does not belong to it for any purpose of explanation or construction, and that in no sense is it any part of the act; I, for one, must deny, that there is any such settled principle of law. On the contrary, I understand that the title of an act, (though it is not ordinarily resorted to,) may be legitimately resorted to for the purpose of ascertaining the legislative intention, just as much as any other part of the act. In point of fact it is usually resorted to, whenever it may assist us in removing any ambiguities in the enacting clauses. Thus, in the great case of Sutton's Hospital, (10 Co. R. 23, 24, b.) the title of an act of parliament was thought not unworthy to be examined in construing the design of the act. In Boulton v. Bull, (2 Hen. Bl. 463, 500,) the effect of the title of an act was largely insisted upon in the argument, as furnishing a key to the intent of the enacting clauses. And Lord Chief Justice Eyre admitted the propriety of the argument, and met it by saying, that, in that case, he would, if necessary, expound the word "engine," in the body of the bill in opposition to the title to it, to mean a "method" in order to support the patent. In the case of the United States v. Fisher, (2 Cranch, R. 358; S. C., 1 Peters' Con. R. 421,) the Supreme Court of the United States expressly recognised the doctrine, and gave it a practical application. In that case the Chief Justice, in delivering the opinion of the Court, after adverting to the argument at the bar, respecting the degree of influence which the title of an act ought to have in construing the enacting clauses, said: "Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived; and in such a case the title claims a degree of notice, and will have its due share of consideration."

According to my views of the terms of the charter, the grant, then, is of the franchise of erecting a bridge over Charles river, between Charlestown and Boston, and of taking tolls or pontage from passengers. It is, therefore, limited to those towns; and does not exclude the legislature from any right to grant a bridge over the same river between any other towns and Boston; as, for example, between Chelsea and Boston, or Cambridge and Boston, or Roxbury and Boston.

But although, in my judgment, this is the true construction of the limits of the charter, ex vi terminorum, my opinion does not, in any important degree, rest upon it. Taking this to be a grant of a right to build a bridge over Charles river, in the place where the old ferry between Charlestown and Boston was then kept, (as is contended for by the defendants;) still it has, as all such grants must have, a fixed locality, and the same question meets us: is the grant confined to the mere right to erect a bridge on the proper spot, and to take toll of the passengers, who may pass over it, without any exclusive franchise on either side of the local limits of the bridge? Or does it, by implication, include an exclusive franchise on each side to an extent, which shall shut out any injurious competition? In other words, does the grant still leave the legislature at liberty to erect other bridges on either side, free or with tolls, even in juxta-position with the timbers and planks of this bridge? Or is there an implied obligation on the part of the legislature, to abstain from all acts of this sort, which shall impair or destroy the value of the grant? The defendants contend, that the exclusive right of the plaintiffs extends no further than the planks and timbers of the bridge; and that the legislature is at full liberty to grant any new bridge, however near; and although it may take away a large portion, or even the whole of the travel which would otherwise pass over the bridge of the plaintiffs. And to this extent the defendants must contend; for their bridge is, to all intents and purposes, in a legal and practical sense, contiguous to that of the plaintiffs.

The argument of the defendants is, that the plaintiffs are to take nothing by implication. Either (say they) the exclusive grant extends only to the local limits of the bridge; or it extends the whole length of the river, or at least up to old Cambridge bridge. The latter construction would be absurd and monstrous; and therefore the former must be the true one. Now, I utterly deny the alternatives involved in the dilemma. The right to build a bridge over a

river, and to take toll, may well include an exclusive franchise be-
yond the local limits of the bridge; and yet not extend through the
whole course of the river, or even to any considerable distance on
the river. There is no difficulty in common sense, or in law, in
maintaining such a doctrine. But then, it is asked, what limits can
be assigned to such a franchise? The answer is obvious; the grant
carries with it an exclusive franchise to a reasonable distance on the
river; so that the ordinary travel to the bridge shall not be diverted
by any new bridge to the injury or ruin of the franchise. A new
bridge, which would be a nuisance to the old bridge, would be with-
in the reach of its exclusive right. The question would not be so
much as to the fact of distance, as it would be as to the fact of nui-
sance. There is nothing new in such expositions of incorporeal
rights; and nothing new in thus administering, upon this foundation,
remedies in regard thereto. The doctrine is coeval with the common
law itself. Suppose an action is brought for shutting up the ancient
lights belonging to a messuage; or for diverting a water-course; or
for flowing back a stream; or for erecting a nuisance near a dwelling
house; the question in cases is not a question of mere distance; of
mere feet and inches, but of injury; permanent, real, and substantial
injury to be decided upon all the circumstances of the case. But of
this I shall speak again hereafter.

Let us see what is the result of the narrow construction contended
for by the defendants. If that result be such as is inconsistent with
all reasonable presumptions growing out of the case; if it be repug-
nant to the principles of equal justice; if it will defeat the whole
objects of the grant; it will not, I trust, be insisted on, that this
Court is bound to adopt it.

I have before had occasion to take notice that the original charter
is a limited one for forty years; that the whole compensation of the
proprietors for all their outlay of capital, their annuity to Harvard
college and their other annual burthens and charges, is to arise out of
the tolls allowed them during that period. No other fund is provided
for their indemnity; and they are to take it subject to all the perils
of failure and the chances of an inadequate remuneration. The mo-
ment the charter was accepted, the proprietors were bound to all the
obligations of this contract, on their part. Whether the bargain
should turn out to be good or bad, productive or unproductive of
profit, did not vary their duties. The franchise was not a mere jus
privatum. From the moment of its acceptance, and the erection of

the bridge, it became charged with a jus publicum. The government had a right to insist that the bridge should be kept in perfect repair for public travel by the proprietors: that the bridge should be lighted: that the draw should be raised without expense, for the purposes of navigation. And if the proprietors had refused or neglected to do their duty in any of these respects, they would have been liable to a public prosecution. It could be no apology or defence that the bridge was unprofitable; that the tolls were inadequate; that the repairs were expensive; or that the whole concern was a ruinous enterprise. The proprietors took the charter cum onere, and must abide by their choice. It is no answer to all this, to say that the proprietors might surrender their charter, and thus escape from the burthen. They could have no right to make such a surrender. It would depend upon the good pleasure of the government, whether it would accept of such a surrender, or not: and until such an acceptance, the burthens would be obligatory to the last hour of the charter. And when that hour shall have arrived, the bridge itself, in good repair, is to be delivered to the state.

Now, I put it to the common sense of every man, whether if at the moment of granting the charter the legislature had said to the proprietors; you shall build the bridge; you shall bear the burthens; you shall be bound by the charges; and your sole reimbursement shall be from the tolls of forty years: and yet we will not even guaranty you any certainty of receiving any tolls. On the contrary we reserve to ourselves the full power and authority to erect other bridges, toll, or free bridges, according to our own free will and pleasure, contiguous to yours, and having the same termini with yours; and if you are successful we may thus supplant you, divide, destroy your profits, and annihilate your tolls, without annihilating your burthens: if, I say, such had been the language of the legislature, is there a man living of ordinary discretion or prudence, who would have accepted such a charter upon such terms? I fearlessly answer, no. There would have been such a gross inadequacy of consideration, and such a total insecurity of all the rights of property, under such circumstances, that the project would have dropped, still born. And I put the question farther, whether any legislature, meaning to promote a project of permanent public utility, (such as this confessedly was) would ever have dreamed of such a qualification of its own grant; when it sought to enlist private capital and private patronage to insure the accomplishment of it?

Yet, this is the very form and pressure of the present case. It is not an imaginary and extravagant case. Warren Bridge has been erected, under such a supposed reserved authority, in the immediate neighbourhood of Charles River Bridge; and with the same termini, to accommodate the same line of travel. For a half dozen years it was to be a toll bridge for the benefit of the proprietors, to reimburse them for their expenditures. At the end of that period, the bridge is to become the property of the state, and free of toll; unless the legislature should hereafter impose one. In point of fact, it has since become, and now is, under the sanction of the act of incorporation, and other subsequent acts, a free bridge without the payment of any tolls for all persons. So that, in truth, here now is a free bridge, owned by and erected under the authority of the commonwealth, which necessarily takes away all the tolls from Charles River Bridge; while its prolonged charter has twenty years to run. And yet the act of the legislature establishing Warren Bridge, is said to be no violation of the franchise granted to the Charles River Bridge. The legislature may annihilate, nay has annihilated by its own acts all chance of receiving tolls, by withdrawing the whole travel; though it is admitted that it cannot take away the barren right to gather tolls, if any should occur, when there is no travel to bring a dollar. According to the same course of argument, the legislature would have a perfect right to block up every avenue to the bridge, and to obstruct every highway which should lead to it, without any violation of the chartered rights of Charles River Bridge; and at the same time it might require every burthen to be punctiliously discharged by the proprietors, during the prolonged period of seventy years. I confess, that the very statement of such propositions is so startling to my mind, and so irreconcilable with all my notions of good faith, and of any fair interpretation of the legislative intentions; that I should always doubt the soundness of any reasoning which should conduct me to such results.

But it is said that there is no prohibitory covenant in the charter, and no implications are to be made of any such prohibition. The proprietors are to stand upon the letter of their contract, and the maxim applies, de non apparentibus et non existentibus, eadem est lex. And yet it is conceded, that the legislature cannot revoke or resume this grant. Why not, I pray to know? There is no negative covenant in the charter; there is no express prohibition to be found there. The reason is plain. The prohibition arises by natu-

ral, if not by necessary implication.   It would be against the first principles of justice to presume that the legislature reserved a right to destroy its own grant.   That was the doctrine in Fletcher v. Peck, 6 Cranch 87, in this Court: and in other cases turning upon the same great principle of political and constitutional duty and right.   Can the legislature have power to do that indirectly, which it cannot do directly?   If it cannot take away, or resume the franchise itself, can it take away its whole substance and value?   If the law will create an implication that the legislature shall not resume its own grant, is it not equally as natural and as necessary an implication, that the legislature shall not do any act directly to prejudice its own grant, or to destroy its value?   If there were no authority in favour of so reasonable a doctrine, I would say, in the language of the late lamented Mr. Chief Justice Parker, in this very case: "I ground it on the principles of our government and constitution, and on the immutable principles of justice: which ought to bind governments, as well as people."

But it is most important to remember, that in the construction of all legislative grants, the common law must be taken into consideration; for the legislature must be presumed to have in view the general principles of construction which are recognised by the common law.   Now, no principle is better established, than the principle that when a thing is given or granted, the law giveth, impliedly, whatever is necessary for the taking and enjoying the same.   This is laid down in Co. Litt. 56, a; and is, indeed, the dictate of common sense applicable to all grants.   Is not the unobstructed possession of the tolls, indispensable to the full enjoyment of the corporate rights granted to the proprietors of Charles River Bridge?   If the tolls were withdrawn, directly or indirectly, by the authority of the legislature, would not the franchise be utterly worthless?   A burthen, and not a benefit?   Would not the reservation of authority in the legislature to create a rival bridge, impair, if it did not absolutely destroy the exclusive right of the proprietors of Charles River Bridge? I conceive it utterly impossible to give any other than an affirmative answer to each of these questions.   How, then, are we to escape from the conclusion, that that which would impair or destroy the grant, is prohibited by implication of law, from the nature of the grant?   "We are satisfied," said Mr. Chief Justice Parsons, in delivering the opinion of the court in Wales v. Stetson, 2 Mass. R. 143, 146, "that the rights legally vested in any corporation cannot

be controlled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature, in the act of incorporation." Where is any such reservation to be found in the charter of Charles River Bridge?

My brother Washington, (than whom few judges ever possessed a sounder judgment, or clearer learning;) in his able opinion in the case of Dartmouth College v. Woodward, 4 Wheat. R. 658, took this same view of the true sense of the passage in Blackstone's Commentaries; and uses the following strong language in the subject of a charter of the government. "Certain obligations are created (by it) both on the grantor and the grantees. On the part of the former, it amounts to an extinguishment of the king's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his former grant. It implies, therefore, a contract not to reassert the right to grant the franchise to another, or to impair it." I know not how language more apposite could be applied to the present case. None of us then doubted its entire correctness, when he uttered it; and I am not able to perceive how the legal inference can now be escaped. The case of The Chesapeake and Ohio Canal Company v. The Baltimore and Ohio Rail Road Company, 4 Gill and Johnson's R. 1, 4, 6, 143, 146, 149, fully sustains the same doctrine; and most elaborately expounds its nature, and operation, and extent.

But we are not left to mere general reasoning on this subject. There are cases of grants of the crown in which a like construction has prevailed, which are as conclusive upon this subject in point of authority, as any can be. How stands the law in relation to grants by the crown of fairs, markets, and ferries? I speak of grants, for all claims of this sort resolve themselves into grants; a prescription being merely evidence of, and presupposing an ancient grant, which can be no longer traced, except by the constant use and possession of the franchise. If the king grants a fair, or a market, or a ferry, has the franchise no existence beyond the local limits where it is erected? Does the grant import no more than a right to set up such fair, or market, or ferry, leaving in the crown full power and authority to make other grants of the same nature, in juxtaposition with those local limits? No case, I will venture to say, has ever maintained such a doctrine; and the common law repudiates it (as will be presently shown,) in the most express terms.

The authorities are abundant to establish, that the king cannot

make any second grant which shall prejudice the profits of the former grant. And why not? Because the grant imposes public burdens on the grantee, and subjects him to public charges, and the profits constitute his only means of remuneration; and the crown shall not be at liberty directly to impair, much less to destroy the whole value and objects of its grant. In confirmation of this reasoning, it has been repeatedly laid down in the books, that when the king grants a fair, or market, or ferry, it is usual to insert in all such grants a clause or proviso that it shall not be to the prejudice of any other existing franchise of the same nature; as a fair, or market, or ferry. But if such a clause or proviso is not inserted, the grant is always construed with the like restriction; for such a clause will be implied by law. And, therefore, if such new grant is without such a clause, if it occasion any damage either to the king, or to a subject in any other thing, it will be revocable. So my Lord Coke laid it down in 2 Inst. 406. The judges laid down the same law in the house of lords in the case of The King v. Butler, (3 Leo. 220, 222;) which was the case of a grant of a new market to the supposed prejudice of an old market. Their language on that occasion deserves to be cited. It was, " that the king has an undoubted right to repeal a patent wherein he is deceived, or his subjects prejudiced, and that by scire facias." And afterwards, referring to cases where a writ of ad quod damnum had been issued, they added, " there, the king takes notice, that it is not ad damnum; and yet, if it be ad damnum, the patent is void; for in all such patents the condition is implied, viz., that it be not ad damnum of the neighbouring merchants." And they added farther; " this is positively alleged, (in the scire facias,) that concessio predicta est ad damnum et depauperationem &c.; which is a sufficient cause to revoke the patent, if there were nothing more." The same doctrine is laid down in Mr. Sergeant William's learned note (2) to the case of Yard v. Ford; 2 Saund. R. 174. Now, if in the grant of any such franchise of a fair, or market, or ferry, there is no implied obligation or condition that the king will not make any subsequent grant to the prejudice of such prior grant, or impairing its rights, it is inconceivable why such a proviso should be implied. But, if, (as the law certainly is,) the king can make no subsequent grant to the prejudice of his former grant, then the reason of such implication is clear; for the king will not be presumed to intend to violate his duty, but rather to be deceived in his second grant, if to the prejudice of the first.

It is upon this ground, and this ground only, that we can explain the established doctrine in relation to ferries. When the crown grants a ferry from A. to B. without using any words which import it to be an exclusive ferry, why is it, (as will be presently shown) that by the common law the grant is construed to be exclusive of all other ferries between the same places, or termini; at least, if such ferries are so near that they are injurious to the first ferry, and tend to a direct diminution of its receipts? Plainly, it must be because from the nature of such a franchise it can have no permanent value, unless it is exclusive; and the circumstance that during the existence of the grant, the grantee has public burdens imposed upon him, raises the implication that nothing shall be done to the prejudice of it, while it is a subsisting franchise. The words of the grant do, indeed, import *per se* merely to confer a right of ferry between A. and B. But the common law steps in, and, ut res magis valeat quam pereat, expands the terms into an exclusive right; from the very nature, and objects, and motives, of the grant.

I say this is the theory of the common law on this subject. Let us now see if it is not fully borne out by the authorities in relation to ferries; a franchise, which approaches so near to that of a bridge, that human ingenuity has not as yet been able to state any assignable difference between them; except that one includes the right of pontage, and the other of passage or ferriage; see Webb's case, 8 Co. R. 46, (b); that is, each includes public duties, and burdens, and an indemnity for these duties and burdens by a right to receive tolls. A grant of a ferry must always be by local limits; it must have some termini; and must be between some fixed points, vills, or places. But is the franchise of a ferry limited to the mere ferry-ways? Unless I am greatly mistaken, there is an unbroken series of authorities establishing the contrary doctrine; a doctrine firmly fixed in the common law, and brought to America by our ancestors as a part of their inheritance. The case of a ferry is put as a case of clear law by Paston, Just. as long ago as in 22 Hen. V. 14, b. · "If, says he, I have a market or a fair on a particular day, and another sets up a market or fair on the same day in a ville, which is near to my market, so that my market, or my fair is impaired, I shall have against him an assize of nuisance, or an action on the case." And the same law is, " If I have an ancient ferry in a ville, and another sets up another ferry upon the same river near to my ferry, so that the profits of my ferry are impaired, I shall have an action on the case

[Charles River Bridge v. Warren Bridge et al.]

against him." And Newton, (who it seems was of counsel for the defendant in that case) admitted the law to be so; and gave as a reason, " for you are bound to support the ferry, and to serve and repair it for the ease of the common people, and otherwise you shall be grievously amerced; and it is enquirable before the sheriff at his tourn, and also before the justices in Eyre." As to the case of a market or fair, Newton said, that in the king's grant of a market or fair, there is always a proviso that it should not be to the nuisance of another market or fair. To which Paston, Just. replied; " suppose the king grants to me a market without any proviso, if one sets up after that time another market, which is a nuisance to that, I shall have against him an assize of nuisance."

The doctrine here laid down seems indisputable law; and it was cited and approved by Lord Abinger in Huzzy v. Field, 2 Cromp. Mees. and Roscoe, 432; to which reference will presently be made. In Bacon's Abridgment, Prerogative, F. 1, it is laid down, " that if the king creates or grants a fair, or market, to a person, and afterwards grants another to another person to the prejudice of the first, the second grant is void;" see 16 Viner's Abridg. Nuisance, G. pl. 2. The same law is laid down in 3 Black. Comm. 218, 219. " If (says he) I am entitled to hold a fair or market, and another person sets up a fair or market, so near mine that it does me a prejudice, it is a nuisance to the freehold which I have in my market or fair." He adds; " if a ferry is erected on a river, so near another ancient ferry as to draw away the custom, it is a nuisance to the old one; for where there is a ferry by prescription, the owner is bound always to keep it in repair and readiness for the ease of the king's subjects, otherwise he may be grievously amerced. It would be, therefore, extremely hard if a new ferry were suffered to share the profits, which does not also share the burden." The same doctrine is to be found in Comyn's Digest (Action upon the case for a Nuisance, A.) and in many other authorities; see Yard v. Ford, 2 Saund. R. 175, and note (2); Fitz. N. Brev. 184; Hale de Port. Maris, ch. 5; Harg. Law Tracts, p. 59; Com. Dig. Piscary, B. Id; Market C. 2, C. 3; 2 Black. Comm. 27.

The doctrine is in England just as true now, and just as strictly enforced, as it was three centuries ago. In Blissett v. Hart, (Willes' R. 508) the plaintiff recovered damages for a violation of his right to an ancient ferry against the defendant who had set up a neighbouring ferry to his nuisance. The court said; " A ferry is publici

juris.    It is a franchise, that no one can erect without a license from the crown; and when one is erected, another cannot be erected without an ad quod damnum.    If a second is erected without a license, the crown has a remedy by a quo warranto; and the former grantee has a remedy by action."    The case of Tripp v. Frank, 4 Term. R. 666, proceeds upon the admission of the same doctrine; as does Prince v. Lewis, 5 Barn. & Cress. 363; Peter v. Kendall, 6 Barn. & Cress. 703; Mosley v. Chadwick, 7 Barn. & Cress. 47, note a; and Mosley v. Walker, 7 Barn. & Cress. 40.

There is a very recent case, (already alluded to) which was decided by the court of exchequer, upon the fullest consideration, and in which the leading authorities upon this point were discussed with great acuteness and ability.    I mean the case of Huzzy v. Field, in 1835; 13 Law Journ. 239; S. C. 2 Cromp. Meeson & Rosc. 432. Lord Abinger, in delivering the opinion of the court on that occasion, used the following language: "So far the authorities appear to be clear, that if a new ferry be put up without the king's license, to the prejudice of an old one, an action will lie; and there is no case, which has the appearance of being to the contrary, except that of Tripp v. Frank, hereafter mentioned.    These old authorities proceed upon the ground, first, that the grant of the franchise is good in law, being for a sufficient consideration to the subject, who as he received a benefit, may have by the grant of the crown a corresponding obligation imposed upon him in return for the benefit received; and secondly, that if another, without legal authority interrupts the grantee in the exercise of his franchise by withdrawing the profits of passengers, which he would otherwise have had, and which he has in a manner purchased from the public at the price of his corresponding liability; the disturber is subject to an action for the injury.    And the case is in this respect analogous to the grant of a fair or market, which is also a privilege of the nature of a monopoly. A public ferry, then, is a public highway of a special description; and its termini must be in places where the public have rights, as towns, or vills, or highways leading to towns or vills.    The right of the grantee is in one case an exclusive right of carrying from town to town; in the other of carrying from one point to the other, all, who are going to use the highway to the nearest town or ville to which the highway leads on the other side.    Any new ferry, therefore, which has the effect of taking away such passengers, must be injurious.    For instance, if any one should construct a new landing

[Charles River Bridge v. Warren Bridge et al.]

place at a short distance of one terminus of the ferry, and make a proclamation of carrying passengers over from the other terminus, and then landing them at that place, from which they pass to the same public highway. upon which the ferry is established, before it reaches any town or vill, by which the passengers go immediately to the first and all the vills, to which that highway leads; there could not be any doubt but such an act would be an infringement of the right of ferry, whether the person so acting intended to defraud the grantee of the ferry, or not. If such new ferry be nearer, or the boat used more commodious, or the fare less; it is obvious, that all the custom must be inevitably withdrawn from the old ferry. And, thus, the grantee would be deprived of all the benefit of the franchise, whilst he continued liable to all the burdens imposed upon him."

Language more apposite to the present case could scarcely have been used. And, what makes it still stronger, is, that the very case before the court was of a new ferry starting on one side from the same town, but not at the same place in the town, to a terminus on the other side different from that of the old ferry house, and more than a half a mile from it, and thence by a highway communicated with the highway which was connected with the old ferry, at a mile distance from the ferry. Now, if the right of the old ferry did not, by implication, extend on either side beyond its local termini, no question could have arisen as to the disturbance. Trotter v. Harris, 2 Younge and Jerv. R. 285, proceeded upon similar principles; though it did not call for so exact an exposition of them.

It is observable, that in the case of Huzzy v. Field the defendant did not claim under any license or grant from the crown; and therefore it may be supposed in argument, that it does not apply to a case where that is a grant of the new ferry from the crown. But in point of law there is no difference between the cases. In each case the new ferry must be treated as a clear disturbance of the rights of the old ferry, or it is not in either case; for if the first grant does not, by implication, carry an exclusive right above and below its local termini, then there can be no pretence, in either case, for the grantee of the old ferry to complain of the new ferry; for it does not violate his rights under his grant. If the first grant does, by implication, carry an exclusive right above and below its local termini, so far as it may be prejudiced or disturbed by a new ferry, then it is equally clear, upon established principles, that the king

cannot, by a new grant prejudice his former grant; for the law deprives him of any such prerogative. It is true that where the new ferry is got up without a license from the crown, it may be abated as a nuisance; upon a quo warranto, or information, by the crown. But this will not confer any right of action on the grantee of the old ferry, unless his own rights have been disturbed.

I have said that this is the result of established principles; and the case of the Islington Market, recently before the judges of England upon certain questions submitted to them by the house of lords, is an authority of the most solemn and conclusive nature upon this identical point of franchise. What gives it still more importance is, that in the three last questions proposed to the judges by the house of lords, the very point as to the power of the king to make a second grant of a market to the prejudice of his former grant, within the limits of the common law, arose, and was pointedly answered in the negative. On that occasion the judges said, that while the first grant of a market remains unrepealed, even the default of the grantee of the franchise, in not providing, according to his duty, proper accommodations for the public, cannot operate, in point of law, as a ground for granting a new charter to another to hold a market *within the common law*, which shall really be injurious to the existing market. The judges, after adverting to the usual course of the issuing of a writ of ad quod damnum, in cases where a new market is asked for, added: "We do not say, that a writ of ad quod damnum is absolutely necessary. But if the crown were to grant a new charter without a writ of ad quod damnum, and it should appear, that the interests of other persons were prejudiced, the crown would be supposed to be deceived, and the grant might be repealed on a scire facias." And they cited, with approbation, the doctrine of Lord Coke, in 2 Inst. 406, that "If one held a market either by prescription or by letters patent, and another obtains a market to the nuisance of the former market, he shall not tarry till he have avoided the letters patent of the latter market by course of law, that he may have an assize of nuisance:" thus establishing the doctrine, that there is no difference in point of law, whether the first market be by prescription or by grant; or whether the new market be with or without a patent from the crown. In each case the remedy is the same for the owner of the first market if the new market is a nuisance to him. The judges also held, that the circum-

stance of the benefit of the public requiring a new market would not, of itself, warrant the grant of the new market.

Mr. Dane, in his Abridgment, (2 Dane's Abridg. ch. 67, p. 683,) lays down the doctrine in terms equally broad and comprehensive, as applicable to America. After having spoken of a ferry as imposing burdens, publici juris, he adds; "in this way a ferry becomes property, an incorporeal hereditament; the owners of which, for the public convenience being obliged by law to perform certain public services, must, as a reasonable equivalent, be protected in this property." And he cites the case of Chadwick v. the Proprietors of the Haverhill Bridge, as directly in point; that the erection of a neighbouring bridge under the authority of the legislature is a nuisance to a ferry. Notwithstanding all the commentary bestowed on that case to escape from its legal pressure, I am of opinion that the report of the referees never could have been accepted by the court, or judgment given thereon, if the declaration had not stated a right which in point of law was capable of supporting such a judgment. The court seems, from Mr. Dane's statement of the case, clearly to have recognised the title of the plaintiff, if he should prove himself the owner of a ferry. Besides, without disparagement to any other man, Mr. Dane himself, (the chairman of the referees,) from his great learning and ability, is well entitled to speak with the authority of a commentator of the highest character upon such a subject.

It is true, that there is the case of Churchman v. Tunstal, (Hard. R. 162,) where a different doctrine, as to a ferry, was laid down. But that case is repugnant to all former cases, as well as later cases; and Lord Ch. Baron Macdonald, in Attorney General v. Richard, (2 Anst. R. 603,) informs us, that it was afterwards overturned. Lord Abinger in Huzzy v. Field, (13 Law Jour. 239; S. C., 2 Cromp. Mees. and Roscoe, 432,) goes farther, and informs us, that after the bill in that case was dismissed; (which was a bill by a farmer of a ferry, as it should seem, under the crown, for an injunction to restrain the defendant, who had lands on both sides of the Thames, three-quarters of a mile off, and who was in the habit of ferrying passengers across, from continuing to do so;) another bill was brought after the restoration, in 1663, and a decree made by lord Hale in favour of the plaintiff, that the new ferry should be put down. This last determination is exceedingly strong, carrying the implication in regard to the franchise of a ferry, as exclusive of all other ferries

[Charles River Bridge v. Warren Bridge et al.]

injurious to it, to a very enlarged extent; and it was made by one of the greatest judges who ever adorned the English bench.

But it has been suggested that the doctrine as to ferries is confined to ancient ferries by prescription, and does not apply to those where there is a grant, which may be shown.  In the former case the exclusive right may be proved by long use, and exclusive use.  In the latter, the terms of the grant show whether it is exclusive or not; and if not stated to be exclusive in the grant, it cannot by implication be presumed to be exclusive.  Now, there is no authority shown for such a distinction; and it is not sound in itself.  If a ferry exists by prescription, nothing more, from the nature of the thing can be established by long possession, than that the ferry originated in some grant, and that it has local limits, from the ferry ways on one side to those on the other side.  The mere absence of any other near ferry proves nothing, except that there is no competition; for until there is some interference by the erection of another ferry, there can be nothing exclusive above or below the ferry ways established by the mere use of the ferry.  If such an interference should occur, then the question might arise; and the long use could establish no more than the rightful possession of the franchise.  The question, whet    the franchise is exclusive or not must depend upon the nature of such a franchise at the common law, and the implications belonging to it.  In short, it is in the authorities taken to be exclusive, unless a contrary presumption arises from the facts, as it did in Holcroft v. Heel, 1 Bos. and Pull. 400.  But lord Coke, (in 2 Inst. 406,) lays down the law as equally applicable to all cases of prescription and of grant.  "If, says he, one hath a market either by prescription or by letters patent of the king, and another obtains a market to the nuisance of the former market, he shall not tarry till he have avoided the letters patent of the latter market, by course of law; but he may have an assize of nuisance."  The same rule must, for the same reason, apply to fairs and ferries.  The case of Prince v. Lewis, 5 B. and Cresw. 363, was the case of the grant of a market, and not of a market by prescription; yet no one suggested any distinction on this account.  Holcroft v. Heel, (1 Bos. and Pull. 400,) was the case of a grant of a market by letters patent.

In Ogden v. Gibbons, (4 John Ch. R. 150,) Mr. Chancellor Kent recognises, in the most ample manner, the general principles of the common law.  Speaking of the grant in that case of an exclusive right to navigate with steamboats from New York to Elizabethtown Point,

&c., he declared, that the true intent was to include not merely that point, but the whole shore or navigable part of Elizabethtown. "Any narrower construction" said he, "in favour of the grantor would render the deed a fraud upon the grantee. It would be like granting an exclusive right of ferriage between two given points, and then setting up a rival ferry within a few rods of those very points, and within the same course of the line of travel. The common law contained principles applicable to this very case, dictated by a sounder judgment, and a more enlightened morality. If one had a ferry by prescription, and another erected a ferry so near to it as to draw away its custom, it was a nuisance; for which the injured party had his remedy by action, &c. The same rule applies, in its spirit and substance, to all exclusive grants and monopolies. The grant must be so construed so as to give it due effect by excluding all contiguous and injurious competition." Language more apposite to the present case could not well be imagined. Here, there is an exclusive grant of a bridge from Charlestown to Boston on the old ferry ways; must it not also be so construed as to exclude all contiguous and injurious competition? Such an opinion, from such an enlightened judge, is not to be overthrown by general suggestions against making any implications in legislative grants.

The case of the Newburgh Turnpike Company v. Miller, (5 Johns. Ch. R. 101,) decided by the same learned judge; is still more directly in point; and, as far as his authority can go, conclusively establishes the doctrine, not only that the franchise of a ferry is not confined to the ferry ways, but that the franchise of a bridge is not confined to the termini, and local limits of the bridge. In that case, the plaintiffs had erected a toll bridge over the river Wallkill in connexion with a turnpike, under an act of the legislature; and the defendants afterwards erected another road and bridge near to the former, and thereby diverted the toll from the plaintiffs' bridge. The suit was a bill in chancery, for a perpetual injunction of this nuisance of the plaintiffs' bridge; and it was accordingly, at the hearing, granted by the Court. Mr. Chancellor Kent, on that occasion, said: "Considering the proximity of the new bridge, and the facility that every traveller has by means of that bridge, and the road connected with it, to shun the plaintiffs' gate which he would otherwise be obliged to pass, I cannot doubt, for a moment, that the new bridge is a direct and immediate disturbance of the plaintiffs' enjoyment of their privileges," &c. "The new road, by its termini, created a competition

most injurious to the statute franchise; and becomes, what is deemed in law, in respect to such franchise, a nuisance." And, after adverting to his own language, already quoted in Ogden v. Gibbons, (4 John. Ch. R. 150, 160,) he added: "The same doctrine applies to any exclusive privilege created by statute. All such privileges come within the equity and reason of the principle. No rival road, bridge, or ferry, or other establishment of a similar kind, and for like purposes, can be tolerated so near to the other as materially to affect or take away its custom. It operates as a fraud upon the grant, and goes to defeat it. The consideration, by which individuals are invited to expend money upon great, and expensive, and hazardous public works, as roads and bridges; and to become bound to keep them in constant and good repair; *is the grant of an exclusive toll.* This right, thus purchased for a valuable consideration, cannot be taken away by direct or indirect means devised for the purpose, both of which are equally unlawful." Now, when the learned chancellor here speaks of an *exclusive* privilege, or franchise, he does not allude to any terms in the statute grant expressly giving such a privilege beyond the local limits; for the statute contained no words to such an effect. The grant, indeed, was by necessary implication exclusive, as to the local limits, for the legislature could not grant any other bridge in the same place with the same termini. It was to such a grant of a franchise, exclusive in this sense, and in no other, that his language applies. And he affirms the doctrine in the most positive terms, that such a grant carries with it a necessary right to exclude all injurious competition, as an indispensable incident. And his judgment turned altogether upon this doctrine.

It is true, that in this case, the defendants did not erect the new bridge under any legislative act. But that is not material in regard to the point now under consideration. The point we are now considering is, whether the grant of a franchise to erect a bridge or a ferry, is confined to the local limits or termini, to the points and planks of the bridge, or to the ferry ways of the ferry. The learned chancellor rejects such a doctrine, with the most pointed severity of phrase. "It operates" (says he) "as a fraud upon the grant, and goes to defeat it." The grant necessarily includes " a right to an *exclusive* toll." "No rival road, bridge, or ferry can be tolerated so near to the former as to affect or take away its custom." Now, if such be the true construction of the grant of such a franchise, it is just as true a construction in relation to the government as in rela-

tion to private persons. It would be absurd to say that the same grant means one thing as to the public, and an entirely opposite thing in relation to individuals. If the right to an *exclusive* franchise or toll exists, it exists from the nature and objects of the grant; and applies equally in all directions. It would be repugnant to all notions of common sense, as well as of justice, to say that the legislature had a right to commit a fraud upon its own grant. The whole reasoning of the learned chancellor repudiates such a notion.

But in what manner is the doctrine to be maintained, that the franchise of a ferry is confined to the ferry ways, and the franchise of a bridge to the planks? It is said, that in Saville's Reports, 11, it is laid down "that a ferry is in respect to the landing place, and not of the water; which water may belong to one, and the ferry to another." There can be no doubt of this doctrine. A ferry must have local limits. It must have termini, or landing places; and it may include only a right of passage over the water. And is not this equally true, whether it be a ferry by prescription, or by grant? If so, can there be any difference as to the value of the exclusive right in cases of grant, or of prescription? Does not each rest on its landing places? But it is added, in Saville: "And in every ferry, the land on both sides of the water ought to be (belong) to the owner of the ferry; for otherwise he cannot land upon the other part." Now, if by this is meant that the owner of the ferry must be the owner of the land, it is not law; for all that is required is, that he should have a right or easement in the landing places. So it was adjudged in Peter v. Kendall, 6 Barn. and Cress. 703; and the dictum of Saville was there overruled. If the same principle is to be applied, (as I think it must be,) to a bridge, then, as there must be a subsisting right in the proprietors of Charles River Bridge to have such landing places on the old ferry ways, there must be an assignment or grant implied of those ferry ways by Harvard college, to the proprietors for that purpose. But of this I shall speak hereafter.

One of the learned judges in the state court (who was against the plaintiffs) admitted, that if any person should be forcibly prevented from passing over the plaintiffs' bridge, it would be an injury; for which an action on the case would lie. I entirely assent to this doctrine, which appears to me to be founded in the most sound reasoning. It is supported by the case of the Bailiffs of Tewksbury v. Diston, 6 East, R. 438, and by the authorities cited by lord Ellen-

borough on that occasion; and especially by the doctrine of Mr. Justice Powell, in Ashby v. White, 2 Lord Raym. 948; and S. C., 6 Mod. 49. But how can this be, if the franchise of the bridge is confined to the mere local limits or timbers of the bridge? If the right to take toll does not commence or attach in the plaintiffs, except when the passengers arrive on the bridge, how can an action lie for the proprietors for obstructing passengers from coming to the bridge? The remedy of the plaintiffs can only be coextensive with their rights and franchise. And if an action lies for an obstruction of passengers, because it goes to impair the right of toll, and to prevent its being earned, why does not the diversion of passengers from the bridge by other means, equally give a cause of action, since it goes, equally, nay more, to impair the right of the plaintiffs to toll? If the legislature could not impair or destroy its own grant by blocking up all avenues to the bridge, how can it possess the right to draw away all the tolls by a free bridge, which must necessarily withdraw all passengers? For myself, I cannot perceive any ground upon which a right of action is maintainable for any obstruction of passengers, which does not equally apply to the diversion of passengers. In each case, the injury of the franchise is the same, although the means used are, or may be different.

The truth is, that the reason why the grant of a franchise, as, for example, of a ferry, or of a bridge, though necessarily local in its limits, is yet deemed to extend beyond those local limits by operation and intendment of law; is founded upon two great fundamental maxims of law applicable to all grants. One is the doctrine already alluded to, and laid down in Liford's case, in 11 Co. R. 46, 52, a. Lex est cuicunque, aliquis, quod concedit, concedere videtur et id, sine quo res ipsa esse non potuit; or, as it is expressed with pregnant brevity by Mr. Justice Twisden, in Pomfret v. Ricroft, 1 Saund. R. 321, 323: "When the use is granted, every thing is granted by which the grantee may have and enjoy the use." See also Lord Darcy v. Askwith, Hob. R. 234; 1 Saund. R. 323; Note (6) by Williams; Co. Lit. 56, (a). Another is, that wherever a grant is made for a valuable consideration, which involves public duties and charges, the grant shall be construed so as to make the indemnity coextensive with the burden. Qui sentit onus, sentire debet et commodum. In the case of a ferry, there is a public charge and duty. The owner must keep the ferry in good repair, upon the peril of an indictment. He must keep sufficient accommodations for all travel-

[Charles River Bridge v. Warren Bridge et al.]

lers, at all reasonable times. He must content himself with a reason-able toll. Such is the jus publicum. In return, the law will exclude all injurious competition, and deem every new ferry a nuisance which subtracts from him the ordinary custom and toll. See Com. Dig. Piscary, B. Id. Ferry. So strong is the duty of the ferry owner to the public, that it was held, in Paine v. Patrick, 3 Mod. 289, 294, that the ferry owner could not excuse himself from not keeping proper boats, even by showing that he had erected a bridge more convenient for passengers. It would be a fraud upon such a grant of a ferry, to divert the travel, and yet to impose the burden. The right to take toll would, or might be useless, unless it should be ex-clusive within all the bounds of injurious rivalship from another ferry. The franchise is therefore construed to extend beyond the local limits, and to be exclusive within a reasonable distance; for the plain reason that it is indispensable to the fair enjoyment of the franchise and right of toll. The same principle applies, without a shadow of difference that I am able to perceive, to the case of a bridge; for the duties are publici juris, and pontage and passage are but different names for exclusive toll for transportation.

In the argument at the present term it has been further contended, that at all events, in the state of Massachusetts, the ancient doctrine of the common law in relation to ferries is not in force, and never has been recognised; that all ferries in Massachusetts are held at the mere will of the legislature, and may be established by them and annihilated by them at pleasure; and of course that the grantees hold them durante bene placito of the legislature. And in confirmation of this view of the subject, certain proceedings of the colonial legis-lature have been relied on, and especially those stated in the record, between the years 1629 to 1650; to the colonial act of 1641, against monopolies, (which is, in substance, like the statute of monopolies of the 21 of James I. ch. 3); and to the general colonial and pro-vincial and state statutes, regulating ferries, passed in 1641, 1644, 1646, 1647, 1695, 1696, 1710, 1719, 1781, and 1787; some of which contain special provisions respecting Charlestown and Boston ferry.

As to the proceedings of the colonial government, so referred to, in my judgment they establish no such conclusion. But some of them, at least, are directly opposed to it. Thus, for example, in 1638 a ferry was granted to Garret Spencer at Lynn for two years. In 1641, it was ordered that they that put two boats be-

tween Cape Ann and Annisquam, shall have liberty to take suffi-
cient toll, as the court shall think fit, for one-and-twenty years.
Could the colonial government have repealed these grants within the
terms specified at their pleasure?   In 1648 John Glover had power
given him to let a ferry over Neponset river between Dorchester
and Braintree, to any person or persons for the term of seven years,
&c.; or else to take it to himself and his heirs, as his inheritance for-
ever; provided it be kept in such a place and at such a price as may
be most convenient for the country, and pleasant to the general
court.   Now, if Glover, according to this act, had taken this ferry
to him and his heirs as an inheritance, could the colonial legislature
have revoked it at its pleasure?   Or rather, can it be presumed that
the colonial legislature intended such a ferry, confessedly an inheri-
tance, to be an estate held only at will?   It would be repugnant to
all notions of legal interpretation.

In 1637, the general court ordered the ferry between Boston and
Charlestown to be let for three years.   It was afterwards, in 1640,
granted to Harvard college.   From that time down to 1785, it was
always held and claimed by the college as its inheritance.   But the
college never supposed that it was not subject to the regulation of
the legislature, so far as the public interests were concerned.   The
acts of 1650, 1654, 1694, 1696, 1710 and 1781, establish this.
But they show no more.   That many of the ferries in Massachu-
setts were held, and perhaps were always held under mere tempo-
rary licenses of the legislature, or of certain magistrates to whom
they were entrusted, is not denied.   But it is as clear, that there
were other ferries held under more permanent tenures.   The co-
lonial act of 1644, authorizing magistrates to pass ferries toll free,
except such ferries as are appropriated to any, or rented out,
and are out of the countries' hands; and then it is " ordered that
their passages be paid by the country."   The act of 1694 excepts
from its operation " such ferries as are already stated and settled
either by the court or town, to whom they appertain."   The colo-
nial act of 1670, as an inducement to the town of Cambridge, or
other persons to repair the bridge at Cambridge, or to erect a new one,
declared, " that this order, (granting certain tolls) should continue
in force so long a time as the said bridge is maintained serviceable
and safe for passage."   So that it is plain, that the colonial legisla-
ture did contemplate both ferries and bridges to be held by perma-
nent tenures, and not to be revocable at pleasure.

[Charles River Bridge v. Warren Bridge et al.]

· But to all the general laws respecting ferries, one answer may be given, that their provisions are generally confined to the due regulation of public ferries and matters publici juris; and so far as the public have rights which ought to be enforced and protected, and which the legislature had a proper right to enforce and protect by suitable laws. And in regard to matters not strictly of this nature, the enactments may well apply to all such ferries within the state as were held under the mere temporary license of the state, and were revocable and controllable at pleasure by the legislature, in which predicament a very large number of ferries in the state were; and also to those ferries, (among which Charlestown ferry seems to have been,) over which a modified legislative control had been, at their original establishment, reserved. Beyond these results, I am not prepared to admit that these statutes either had, or ever were supposed to have any legitimate operation. And before I should admit such a conclusion, I should require the evidence of some solemn judgment of a court of justice, in Massachusetts, to the very point.

But the argument presses the doctrine to an extent which it is impossible can be correct, if any principles respecting vested rights exist, or have any recognition in a free government. What is it? That all ferries in Massachusetts are revocable and extinguishable at pleasure. Suppose, then, the legislature of Massachusetts for a valuable consideration should grant a ferry from A to B to a grantee and his heirs, or to a grantee for forty years, or for life; will it be contended that the legislature can take away, revoke, or annihilate that grant within the period? That it may make such a grant cannot well be denied; for there is no prohibition touching it in the constitution of Massachusetts. That it can take away or resume such a grant, has never yet been held by any judicial tribunal in that state. The contrary is as well established as to all sorts of grants, unless an express power be reserved for the purpose, as any principle in its jurisprudence. In the very case now before this Court, every judge of the supreme court of the state admitted that the legislature could not resume or revoke its charter to Charles River Bridge. Why not, if it could revoke its solemn grant of a ferry to a private person, or to a corporation, during the stipulated period of the grant? The legislature might just as well resume its grant of the public land, or the grant of a turnpike, or of a rail road, or of any other franchise, within the period stipulated by its charter.

The doctrine then is untenable. The moment that you ascertain

what the terms and stipulations of a grant of a ferry, or any other franchise, are, that moment they are obligatory. They cannot be gainsaid, or resumed. So this Court has said in the case of Fletcher v. Peck, 6 Cranch, 871; and so are the unequivocable principles of justice, which cannot be overturned without shaking every free government to its very foundations. If, then, the ferry between Charlestown and Boston was vested in perpetuity in the corporation of Harvard college, it could not be taken away without its consent by the legislature. It was a ferry, so far withdrawn from the power of any legislation trenching on its rights and franchises. It is assuming the very point in controversy, to say that the ferry was held at the mere pleasure of the legislature. An exclusive claim, and possession, and user, and taking of the profits thereof for one hundred and fifty years by the corporation of Harvard college, without interruption; was as decisive evidence of its exclusive right to the franchise in perpetuity, as the title deed of any man to his own estate. The legislature of Massachusetts has never, as far as I know, breathed a doubt on the point. All the judges of the state court admit the exclusive right of Harvard college to the ferry, in the most unequivocal terms. The argument, then, that the English doctrine as to ferries has not been adopted, and is not in force in Massachusetts, is not supported. For myself, I can only say that I have always understood that the English doctrine on this subject constitutes a part of the common law of Massachusetts. But what is most material to be stated, not one of the learned judges in the state court doubted or denied the doctrine, though it was brought directly before them; and they gave, seriatim, opinions containing great diversities of judgment on other points.* It is also fully established by the case of Chadwick v. the Proprietors of Haverhill Bridge, already cited.

But it is urged that some local limits must be assigned to such grants; and the Court must assign them, for otherwise they would involve the absurdity of being coextensive with the range of the river; for every other bridge or ferry must involve some diminution of toll; and how much (it is asked) is necessary to constitute an infringement of the right? I have already given an answer, in part, to this suggestion. The rule of law is clear. The application of it must depend upon the particular circumstances of each case. Wherever

---

* See Proprietors of Charles River Bridge v. Proprietors of Warren Bridge, 7 Pick. R. 341.

any other bridge or ferry is so near that it injures the franchise, or diminishes the toll in a positive and essential degree, there it is a nuisance, and is actionable. It invades the franchise, and ought to be abated. But whether there be such an injury or not, is a matter, not of law, but of fact. Distance is no otherwise important, than as it bears on the question of fact. All that is required, is, that there should be a sensible, positive injury. In the present case there is no room to doubt upon this point, for the bridges are contiguous; and Warren Bridge, after it was opened, took away three-fourths of the profits of the travel from Charles River Bridge; and when it became free, (as it now is,) it necessarily took away all the tolls, or all except an unimportant and trivial amount of tolls.

What I have said, however, is to be understood with this qualification, that the franchise of the bridge has no assigned local limits; but, it is a simple grant of the right to erect a bridge across a river from one point to another, without being limited between any particular vills or towns, or by other local limits. In the case now before the Court, I have already stated that my judgment is that the franchise is merely to erect a bridge between Charlestown and Boston; and therefore it does not, necessarily, exclude the legislature from mak .g any other grant for the erecting of a bridge between Boston and any other town. The exclusive right being between those towns, it only precludes another legislative grant between those towns which is injurious to Charles River Bridge. The case of Tripp v. Frank (4 T. R. 666) is a clear authority for this doctrine. It was there decided that the grant of an exclusive ferry between A and B, did not exclude a ferry between A and C. But the argument of the plaintiffs' counsel was tacitly admitted by the Court, that "ferries in general must have some considerable extent, upon which their right may operate; otherwise the exclusive privilege would be of no avail. That extent must be governed by local circumstances." And there is the greatest reason for supporting such rights, because the owners of ferries are bound at their peril to supply them to the public use; and are therefore fairly entitled to the public advantage arising from them.

But it is said, if this is the law, what then is to become of turnpikes and canals? Is the legislature precluded from authorizing new turnpikes or new canals, simply because they cross the path of the old ones, and incidentally diminish their receipt of tolls? The answer is plain. Every turnpike has its local limits and local termini; its points of beginning and of end. No one ever imagined that the

legislature might grant a new turnpike, with exactly the same location and termini. That would be to rescind its first grant. The grant of a turnpike between A and B, does not preclude the legislature from the grant of a turnpike between A and C, even though it should incidentally intercept some of the travel; for it is not necessarily a nuisance to the former grant. The termini being different, the grants are or may be substantially different. But if the legislature should grant a second turnpike, substantially taking away the whole travel from the first turnpike between the same local points; then, I say, it is a violation of the rights of the first turnpike. And the opinion of Mr. Chancellor Kent, and all the old authorities on the subject of ferries, support me in the doctrine.

Some reliance has been placed upon the cases of Prince v. Lewis, (5 Barn. and Cress. 363) and Mosley v. Walker, (7 Barn. and Cress. 40,) as impugning the reasoning. But, it appears to me, that they rather fortify than shake it. In the former case, the king granted a market to A and his heirs, in a place within certain specified limits, and the grantee used part of the limits for other purposes, and space enough was not ordinarily left for the marketing. It was held, that the owner of the market could not maintain an action against a person for selling marketable goods in the neighbourhood, without showing that at the time of the sale there was room enough in the market for the seller. This clearly admits the exclusive right of the owner, if there is room enough in the market. The other case affirms the same principle, as indeed it was before affirmed in Mosley v. Chadwick, 7 Barn. and Cress. 47, note.

But then again, it is said, that all this rests upon implication, and not upon the words of the charter. I admit that it does; but I again say, that the implication is natural and necessary. It is indispensable to the proper effect of the grant. The franchise cannot subsist without it, at least for any valuable or practical purpose. What objection can there be to implications, if they arise from the very nature and objects of the grant? If it be indispensable to the full enjoyment of the right to take toll, that it should be exclusive within certain limits; is it not just and reasonable, that it should be so construed? If the legislative power to erect a new bridge would annihilate a franchise already granted, is it not, unless expressly reserved, necessarily excluded by intendment of law? Can any reservations be raised by mere implication to defeat the operation of a grant, especially when such a reservation would be coextensive with the whole

[Charles River Bridge v. Warren Bridge et al.]

right granted, and amount to the reservation of a right to recall the whole grant?

Besides, in this very case it is admitted on all sides, that from the defective language and wording of the charter, no power is directly given to the proprietors to erect the bridge; and yet it is agreed, that the power passes by necessary implication from the grant, for otherwise it would be utterly void. The argument, therefore, surrenders the point as to the propriety of making implications; and reduces the question to the mere consideration of what is a necessary implication. Now, I would willingly put the whole case upon this point, whether it is not as indispensable to the fair and full operation of the grant, that the plaintiffs should be secure in the full enjoyment of their right to tolls, without disturbance or diversion; as that they should have the power to erect the bridge. If the tolls may be all swept away by a contiguous free bridge, erected the next day, can it be said, in any sense, that the object of the franchise is obtained? What does the sound logic of the common law teach us on this point? If a grant, even of the crown, admits of two constructions, one of which will defeat, and the other will promote and secure the fair operation of the grant; the latter is to be followed.

The truth is, that the whole argument of the defendants turns upon an implied reservation of power in the legislature to defeat and destroy its own grant. The grant, construed upon its own terms, upon the plain principles of construction of the common law, by which alone it ought to be judged, is an exclusive grant. It is the grant of a franchise, publici juris, with a right of tolls; and in all such cases the common law asserts the grant to be exclusive, so as to prevent injurious competition. The argument seeks to exclude the common law from touching the grant, by implying an exception in favour of the legislative authority to make any new grant. And let us change the position of the question as often as we may, it comes to this, as a necessary result; that the legislature has reserved the power to destroy its own grant, and annihilate the right of pontage of the Charles River Bridge. If it stops short of this exercise of its power; it is its own choice, and not its duty. Now, I maintain, that such a reservation is equivalent to a power to resume the grant; and yet it has never been for a moment contended, that the legislature was competent to resume it.

To the answer already given to the objection, that, unless such a reservation of power exists, there will be a stop put to the progress

of all public improvements; I wish, in this connexion, to add, that there never can any such consequence follow upon the opposite doctrine. If the public exigencies and interests require that the franchise of Charles River Bridge should be taken away, or impaired; it may be lawfully done upon making due compensation to the proprietors. "Whenever" says the constitution of Massachusetts, "the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor:" and this franchise is property; is fixed, determinate property. We have been told, indeed, that where the damage is merely *consequential*, (as, by the erection of a new bridge, it is said that it would be,) the constitution does not entitle the party to compensation; and Thruston v. Hancock, 12 Mass. R. 220, and Callender v. Marsh, 1 Pick. R. 418; are cited in support of the doctrine. With all possible respect for the opinions of others, I confess myself to be among those who never could comprehend the law of either of those cases; and I humbly continue to doubt, if upon principle or authority they are easily maintainable; and I think my doubts fortified by the recent English decisions. But, assuming these cases to be unquestionable, they do not apply to a case like the present; if the erection of such a new bridge is a violation of the plaintiffs' franchise. That franchise, so far as it reaches, is private property; and so far as it is injured, it is the taking away of private property. Suppose a man is the owner of a mill, and the legislature authorizes a diversion of the water course which supplies it, whereby the mill is injured or ruined; are we to be told, that this is a consequential injury, and not within the scope of the constitution? If not within the scope of the constitution, it is, according to the fundamental principles of a free government, a violation of private rights, which cannot be taken away without compensation. The case of Gardner v. The Village of Newburgh, 2 John. Ch. R. 139, would be a sufficient authority to sustain this reasoning; if it did not stand upon the eternal principles of justice, recognised by every government which is not a pure despotism.

Not a shadow of authority has been introduced to establish the position of the defendants, that the franchise of a toll-bridge is confined to the planks of the bridge; and yet it seems to me, that the onus probandi is on them; for all the analogies of the common law are against them. They are driven, indeed, to contend that the same principles apply to ferries, which are limited to the ferry ways,

unless some prescription has given them a more extensive range. But here, unless I am entirely mistaken, they have failed to establish their position. As I understand the authorities, they are, unequivocally, the other way. Are we then to desert the wholesome principles of the common law, the bulwark of our public liberties, and the protecting shield of our private property; and assume a doctrine, which substantially annihilates the security of all franchises affected with public easements?

But it is said, that if the doctrine contended for be not true, then every grant to a corporation becomes, ipso facto, a monopoly or exclusive privilege. The grant of a bank, or of an insurance company, or of a manufacturing company, becomes a monopoly; and excludes all injurious competition. With the greatest deference and respect for those who press such an argument, I cannot but express my surprise that it should be urged. As long ago as the case in the year book, 22 Hen. VI. 14; the difference was pointed out in argument between such grants as involve public duties and public matters for the common benefit of the people, and such as are for mere private benefit, involving no such consideration. If a bank, or insurance company, or manufacturing company, is established in any town by an act of incorporation; no one ever imagined that the corporation was bound to do business, to employ its capital, to manufacture goods, to make insurance. The privilege is a mere private corporate privilege for the benefit of the stockholders, to be used or not at their own pleasure; to operate when they please; and to stop when they please. Did any man ever imagine that he had a right to have a note discounted by a bank, or a policy underwritten by an insurance company? Such grants are always deemed privati juris. No indictment lies for a non user. But in cases of ferries and bridges, and other franchises of a like nature, (as has been shown,) they are affected with a jus publicum. Such grants are made for the public accommodation; and pontage and passage are authorized to be levied upon travellers; (which can only be by public authority;) and, in return, the proprietors are bound to keep up all suitable accommodations for travellers, under the penalty of indictment for their neglect.

The tolls are deemed an equivalent for the burden, and are deemed exclusive, because they might not otherwise afford any just indemnity. In the very case at bar, the proprietors of Charles River Bridge, (as we have seen,) are compellable to keep their draws and

bridge in good repair, during the period of seventy years; to pay an
annuity to Harvard college; to give all reasonable accommodations
to the public travel: and, if they do not, they may be grievously
amerced.   The burdens being exclusively on them, must not the
tolls granted by way of remuneration; (I repeat it,) must they not
be equally exclusive, to insure an indemnity?   Is there any analogy
in such a case to the case of a bank, or an insurance company, or a
manufacturing company?   The case of Jackson v. Lamphire, 3 Pe-
ters' R. 280, contains no doctrine which, in the slightest degree, in-
terferes with that which I have been endeavouring to establish in
the present case.   In that decision, I believe that I concurred; and I
see no reason now to call in question the soundness of that decision.
That case does not pretend to inculcate the doctrine that no implica-
tions can be made, as to matters of contract, beyond the express
terms of a grant.   If it did, it would be in direct conflict with other
most profoundly considered adjudications of this Court.   It asserted,
only, that the grant in that case carried no implication that the
grantee should enjoy the land therein granted, free from any legisla-
tive regulations to be made in violation of the constitution of the
state.   Such an implication, so broad and so unmeasured, which
might extend far beyond any acts which could be held in any just
sense to revoke or impair the grant, could, by no fit reasoning, be
deduced from the nature of the grant.   What said the Court on that
occasion?   " The only contract made by the state, is a grant to J. C.,
his heirs, and assigns, of the land in question.,   The patent contains
no covenant to do or not to do any further act in relation to the
land; and we do not, in this case, feel at liberty to create one by
implication.   The state has not, by this act, impaired the force of
the grant.   It does not profess or attempt to take the land from the
assigns of C., and give it to one not claiming under him.   Neither
does the award produce that effect.   The grant remains in full force;
the property conveyed is held by the grantee; and, the state asserts
no claim to it."   But suppose the reverse had been the fact.   Sup-
pose that the state had taken away the land, and granted it to ano-
ther; or asserted its own right otherwise to impair the grant: does
it not follow, from this very reasoning of the Court, that it would
have been held to have violated the implied obligations of the grant?,
Certainly it must have been so held, or the Court would have over-
turned its own most solemn judgments in other cases.   Now, there
is not, and cannot be, any real distinction between a grant of land

and a grant of franchises. The implication, in each case, must be the same, viz. that the thing granted shall not be resumed, or impaired by the grantor.

It has been further argued, that even if the charter of the Charles River Bridge does imply such a contract on the part of the legislature as is contended for, it is void for want of authority in the legislature to make it; because it is a surrender of the right of eminent domain, entrusted to the legislature and its successors for the benefit of the public, which it is not at liberty to alienate. If the argument means no more than that the legislature, being entrusted with the power to grant franchises, cannot, by contract, agree to surrender or part with this power, generally, it would be unnecessary to consider the argument; for no one supposes that the legislature can rightfully surrender its legislative power. If the argument means no more than that the legislature, having the right by the constitution to take private property, (among which property are franchises,) for public purposes, cannot divest itself of such a right by contract, there would be as little reason to contest it. Neither of these cases is like that before the Court. But the argument, (if I do not misunderstand it,) goes further, and denies the right of the legislature to make a contract granting the exclusive right to build a bridge between Charlestown and Boston, and thereby taking from itself the right to grant another bridge between Charlestown and Boston, at its pleasure; although the contract does not exclude the legislature from taking it for public use upon making actual compensation; because it trenches upon the sovereign right of eminent domain.

It is unnecessary to consider whether the phrase "eminent domain," in the sense in which it is used in the objection, is quite accurate. The right of eminent domain is usually understood to be the ultimate right of the sovereign power to appropriate, not only the public property, but the private property of all citizens within the territorial sovereignty, to public purposes. Vattel (B. 1, ch. 20, s. 244) seems so to have understood the terms; for he says, that the right, which belongs to the society or the sovereign of disposing, in case of necessity, and for the public safety, of all the wealth (the property) contained in the state, is called the "eminent domain." And he adds, that it is placed among the prerogatives of majesty; which, in another section, (B. 1, ch. 4, s. 45,) he defines to be, "all the prerogatives without which the sovereign command, or authority,

could not be exerted in the manner most conducive to the public welfare." The right of " eminent domain," then, does not comprehend all, but only is among the prerogatives of majesty.

But the objection uses the words in a broader sense, as including what may be deemed the essential and ordinary attributes of sovereignty; such as the right to provide for the public welfare, to open highways, to build bridges, and from time to time to make grants of franchises for the public good. Without doubt, these are proper attributes of sovereignty, and prerogatives resulting from its general nature and functions. And so Vattel considers them in the passage cited at the bar; b. 1, ch. 9, sec. 100, 101. But they are attributes and prerogatives of sovereignty only, and can be exercised only by itself, unless specially delegated.

But, without stopping to examine into the true meaning of phrases, it may be proper to say, that however extensive the prerogatives and attributes of sovereignty may theoretically be, in free governments they are universally held to be restrained within some limits. Although the sovereign power in free governments may appropriate all the property, public as well as private, for public purposes, making compensation therefor; yet it has never been understood, at least never in our republic, that the sovereign power can take the private property of A and give it to B, by the right of " eminent domain;" or, that it can take it at all, except for public purposes; or, that it can take it for public purposes, without the duty and responsibility of making compensation for the sacrifice of the private property of one, for the good of the whole. These limitations have been held to be fundamental axioms in free governments, like ours; and have accordingly received the sanction of some of our most eminent judges and jurists. Vattel himself lays them down, in discussing the question of the right of eminent domain, as among the fundamental principles of government, binding even upon sovereignty itself. " If," says he, " the nation itself disposes of the public property in virtue of this eminent domain, the alienation is valid, as having been made with a sufficient power. When it disposes in like manner, in a case of necessity, of the possessions (the property) of a community, or of an individual, the alienation will be valid for the same reason. But justice demands, that this community, or this individual be recompensed out of the public money; and, if the treasury is not able to pay, all the citizens are obliged to contribute to it;"

Vattel, b. 1, ch. 20, s. 244. They have also been incorporated into most of our state constitutions, and into that of the United States; and, what is most important to the present argument, with the state constitution of Massachusetts. So long as they remain in those constitutions, they must be treated as limitations imposed by the sovereign authority upon itself; and, a fortiori, upon all its delegated agents. The legislature of Massachusetts is in no just sense sovereign. It is but the agent, with limited authority, of the state sovereignty; and it cannot rightfully transcend the bounds fixed in the constitution. What those limits are, I shall presently consider. It is but justice to the argument to say, that I do not understand it to maintain that the legislature ought not in all cases, as a matter of duty, to give compensation; where private property or franchises are taken away. But that the legislature is the final judge as to the time, the manner, and the circumstances, under which it should be given or withheld; whether when the property is taken, or afterwards; and whether it is, or is not a case for compensation at all.

But let us see what the argument is in relation to sovereignty in general. It admits, that the sovereign power has, among its prerogatives, the right to make grants, to build bridges, to erect ferries, to lay out highways; and to create franchises for public and private purposes. If it has a right to make such grants, it follows that the grantees have a right to take, and to hold these franchises. It would be a solecism to declare that the sovereign power could grant, and yet no one could have a right to take. If it may grant such franchises, it may define and limit the nature and extent of such franchises; for, as the power is general, the limitations must depend upon the good pleasure and discretion of the sovereign power in making the particular grant. If it may prescribe the limits, it may contract that these limits shall not be invaded by itself or by others.

It follows, from this view of the subject, that if the sovereign power grants any franchise, it is good and irrevocable within the limits granted, whatever they may be; or else, in every case, the grant will be held only during pleasure; and the identical franchise may be granted to any other person, or may be revoked at the will of the sovereign. This latter doctrine is not pretended; and, indeed, is unmaintainable in our systems of free government. If, on the other hand, the argument be sound, that the sovereign power cannot grant a franchise to be exclusive within certain limits, and cannot contract

not to grant the same, or any like franchise, within the same limits, to the prejudice of the first grant, because it would abridge the sovereign power in the exercise of its right to grant franchises; the argument applies equally to all grants of franchises, whether they are broad or narrow: for, pro tanto, they do abridge the exercise of the sovereign power to grant the same franchise within the same limits. Thus, for example, if the sovereign power should expressly grant an exclusive right to build a bridge over navigable waters, between the towns of A and B, and should expressly contract with the grantees, that no other bridge should be built between the same towns; the grant would, upon the principles of the argument, be equally void in regard to the franchise within the planks of the bridge, as it would be in regard to the franchise outside of the planks of the bridge; for, in each case, it would, pro tanto, abridge or surrender the right of the sovereign to grant a new bridge within the local limits. I am aware that the argument is not pressed to this extent; but it seems to me a necessary consequence flowing from it. The grant of the franchise of a bridge, twenty feet wide, to be exclusive within those limits, is certainly, if obligatory, an abridgment or surrender of the sovereign power to grant another bridge within the same limits; if we mean to say that every grant that diminishes the things upon which that power can rightfully act, is such an abridgment. Yet the argument admits, that within the limits and planks of the bridge itself, the grant is exclusive; and cannot be recalled. There is no doubt, that there is a necessary exception in every such grant, that if it is wanted for public use, it may be taken by the sovereign power for such use, upon making compensation. Such a taking is not a violation of the contract; but it is strictly an exception resulting from the nature and attributes of sovereignty; implied from the very terms, or at least acting upon the subject matter of the grant, suo jure.

But the legislature of Massachusetts is, as I have already said, in no just sense the sovereign of the state. The sovereignty belongs to the people of the state in their original character as an independent community; and the legislature possesses those attributes of sovereignty, and those only, which have been delegated to it by the people of the state, under its constitution.

There is no doubt, that among the powers so delegated to the legislature, is the power to grant the franchises of bridges and ferries, and others of a like nature. The power to grant is not limited by

[Charles River Bridge v. Warren Bridge et al]

any restrictive terms in the constitution; and it is of course general and unlimited as to the terms, the manner, and the extent of granting franchises. These are matters resting in its sound discretion; and having the right to grant, its grantees have a right to hold, according to the terms of their grant, and to the extent of the exclusive privileges conferred thereby. This is the necessary result of the general authority, upon the principles already stated.

But this doctrine does not stand upon general reasoning alone. It is directly and positively affirmed by all the judges of the state court, (the true and rightful expositors of the state constitution,) in this very case. All of them admit that the grant of an exclusive franchise of this sort, made by the legislature, is absolutely obligatory upon the legislature, and cannot be revoked or resumed; and that it is a part of the contract, implied in the grant, that it shall not be revoked or resumed; and that, as a contract, it is valid to the extent of the exclusive franchise granted. So that the highest tribunal in the state which is entitled to pass judgment on this very point, has decided against the soundness of the very objection now stated; and has affirmed the validity and obligation of such a grant of the franchise. The question, among the learned judges, was not whether the grant was valid or not; for all of them admitted it to be good and irrevocable. But the question was, what was, in legal construction, the nature and extent of the exclusive franchise granted. This is not all. Although the legislature have an unlimited power to grant franchises, by the constitution of Massachusetts; they are not entrusted with any general sovereign power to recall or resume them. On the contrary, there is an express prohibition in the bill of rights in that constitution, restraining the legislature from taking any private property, except upon two conditions; first, that it is wanted for public use: and secondly, that due compensation is made. So that the power to grant franchises, which are confessedly property, is general; while the power to impair the obligation of the grant, and to resume the property, is limited. An act of the legislature transcending these bounds, is utterly void; and so it has been constantly held by the state judges. The same doctrine has been maintained by this Court, on various occasions; and especially in Fletcher v. Peck, 6 Cranch, R. 136; and in Woodward v. Trustees of Dartmouth College, 4 Wheaton, R. 518.

Another answer to the argument has been, in fact, already given. It is, that by the grant of a particular franchise the legislature does

not surrender its power to grant franchises, but merely parts with
its power to grant the same franchise; for it cannot grant that which
it has already parted with.   Its power remains the same; but the.
thing on which it can alone operate, is disposed of.   It may, indeed,
take it again for public uses, paying a compensation.   But it cannot
resume it, or grant it to another person; under any other circum-
stances, or for any other purposes.

    In truth, however, the argument itself proceeds upon a ground
which the Court cannot act upon or sustain.   The argument is, that if
the state legislature makes a grant of a franchise exclusive, and con-
tracts that it shall remain exclusive within certain local limits; it is an
excess of power, and void as an abridgment or surrender of the rights
of sovereignty, under the state constitution.  But this is a point over
which this Court has no jurisdiction.   We have no right to inquire
in this case, whether a state law is repugnant to its own constitu-
tion; but only whether it is repugnant to the constitution of the
United States.   If the contract has been made, we are to say whether.
its obligation has been impaired; and not to ascertain whether the
legislature could rightfully make it.   Such was the doctrine of this
Court in the case of Jackson v. Lamphire, already cited; 3 Peters'
R. 280—289.   But the conclusive answer is, that the state judges
have already settled that point, and held the present grant a contract;
to be valid to the extent of the exclusive limits of the grant, what-
ever they are.

    To sum up, then, the whole argument on this head; I maintain,
that, upon the principles of common reason and legal interpreta-
tion, the present grant carries with it a necessary implication that
the legislature shall do no act to destroy or essentially to impair the
franchise; that, (as one of the learned judges of the state court ex-
pressed it,) there is an implied agreement that the state will not grant
another bridge between Boston and Charlestown, so near as to draw
away the custom from the old one; and, (as another learned judge
expressed it,) that there is an implied agreement of the state to grant
the undisturbed use of the bridge and its tolls, so far as respects any
acts of its own, or of any persons acting under its authority.   In
other words, the state, impliedly, contracts not to resume its grant,
or to do any act to the prejudice or destruction of its grant.   I main-
tain, that there is no authority or principle established in relation to
the construction of crown grants, or legislative grants; which does
not concede and justify this doctrine.   Where the thing is given,

the incidents, without which it cannot be enjoyed, are also given; ut res magis valeat quam pereat. I maintain that a different doctrine is utterly repugnant to all the principles of the common law, applicable to all franchises of a like nature; and that we must overturn some of the best securities of the rights of property, before it can be established. I maintain, that the common law is the birthright of every citizen of Massachusetts, and that he holds the title deeds of his property, corporeal, and incorporeal, under it. I maintain, that under the principles of the common law, there exists no more right in the legislature of Massachusetts, to erect the Warren Bridge, to the ruin of the franchise of the Charles River Bridge, than exists to transfer the latter to the former, or to authorize the former to demolish the latter. If the legislature does not mean in its grant to give any exclusive rights, let it say so, expressly; directly; and in terms admitting of no misconstruction. The grantees will then take at their peril, and must abide the results of their overweening confidence, indiscretion, and zeal.

My judgment is formed upon the terms of the grant, its nature and objects, its design and duties; and, in its interpretation, I seek for no new principles, but I apply such as are as old as the very rudiments of the common law.

But, if I could persuade myself that this view of the case were not conclusive upon the only question before this Court, I should rely upon another ground, which, in my humble judgment, is equally decisive in favour of the plaintiffs. I hold, that the plaintiffs are the equitable assignees (during the period of their ownership of the bridge) of the old ferry, belonging to Harvard college, between Charlestown and Boston, for a valuable consideration; and, as such assignees, they are entitled to an exclusive right to the ferry, so as to exclude any new bridge from being erected between those places during that period. If Charles River Bridge did not exist, the erection of Warren Bridge would be a nuisance to that ferry, and would in fact ruin it. It would be exactly the case of Chadwick v. The Proprietors of Haverhill Bridge; which, notwithstanding all I have heard to the contrary, I deem of the very highest authority. But, independently of that case, I should arrive at the same conclusion upon general principles. The general rights and duties of the owners of ferries, at the common law, were not disputed by any of the learned judges in the state court to be precisely the same in Massachusetts, as in England. I shall not, therefore, attempt to go over

that ground with any farther illustrations, than what have already, in another part of this opinion, been suggested. I cannot accede to the argument, that the ferry was extinguished by operation of law by the grant of the bridge, and the acceptance of the annuity. In my judgment, it was indispensable to the existence of the bridge, as to its termini, that the ferry should be deemed to be still a subsisting franchise; for otherwise, the right of landing on each side would be gone. I shall not attempt to go over the reasoning, by which I shall maintain this opinion; as it is examined with great clearness and ability by Mr. Justice Putnam, in his opinion in the state court, to which I gladly refer, as expressing mainly all my own views on this topic. Indeed, there is in the whole of that opinion such a masculine vigour, such a soundness and depth of learning, such a forcible style of argumentation and illustration; that in every step of my own progress I have sedulously availed myself of his enlightened labours. For myself, I can only say that I have as yet heard no answer to his reasoning; and my belief is, that in a juridical sense, it is unanswerable.

Before I close, it is proper to notice, and I shall do it briefly, another argument strongly pressed at the bar against the plaintiffs; and that is, that the extension of the term of the franchise of the plaintiffs for thirty years, by the act of 1792, (erecting the West Boston Bridge, between Boston and Cambridge,) and the acceptance thereof by the plaintiffs, amounted to a surrender or extinguishment of their exclusive franchise, if they ever had any, to build bridges over Charles river; so that they are barred from now setting it up against the Warren Bridge. In my judgment, there is no foundation whatsoever, either in law, or in the facts, to sustain this objection. If any legitimate conclusion be deducible from the terms of that act, it is, that the plaintiffs, if they had claimed any such exclusive right over the whole river, would by their acceptance of the new term of years have been estopped to claim any damages done to their franchise by the erection of West Boston Bridge; and that their consent must be implied to its erection. But there is no warrant for the objection, in any part of the language of the act. The extension of the term is not granted upon any condition whatsoever. No surrender of any right is asked, or required. The clause extending the term, purports, in its face, to be a mere donation or bounty of the legislature, founded on motives of public liberality and policy. It is granted expressly, as an encouragement to enterprise, and as a compensation

for the supposed diminution of tolls, which West Boston Bridge would occasion to Charles River Bridge; and in no manner suggests any sacrifice or surrender of right whatsoever, to be made by the plaintiffs.　In the next place, the erection of West Boston Bridge was no invasion, whatsoever, of the franchise of the plaintiffs.　Their right, as I have endeavoured to show, was limited to a bridge, and the travel between Charlestown and Boston; and did not extend beyond those towns.　West Boston Bridge was between Boston and Cambridge, at the distance of more than a mile by water, and by land of nearly three miles; and as the roads then ran, the line of travel for West Boston Bridge would scarcely ever, perhaps never, approach nearer than that distance to Charles River Bridge.　The grant, therefore, could not have been founded in any notion of any surrender or extinguishment of the exclusive franchise of the plaintiffs; for it did reach to such an extent.　It did not reach Cambridge, and never had reached it.

As to the report of the committee, on the basis of which the West Boston Bridge was granted, it has in my judgment no legal bearing on the question.　The committee say, that they are of opinion, that the act of 1785, did not confer "an exclusive grant of the right to build over the waters of Charles river."　That is true; and it is equally true, that the plaintiffs never asserted, or pretended to have any such right.　In their remonstrance against the erection of West Boston Bridge, they assert no such right; but they put themselves upon mere equitable considerations, addressing themselves to the sound discretion of the legislature.　If they had asserted such a broad right, it would not justify any conclusion that they were called upon to surrender, or did surrender their real and unquestionable rights.　The legislature understood itself to be granting a boon; and not making a bargain, or asking a favour.　It was liberal, because it meant to be just, in a case of acknowledged hazard, and of honourable enterprise, very beneficial to the public.　To suppose, that the plaintiffs meant to surrender their present valuable and exclusive right of franchise for thirty-four remaining years, and to put it in the power of the legislature, the next day, or the next year, to erect a bridge, toll or free, which by its contiguity should ruin theirs, or take away all their profits; is a supposition, in my judgment, truly extravagant, and without a scintilla of evidence to support it.　The burdens of maintaining the bridge were to remain; the payment of the annuity to Harvard college was to remain: and yet, upon this

supposition, the extension of the term of their charter, granted in the shape of a bounty, would amount to a right to destroy the franchise the next day, or the next hour, at the pleasure of the legislature. I cannot perceive, upon what ground such an implication can be made; an implication, not arising from any words or intent expressed on the face of the act; or fairly inferrible from its purposes; and wholly repugnant to the avowed objects of the grant, which are to confer a benefit, and not to impose an oppressive burden, or create a ruinous competition.

Upon the whole, my judgment is, that the act of the legislature of Massachusetts granting the charter of Warren Bridge, is an act impairing the obligation of the prior contract and grant to the proprietors of Charles River Bridge; and, by the constitution of the United States, it is, therefore, utterly void. I am for reversing the decree of the state court, (dismissing the bill;) and for remanding the cause to the state court for further proceedings, as to law and justice shall appertain.

Mr. Justice THOMPSON.

The opinion delivered by my brother, Mr. Justice Story, I have read over, and deliberately considered. On this full consideration, I concur entirely in all the principles and reasonings contained in it; and I am of opinion the decree of the supreme judicial court of Massachusetts should be reversed.

This cause came on to be heard on the transcript of the record from the supreme judicial court, holden in and for the county of Suffolk, in the commonwealth of Massachusetts, and was argued by counsel; on consideration whereof, it is ordered, adjudged, and decreed by this Court, that the decree of the said supreme judicial court in this cause, be, and the same is hereby affirmed, with costs.